IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **CARBO CERAMICS INC.,** *et al.*[1] | § | Case No. 20-31973 (MI) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE DEBTORS' APPLICATION FOR ENTRY OF AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF PERELLA WEINBERG PARTNERS LP AS INVESTMENT BANKER TO THE DEBTORS EFFECTIVE TO THE PETITION DATE**

The Official Committee of Unsecured Creditors ("Committee") of CARBO Ceramics Inc. and its related debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), hereby submits this objection (the "Objection") to the *Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Perella Weinberg Partners LP as Investment Banker to the Debtors Effective to the Petition Date* [Docket No. 118] ("PWP Application").[2] In support of the Objection, the Committee respectfully states as follows:

## I. PRELIMINARY STATEMENT

1. These chapter 11 cases were pre-arranged between the Debtors and Wilks Brothers, LLC ("Wilks"), and Equify Financial, LLC ("Equify" and collectively with Wilks, the "Prepetition Secured Lenders"). The *Debtors' First Amended Joint Chapter 11 Plan of Reorganization* [Docket No. 254] (the "Plan"), which was filed one week into these cases and is based on a

---

[1] The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are: CARBO Ceramics Inc. ("CARBO") (0013); StrataGen, Inc. ("StrataGen") (5205); and Asset Guard Products Inc. ("Asset Guard") (6422). The location of the Debtors' U.S. corporate headquarters and the Debtors' service address is: 575 N. Dairy Ashford Road, Suite 300, Houston, Texas 77079.

[2] Capitalized terms used but not defined herein, other than in the Preliminary Statement, have the meaning ascribed to them in the PWP Application.

4827-5216-9659.7

prepetition Restructuring Support Agreement ("RSA"), converts the Prepetition Secured Lenders' claims into the equity of the reorganized debtors.  Neither the Plan nor the RSA contemplate a postpetition marketing process of the Debtors' assets, and the Debtors have not suggested such a process in any filing.  To the contrary, the Debtors and the Lenders have set the course for a very fast-track process with confirmation scheduled for June 8, 2020—only 34 days from now.  Nevertheless, the Debtors propose to retain Perella Weinberg Partners LP ("PWP"), which was the Debtors' prepetition investment banker as well as an advisor to the Special Committee of the Board of Directors of CARBO (the "Special Committee"), as its postpetition "investment banker" with projected aggregate compensation of over $4.5 mm (the "PWP Compensation").  Effectively, the Debtors want to hire PWP to <u>not</u> perform any postpetition investment banking services, yet walk away with compensation that is nine (9) times the *de minimis* cash payment of $500,000 proposed to be paid to the CARBO unsecured creditors.  Based on the facts and circumstances of this case, the employment of PWP is wholly unnecessary,[3] and the projected PWP Compensation is unconscionable.

2.    In reality, the Debtors are attempting to assume PWP's prepetition Engagement Letter dated November 7, 2019 ("Engagement Letter"), reward PWP for running a prepetition process that failed, and at best, convert an unsecured prepetition claim (if one is even owed) to PWP to an exorbitant postpetition administrative expense to the detriment of CARBO's unsecured creditors.

---

[3] The Debtors are also seeking to retain FTI Consulting, Inc. ("FTI") as financial advisor to the Debtors. *See Debtors' Application for Entry of an Order Authorizing the Retention and Employment of FTI Consulting, Inc. as Financial Advisor to the Debtors Effective to the Petition Date* [Docket No. 117] (the "FTI Application").  Pursuant to the FTI Application, the Debtors request that FTI perform various financial advisory services, including, but not limited to, development of the Debtors' business plan and 13-week cash flow forecast, **identification of executory contracts and unexpired leases and performing the cost/benefit evaluation with respect to the assumption or rejection of each**, and preparing financial disclosures required by the Court.  *See* FTI Application, ¶ 10 (emphasis added).

3. Further, even if PWP's employment is approved by this Court, the Court should not approve that employment under section 328 of the Bankruptcy Code. Instead, under the facts of these cases, the Court should employ PWP under sections 330 and 331. Creditors and parties in interest should have the opportunity to evaluate the reasonableness of the fees at the end of the cases. This is true given what we have learned in a short period of time, including the following:

- PWP is not marketing the Debtors' assets or businesses during the pendency of these bankruptcy proceedings.

- Confirmation is currently set in 34 days.

- The businesses and these cases are being financed effectively by previously unencumbered assets, nothing that PWP brought to the table.

- Under the Plan, the Debtors propose to pay $500,000 cash to the CARBO unsecured creditors; yet, the Debtors project that the PWP Fee will be approximately $4.6 million.

- Strikingly, $1.150 million of the PWP Compensation relates to the alleged net present value of rejected leases, whereby PWP contends such rejection damages (that the reorganized debtors will be discharged from paying) fall within the definition of "Restructuring Fee."  In effect, the PWP Compensation would balloon the more the Debtors utilized its rights under the Bankruptcy Code to reject leases, which obviously has nothing to do with any expertise that PWP brought to the table.

4. In sum, the proposed scope of PWP's work is too broad under the circumstances, and the PWP Compensation is unwarranted.  PWP's fees only add to the size of the DIP Facility, which is secured by prepetition unencumbered assets.  Any cost savings available for the Debtors' estates are potential recoveries available for general unsecured creditors.  The Debtors' estates should not be burdened by unnecessary and excessive costs.  As a result, and for foregoing reasons and subsequent explanation, this Court should deny the PWP Application in its present form.

## II. BACKGROUND

5.The Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on March 29, 2020 (the "Petition Date"). The Debtors operate their businesses and manage their properties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code. As of the date hereof, no request for the appointment of a trustee or examiner has been made.

6.On April 14, 2020, the United States Trustee for the Southern District of Texas appointed the Committee in these chapter 11 cases [Docket No. 113].

### The Restructuring Support Agreement and Plan

7.On March 28, 2020, the Debtors and the Prepetition Secured Lenders entered into the RSA. *See* First Day Declaration,[4] ¶ 50. In accordance with the RSA, the Debtors filed the Plan that proposes to convert all of the Prepetition Secured Lenders' claims into equity of the reorganized debtors. *See id.*; Docket No. 254.

8.Further, pursuant to the RSA, Wilks agreed to provide debtor-in-possession financing, up to an amount of $15 million (the "DIP Facility"), to fund these chapter 11 cases. *See id.* at ¶ 51. On April 23, 2020, the Court entered the *Final Order (I) Authorizing Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Liens and Superpriority Administrative Expense Status, and (C) Utilize Cash Collateral, (II) Granting Adequate Property to Prepetition Secured Lenders, and (III) Granting Related Relief* [Docket No. 218] (the "DIP Order"). The amount of the DIP Facility, if not rolled into an exit facility, will be converted into equity in the reorganized debtors. *See id.*

---

[4] The "First Day Declaration" means the *Declaration of Ernesto Bautista III in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 6].

## PWP's Pre-Bankruptcy Employment

9. PWP was initially engaged by the Special Committee "effective" February 12, 2019 "to evaluate various alternatives to maximize the Company's liquidity such as 'at-the-market' equity issuances, asset sales, and refinancing options in light of a scheduled maturity payment on two subordinated promissory notes issues by [CARBO] and payable to two now-former directors of the Company." *See Affidavit of Lance Gilliland in Support of the Debtors' Application for Entry of an Order Authorizing the Retention and Employment of PWP Consulting, Inc. as Investment Banker to the Debtors Effective to the Petition Date*, ¶ 5 (the "Gilliland Affidavit").

10. Effective November 7, 2019, the parties terminated PWP's engagement by the Special Committee and PWP became formally engaged directly by the Debtors to provide services to the Debtors regarding the evaluation of strategic alternatives, including potential financing, restructuring or sale transactions. *See id.* On December 11, 2019, the Debtors and PWP ostensibly began to market substantially all of the Debtors' assets. *See* First Day Declaration, at ¶ 49. The PWP marketing process was as short as it was unsuccessful and did not result in any transaction. Rather, the Debtors pivoted to negotiating with Wilks, their existing lender for a debt-to-equity swap.

## PWP's Proposed Fee and Expense Structure

11. As set forth in the PWP Application and the accompanying Engagement Letter dated November 7, 2019, the Debtors propose the following fee and expense structure (the "Fee and Expense Structure"):

    (a) **Financial Advisory Fee.** A quarterly fee of $250,000 per quarter. *See* PWP Application, ¶ 14.

    (b) **Restructuring Fee**. A fee that is calculated as 2% of the principal amount of any Debt Obligations exchanged, refinanced, paid down, materially modified, restructured, expunged, or discharged; provided, however, if the debt

4827-5216-9659.7

obligation is refinanced or repaid in full with the net proceeds of the Financing for which PWP receives as a Financing Fee, then no Restructuring Fee shall be due on the principal amount of such debt obligation so refinanced or repaid in full.[5] *See id.*

(c) **Financing Fee**. A fee that is calculated as 5% of any equity capital, 3% of any convertible debt, and 1% of any non-convertible debt raised.[6] *See id.*

(d) **Sale Fee**. In the event of a Sale, as defined in the Engagement Letter, there will be a sale fee equal to the greater of 1.5% of the Transaction Value (as defined in the Engagement Letter) or $1,250,000. *See id.*

(e) **Asset Sale Fee**. In the event of an Asset Sale,[7] as defined in the Engagement Letter, there will be an asset sale fee of 1.5% of the Transaction Value of a Target Asset,[8] provided that the aggregate Asset Sale Fees may not be less than $1,250,000, 50% of which shall be due and payable at the second Asset Sale consummation and the remaining 50% shall become payable at the earlier to occur of (i) consummation of the final Asset Sale (following which all three Target Assets have been sold) and (ii) March 31, 2019. *See id.*

12. The PWP Application does not include an estimated amount to be paid to PWP under the proposed retention. After several days and requests, the Committee received a high-

---

[5] "Restructuring" is defined as:

> any recapitalization, modification or restructuring of the Company's equity and/or debt securities and/or other indebtedness, obligations or liabilities (including partnership interests, lease and other real estate obligations, rail leases, trade credit facilities and/or contract or tort obligations (collectively, "Debt Obligations"), including pursuant to any repurchase, exchange, equitization, partial or full paydown, conversion, cancellation, forgiveness, expungement, retirement, plan, solicitation of consents, waivers, acceptances, authorizations and/or modification or amendment to the terms, conditions or covenants thereof.

Engagement Letter, § 1, page 3.
[6] "Financing" is defined as: "a private issuance, sale or placement of the equity, equity-linked or debt securities, instruments or obligations of the Company with one or more lenders and/or investors, or any loan or other financing, or a rights offering." *Id.*
[7] "Asset Sale" means "the disposition in one or a series of related transactions of all or a significant portion of the [Target Assets]". PWP Engagement Letter, § 1, page 4.
[8] "Target Asset" means each of FracPro Software, ASSETGUARD, and/or the Toomsboro Facility. *Id.* § 1, page 4.

6

level summary of what the Debtors are projected to pay PWP under this proposed engagement, as follows:

| Fee | Amount |
|---|---|
| Financial Advisory Fees | $750,000[9] |
| Financing Fee | $150,000[10] |
| Restructuring Fee: Funded Debt | $1,300,000 |
| Restructuring Fee: Lease Liabilities | $1,140,000 |
| Asset Sale Fee | $1,250,000 |
| **Total** | **$4,590,000** |

13. This amount does not include expenses that are also expected to be paid during these cases.

### III. OBJECTION

14. Section 328(a) of the Bankruptcy Code authorizes the employment of professionals under section 327 "on any reasonable terms and conditions of employment." 11 U.S.C. § 328(a); *see also In re Motors Liquidation Co.*, 438 B.R. 365, 375 (Bankr. S.D.N.Y. 2010) ("[I]f terms and conditions of employment of professionals are to be approved under section 328, they must be reasonable."). Further, in order to approve the retention of PWP under section 328(a), PWP must provide specific evidence to establish that "the terms and conditions are in the best interest of the estate." *In re Gillett Holdings, Inc.*, 137 B.R. 452, 455 (Bankr. D. Colo. 1991).

15. In the context of section 328(a), "the Court examines the reasonableness of the terms and conditions at the time of retention." *In re XO Commc'ns, Inc.*, 398 B.R. 106, 115–16 (Bankr. S.D.N.Y. 2008). It is well settled that the standard for departing from a fee award in the

---

[9] The Committee understands that $500,000 of the Financial Advisory Fees relate to Financial Advisory Fees for prepetition time periods.

[10] The Financing Fee amount only includes a fee amount for the DIP Facility and does not include amount for an Exit Facility that may be provided under the Plan. *See* Plan, Art. I.A.50.

7

pre-approved amount under section 328(a) is very difficult to satisfy. The preapproval of the Fee and Expense Structure in these cases must not be taken lightly. *See Committee of Equity Sec. Holders of Federal-Mogul Corp. v. Official Comm. of Unsecured Creditors (In re Federal Mogul-Global Inc.)*, 348 F.3d 390, 397 (3d Cir. 2003); *In re XO Commc'ns, Inc.*, 323 B.R. 330, 339 (Bankr. S.D.N.Y. 2005) ("Under section 328(a), a court may not revisit its prior determination as to the reasonableness of an agreement previously approved unless it determines that the terms and conditions proved to be improvident at the time approved in light of then-unforeseen circumstances.").

16.   Consequently, the Court must act as a gatekeeper in evaluating the PWP Application under section 328, and there must be a sufficiently strong record, with "evidence, not conclusory statements," in order for the Debtor to satisfy its burden of the reasonable terms and conditions of PWP's employment postpetition. *See In re Energy Partners, Ltd.*, 409 B.R. 211, 225–26 (Bankr. S.D. Tex. 2009); *In re High Voltage Eng'g Corp.*, 311 B.R. 320, 333 (Bankr. D. Mass. 2004). In determining the reasonableness of an application under section 328(a), courts have looked to the following non-exclusive list of factors:

   a.   whether terms of an engagement agreement reflect normal business terms in the marketplace;

   b.   the relationship between the debtor and the professionals, *i.e.*, whether the parties involved are sophisticated business entities with equal bargaining power who engaged in an arms-length negotiation;

   c.   whether the retention, as proposed, is in the best interest of the estate;

   d.   whether there is a creditor opposition to the retention and retainer provisions; and

   e.   whether, given the size, circumstances and posture of the case, the amount of the retainer is itself reasonable, including whether the retainer provides the appropriate level of "risk

4827-5216-9659.7

>   minimization," especially in light of the existence of any other "risk minimizing" devices, such as an administrative order and/or a carve out.

*Energy Partners*, 409 B.R. at 226 (quoting *High Voltage*, 311 B.R. at 333).

17. In addition to the above factors, courts have also reviewed the additional items with respect to the retention of investment bankers under section 328(a):

>   a. the specific scope and complexity of the assignment, its anticipated duration, expected results, required resources, the extent to which highly specialized skills may be needed and the extent to which they have them or may have to obtain them;
>
>   b. projected salaries of participating professionals, billing rates and prevailing fees for comparative engagements;
>
>   c. the process by which the investment banker was selected; and
>
>   d. the process for how the investment banker will eliminate or reduce the duplication of efforts.

*Id.* at 232–33 (quoting *High Voltage*, 311 B.R. at 333–34).

A. ***An Investment Banker Is Not Necessary in these Chapter 11 Cases.***

18. PWP's retention in these cases is not necessary. The direction of these chapter 11 cases and the proposed treatment of claims against the estates are all consistent with the RSA between the Debtors and Prepetition Secured Lenders. The Plan, the treatment of creditors and equity claimants, and the proposed reorganization is based on the terms of the RSA. The Debtors propose to confirm the Plan within approximately 70 days from the Petition Date—and 38 days from now.

19. The RSA, the Plan, the financing in the DIP Order, and substantially all of the current case structure were all negotiated and agreed to prior to the Petition Date. An investment banker is not necessary in these expedited bankruptcy cases because the financing, restructuring

9

plan, and business operations of the Debtors and reorganized company have been pre-negotiated and pre-determined and are baked into the pre-arranged Plan structure. Indeed, the work proposed to be performed by PWP in the PWP Application occurred prepetition. *See* PWP Application, ¶ 12. None of these services are required on a postpetition basis.

20. Further, the Debtors have contractually agreed to essentially prevent PWP from performing any investment banking services. These chapter 11 cases are funded pursuant to the DIP Facility with Wilks. *See* DIP Order [Docket No. 218]. Pursuant to the DIP Order, the Debtors and PWP are prevented from performing any activity necessary for an investment banker. The DIP Order states that an Event of Default (as defined in the DIP Order) occurs if, without the written consent of Wilks, the Court enters an order approving any financing under section 364 of the Bankruptcy Code that does not pay the DIP Obligations (as defined in the DIP Order) in full. *See* DIP Order, ¶ 26.l. Further, any sale order approving the sale of substantially all of the Debtors' assets that (a) does not propose to pay all DIP Obligations in full or (b) is not consented to by Wilks is considered an Event of Default. *See id.*, at ¶ 26.o. Essentially, the Debtors cannot perform any activities that would require PWP's services on a postpetition basis without the consent of Wilks—the party that receives substantially all of the benefit from the current Plan structure.

21. As PWP's services are not necessary on a postpetition basis, the Court should deny the PWP application.

### B.  *PWP Is Being Compensated for Work Performed by Other Professionals*

22. Under the proposed Fee and Expense Structure, PWP is being compensated for the work performed by the Debtors' other professionals who negotiated the RSA and analyzed the executory contracts and unexpired leases that have been rejected. The Plan was negotiated as part

10

of the RSA, with current parties to the Debtors' capital structure. PWP was not required to go to the market and find these parties.

23. In particular, PWP's scope of services does not include any reference to performing any services related to the Debtors' executory contracts and unexpired leases. *See* PWP Application, ¶ 12. However, the FTI Application expressly states that FTI's responsibilities include "[a]ssisting in the identification of executory contracts and unexpired leases and performing the cost/benefit evaluations with respect to the assumption or rejection of each, as needed." FTI Application, ¶ 10.f. Incredulously, PWP is seeking approximately $1.14 mm in Restructuring Fees from the work that is expressly within FTI's scope of services and not within PWP's. PWP cannot receive such extravagant and unreasonable compensation from the work performed by the Debtors' other professionals.

24. Under the proposed PWP Application, however, PWP will still be entitled to both a Restructuring Fee of approximately $2.44 mm as well as a Financing Fee for the efforts exerted by others. Such a retention is not reasonable and is not in the best interests of the Debtors' estates and creditors.

C. *The Proposed Fee and Expense Structure Does Not Reflect Normal Business Terms*

25. The Committee does not contend that PWP is not entitled to compensation for assisting in the consummation of a new-money, value-maximizing transaction or financing involving the Debtors, but such a transaction does not represent the reality of these cases—or even a possibility for these cases. Essentially, the Debtors attempt to carve-out payments to PWP for prepetition work from the DIP Facility—an improper re-characterization or transformation of an unsecured prepetition claim entitled to fractional (dollar) recovery to a postpetition administrative expense claim entitled to 100% recovery. This re-characterization/transformation is exemplified

11

4827-5216-9659.7

by the fact that two-thirds of the Financial Advisory Fees proposed to be paid as part of the Fee and Expense structure are from prepetition periods.

26. Such a fee arrangement is not typical of investment bankers in chapter 11 cases that are utilized to perform postpetition investment banking services. The RSA sets forth the terms of the DIP Facility, the Plan, the equity structure of the reorganized debtors, and any Exit Facility for the reorganized Debtors. All of this work was done prior to the Petition Date. Rather than have PWP seek recovery on an unsecured claim for their prepetition work like any other professional, the Debtors are attempting to re-characterize PWP's prepetition unsecured claim to a postpetition administrative claim. Such proposed treatment is not comparable to standard investment banking retentions.

27. The Court should not permit the Debtors to make such an impermissible re-characterization through this employment application; this Court should deny the PWP Application.

### D. *PWP's Representation of the Special Committee Creates a Conflict to Its Representation of the Debtors*

28. As noted above, PWP was engaged by the Special Committee prior to being retained by the Debtors. Notably, PWP's engagement involved the analysis and repayment of two subordinated promissory notes involving two former CARBO directors. *See* Gilliland Affidavit, ¶ 5. The Debtors' estates have potential causes of action against these individuals. PWP may have material information and may be a material witness related to its representation of the Special Committee—conflicting with the interests of the Debtors' estates. PWP cannot represent both the Special Committee and the Debtors with respect to the matters involving its representation of the

12

Special Committee and should not be permitted to receive the PWP Compensation when it is conflicted.[11]

### E. The Fee and Expense Structure Is Excessive and Not in the Best Interests of the Debtors' Estates

29. PWP's Fee and Expense Structure is a mystery. The Committee has only received minimal information from the Debtors and PWP regarding the scope and size of the Fee and Expense Structure the Debtors intend to pay PWP. At minimum, the Debtors and PWP must provide a complete disclosure of the full extent of the fees that are intended to be paid to PWP under this proposed retention. Even with the limited disclosure, the Committee has been able to make a preliminary determination that the Fee and Expense Structure is unwarranted and not in the best interests of the Debtors' estates.

30. If the Court approves the PWP Application, the Court must not pre-approve the Fee and Expense Structure. Any proposed compensation structure should be in proportion with the amount of any proposed postpetition work. As indicated to the Committee, the Debtors propose to pay approximately $4.6 million to PWP for its postpetition work, which is neither significant nor complex. This amount is particularly disproportionate when the Plan proposes to distribute only $500,000 in cash to CARBO's over $80 million of unsecured creditors. *See* Plan, Art. I.D.4. Given that the Debtors have not shown the necessity for employing an investment banker postpetition and given that maximizing value for the recovery of the Debtors' creditors should be the primary focus of any estate professional in these bankruptcy cases, the Fee and Expense Structure is excessive and is not in the best interest of the Debtors' estates.

---

[11] For the avoidance of doubt, the Committee reserves all rights with regards to any and all causes of actions or claims related to the acts or omissions of the Special Committee, including, but not limited to, the promissory notes and the services performed by PWP on behalf of the Special Committee.

13

31. The Financing Fee and Restructuring Fees are unreasonable, given the circumstances of these chapter 11 cases. The current Financing Fee only provides for a fee related to the DIP Facility. In the event PWP seeks a Financing Fee with regards to a potential Exit Facility under the Plan, the Committee requests that PWP only receive a Financing Fee for the amount of the new money in the Exit Facility and not the amount of the DIP Facility rolled into the Exit Facility. Any order approving PWP's retention must include this clarifying language.

32. The Debtors also propose to pay PWP a Restructuring Fee for (a) the restructuring of the Prepetition Secured Lenders' prepetition debt and (b) the rejection of lease liabilities. *See* PWP Application, ¶ 14. The Restructuring Fee for the funded debt was earned—if at all—from the prepetition efforts of others that negotiated the RSA, which provides the equitization framework. PWP will receive this Restructuring Fee so long as these chapter 11 cases do not implode—not through any of its work. Even if PWP worked to generate the RSA, that work was prepetition work. The Court should adjust the Restructuring Fee to reflect the actual work being performed by PWP in these cases toward confirmation and in proportion to the benefits achieved for the general unsecured creditors.

33. Further, allowing PWP to profit from the Debtors' rejection of executory contracts and unexpired leases is inequitable, conflicts with PWP's duties to the Debtors and duties to the creditors, and is not in the best interests of the Debtors' estates. The Debtors pay this Restructuring Fee only when rejection claims arise. As such, this fee only adds to the amount of CARBO's class of general unsecured creditors and significantly dilutes pro-rata recoveries for CARBO's general unsecured creditors. This proposed structure incentivized PWP to advise the Debtors to reject as many leases as possible—because PWP's proposed fees increase with each dollar of rejection

14

damages. It is antithetical to compensate estate professionals based on the increase in claims against the Debtors' estates

34. In addition, the Debtors and PWP fail to state how PWP was involved and necessary in determining which executory contracts and unexpired leases were rejected by the Debtors' estates. Rather, it appears that CARBO undertook a wholesale rejection of its railcar leases and certain other non-residential real property leases. *See Motion for Entry of an Order (I) Authorizing the Debtors to (A) Reject Certain Executory Contracts and Unexpired Leases Nunc Pro Tunc to the Petition Date and (B) Abandon Any Remaining Property in Connection Therewith, and (III) Granting Related Relief* [Docket No. 25]. Reason would dictate that an investment banker is not necessary for the Debtors to understand that they are paying above-market rate for these contracts and leases and rejecting such agreements is within their business judgment—particularly when analyzing executory contracts and unexpired leases is within the scope of FTI's proposed retention. *See* FTI Application, ¶ 10.f. The Debtors have failed to justify why an investment banker is necessary in this process and should be compensated for the amount of the rejection damages, and this should not be permitted.

35. Further, it is unclear how PWP is entitled to an Asset Sale Fee of $1.25 million. The Debtors have not sold any of the Target Assets in these chapter 11 cases. The RSA and Plan do not contemplate a sale of the Debtors' assets, and the Debtors have not filed any pleadings indicating that they intend to perform an Asset Sale or marketing process of the Target Assets. Rather, the Plan simply seeks to equitize the Prepetition Secured Lenders' prepetition secured debt into the equity of the reorganized debtors. There is no justification for the Debtors to even consider paying an Asset Sale Fee in these chapter 11 cases, and the Court should not approve any PWP retention that would permit the payment of an Asset Sale Fee under these facts.

36. A stringent analysis of the Fee and Expense Structure is particularly important in these chapter 11 cases—where the Debtors' Plan is based off of the prepetition RSA. Under the current Fee and Expense Structure, PWP appears to receive, at a minimum: (a) a Financing Fee for the DIP Facility;[12] (b) a Restructuring Fee for the equitization of the Prepetition Term Lenders' prepetition debt; (c) a Restructuring Fee—based on the value of rejection damages—from the Debtors' rejection of executory contracts and unexpired leases; (d) an Asset Sale Fee; (e) the quarterly Financial Advisor Fee, and (f) expense reimbursement. These fees would be paid to PWP regardless of the amount of work PWP performed or whether any of that work occurred after the Petition Date.

37. For these reasons, the Court should not approve the PWP Application as currently proposed because the Fee and Expense Structure is excessive and not in the best interests of the Debtors' estates.

### F. *The Financial Advisory Fees Are Not Reasonable and the Fee and Expense Structure Is Duplicative*

38. The Fee and Expense Structure appears to be duplicative to services provided by PWP. The PWP Application is unclear as to whether, if at all, services regarding financial advice, restructuring, or sales overlap and fall under more than one fee structure. To the extent any of these fees included in the Fee and Expense Structure are duplicative, the Debtors cannot argue fees are reasonable and should revise and clarify the fee structure and the scope of PWP's services.

39. Further, the PWP Application does not credit any of the quarterly Financial Advisory Fees against the other fees proposed to be paid to PWP. Given the size of the proposed Restructuring Fees and the potential that PWP will receive those fees under the currently proposed

---

[12] As noted above, it is not clear if PWP will seek a Financing Fee for any Exit Facility entered into under the Plan. *See* Plan, Art. I.A.50.

Fee and Expense Structure, at least 50% of the quarterly Financial Advisory Fees should be credited against the Restructuring Fees. In prior engagements, PWP credited a portion of these retainer-like fees against other fees to be received in the cases. *See In re Gastar Expl. Inc.*, Case No. 18-36057 [Docket No. 278] (Bankr. S.D. Tex. Dec. 19, 2018) (credited 50% of the monthly retainer fee paid after the sixth monthly retainer fee against the aggregate amount of all fees to be earned in the case); *In re Mem'l Prod. Partners LP*, Case No. 17-30262 [Docket No. 242] (Bankr. S.D. Tex. Feb. 27, 2017) (credited 50% of the monthly retainer fee paid after the fourth monthly retainer fee against the aggregate amount of all fees to be earned in the case).

40. These excessive and unreasonable fees are not in the best interests of the Debtors' estates and will result in harm to the unsecured creditors' recoveries in these cases. Therefore, the Court should deny the PWP Application, or in the alternative, require the Debtors to provide substantial changes and clarification to the Fee and Expense Structure to make it reasonable and in the best interest of the Debtors' estates.

### G. *PWP's Retention Is Neither Significantly Complex Nor Long in Duration*

41. If the Court determines PWP's retention is necessary, it should not approve PWP's retention in its current form because it is neither significantly complex nor long in duration. The RSA sets for a pre-arranged plan structure that bakes in various metrics and provisions for a potentially quick bankruptcy—approximately 70 days from start to finish. Further, the RSA and Plan also provide for the equitization of the Prepetition Secured Lenders' claims into equity in the reorganized Debtors, which does not require much, if any, effort or material participation from PWP—at least not effort or material participation that justifies a $4.5 mm fee.

42. The Committee would support PWP receiving reasonable compensation and fees for assisting in the consummation of a new-money, value-maximizing transaction or financing.

But here, the Debtors propose to retain PWP for an engagement that is neither overly complex nor significant in length; nor does the proposed engagement require much, if any, effort from PWP. As such, the PWP Application should not be approved under its current structure.

## IV. RESERVATION OF RIGHTS

43. The Committee expressly reserves all rights, claims defenses, and remedies, including, without limitation, to supplement and amend this Objection, to raise further and other objections to the PWP Retention and the form of final order, and to introduce evidence prior to or at any hearing regarding the PWP Retention in the event the Committee's objections are not resolved prior to such hearing.

## V. CONCLUSION

For all of the foregoing reasons, the Committee respectfully requests that the Court deny approval of the PWP Retention on the terms proposed.

Dated: May 7, 2020         Respectfully submitted,

**FOLEY & LARDNER LLP**

*/s/Michael K. Riordan*
Michael K. Riordan
State Bar No. 24070502
1000 Louisiana, Suite 2000
Houston, Texas 77002-5011
Telephone: 713-276-5727
Email: mriordan@foley.com

-and-

Holland N. O'Neil
State Bar No. 14864700
Telephone: 214-999-4961
Email: honeil@foley.com
Marcus Helt
State Bar No. 24052187
Telephone: 214-999-4526
Email: mhelt@foley.com
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201

**PROPOSED COUNSEL FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

**CERTIFICATE OF SERVICE**

    I hereby certify that, on the May 7, 2020, the foregoing document was served on all parties consenting to electronic service pursuant to the *Electronic Case Management System* of the United States Bankruptcy Court for the Southern District of Texas.

*/s Michael K. Riordan*
Michael K. Riordan