**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 20-31973 (MI)** |
| | § | |
| **CARBO CERAMICS INC.,** *et al.*, | § | **(Chapter 11)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | **Related to Dkt. No. 254** |

**NOTICE OF FILING SUPPLEMENT TO THE**
**DEBTORS' FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION**

      **PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "***Debtors***"), hereby file this supplement (the "***Plan Supplement***") to the *Debtors' First Amended Joint Chapter 11 Plan of Reorganization* [Docket No. 254] (as it may be amended, altered, modified, or supplemented, and including all exhibits and supplements thereto, the "***Plan***"), filed in these Chapter 11 Cases on April 29, 2020.[2]

      **PLEASE TAKE FURTHER NOTICE** that this Plan Supplement includes the following documents, as may be modified, amended, or supplemented from time to time in accordance with the Plan and the Restructuring Support Agreement:[3]

- **Exhibit A** – Amount of Administrative and Priority Claims Reserve
- **Exhibit B** – List of Retained Causes of Action
- **Exhibit C** – Identity and Affiliations of Plan Administrator
- **Exhibit D** – Liquidating Trust Agreement
- **Exhibit E** – Schedule of Rejected Executory Contracts and Unexpired Leases
- **Exhibit F** – Schedule of Proposed Cure Amounts
- **Exhibit G** – Form of Exit Facility Credit Agreement
- **Exhibit H** – Identity and Affiliations of the Members of the New Board of Reorganized CARBO as of the Effective Date
- **Exhibit I** – Forms of Material New Organizational Documents

---

[1]    The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are: CARBO Ceramics Inc. (0013); StrataGen, Inc. (5205); and Asset Guard Products Inc. (6422). The location of the Debtors' U.S. corporate headquarters and the Debtors' service address is: 575 N. Dairy Ashford Road, Suite 300, Houston, Texas 77079.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

[3]    To the extent a document is identified in the Plan as a document to be included in the Plan Supplement and has not yet been filed with the Court, the Debtors will file such document with the Court as soon as practicable.

US 7087371

**PLEASE TAKE FURTHER NOTICE** that the Plan Supplement and any exhibits, appendices, supplements, or annexes to the Plan Supplement documents are incorporated into the Plan by reference and are a part of the Plan as if set forth therein.  If the Plan is confirmed, the Plan Supplement will be approved as well.  The documents, or portions thereof, contained in this Plan Supplement remain subject to continuing negotiations among the Debtors and the Supporting Lenders, and such documents are subject to any applicable consent rights contained in the Plan and the Restructuring Support Agreement.  The Debtors reserve the right to alter, amend, modify, or supplement any document or exhibit in the Plan Supplement until the Effective Date or as otherwise provided in the Plan, in each case in accordance with the Plan and the Restructuring Support Agreement, as applicable; *provided* that if any document in the Plan Supplement is altered, amended, modified, or supplemented in any material respect, the Debtors will file a revised version of such document with the Court.

**PLEASE TAKE FURTHER NOTICE** that a hearing (the "***Combined Hearing***") will be held before the Honorable Marvin Isgur, United States Bankruptcy Judge, in Courtroom 404 of the United States Bankruptcy Court, 4th Floor, 515 Rusk Street, Houston, Texas 77002, on **June 9, 2020, at 1:30 p.m. (Prevailing Central Time)**, to consider the adequacy of the Disclosure Statement, any objections thereto, confirmation of the Plan, any objections thereto, and any other matter that may properly come before the Court.  Please be advised that the Combined Hearing may be continued from time to time by the Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Court and served on other parties entitled to notice.

**PLEASE TAKE FURTHER NOTICE** any objections (each, an "***Objection***") to the Plan or the Disclosure Statement <u>must</u>:  (a) be in writing; (b) conform to the applicable Federal Rules of Bankruptcy Procedure and the Bankruptcy Local Rules for the Southern District of Texas; (c) set forth the name of the objecting party, the nature and amount of Claims or Interests held or asserted by the objecting party against the Debtors, the basis for the Objection, and the specific ground thereof; and (d) be filed with the Court, together with proof of service, and served on the following parties so as to be **<u>actually received</u>** no later than **<u>June 3, 2020, at 5:00 p.m. (Prevailing Central Time) (the "*Objection Deadline*")</u>**.  Objections must be served on:

    i.    the Debtors, 575 N. Dairy Ashford Road, Suite 300, Houston, Texas 77079, Attn: Robert J. Willette (robert.willette@carboceramics.com);

    ii.    counsel to the Debtors, Vinson & Elkins LLP, Trammel Crow Center, 2001 Ross Avenue, Suite 3900, Dallas, Texas 75201, Attn:  Paul E. Heath and Garrick C. Smith (pheath@velaw.com; gsmith@velaw.com);

    iii.    counsel to the secured lender and administrative agent under the Debtors' prepetition secured credit agreement, Norton Rose Fulbright US LLP, 2200 Ross Avenue, Suite 3600, Dallas, Texas  75201, Attn:  Greg M. Wilkes (greg.wilkes@nortonrosefulbright.com); and

    i.    the Office of the United States Trustee for the Southern District of Texas, 515 Rusk Street, Suite 3516, Houston, Texas 77002, Attn:  Hector Duran.

**PLEASE TAKE FURTHER NOTICE** that copies of all pleadings, including the Plan and Plan Supplement, may be obtained upon request made to the Debtors' counsel at the address

US 7087371

specified below and are on file with the Clerk of the Court, 515 Rusk Street, Houston, Texas 77002 where they are available for review between the normal operating hours. The Plan, Plan Supplement, and all other pleadings are also are available for inspection on the Court's website at www.txs.uscourts.gov or free of charge on the Debtors' restructuring website at https://dm.epiq11.com/Carbo.

Dated: May 29, 2020
Houston, Texas

**VINSON & ELKINS LLP**

By:  */s/  Paul E. Heath*
      Paul E. Heath (TX 09355050)
      Matthew W. Moran (TX 24002642)
      Garrick C. Smith (TX 24088435)
      Matthew D. Struble (TX 24102544)
      Trammell Crow Center
      2001 Ross Avenue, Suite 3900
      Dallas, TX 75201
      Tel:  214.220.7700
      Fax:  214.999.7787
      pheath@velaw.com; mmoran@velaw.com
      gsmith@velaw.com; mstruble@velaw.com

      -and-

      David S. Meyer (admitted *pro hac vice*)
      Michael A. Garza (admitted *pro hac vice*)
      The Grace Building
      1114 Avenue of the Americas
      New York, NY 10036-7708
      Tel:  212.237.0000
      Fax:  212.237.0100
      dmeyer@velaw.com; mgarza@velaw.com

      **ATTORNEYS FOR THE DEBTORS**

US 7087371

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 29, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/      Garrick C. Smith*
One of Counsel

US 7087371

**Exhibit A**

**Amount of Administrative and Priority Claims Reserve**

The Debtors and the Supporting Lenders have agreed that the Administrative and Priority Claims Reserve will be funded by the applicable Supporting Lenders in the amount of $1,600,000.00.

Exhibit A-1

**Exhibit B**

**List of Retained Causes of Action**

Article IV.N of the Plan provides that:

> All Avoidance Actions of Asset Guard and StrataGen are hereby released as of the Effective Date.  Except as provided in the preceding sentence, in accordance with section 1123(b)(3) of the Bankruptcy Code, but subject in all respects to Article VIII, the Reorganized Debtors, or with respect to any Avoidance Actions not otherwise released under the Plan, the Plan Administrator, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any Avoidance Actions not otherwise released under the Plan and any other actions specifically enumerated in the List of Retained Causes of Action, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors, or with respect to any Avoidance Actions not otherwise released under the Plan, the Plan Administrator, may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors or the Liquidating Trust, as applicable.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, will not pursue any and all available Causes of Action against it.  The Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Court order, including, pursuant to Article VIII hereof, the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.  For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Article IV.N include any claim or Cause of Action released pursuant to Article VIII.

In accordance with Article IV.N of the Plan, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all Causes of Action not expressly released, waived, or transferred to the Liquidating Trust under the Plan, including, but not limited to, the following:

**A.      Causes of Action Related to Litigation and Potential Litigation.**

Unless otherwise released by the Plan, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all Claims and Causes of Action against, or related to, all Entities that are party to or that may in the future become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal or judicial or non-judicial, including, but not limited to, any rights, defenses, claims, counterclaims, causes of action, rights of offset, or rights to recoupment that the Debtors and the Reorganized Debtors may have related to any previously filed lawsuits where a Debtor is a defendant or claims exist against the Debtor.

CARBO expressly retains any potential Claims or Causes of Action arising under, or related to, that certain Escrow Holdback Agreement dated December 31, 2018, by and among Carbo Ceramics Inc., Spruce Acquisition, LLC, and Fidelity National Title Insurance Company, in its capacity as escrow agent.

**B.      Causes of Action Related to Insurance Policies and Surety Bonds.**

Unless otherwise released by the Plan, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all Claims and Causes of Action against, or related to, all Entities based in whole or in part upon any and all insurance contracts, insurance policies, occurrence policies, occurrence contracts, and surety bonds to which any of the Debtors or Reorganized Debtors are a party, including, without limitation, Claims and Causes of Action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, or any other matters.

**C.      Causes of Action Related to Contracts and Leases.**

Unless otherwise released by the Plan, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all Claims and Causes of Action against, or related to, all contracts and leases to which any Debtor or Reorganized Debtor has any rights whatsoever, including, but not limited to, any contracts assumed by the Debtors under the Plan or otherwise in these Chapter 11 Cases.

**D.      Causes of Action Related to Taxes, Fees, and Tax Refunds or Credits.**

Unless otherwise released by the Plan, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all Claims and Causes of Action against, or related to, all Governmental Units or Entities that owe or may in the future owe money related to tax credits or refunds to any of the Debtors or the Reorganized Debtors regardless of whether such Governmental Unit or Entity is specifically identified herein.  Furthermore, the Debtors and Reorganized Debtors, as applicable, expressly reserve all Claims and Causes of Action against or related to all Governmental Units who assert or may assert that the Debtors or the Reorganized Debtors owe taxes or other amounts to them.

**E.     Causes of Action Related to Preferential or Fraudulent Transfers.**

Unless otherwise released by the Plan, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all Claims and Causes of Action held by the Estate for any state or foreign law fraudulent transfer, preferential transfer, fraudulent conveyance, or similar claim that are not released under the Plan.

CARBO expressly retains any potential Avoidance Actions of CARBO against William C. Morris and Robert S. Rubin (collectively "**Payees**") on account of payments received by Payees in respect of those certain Promissory Notes made by CARBO in favor of Payees dated as of May 18, 2016 (such potential Avoidance Actions, the "**Payee Avoidance Actions**"), which Payee Avoidance Actions, for the avoidance of doubt, are not released under the Plan.  The Payee Avoidance Actions will constitute Liquidating Trust Assets and will be assigned to the Liquidating Trust on the Effective Date in accordance with the Plan.

**F.     Causes of Action Related to Deposits, Prepayments, Adequate Assurance Postings, and Other Collateral Postings.**

Unless otherwise released by the Plan, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all Claims and Causes of Action based in whole, or in part, upon any and all postings of a security deposit, adequate assurance payment, or any other type of deposit, prepayment, or collateral, regardless of whether such posting of security deposit, adequate assurance payment, or any other type of deposit, prepayment, or collateral is specifically identified herein.

**Exhibit C**

**Identity and Affiliations of Plan Administrator**

[Forthcoming][4]

---

[4]    The Debtors, with the consent of the Supporting Lenders, intend to consult with the Committee to select an individual acceptable to the parties to serve as Plan Administrator.

Exhibit C-1

## Exhibit D

**Liquidating Trust Agreement**

US 7087371

## LIQUIDATING TRUST AGREEMENT

THIS LIQUIDATING TRUST AGREEMENT (this "*Liquidating Trust Agreement*") dated as of June [__], 2020, by and among CARBO Ceramics Inc. ("*CARBO*"), a Delaware corporation, Asset Guard Products Inc. ("*Asset Guard*"), a Delaware corporation, and StrataGen, Inc., ("*StrataGen*") a Delaware corporation  (collectively, the "*Debtors*"), and [_____] as trustee (in such capacity as trustee of the Liquidating Trust, the "*Plan Administrator*"), is executed to facilitate the implementation of the *Debtors' First Amended Joint Chapter 11 Plan of Reorganization* [Docket No. 254] (as amended, modified, and supplemented from time to time, the "*Plan*").  All capitalized terms used and not otherwise defined in this Liquidating Trust Agreement and defined in the Plan shall have the meanings ascribed to them in the Plan.

**WHEREAS**, on March 29, 2020 (the "*Petition Date*"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the Southern District of Texas (the "*Bankruptcy Court*");

**WHEREAS**, the Plan provides for, among other things, the transfer of all Liquidating Trust Assets to the Liquidating Trust and the management and liquidation of the Liquidating Trust Assets by the Plan Administrator and the making of distributions pursuant to the Plan; and

**WHEREAS**, the Liquidating Trust is intended to qualify as a liquidating trust treated as a grantor trust within the meaning of Treasury Regulations Section 301.7701-4(d) and is established for the purpose of (i) liquidating the Liquidating Trust Assets for the benefit of holders of the Liquidating Trust Interests in accordance with the Plan and (ii) making such other distributions as set forth in the Plan.

**NOW**, **THEREFORE**, in consideration of the premises and mutual covenants and agreements contained herein and in the Plan, the parties hereto agree as follows:

## ARTICLE I.

## ESTABLISHMENT OF THE LIQUIDATING TRUST

1.1     **Establishment of Liquidating Trust**.  Pursuant to the Plan, the Debtors and the Plan Administrator hereby establish the Liquidating Trust on behalf of, and for the benefit of, the holders of Liquidating Trust Interests (the "*Liquidating Trust Beneficiaries*").  The name of the Liquidating Trust is the [CARBO Creditors' Trust].  The Plan Administrator shall accept and hold the Liquidating Trust Assets in trust for the Liquidating Trust Beneficiaries subject to the terms of this Liquidating Trust Agreement and the Plan.  The Liquidating Trust shall be established as a liquidating trust treated as a grantor trust within the meaning of Treasury Regulations Section 301.7701-4(d) with no objective or authority to carry on or conduct a trade or business, or accept an assignment of any claim or right of action from, or assume any liabilities of, any person or entity other than the Debtors, and no part of the Liquidating Trust Assets or the proceeds, revenue or income from the Liquidating Trust Assets shall be used or disposed of by the Liquidating Trust in furtherance of any trade or business.

US 7083206v.4

1.2     **Purpose of Liquidating Trust**.  The sole purpose of this Liquidating Trust is to liquidate the Liquidating Trust Assets and make distributions to Holders of Allowed General Unsecured Claims on account of their Liquidating Trust Interests as set forth in the Plan.  In the exercise of such purpose, in addition to the powers listed in Section 4.1 of this Liquidating Trust Agreement, the Plan Administrator shall be authorized to, among other things, (i) investigate and prosecute the Avoidance Actions that are Liquidating Trust Assets, (ii) file all U.S. federal, state, local and foreign tax returns of the Liquidating Trust and furnish appropriate tax reporting information to the Liquidating Trust Beneficiaries, (iii) establish reserves, including the Undeliverable Distribution Reserve (as defined below) and any additional accounts and reserves established in accordance with Section 4.6(a)(iii) (collectively, the "***Reserve Accounts***"), and open, maintain and administer bank accounts as necessary to discharge the duties of the Plan Administrator, and (iv) represent the Estate before the Bankruptcy Court or other courts of competent jurisdiction with respect to matters concerning the Liquidating Trust and Liquidating Trust Assets.  The Plan further provides that the Liquidating Trust will be responsible for making certain distributions to the Liquidating Trust Beneficiaries and holders of Claims in accordance with the Plan.  Pursuant to these express purposes and subject to the provisions of Article IV of this Liquidating Trust Agreement, the Plan Administrator is hereby authorized and directed to take all reasonable and necessary actions to hold, conserve, protect and maximize the Liquidating Trust Assets, to collect upon, sell, or otherwise liquidate or dispose of the Liquidating Trust Assets and to distribute the net proceeds of the Liquidating Trust Assets to the Liquidating Trust Beneficiaries, in accordance with the provisions of the Plan and this Liquidating Trust Agreement; *provided*, *however*, that the investment powers of the Plan Administrator, other than those reasonably necessary to maintain the value of the Liquidating Trust Assets and to further the liquidating purpose of the Liquidating Trust, shall be limited as set forth in Section 4.3 hereof.

1.3     **No Additional Beneficiaries**.  The Liquidating Trust shall be solely for the benefit of the Liquidating Trust Beneficiaries.

1.4     **Transfer of Liquidating Trust Assets and Rights to the Liquidating Trust**. As of the Effective Date, the Debtors hereby convey, transfer, assign and deliver to the Liquidating Trust (a) all of their rights, title and interests in the Liquidating Trust Assets Free and Clear of any Liens or Claims of any other Person, but subject to the Plan Administrator's obligations under the Plan, except as otherwise provided in the Plan and (b) all of their rights with respect to the Liquidating Trust Assets and hereby waive their right and the right of any legal, financial or other advisors to assert such rights as a defense or otherwise.  The Liquidating Trust Assets shall be subject to any sanctions, attorney fees, or other remedies imposed by any court having jurisdiction over any Avoidance Actions; *provided* that such remedies shall only be to the extent permitted by applicable law.

1.5     **Instruments of Further Assurance; Information**.  All such Persons as shall have the right and power after the Effective Date, upon reasonable request of the Plan Administrator or its successors or assigns, shall execute, acknowledge and deliver such further instruments, documents, books and records and take, or cause to be taken, all such further actions as may be necessary or proper to effectively carry out the purposes of this Liquidating Trust Agreement and the Plan and to otherwise carry out the intent of the parties hereunder and under the Plan.

US 7083206v.4

1.6     **Title to Liquidating Trust Assets**.  On the Effective Date, the Liquidating Trust Assets shall be vested in, and indefeasibly transferred to, the Liquidating Trust pursuant to the Plan for the benefit of the Liquidating Trust Beneficiaries.  As of the Effective Date, the Liquidating Trust shall hold legal title to all Liquidating Trust Assets and will succeed to all of the Debtors' right, title and interest in the Liquidating Trust Assets and the Debtors will have no further interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust, except as provided in the Plan.  The Plan Administrator hereby declares that it shall hold the Liquidating Trust Assets in trust to be administered and disposed of pursuant to the terms of this Liquidating Trust Agreement and the Plan for the benefit of the Liquidating Trust Beneficiaries.

1.7     **Valuation of Trust Assets**.  The fair market value of the Liquidating Trust Assets as of the Effective Date will be determined by the Plan Administrator, in consultation with the Liquidating Trust Committee, in accordance with Article IV.E.2 of the Plan. As soon as practicable after the Effective Date, the Plan Administrator shall inform the Liquidating Trust Beneficiaries in writing of the agreed upon value of the Liquidating Trust Assets transferred to the Liquidating Trust.  Such valuation shall be used consistently by all parties, including, without limitation, the Debtors, the Plan Administrator and the Liquidating Trust Beneficiaries, for all U.S. federal and applicable state and local income tax purposes.

1.8     **Reliance**.  The Plan Administrator may rely upon the Debtors' Schedules and all other information provided by the Debtors or their representatives concerning Claims against the Debtors' Estates and their reconciliation and documents supporting such reconciliation.

1.9     **Governance of the Liquidating Trust**.  The Liquidating Trust shall be governed by the Plan Administrator.  The Plan Administrator's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the purposes of this Liquidating Trust Agreement and not otherwise. Subject to the terms and conditions of this Liquidating Trust Agreement, the Plan Administrator may delegate responsibility for discrete issues or decisions to one or more third parties subject to continued oversight by the Plan Administrator.

1.10    **Appointment of the Plan Administrator**.  As of the date hereof, the Plan Administrator shall be [_____].  The Plan Administrator accepts the trust imposed on him or her by this Liquidating Trust Agreement and agrees to observe and perform that trust on and subject to the terms and conditions set forth in this Liquidating Trust Agreement.

1.11    **Liquidating Trust Interests; Transferability; Surrender**.

(a)     Liquidating Trust Interests shall be issued by the Plan Administrator to the Liquidating Trust Beneficiaries.  In lieu of certificates evidencing Liquidating Trust Interests, the Plan Administrator shall maintain a register of the names, addresses, and interest percentages of the Liquidating Trust Beneficiaries based upon the provisions of the Plan which designate the Persons who are entitled to receive the Liquidating Trust Interests.

(b)     The Liquidating Trust Interests may not be transferred, sold, pledged or otherwise disposed of, or offered for sale except for transfers by operation of law.

## ARTICLE II.

## DURATION AND TERMINATION OF LIQUIDATING TRUST

2.1    **Duration**.  The duties, responsibilities and powers of the Plan Administrator shall terminate after all Liquidating Trust Assets transferred and assigned to the Liquidating Trust, or involving the Plan Administrator on behalf of the Liquidating Trust, are fully resolved, abandoned, or liquidated and the net proceeds of the Liquidating Trust Assets have been distributed in accordance with the Plan and this Liquidating Trust Agreement.  Except in the circumstances set forth below, the Liquidating Trust shall terminate no later than three years after the Effective Date.  However, if warranted by the facts and circumstances provided for in the Plan, and subject to the approval of the Bankruptcy Court upon a finding that an extension is necessary for the purpose of the Liquidating Trust, the term of the Liquidating Trust may be extended, one or more times (not to exceed a total of four extensions, unless the Plan Administrator receives a favorable ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Liquidating Trust as a grantor trust for U.S. federal income tax purposes) for a finite period, not to exceed six months, based on the particular circumstances at issue.  Each such extension must be approved by the Bankruptcy Court within two months prior to the beginning of the extended term with notice thereof to the Liquidating Trust Beneficiaries.  Upon the occurrence of the termination of the Liquidating Trust, the Plan Administrator shall File with the Bankruptcy Court a report thereof, seeking an order discharging the Plan Administrator.

2.2    **Continuance of Liquidating Trust for Winding Up**.  After the termination of the Liquidating Trust and for the purpose of liquidating and winding up the affairs of the Liquidating Trust, the Plan Administrator shall continue to act as such until all duties under the Plan and this Liquidating Trust Agreement have been fully performed.  Upon distribution of all of the Liquidating Trust Assets, or the proceeds thereof, the Plan Administrator shall hold the books, records and files delivered to or created by the Plan Administrator for a period of four years after the last distribution of net proceeds is made.  All costs and expenses associated with the storage of such documents shall be paid by the Liquidating Trust.    At the Plan Administrator's discretion, in consultation with the Liquidating Trust Committee, all such records and documents may be destroyed at any time after four years from the distribution of all of the Liquidating Trust Assets.  Except as otherwise specifically provided herein, upon the distribution of all of the Liquidating Trust Assets, the Plan Administrator shall have no further duties or obligations hereunder except (a) to account and report as provided in Sections 2.3 and 3.3 hereof and (b) to perform such other acts as may be required by law.

2.3    **Final Accounting**.    Upon termination of the Liquidating Trust, the Plan Administrator shall file an accounting with the Bankruptcy Court setting forth the amount he or she has collected and disbursed, and the fees and expenses incurred in administering the Liquidating Trust, including the fees and expenses incurred by the Plan Administrator and its professionals.  The Plan Administrator shall seek the issuance and entry of any orders necessary to approve such accounting and discharge it from any and all liability for acting as Plan Administrator under the Plan and this Liquidating Trust Agreement.  The Liquidating Trust's professionals shall be required to maintain accurate time and expense records to the extent required by the Plan.

## ARTICLE III.

## ADMINISTRATION OF TRUST ESTATE

3.1 **Payment of Expenses**. The reasonable costs and expenses incurred by the Plan Administrator in performing the duties set forth in the Plan shall be paid solely from the Liquidating Trust Expense Reserve as set forth in the Plan.

3.2 **Disbursement to Liquidating Trust Beneficiaries**. The Plan Administrator shall disburse funds to the Liquidating Trust Beneficiaries in accordance with Article VI of the Plan and the following terms and conditions:

(a) Any payments to be made by the Liquidating Trust to the Liquidating Trust Beneficiaries shall be made only from the Liquidating Trust Assets to the extent that the Liquidating Trust shall have sufficient Liquidating Trust Assets to make such payments in accordance with the terms of this Section 3.2. Except as otherwise provided in the Plan, the Liquidating Trust Beneficiaries shall look solely to Liquidating Trust Assets for any distributions provided herein or in the Plan.

(b) The Plan Administrator shall distribute at least annually to the Liquidating Trust Beneficiaries any net income of the Liquidating Trust plus any net proceeds derived from the Liquidating Trust Assets, in accordance with Article VI of the Plan, except that the Liquidating Trust may retain an amount that is reasonably necessary to maintain the value of the Liquidating Trust Assets, administer the Liquidating Trust, satisfy Allowed Claims as set forth in Article VI of the Plan, prosecute the Avoidance Actions that are Liquidating Trust Assets, and pay contingent liabilities or as otherwise required by the Plan.

(c) Distributions shall be made by the Plan Administrator to the Liquidating Trust Beneficiaries pursuant to the terms of the Plan until all Liquidating Trust Assets have been exhausted. Subject to the foregoing, distributions to the Liquidating Trust Beneficiaries shall be made on or before each anniversary of the Effective Date. In the event that any distribution is returned to the Liquidating Trust as undeliverable or is unclaimed, such distribution shall remain in the Liquidating Trust's possession and be held in the Undeliverable Distribution Reserve (as defined below) until such time as a distribution becomes deliverable or such Holder accepts distribution, or such distribution reverts back to the Liquidating Trust (as described immediately below), as applicable, and shall not be supplemented with any interest, dividends, or other accruals of any kind. Such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of 180 days from the date of attempted distribution. After such date, all unclaimed property or interest in property shall revert to the Liquidating Trust, and the Claim of any other Holder to such property or interest in property shall be discharged and forever barred. All funds or other property that vests or revests in the Liquidating Trust pursuant to this Section 3.2(c) shall be used, first, to pay any fees and expenses of the Liquidating Trust in accordance with this Liquidating Trust Agreement, and second, if any balance remains, such balance shall be distributed pro rata to the other Liquidating Trust Beneficiaries who are Holders of Allowed Claims to the extent such Claims have not already been satisfied in full.

US 7083206v.4

(d)      The Plan Administrator may require any Liquidating Trust Beneficiary or any holder of an Allowed Claim entitled to a distribution from the Liquidating Trust to furnish to the Plan Administrator such holder's Employer Identification Number or Federal Tax Identification Number as assigned by the IRS, and the Plan Administrator may condition any distribution to such holder upon receipt of such identification number.

(e)      All checks shall be transmitted by United States Post Office – First Class Mail, postage prepaid and addressed to the payee at such payee's address determined as set forth in Article VI.C.1.a of the Plan.

3.3      **Reports**.

(a)      The Plan Administrator shall maintain good and sufficient books and records of account relating to the Liquidating Trust Assets, the management thereof, all transactions undertaken by the Plan Administrator, all expenses incurred by or on behalf of the Liquidating Trust, and all distributions either contemplated or effectuated under the Plan or this Liquidating Trust Agreement.

(b)      As soon as practicable, but no later than 35 days after each calendar quarter or the termination of the Liquidating Trust, the Plan Administrator shall provide the Liquidating Trust Committee with, and file with the Bankruptcy Court, a written report and account showing (i) the assets and liabilities of the Liquidating Trust at the end of such quarter or upon termination of the Liquidating Trust and the receipts and disbursements of the Liquidating Trust for such quarter, (ii) any changes in the Liquidating Trust Assets or to the allowance of Claims which have not been previously reported, (iii) a general description of the activities of the Liquidating Trust, and (iv) if applicable, the amount of compensation paid to the Plan Administrator for the preceding quarter pursuant to Section 6.1 hereof.  The Plan Administrator may file similar reports for such interim periods as he or she, in his or her discretion, in consultation with the Liquidating Trust Committee, deems advisable.  The Plan Administrator shall provide such other and further information regarding the Liquidating Trust and the Liquidating Trust Assets as may be necessary to be in compliance with applicable law and shall prepare such additional reports as required by the Bankruptcy Court or the Plan.

(c)      No later than 35 days after the end of each fiscal year, the Plan Administrator shall furnish to each Liquidating Trust Beneficiary a written statement indicating (i) the assets and liabilities of the Liquidating Trust at the end of such fiscal year and the receipts and disbursements of the Liquidating Trust for such fiscal year, and (ii) any changes in the Liquidating Trust Assets or to the allowance of Claims which have not been previously reported.

(d)      The fiscal year of the Liquidating Trust shall end on the last day of December of each year unless some other fiscal year-end date is required by applicable law and is permissible under the Internal Revenue Code of 1986, as amended (the "***Internal Revenue Code***").

## ARTICLE IV.

## POWERS OF AND LIMITATIONS ON THE PLAN ADMINISTRATOR

4.1    **General Powers of Plan Administrator**.    Subject to the express limitations contained in this Liquidating Trust Agreement and the Plan, the Plan Administrator shall have, in addition to any powers conferred by other provisions of this Liquidating Trust Agreement or the Plan, the power to take any and all actions as, in the sole discretion of the Plan Administrator, are necessary or advisable to effectuate the purpose of the Liquidating Trust, including the following powers, which it may exercise without the approval of the Bankruptcy Court, except to the extent otherwise required under the provisions of the Plan or this Liquidating Trust Agreement:

(a)    To hold legal title to any and all rights of the Liquidating Trust Beneficiaries in or arising from the Liquidating Trust Assets, including, without limitation, the right to collect and receive any and all money and other property belonging to the Liquidating Trust;

(b)    To invest or reinvest Liquidating Trust Assets as provided in Section 4.3 hereof and to cause such investments, or any part thereof, to be registered and held in its name, as Plan Administrator, or in the names of nominees;

(c)    To establish and maintain such bank accounts as may be necessary or appropriate, to draw checks on such bank accounts and to perform such other necessary and appropriate duties with respect to such accounts, or designate individuals as signatories therefor, as the Plan Administrator may direct and authorize;

(d)    To engage employees, agents and professional persons, including, without limitation, former employees of the Debtors, to assist the Plan Administrator with respect to its responsibilities;

(e)    To perform all of the Plan Administrator's obligations under the Plan and this Liquidating Trust Agreement, including maintaining the Reserve Accounts and making all required distributions to holders of Allowed Claims and payment of U.S. Trustee Fees;

(f)    To pay all reasonable expenses of maintaining the Liquidating Trust, solely from the Liquidating Trust Expense Reserve;

(g)    To avoid and recover transfers of the Debtors' property as may be permitted by the Bankruptcy Code, applicable state law, and the Plan, to the extent the right to avoid and recover such transfers are Liquidating Trust Assets and are not released under the Plan or otherwise;

(h)    To exercise offsets against Claims as permitted under the Plan, to the extent such offset rights are Liquidating Trust Assets under the Plan;

(i)    To object to the allowance of any Claims or Interests that are not Allowed under the Plan or by Court Order and to compromise and settle Disputed Claims, both as set forth in Article VII of the Plan;

(j)     To pursue and prosecute all the Avoidance Actions that are Liquidating Trust Assets as set forth in Article IV.D.3 of the Plan;

(k)     To institute, join or defend actions or other requests for relief and to take such other actions, including settlements thereof, on any terms deemed reasonable by the Plan Administrator, in consultation with the Liquidating Trust Committee, to enforce or collect upon any instruments, contracts, agreements, or Causes of Action constituting or relating to the Liquidating Trust Assets;

(l)     To perform any act authorized, permitted, or required under any instrument, contract, agreement, claim, or Cause of Action constituting or relating to the Liquidating Trust Assets, whether in the nature of an approval, consent, demand, or notice thereunder or otherwise, unless such act would require the consent of the Liquidating Trust Committee in accordance with the express provisions of this Liquidating Trust Agreement;

(m)     To file or cause to be filed all required U.S. federal, state, local, and foreign tax filings of the Liquidating Trust, pay taxes, if any, imposed on the Liquidating Trust, make tax elections, if any, available to the Liquidating Trust under U.S. federal, state, local, or foreign law, and prepare applications for rulings or other administrative determinations from U.S. federal, state, local and foreign tax authorities as may be reasonably necessary to determine the tax liabilities of the Liquidating Trust or the Liquidating Trust Beneficiaries;

(n)     To request any appropriate tax determination with respect to the Liquidating Trust, including, without limitation, a determination pursuant to section 505 of the Bankruptcy Code;

(o)     To obtain insurance coverage with respect to its liabilities and obligations as Plan Administrator under this Liquidating Trust Agreement (in the form of an errors and omissions policy or otherwise);

(p)     To close and, if necessary, re-open the Debtors' bankruptcy cases;

(q)     To assert or waive any privilege on behalf of the Debtors, solely with respect to the Liquidating Trust Assets, or on behalf of the Liquidating Trust;

(r)     To exercise such other powers as may be vested in or assumed by the Plan Administrator pursuant to the Plan, this Liquidating Trust Agreement, or the Confirmation Order or as may be necessary and desirable to carry out the provisions of this Liquidating Trust Agreement and applicable law; and

(s)     To withhold from the amount distributable to any Liquidating Trust Beneficiaries such amounts required to be withheld under applicable tax laws of the United States, any foreign country, any state or political subdivision thereof.

4.2    **Limitations on Plan Administrator**.

(a)     The Plan Administrator shall carry out the purposes of the Liquidating Trust and the directions contained herein, and shall not at any time, on behalf of the Liquidating

Trust or the Liquidating Trust Beneficiaries, (i) enter into or engage in any business or (ii) accept an assignment of any right of action from, or assume any liabilities of, any person or entity other than the Debtors, and no part of the Liquidating Trust Assets or the proceeds, revenue, or income therefrom shall be used or disposed of by the Plan Administrator in furtherance of any business other than as contemplated by the Plan.  This limitation shall apply irrespective of whether the conduct of any such business activities is deemed by the Plan Administrator to be necessary or proper for the conservation and protection of the Liquidating Trust.

(b)     The Plan Administrator shall make continuing efforts to liquidate the Liquidating Trust Assets, make timely distributions, and not unduly prolong the duration of the Liquidating Trust.

(c)     The Plan Administrator may not hold a controlling interest in the stock of, or be a partner, an officer or a director of any of the Liquidating Trust Beneficiaries.

4.3     **Investment Power**.  The investment power of the Plan Administrator, other than that reasonably necessary to maintain the value of the Liquidating Trust Assets and to further the liquidating purpose of the Liquidating Trust, shall be limited to the power to invest (a) in demand and time deposits, such as short-term certificates of deposit, (b) in banks or other savings institutions, or (c) in other temporary, liquid investments, such as Treasury bills.  Once such funds are so invested, the Plan Administrator shall not sell or otherwise liquidate the investment until such time as such funds are (a) needed to pay expenses incurred pursuant to this Liquidating Trust Agreement or the Plan, or (b) to be distributed pursuant to the Plan or this Liquidating Trust Agreement; *provided*, *however*, that the Plan Administrator may liquidate such investments if the Plan Administrator determines in his or her discretion, subject to the consent of the Liquidating Trust Committee, that such liquidation is necessary to protect the Liquidating Trust from loss on the amounts invested.  The Plan Administrator shall be restricted to the holding and collection of the Liquidating Trust Assets and the payment and distribution thereof for the purposes set forth herein and in the Plan and to the conservation, protection, and maximization of the Liquidating Trust Assets and to the administration thereof in accordance with the provisions of this Liquidating Trust Agreement.  The Plan Administrator shall keep all Liquidating Trust Assets segregated from and shall not commingle any Liquidating Trust Assets with any assets of any other Person, including any of the Plan Administrator's own assets.

4.4     **Additional Powers of Plan Administrator**.  Subject to the express limitations contained herein, the Plan Administrator shall have, and may exercise with respect to the Liquidating Trust Assets, or any part thereof, and to the administration and distribution of the Liquidating Trust Assets, all powers now or hereafter conferred on trustees by the laws of the State of Texas.  The powers conferred by this Section 4.4 in no way limit any power conferred on the Plan Administrator by any other section hereof or in the Plan but shall be in addition thereto; *provided*, *however*, that the powers conferred by this Section 4.4 are conferred and may be exercised only and solely within the limitations and for the limited purposes imposed and expressed in the Plan and in Article III and Section 4.2 hereof.

4.5     **Tax and Reporting Duties of the Plan Administrator**.  The Plan Administrator shall be responsible for all tax and other matters as set forth in Article V of this Liquidating Trust Agreement.

-9-

4.6     **Establishment and Maintenance of Accounts and Reserves**.

(a)     On the Effective Date, or as soon thereafter as practicable, the Plan Administrator, in consultation with the Liquidating Trust Committee, shall establish the following accounts and reserves (which, notwithstanding anything to the contrary contained in this Liquidating Trust Agreement, may be effected by either establishing segregated accounts or establishing book entry accounts, in the sole discretion of the Plan Administrator):

(i)     General Account:  One or more general accounts (collectively, the "***General Account***") (A) into which shall be deposited all funds not required or permitted to be deposited into any other account or reserve described in or contemplated by this Liquidating Trust Agreement and (B) from which shall be made all distributions to Liquidating Trust Beneficiaries.

(ii)     Disputed Claim Account: One or more accounts for Disputed Claims (collectively, the "***Disputed Claim Account***").  The Plan Administrator shall retain on account of Disputed Claims an amount the Plan Administrator estimates is necessary to fund the Pro Rata share of such distributions to Holders of Disputed Claims if such Claims were Allowed, with any Disputed Claims that are unliquidated or contingent being reserved in an amount reasonably determined by the Plan Administrator. Cash retained on account of such Disputed Claims shall be retained in the Disputed Claims Account for the benefit of the Holders of Disputed Claims pending a determination of their entitlement thereto under the terms of the Plan. The Plan Administrator shall, in its sole discretion, determine the best way to treat for tax purposes the Disputed Claim Account, including electing to treat as, without limitation, a disputed ownership fund under Treasury Regulation Section 1.468B-9 or otherwise as a separate trust or entity, and shall file all income tax returns consistent with respect to such treatment. Absent an election by the Plan Administrator to treat the Disputed Claim Account as a disputed ownership fund or otherwise as a separate trust or entity, then, the Plan Administrator shall treat as taxable income or loss of each Disputed Claim, with respect to any given taxable year, the portion of the taxable income or loss of the Liquidating Trust that would have been allocated to the holders of Disputed Claims had such Disputed Claims been Allowed on the Effective Date (but only for the portion of the taxable year with respect to which such Disputed Claims are unresolved).  If a disputed ownership fund election is made, any amounts allocable to, or retained on account of, Disputed Claims generally will be subject to tax annually on a separate entity basis on any net income earned with respect to the Liquidating Trust Assets in the Disputed Claim Account. All parties (including, without limitation, the Debtors, the Reorganized Debtors, the Plan Administrator, the Liquidating Trust and the Liquidating Trust Beneficiaries) will be required to report for tax purposes consistently with the foregoing.

(iii)     Subsequent Establishment of Accounts and Reserves.  On or after the Effective Date, the Plan Administrator (i) shall establish and maintain such additional accounts and reserves as may be required by applicable law or by order of the Bankruptcy Court and (ii) may establish and maintain such additional accounts and reserves as it deems necessary or desirable to carry out the provisions of the Plan and this Liquidating Trust Agreement, including without limitation, an account, designated as an "***Undeliverable Distribution Reserve***," as described more fully in Section 4.7 of this Liquidating Trust Agreement.

4.7    **Undeliverable Distribution Reserve**.

      (a)    The Plan Administrator shall establish the Undeliverable Distribution Reserve (which may be affected by either establishing a segregated account or establishing book entry accounts, in the sole discretion of the Plan Administrator).

      (b)    If a distribution to any holder of an Allowed Claim is returned to the Plan Administrator as undeliverable or is otherwise unclaimed, such distribution shall be deposited in a segregated, interest bearing account, designated as an "Undeliverable Distribution Reserve," for the benefit of such holder until such time as such distribution becomes deliverable, is claimed, or is deemed to be unclaimed property and is revested in the Liquidating Trust in accordance with Section 3.2(c) of this Liquidating Trust Agreement.

## ARTICLE V.

## TAX MATTERS

5.1    **Classification of the Liquidating Trust**.  For all U.S. federal income tax purposes, all parties (including the Debtors, the Plan Administrator, and the Liquidating Trust Beneficiaries) are required to treat the vesting of the Liquidating Trust Assets in the Liquidating Trust, and the transfer of the Liquidating Trust Assets to the Liquidating Trust for the benefit of the Liquidating Trust Beneficiaries as (a) a transfer of the Liquidating Trust Assets directly to the Liquidating Trust Beneficiaries followed by (b) the transfer by the Liquidating Trust Beneficiaries to the Liquidating Trust of the Liquidating Trust Assets.  The Liquidating Trust will be treated as a grantor trust for U.S. federal income tax purposes and, to the extent permitted under applicable law, for state and local income tax purposes.  The Liquidating Trust Beneficiaries shall be treated as the grantors and owners of their allocable portion of the Liquidating Trust Assets for U.S. federal income tax purposes.  The parties shall not take any position on their respective tax returns or with respect to any other matter related to taxes that is inconsistent with treating the Liquidating Trust as a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d), unless any party receives definitive guidance to the contrary from the Internal Revenue Service.

5.2    **General Tax Reporting by the Liquidating Trust and the Liquidating Trust Beneficiaries**.  (a)  The Plan Administrator shall prepare, consistent with Section 4.1 hereof, and file on behalf of the Liquidating Trust, at the time and in the manner prescribed by the Internal Revenue Code and applicable state and local law, such tax returns and reports as may be required, including but not limited to returns and reports required by Treasury Regulations Section 1.671-4(a), and shall promptly furnish copies of such returns and reports as filed to the Liquidating Trust Beneficiaries.  The Plan Administrator shall pay or cause to be paid any and all taxes imposed on the Liquidating Trust.

      (b)    As soon as practicable after the close of each fiscal year, the Plan Administrator shall mail to each of the Liquidating Trust Beneficiaries a statement setting forth the beneficiary's share of items of income, gain, loss, deduction, or credit and will instruct all such beneficiaries to report such items on their U.S. federal income tax returns.  The Liquidating

-11-

Trust's taxable income, gain, loss, deduction, or credit will be allocated to the Liquidating Trust Beneficiaries in accordance with their relative beneficial interests in the Liquidating Trust.

(c) The Plan Administrator shall be responsible for payments, out of the Liquidating Trust Assets, of any taxes imposed on the Liquidating Trust or its assets. In the event, and to the extent any cash retained on account of Disputed Claims in any such reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such taxes paid by the Plan Administrator other than from the reserve for Disputed Claims shall be (i) reimbursed from any subsequent cash amount retained on account of Disputed Claims or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts distributable by the Plan Administrator as a result of the resolutions of such Disputed Claims.

(d) The Liquidating Trust may retain professionals to perform the Plan Administrator's duties under this <u>Section 5.2</u> and, subject to <u>Section 6.6</u>, may rely upon the performance of such professionals with respect to such duties.

(e) The Plan Administrator may request an expedited determination of taxes of the Liquidating Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust.

5.3 **Withholding of Taxes and Other Charges**. The Liquidating Trust may withhold from any amounts distributable at any time to the Liquidating Trust Beneficiaries such sum or sums as may be necessary to pay any taxes or other charges which have been or may be imposed on the Liquidating Trust or the Liquidating Trust Beneficiaries under the income tax laws of the United States or of any state or political subdivision by reason of any distribution provided for in <u>Section 3.2</u> hereof or in the Plan, whenever such withholding is required by any law, regulation, rule, ruling, directive, or other governmental requirement, and the Plan Administrator, in the exercise of its discretion and judgment, may enter into agreements with taxing or other authorities for the payment of such amounts as may be withheld in accordance with the provisions of this <u>Section 5.3</u>. All Liquidating Trust Beneficiaries shall be required to provide any documentation reasonably requested by the Plan Administrator to establish an exemption or reduction from withholding. Notwithstanding the foregoing, but without prejudice to the Liquidating Trust's rights hereunder, the Liquidating Trust Beneficiaries shall have the right with respect to the United States or any state or political subdivision or entity to contest the imposition of any tax or other charge by reason of any distribution hereunder or under the Plan.

5.4 **Other**. The Plan Administrator shall file, or cause to be filed, any other statements, returns, or disclosures relating to the Liquidating Trust that are required by any governmental unit or applicable law.

## ARTICLE VI.

## THE PLAN ADMINISTRATOR

6.1 **Plan Administrator's Compensation and Reimbursement**.

(a)      [Beginning on the Effective Date and continuing throughout the duration of his or her engagement, the Plan Administrator shall be compensated [on an hourly basis]. The Plan Administrator shall bill for his or her services at his or her standard hourly rate, which currently is $[___] per hour; *provided* that the Plan Administrator's standard hourly rate may increase annually beginning January 1, 2021 and thereafter, with each such increase subject to prior approval of the Liquidating Trust Committee.  On a daily basis, the Plan Administrator shall maintain time sheets which record a description of the activities he or she undertakes on behalf of the Liquidating Trust and the amount of time expended for each such activity.  The Plan Administrator shall also be entitled to reimbursement of all reasonable expenses on a monthly basis.  The payment of the fees of the Plan Administrator and any professionals retained by the Plan Administrator shall be made by the Liquidating Trust from the Liquidating Trust Assets in accordance with the Plan.]

(b)      The Plan Administrator, subject to the consent of the Liquidating Trust Committee, shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties.  The reasonable fees and expenses of such professionals shall be paid by the Liquidating Trust from the proceeds of the Liquidating Trust Assets upon the monthly submission of statements to the Plan Administrator or as otherwise agreed by the Plan Administrator and such professionals.  The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business from the Liquidating Trust Assets and shall not be subject to the approval of the Bankruptcy Court.

6.2      **Resignation**.  The Plan Administrator may resign as Plan Administrator hereunder by giving not less than 90 days' prior written notice thereof to the Liquidating Trust Beneficiaries and the Liquidating Trust Committee.  Such resignation shall become effective on the later to occur of:  (a) the day specified in such notice or (b) the appointment of a successor Plan Administrator pursuant to Section 6.4 of this Liquidating Trust Agreement and the acceptance by such successor Plan Administrator of such appointment.  If a successor Plan Administrator is not appointed or does not accept his or her appointment within 90 days following delivery of notice of resignation, the Plan Administrator may petition the Bankruptcy Court for the appointment of a successor Plan Administrator.

6.3      **Removal**.  The Plan Administrator (and his or her successors) may be removed by the Liquidating Trust Committee by majority vote with or without cause in its sole and absolute discretion at any time.  Such removal shall be effective thirty (30) days after the Liquidating Trust Committee's determination or after such shorter period (or immediately) as the Liquidating Trust Committee may direct.  Upon removal of the Plan Administrator by the Liquidating Trust Committee in accordance with this Section 6.3, unless such removal was for cause (as defined below), the Plan Administrator shall be entitled to all compensation that has accrued (on a prorated basis) through the date of such removal, but remains unpaid as of such date, which payment shall be made promptly by the Liquidating Trust from the General Account.  For purposes of this Liquidating Trust Agreement, "for cause" shall mean: (a) the willful an continued refusal by the Plan Administrator to perform his or her duties as set forth herein; (b) gross negligence, misconduct, fraud, embezzlement, or theft; or (c) such other cause as the Liquidating Trust Committee shall in good faith determine.

6.4     **Appointment of Successor Plan Administrator**.  In the event of the resignation, removal or incapacity of the Plan Administrator, a majority of the Liquidating Trust Committee shall designate a successor Plan Administrator, subject to the approval of the Bankruptcy Court, after notice and a hearing.  The successor Plan Administrator shall give written notice of his or her appointment to the Liquidating Trust Beneficiaries as soon thereafter as is practicable.  Any successor Plan Administrator appointed hereunder shall execute, acknowledge and deliver to the Bankruptcy Court, the Liquidating Trust Committee, and the retiring Plan Administrator an instrument duly accepting such appointment and agreeing to be bound by the terms of this Liquidating Trust Agreement and thereupon such successor Plan Administrator, without further act, deed or conveyance, shall become vested with all the rights, powers, trusts, and duties of the Plan Administrator under this Liquidating Trust Agreement.  All fees and expenses of the Plan Administrator shall be paid unless disputed by the successor Plan Administrator, in which case such dispute shall be subject to resolution by the Bankruptcy Court.

6.5     **Liquidating Trust Continuance**.  The resignation or removal of the Plan Administrator shall not operate to terminate the Liquidating Trust or to revoke any existing agency created pursuant to the terms of this Liquidating Trust Agreement or invalidate any action theretofore taken by the Plan Administrator or any prior Plan Administrator.  In the event of the resignation or removal of the Plan Administrator, such Plan Administrator shall (i) promptly execute and deliver such documents, instruments, and other writings as may be reasonably requested by the successor Plan Administrator to effect the termination of the Plan Administrator's capacity under this Liquidating Trust Agreement and the conveyance of the Liquidating Trust Assets then held by the Plan Administrator to such Plan Administrator's successor; (ii) deliver to the successor Plan Administrator all documents, instruments, records, and other writings related to the Liquidating Trust as may be in the possession of the Plan Administrator; and (iii) otherwise assist and cooperate in effecting the assumption of his or her obligations and functions by such successor Plan Administrator.

6.6     **Reliance by Plan Administrator**.  The Plan Administrator may rely, and shall be fully protected personally in acting upon, any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order, or other instrument or document which the Plan Administrator believes to be genuine and to have been signed or presented by the proper party or parties or, in the case of facsimile transmissions or electronic mail, to have been sent by the proper party or parties, in each case without obligation to satisfy itself that the same was given in good faith and without responsibility for errors in delivery, transmission, or receipt.  In the absence of fraud, willful misconduct, or gross negligence on the Plan Administrator's part, the Plan Administrator may rely as to the truth of any statements contained therein in acting thereon.  The Plan Administrator may consult with and rely on the advice of legal counsel and such other experts, advisors, consultants, or other professionals as shall have been retained pursuant to this Liquidating Trust Agreement and shall be fully protected in respect of any action taken or suffered by them in accordance with the written opinion of legal counsel.  Notwithstanding such authority, the Plan Administrator shall be under no obligation to consult with attorneys, accountants or his or her agents, and his or her determination to not do so should not result in imposition of liability on the Plan Administrator unless such determination is based on willful misconduct, gross negligence, or fraud.

-14-

6.7 **Standard of Care**. The Plan Administrator shall not be liable for any act or omission taken or omitted to be taken in his or her capacity as the Plan Administrator pursuant to the discretion, power, and authority conferred on the Plan Administrator by this Liquidating Trust Agreement, the Plan, and the Confirmation Order, other than acts or omissions resulting from the Plan Administrator's willful misconduct, gross negligence, or fraud. The Plan Administrator may, in connection with the performance of his or her functions, consult with attorneys, accountants, and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such professionals unless found liable for any sanctions, attorney fees, or other remedies imposed by any court having jurisdiction over any Avoidance Action to the extent permitted by applicable law. Notwithstanding such authority, the Plan Administrator shall be under no obligation to consult with attorneys, accountants, or agents, and his or her determination not to do so shall not result in imposition of liability on the Plan Administrator unless such determination is based on willful misconduct, gross negligence, or fraud.

6.8 **No Liability for Acts of Predecessor Trustees**. No successor Plan Administrator shall be in any way liable for the acts or omissions of any predecessor Plan Administrator unless a successor Plan Administrator expressly assumes such responsibility.

6.9 **Insurance**. The Plan Administrator may purchase, at the expense of the Liquidating Trust, errors and omissions insurance with regard to any liabilities, losses, damages, claims, costs, and expenses it may incur, including but not limited to attorneys' fees, arising out of or due to its actions or omissions or consequences of such actions or omissions, other than as a result of its fraud, gross negligence, or willful misconduct, with respect to the implementation of this Liquidating Trust Agreement, the Plan, or the Confirmation Order.

6.10 **No Implied Obligations**. No Plan Administrator shall be liable for any duties or obligations except for the performance of such duties and obligations as are specifically set forth herein, and no implied covenants or obligations shall be read into this Liquidating Trust Agreement.

6.11 **No Personal Liability**. Persons dealing with the Liquidating Trust must look solely to the Liquidating Trust or Liquidating Trust Assets for the enforcement of any claims against the Liquidating Trust or to satisfy any liability incurred by the Plan Administrator to such Persons in carrying out the terms of this Liquidating Trust, and neither the Plan Administrator nor the Debtors or any other Person shall have any personal liability or individual obligation to satisfy any such liability.

6.12 **Indemnification**. The Liquidating Trust shall indemnify and hold harmless the Plan Administrator and his or her agents, representatives, professionals, and employees from and against and in respect to any and all liabilities, losses, damages, claims, costs, and expenses, including, but not limited to attorneys' fees and costs arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Liquidating Trust or the implementation or administration of the Plan, **INCLUDING ANY SUCH LOSS THAT MAY RESULT FROM THE ORDINARY NEGLIGENCE OF THE PLAN ADMINISTRATOR AND HIS OR HER AGENTS, REPRESENTATIVES, PROFESSIONALS, AND EMPLOYEES**; *provided*, *however*, that no such indemnification

-15-

will be made to such Persons for such actions or omissions as a result of willful misconduct, gross negligence, or fraud.

## ARTICLE VII.

## LIQUIDATING TRUST COMMITTEE

7.1     **Creation of Liquidating Trust Committee; Replacement of Members**.

(a)     On the Effective Date, the Liquidating Trust Committee shall be formed and initially constituted of [three] members to be designated by the Debtors, in consultation with the Supporting Lenders.

(b)     If a member of the Liquidating Trust Committee resigns or is otherwise removed, a replacement Liquidating Trust Committee member may be appointed by the remaining members.  Alternatively, the Plan Administrator may apply to the Bankruptcy Court for an order directing the appointment, or not, of a replacement member.

7.2     **Procedures**.  The Liquidating Trust Committee may adopt bylaws by majority vote to provide procedures for the governance of the Liquidating Trust Committee.

7.3     **Function, Duties, and Responsibilities**.  The Liquidating Trust Committee shall have the following function, duties and responsibilities:

(a)     it shall meet with the Plan Administrator upon such regular basis as the Liquidating Trust Committee and the Plan Administrator deem appropriate, but in no event less frequently than quarterly; and

(b)     it shall consult with the Plan Administrator regarding the carrying out of his or her duties, including but not limited to:

(i)     pursuit and resolution of claims and causes of action against third parties;

(ii)     resolution of Claims filed by Creditors against the Debtors;

(iii)     administration of the trust estate and the Liquidating Trust Assets; and

(iv)     distributions to the Liquidating Trust Beneficiaries and Holders of Allowed Claims.

7.4     **Duration**.  The Liquidating Trust Committee shall remain in existence until the Liquidating Trust is terminated as set forth herein.

7.5     **Payment of Fees and Reimbursement of Costs and Expenses**.  The members of the Liquidating Trust Committee may be paid for their fees and reimbursed for their costs and

US 7083206v.4

expenses upon request.  Such payment of fees and reimbursement of costs and expenses shall be paid from the Liquidating Trust Assets without further order of the Bankruptcy Court.

7.6    **Liability; Indemnification**.  Neither the Liquidating Trust Committee, nor any of its members, or designees, nor any duly designated agent or representative of the Liquidating Trust Committee, or their respective employees, shall be liable for the act or omission of any other member, designee, agent, or representative of the Liquidating Trust Committee, nor shall any member of the Liquidating Trust Committee be liable for any act or omission taken or omitted to be taken in its capacity as a member of the Liquidating Trust Committee, other than acts or omissions resulting from such member's willful misconduct, gross negligence, or fraud. The Liquidating Trust Committee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with attorneys, accountants, and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such professionals.  Notwithstanding such authority, the Liquidating Trust Committee shall be under no obligation to consult with attorneys, accountants, or agents, and its determination not to do so shall not result in the imposition of liability on the Liquidating Trust Committee, or its members and/or designees, unless such determination is based on willful misconduct, gross negligence, or fraud.   The Liquidating Trust shall indemnify and hold harmless the Liquidating Trust Committee and its members, designees, and professionals, and any duly designated agent or representative thereof (in their capacity as such), from and against and in respect to any and all liabilities, losses, damages, claims, costs, and expenses, including, but not limited to attorneys' fees and costs arising out of or due to their actions or omissions, or consequences of such actions or omissions with respect to the Liquidating Trust or the implementation or administration of the Plan, **INCLUDING ANY SUCH LOSS THAT MAY RESULT FROM ORDINARY NEGLIGENCE OF THE LIQUIDATING TRUST COMMITTEE AND ITS MEMBERS, DESIGNEES, AND PROFESSIONALS, AGENTS, AND REPRESENTATIVES**; *provided*, *however*, that no such indemnification will be made to such Persons for such actions or omissions as a result of willful misconduct, gross negligence, or fraud.

## ARTICLE VIII.

## AMENDMENTS

8.1    **Amendments**.  The parties hereto may make and execute written amendments to this Liquidating Trust Agreement; *provided*, *however*, that in no event shall this Liquidating Trust Agreement be amended so as to:  (a) change the purpose of the Liquidating Trust as set forth in Article I hereof; (b) allow funds constituting Liquidating Trust Assets to be invested in a manner other than as permitted in Section 4.3 hereof; (c) adversely affect the distributions to be made under this Liquidating Trust Agreement to any Liquidating Trust Beneficiaries; or (d) adversely affect the U.S. federal income tax status of the Liquidating Trust in accordance with Article I hereof.

# ARTICLE IX.

## MISCELLANEOUS PROVISIONS

9.1     **Applicable Law**.   The Liquidating Trust created herein shall be construed, regulated, and administered under the laws of the State of Texas, subject to any rules, regulations and laws applied in the Bankruptcy Court and subject to Article XI of the Plan, without regard to principles of conflicts of law; *provided* that the Liquidating Trust and any interpretation or enforcement of the provisions of this Liquidating Trust Agreement shall be subject to the jurisdiction of the Bankruptcy Court.

9.2     **No Association, Partnership, or Joint Venture**.   This Liquidating Trust Agreement is not intended to create, and shall not be interpreted as creating, an association, partnership, or joint venture of any kind.

9.3     **Partial Invalidity**.   If any term or provision of this Liquidating Trust Agreement is held to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Liquidating Trust Agreement, such term or provision shall be fully severable and this Liquidating Trust Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of this Liquidating Trust Agreement, and the remaining terms and provisions of this Liquidating Trust Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Liquidating Trust Agreement, and this Liquidating Trust Agreement shall be construed so as to limit any term or provision so as to make it a legal, valid, and enforceable provision, provided that such construction, to the maximum extent possible, shall give effect to the purposes of the Plan.

9.4     **Notices**.   All notices, requests, consents and other communications hereunder shall be in writing and shall be addressed (i) if to the Plan Administrator, [ADDRESS], Attn: [NAME], or such other address as such Plan Administrator will have furnished; and (ii) if to any Liquidating Trust Beneficiary, at the address determined as set forth in Article VI.C.1.a of the Plan.  All such notices, requests, consents and other communications shall be given to the Plan Administrator by facsimile, hand delivery, overnight delivery, or, if to a Liquidating Trust Beneficiary, by first-class mail, postage prepaid, and shall be deemed given when actually delivered (with respect to the Plan Administrator), or three (3) business days after deposit in the U.S. mail if mailed (with respect to a Liquidating Trust Beneficiary).

9.5     **Counterparts**.   This Liquidating Trust Agreement may be executed in any number of counterparts, each of which shall be an original, but such counterparts shall together constitute one and the same instrument.

9.6     **Headings**.   The section headings contained in this Liquidating Trust Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Liquidating Trust Agreement or of any term or provision hereof.

9.7     **Confidentiality**.   The Plan Administrator shall, during the period that it serves in such capacity under this Liquidating Trust Agreement and following either the termination of

-18-

this Liquidating Trust Agreement or such Plan Administrator's removal, incapacity, or resignation hereunder, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any entity to which any of the Liquidating Trust Assets relates or of which it has become aware in its capacity as Plan Administrator.

9.8 **No Bond Required**. Notwithstanding any state law to the contrary, the Plan Administrator (including any successor trustee) shall be exempt from giving any bond or other surety in any jurisdiction.

9.9 **Retention of Jurisdiction**. The Bankruptcy Court shall retain jurisdiction as set forth in Article XI of the Plan over issues related to the enforcement or interpretation of this Liquidating Trust Agreement, including the determination of all claims, controversies, disputes and issues arising under or in connection with the Liquidating Trust or this Liquidating Trust Agreement and the management and administration of the Liquidating Trust and for all of the purposes contemplated herein.

9.10 **Relationship to Plan**. The principal purpose of this Liquidating Trust Agreement is to aid in the implementation of the Plan and, therefore, this Liquidating Trust Agreement incorporates and is subject to the provisions of the Plan. In the event any provision of this Liquidating Trust Agreement is found to be inconsistent with a provision of the Plan or the Confirmation Order, the provision of the Plan or the Confirmation Order shall control.

*[Remainder of Page Internationally Left Blank]*

IN WITNESS WHEREOF, the parties hereto have executed this Liquidating Trust Agreement or caused this Liquidating Trust Agreement to be duly executed as of the day and year first written.

**CARBO CERAMICS INC.**

By: /s/ _____
Name: _____
Title: _____

**ASSET GUARD PRODUCTS INC.**

By: /s/ _____
Name: _____
Title: _____

**STRATAGEN, INC.**

By: /s/ _____
Name: _____
Title: _____

_____

[_____]
As Plan Administrator

By: /s/ _____
Name: _____
Title: _____

S-1

**Exhibit E**

**Schedule of Rejected Executory Contracts and Unexpired Leases**

Pursuant to Article V.A of the Plan, on the Effective Date, except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, the Plan shall serve as a motion under sections 365 and 1123(b)(2) of the Bankruptcy Code to assume Executory Contracts and Unexpired Leases, and all Executory Contracts or Unexpired Leases shall be assumed by the Reorganized Debtors in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code without the need for any further notice to or action, order, or approval of the Court, other than:  (1) those that are identified on this Schedule of Rejected Executory Contracts and Unexpired Leases; (2) those that have been previously rejected or assumed by a Final Order; (3) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Effective Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date.

Entry of the Confirmation Order shall constitute the Court's order approving the assumptions or rejections, as applicable, of Executory Contracts or Unexpired Leases as set forth in the Plan or herein, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise indicated, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Court.  Any motions to reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Court on or after the Effective Date. Notwithstanding anything to the contrary in the Plan, the Debtors reserve the right, subject to and in accordance with the terms of the Restructuring Support Agreement and with the consent of the Supporting Lenders, to alter, amend, modify, or supplement this Schedule of Rejected Executory Contracts and Unexpired Leases at any time prior to the Effective Date on no less than 3 days' notice to the applicable non-Debtor counterparties.

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Leases on this Schedule of Rejected Executory Contracts and Unexpired Leases, nor anything else herein or in the Plan, shall constitute an admission by the Debtors or Reorganized Debtors, as applicable, that any such contract or lease is in fact an Executory Contract or Unexpired Lease, or that any Debtor or Reorganized Debtor has any liability thereunder.

US 7087371

**CARBO Ceramics, Inc., et al**
**Contract Rejection Schedule**

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|---|
| CARBO Ceramics, Inc. | AMERICAN AIRLINES | TERMS AND CONDITIONS DTD 3/12/2004 | MD 5675, PO BOX 619616 | | | DFI | TX | 75261-9616 | |
| CARBO Ceramics, Inc. | BLUEMODUS, INC. | Change Request, Invoice Agreement | 1641 CALIFORNIA ST | STE 400 | | Denver | CO | 80202 | |
| CARBO Ceramics, Inc. | BMT CONSULTING GROUP LLC | RAILCAR STORAGE AGREEMENT | ATTN PAUL MCCARTHY, PRES | 36 REDWOOD DR | | BUTTE | MT | 59701 | |
| CARBO Ceramics, Inc. | BMT CONSULTING GROUP LLC | RAILCAR STORAGE AGREEMENT | ATTN PAUL MCCARTHY, PRES | 36 REDWOOD DR | | BUTTE | MT | 59701 | |
| CARBO Ceramics, Inc. | CADDO-BOSSIER PARISHES PORT COMMISSION | SERVICE AGREEMENT DTD 3/28/2008 | D/B/A PORT OF SHREVEPORT-BOSSIER | ATTN ERIC D ENGLAND, EXEC PORT DIR | PO BOX 52071 | SHREVEPORT | LA | 71135-2071 | |
| CARBO Ceramics, Inc. | COMPUTERSHARE-INVESTOR | Investor Relations | 16934 Department Ch | | | Palantine | IL | 60055 | |
| CARBO Ceramics, Inc. | COULEE FRAC SAND LLC | Letter of Intent | 1612 Nakomis Ave | | | La Crosse | WI | 54603 | |
| CARBO Ceramics, Inc. | COULEE FRAC SAND LLC | Sand Supply Agreement. | 1612 Nakomis Ave | | | La Crosse | WI | 54603 | |
| CARBO Ceramics, Inc. | COULEE FRAC SAND LLC | Sand Supply Agmt Amend No 1 | 1612 Nakomis Ave | | | La Crosse | WI | 54603 | |
| CARBO Ceramics, Inc. | COULEE FRAC SAND LLC | Developer Agreement | 1612 Nakomis Ave | | | La Crosse | WI | 54603 | |
| CARBO Ceramics, Inc. | Hansen Sand Products | Sand Supply Agreement | 4362 Dairy Road | | | Arpin | WI | 54410 | |
| CARBO Ceramics, Inc. | HART ENERGY PUBLSHING | | P.O. BOX 301405 | | | Dallas | TX | 75303 | |
| CARBO Ceramics, Inc. | IEP HOLDINGS LLC | SUBLEASE AGREEMENT DTD 6/6/2013 | D/B/A INTERSTATE ENERGY PARTNERS LLC | ATTN  BILL FROTHINGER & NATE HOLBERG | 3033 CAMPUS DR, STE W200 | PLYMOUTH | MN | 55441 | |
| CARBO Ceramics, Inc. | INGERSOLL RAND COMPANY | Letter Agreement | 900 POWDER RAND RD, STE 100 | | | BESSEMER | AL | 35022 | |
| CARBO Ceramics, Inc. | INGERSOLL RAND COMPANY | Maintenance Agreement Addendum | 900 POWDER RAND RD, STE 100 | | | BESSEMER | AL | 35022 | |
| CARBO Ceramics, Inc. | INGERSOLL RAND COMPANY | Maintenance Agreement | 900 POWDER RAND RD, STE 100 | | | BESSEMER | AL | 35022 | |
| CARBO Ceramics, Inc. | LOUISIANA DELTA RAILROAD | Railroad Amendment | 402 W Washington St. | | | New Iberia | LA | 70560 | |
| CARBO Ceramics, Inc. | LOUISIANA DELTA RAILROAD | Demurrage Waivers and Amendments | 402 W Washington St. | | | New Iberia | LA | 70560 | |
| CARBO Ceramics, Inc. | LOUISIANA DELTA RAILROAD | Storage Car Agreement | 402 W Washington St. | | | New Iberia | LA | 70560 | |
| CARBO Ceramics, Inc. | Marawood Sand & Gravel 200, LLC | Sand Supply Agreement | 2025 West Veterans Parkway | | | Marshfield | WI | 54449 | |
| CARBO Ceramics, Inc. | MIDWEST PROPPANT, LLC | Supply Agreement | 600 Washington Ave. | Suite 2500 | | Saint Louis | MO | 63101 | |

CARBO Ceramics, Inc., et al
Contract Rejection Schedule

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|---|
| CARBO Ceramics, Inc. | RAIL ESTATES LLC | TRACK LEASE DTD 8/27/2019 | 25 DELPHINE ST | | | OWEGO | NY | 13827 | |
| CARBO Ceramics, Inc. | RR DONNELLEY | ACTIVE DISCLOSURE SOLUTION PROPOSAL DTD 5/16/2016 | ATTN BRIAN FRICK, VENUE ACCT MGR | 2001 KIRBY DR, STE 400 | | HOUSTON | TX | 77019 | |
| CARBO Ceramics, Inc. | RR DONNELLEY | VIRTUAL DATA ROOM SERVICES  DTD 6/20/2016 | ATTN BRIAN FRICK, VENUE ACCT MGR | 2001 KIRBY DR, STE 400 | | HOUSTON | TX | 77019 | |
| CARBO Ceramics, Inc. | SALESFORCE.COM INC. | | P.O. BOX 203141 | | | Dallas | TX | 75320 | |
| CARBO Ceramics, Inc. | TEXAS PACIFICO | Lease Agreement | 106 S. Chadbourne | | | San Angelo | TX | 76903 | |
| CARBO Ceramics, Inc. | TEXAS PACIFICO | Amendment 1 | 106 S. Chadbourne | | | San Angelo | TX | 76903 | |
| CARBO Ceramics, Inc. | TEXAS PACIFICO | Amendment 2 | 106 S. Chadbourne | | | San Angelo | TX | 76903 | |
| CARBO Ceramics, Inc. | TEXAS PACIFICO TRANSPORTATION LTD | LEASE AGREEMENT | ATTN FEDERICO DIAZ-PAGE | 3814 SHERWOOD WAY | | SAN ANGELO | TX | 76901 | |
| CARBO Ceramics, Inc. | TEXAS PACIFICO TRANSPORTATION LTD | LEASE AGREEMENT | ATTN MR STAN MEADOR | 106 S CHADBOURNE ST | | SAN ANGELO | TX | 76903 | |
| CARBO Ceramics, Inc. | TEXAS PACIFICO TRANSPORTATION LTD | LEASE AGREEMENT | ATTN MR STAN MEADOR | 106 S CHADBOURNE ST | | SAN ANGELO | TX | 76903 | |
| CARBO Ceramics, Inc. | TEXAS PACIFICO TRANSPORTATION LTD | SUBLEASE AGREEMENT | ATTN MR STAN MEADOR | 106 S CHADBOURNE ST | | SAN ANGELO | TX | 76903 | |
| CARBO Ceramics, Inc. | TEXAS PACIFICO TRANSPORTATION LTD | LEASE ARGREEMENT REGARDING THE LEASING OF LAND AMENDMENT 1 DTD 7/31/2013 | ATTN MR STAN MEADOR | 106 S CHADBOURNE ST | | SAN ANGELO | TX | 76903 | |
| CARBO Ceramics, Inc. | TEXAS PACIFICO TRANSPORTATION LTD | AMENDMENT# 1 TO LEASE | ATTN MR STAN MEADOR | 106 S CHADBOURNE ST | | SAN ANGELO | TX | 76903 | |
| CARBO Ceramics, Inc. | TEXAS PACIFICO TRANSPORTATION LTD | AMENDMENT# 2 TO LEASE | ATTN MR STAN MEADOR | 106 S CHADBOURNE ST | | SAN ANGELO | TX | 76903 | |
| CARBO Ceramics, Inc. | Thomson Reuters | Services Contract | The Thomson Reuters Building | 3 Times Square | | New York | NY | 10036 | |
| CARBO Ceramics, Inc. | TURF TAMERS LLC | Staffing Agreement | 3503 S Central | | | Marshfield | WI | 54449 | |
| CARBO Ceramics, Inc. | Waste Management of Louisiana, LLC | Services Agreement | 382 Galleria Pkwy | Ste. 107 | | Madison | MS | 39110 | |
| CARBO Ceramics, Inc. | WELL SITE SUPPLY INC | PRODUCT HANDLING AGREEMENT | 180 BLUE KNOB RD | | | MARIETTA | OH | 45750 | |
| CARBO Ceramics, Inc. | WELL SITE SUPPLY INC | FACILITY OPERATIONS AGREEMENT LETTER | ATTN W TRENT ELLIOTT, PRESIDENT | 112 180 BLUE KNOB RD | | MARIETTA | OH | 45750 | |
| CARBO Ceramics, Inc. | WELL SITE SUPPLY INC | AMENDMENT TO PRODUCT HANDLING AGREEMENT | ATTN W TRENT ELLIOTT, PRESIDENT | 112 180 BLUE KNOB RD | | MARIETTA | OH | 45750 | |

**CARBO Ceramics, Inc., et al**
**Contract Rejection Schedule**

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|---|

*The following execturoy contracts shall be rejected effective as of 11:59 p.m. (prevailing Central Time) on the date immediately preceding the Effective Date:*

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|---|
| CARBO Ceramics, Inc. | BAUTISTA III, ERNESTO | CHANGE IN CONTROL SEVERANCE AGREEMENT | C/O CARBO CERAMICS INC | 575 N DAIRY ASHFORD, STE 500 | | HOUSTON | TX | 77079 | |
| CARBO Ceramics, Inc. | Conkle, Don | CHANGE IN CONTROL SEVERANCE AGREEMENT | C/O CARBO CERAMICS INC | 575 N DAIRY ASHFORD, STE 500 | | HOUSTON | TX | 77079 | |
| CARBO Ceramics, Inc. | Kolstad, Gary | EMPLOYMENT CHANGE IN CONTROL SEVERANCE AGREEMENT | C/O CARBO CERAMICS INC | 575 N DAIRY ASHFORD, STE 500 | | HOUSTON | TX | 77079 | |
| CARBO Ceramics, Inc. | Love, Stephen | CHANGE IN CONTROL SEVERANCE AGREEMENT | C/O CARBO CERAMICS INC | 575 N DAIRY ASHFORD, STE 500 | | HOUSTON | TX | 77079 | |
| CARBO Ceramics, Inc. | Nelson, Shannon | CHANGE IN CONTROL SEVERANCE AGREEMENT | C/O CARBO CERAMICS INC | 575 N DAIRY ASHFORD, STE 500 | | HOUSTON | TX | 77079 | |
| CARBO Ceramics, Inc. | SMITH, ELLEN M | CHANGE IN CONTROL SERVERENCE AGREEMENT | 575 N DAIRY ASHFORD, STE 500 | | | HOUSTON | TX | 77079 | |
| CARBO Ceramics, Inc. | Willette, Robert | CHANGE IN CONTROL SEVERANCE AGREEMENT | C/O CARBO CERAMICS INC | 575 N DAIRY ASHFORD, STE 500 | | HOUSTON | TX | 77079 | |

*The following unexpired lease shall be rejected effective as of July 31, 2020:*

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|---|
| CARBO Ceramics, Inc. | I-10 EC CORRIDOR #2 LTD PARTNERSHIP | 2ND AMENDMENT TO LEASE | C/O AMERICAN REALTY ADVISORS | ATTN STANLEY IEZMAN | 801 N BRAND BLVD, STE 800 | GLENDALE | CA | 91203 | |
| CARBO CERAMICS INC | I-10 CORRIDOR #2 LIMITED PARTNERSHIP | 5.20.23 CCI-I-10 EC Corridor Lease Acquisition Agmt | C/O AMERICAN REALTY ADVISORS | ATTN STANLEY L LEZMAN | 801 N BRAND BLVD STE 800 | GLENDALE | CA | 91203 | |
| CARBO CERAMICS INC | I-10 CORRIDOR #2 LIMITED PARTNERSHIP | 5.20.24 CCI-I-10 EC Corridor Lease Amdmt 1 | C/O AMERICAN REALTY ADVISORS | ATTN STANLEY L LEZMAN | 801 N BRAND BLVD STE 800 | GLENDALE | CA | 91203 | |
| CARBO CERAMICS INC | I-10 CORRIDOR #2 LIMITED PARTNERSHIP | 5.20.25 CCI-I-10 EC Corridor Lease Amdmt 2 | C/O AMERICAN REALTY ADVISORS | ATTN STANLEY L LEZMAN | 801 N BRAND BLVD STE 800 | GLENDALE | CA | 91203 | |
| CARBO CERAMICS INC | I-10 CORRIDOR #2 LIMITED PARTNERSHIP | 5.20.26 CCI-I-10 EC Corridor Lease Amdmt 3 | C/O AMERICAN REALTY ADVISORS | ATTN STANLEY L LEZMAN | 801 N BRAND BLVD STE 800 | GLENDALE | CA | 91203 | |
| CARBO CERAMICS INC | I-10 CORRIDOR #2 LIMITED PARTNERSHIP | 5.20.28 CCI-I-10 EC Corridor Reimbursement Agmt | C/O AMERICAN REALTY ADVISORS | ATTN STANLEY L LEZMAN | 801 N BRAND BLVD STE 800 | GLENDALE | CA | 91203 | |

**CARBO Ceramics, Inc., et al**
**Contract Rejection Schedule**

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|---|
| CARBO CERAMICS INC | I-10 CORRIDOR #2 LIMITED PARTNERSHIP | 5.20.28 CCI-I-10 EC Corridor Reimbursement Agmt | C/O AMERICAN REALTY ADVISORS | ATTN STANLEY L LEZMAN | 801 N BRAND BLVD STE 800 | GLENDALE | CA | 91203 | |
| CARBO CERAMICS INC | I-10 CORRIDOR #2 LIMITED PARTNERSHIP | 5.20.29 CCI-I-10 EC Corridor Right of Refusal | C/O AMERICAN REALTY ADVISORS | ATTN STANLEY L LEZMAN | 801 N BRAND BLVD STE 800 | GLENDALE | CA | 91203 | |
| CARBO CERAMICS INC | I-10 EC CORRIDOR #2 LTD PARTNERSHIP | 5.20.22 CCI-I-10 EC Corridor Amendment | C/O TRAMMELL CROW COMPNAY | ATTN ASSET MANAGER | 2800 POST OAK BLVD, STE 2300 | HOUSTON | TX | 77056 | |
| CARBO CERAMICS INC | I-10 EC CORRIDOR #2 LTD PARTNERSHIP | 5.20.22 CCI-I-10 EC Corridor Amendment | C/O TRAMMELL CROW COMPNAY | ATTN ASSET MANAGER | 2800 POST OAK BLVD, STE 2300 | HOUSTON | TX | 77056 | |
| CARBO CERAMICS INC | I-10 EC CORRIDOR #2 LTD PARTNERSHIP | 5.20.27 CCI-I-10 EC Corridor Office Lease (Houston lease 2009) | C/O TRAMMELL CROW COMPNAY | ATTN ASSET MANAGER | 2800 POST OAK BLVD, STE 2300 | HOUSTON | TX | 77056 | |
| CARBO CERAMICS INC | I-10 EC CORRIDOR #2 LTD PARTNERSHIP | 1.1340 CCI-I-10 EC Corridor (Houston lease) SNDA | ATTN W AARON THIELHORN | 2800 POST OAK BLVD, STE 2300 | | HOUSTON | TX | 77056 | |
| CARBO CERAMICS INC | I-10 EC CORRIDOR #2 LTD PARTNERSHIP | 1.1341 CCI-I-10 EC Corridor Amendment | ATTN W AARON THIELHORN | 2800 POST OAK BLVD, STE 2300 | | HOUSTON | TX | 77056 | |
| CARBO CERAMICS INC | I-10 EC CORRIDOR #2 LTD PARTNERSHIP | 1.1342 CCI-I-10 EC Corridor Lease Acquisition Agmt | C/O AMERICAN REALTY ADVISORS | ATTN STANLEY L IEZMAN | 801 N BRAND BLVD, STE 800 | GLENDALE | CA | 91203 | |
| CARBO CERAMICS INC | I-10 EC CORRIDOR #2 LTD PARTNERSHIP | 1.1343 CCI-I-10 EC Corridor Lease Amdmt 1 | ATTN W AARON THIELHORN | 2800 POST OAK BLVD, STE 2300 | | HOUSTON | TX | 77056 | |
| CARBO CERAMICS INC | I-10 EC CORRIDOR #2 LTD PARTNERSHIP | 1.1344 CCI-I-10 EC Corridor Lease Amdmt 2 | C/O AMERICAN REALTY ADVISORS | ATTN STANLEY IEZMAN | 801 N BRAND BLVD, STE 800 | GLENDALE | CA | 91203 | |
| CARBO CERAMICS INC | I-10 EC CORRIDOR #2 LTD PARTNERSHIP | 1.1345 CCI-I-10 EC Corridor Office Lease (Houston lease 2009) | C/O TRAMMELL CROW CO | ATTN ASSET MANAGER | 2800 POST OAK BLVD, STE 2300 | HOUSTON | TX | 77056 | |
| CARBO CERAMICS INC | I-10 EC CORRIDOR #2 LTD PARTNERSHIP | 1.1346 CCI-I-10 EC Corridor Reimbursement Agmt | ATTN W AARON THIELHORN | 2800 POST OAK BLVD, STE 2300 | | HOUSTON | TX | 77056 | |
| CARBO CERAMICS INC | I-10 EC CORRIDOR #2 LTD PARTNERSHIP | 1.1347 CCI-I-10 EC Corridor Right of Refusal | C/O TRAMMELL CROW CO | ATTN W AARON THIELHORN, VP | 2800 POST OAK BLVD, STE 2300 | HOUSTON | TX | 77056 | |

**Exhibit F**

**Schedule of Proposed Cure Amounts**

Pursuant to Article V.C of the Plan, the Debtors or the Reorganized Debtors, as applicable, shall pay Cure Claims, if any, on the Effective Date or as soon as reasonably practicable thereafter. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure Claims that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be filed and served on the Reorganized Debtors on or before 30 days after the Effective Date. If such Cure Claim dispute is not resolved within seven days of the Reorganized Debtors' receiving such Cure Claim dispute, the counterparty to the applicable assumed Executory Contract or Unexpired Lease shall timely file an objection with the Court within seven days. **Any such request and/or objection that is not timely Filed shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Court.** Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure Claim; *provided*, *however*, that nothing herein or in the Plan shall prevent the Reorganized Debtors from paying any Cure Claim despite the failure of the relevant counterparty to file such request for payment of such Cure Claim. The Reorganized Debtors also may settle any Cure Claim without any further notice to or action, order, or approval of the Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Court on or before 30 days after the Effective Date. Any such objection will be scheduled to be heard by the Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely Filed. **Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.**

If there is any dispute regarding any Cure Claim, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of the Cure Claim shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy or insolvency-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed, including pursuant to the Confirmation Order, shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Court.

Exhibit F-1

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Leases on this Schedule of Proposed Cure Amounts, nor anything else herein or in the Plan, shall constitute an admission by the Debtors or Reorganized Debtors, as applicable, that any such contract or lease is in fact an Executory Contract or Unexpired Lease, or that any Debtor or Reorganized Debtor has any liability thereunder.

Exhibit F-2

CARBO Ceramics, Inc., et al
Assumed Contract Cure Schedule

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Est. Cure Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| AssetGuard Products Inc. | 13 MILE INDUSTRIAL LLC | SHORT TERM TENANCY LEASE AGREEMENT | ATTN W NEIL FOX III | 115 2ND AVE W | | WILLISTON | ND | 58801 | | $0.00 |
| AssetGuard Products Inc. | 320 GATEWAY PARTNERS LLC | CONSENT TO SUBLEASE AGREEMENT DTD 9/24/2015 | C/O ROCKY MOUNTAIN INVESTMENT TARTNERS | ATTN TODD POPPERT | 1008 S JASON ST | DENVER | CO | 80223 | | $0.00 |
| AssetGuard Products Inc. | ABSOLUTE INVESTMENTS INC | LEASE AGREEMENT | ATTN DON HOFFMAN | 4610 N GARFIELD, STE A-3 | | MIDLAND | TX | 79705 | | $0.00 |
| AssetGuard Products Inc. | ABSOLUTE INVESTMENTS INC | AMENDED AND RESTATED LEASE AGREEMENT | ATTN DON HOFFMAN | 4610 N GARFIELD, STE A-3 | | MIDLAND | TX | 79705 | | $0.00 |
| AssetGuard Products Inc. | ABSOLUTE INVESTMENTS INC | AMENDED AND RESTATED LEASE AGREEMENT | ATTN DON HOFFMAN | 4610 N GARFIELD, STE A-3 | | MIDLAND | TX | 79705 | | $0.00 |
| AssetGuard Products Inc. | ALLIANCE OFFICE SYSTEMS | LEASE AGREEMENT FOR 60 MONTH LEASE OF OFFICE EQUIPMENT | 469 CHERRY LN | | | SOUTHLAKE | TX | 76092 | | $0.00 |
| AssetGuard Products Inc. | ALLIANCE OFFICE SYSTEMS | LEASE AGREEMENT FOR 39 MONTH LEASE OF OFFICE EQUIPMENT | 587-B COMMERCE ST | | | SOUTHLAKE | TX | 76092 | | $0.00 |
| AssetGuard Products Inc. | ALLIANCE OFFICE SYSTEMS | MAINTENANCE AGREEMENT FOR OFFICE EQUIPMENT | 587-B COMMERCE ST | | | SOUTHLAKE | TX | 76092 | | $0.00 |
| AssetGuard Products Inc. | AMERAGUARD PROTECTIVE COATINGS | LETTER AGREEMENT FOR LICENSE OF PHOTO UTILIZATION DTD 4/13/2015 | ATTN: KAVEH MEGHDADPOUR | 3221 LAWNWOOD ST | | FORT WORTH | TX | 76111 | | $0.00 |
| AssetGuard Products Inc. | ASA JOHNSON | GRAZING LEASE | 2242 E. HWY 380 | | | Decatur | TX | 76234 | United States | $0.00 |
| AssetGuard Products Inc. | ASFI PARTNERS LP | SETTLEMENT AND DISMISSAL AGREEMENT | ATTN CHAD & RACHEL CORBIN | 10130 FORESTER RD | | SANGER | TX | 76266 | | $0.00 |
| AssetGuard Products Inc. | CBRE SYRACUSE NY LLC | ENGAGEMENT LETTER DTD 12/3/2013 | ATTN RICK SEARLES | 313 E WILLOW ST, STE 202 | | SYRACUSE | NY | 13203 | | $0.00 |
| AssetGuard Products Inc. | CITY OF KELLER PARKS AND RECREATION | PAVILLION RESERVATION | PO BOX 770 | 1100 BEAR CREEK PKWY | | KELLER | TX | 76244 | | $0.00 |
| AssetGuard Products Inc. | CMC BUSINESS SYSTEMS | COPIER USAGE AGREEMENT | P.O BOX 60428 | | | MIDLAND | TX | 79711 | | $603.33 |
| AssetGuard Products Inc. | CONAWAY, JERI LYN | TRANSFER AGREEMENT REGARDING THE LEASING OF LAND | 54341 High Ridge Road | | | Bellaire | Ohio | 43906 | United States | $0.00 |
| AssetGuard Products Inc. | CONAWAY, JERI LYN | LEASE AGREEMENT REGARDING THE LEASING OF LAND AND BUILDING AT BELLAIRE OHIO AMENDMENT #3 | 54341 High Ridge Road | | | Bellaire | Ohio | 43906 | United States | $0.00 |
| AssetGuard Products Inc. | CONAWAY, JERI LYN | LEASE AGREEMENT REGARDING THE LEASING OF LAND AT BELLAIRE OHIO AMENDMENT #4 | 54341 High Ridge Road | | | Bellaire | Ohio | 43906 | United States | $0.00 |
| AssetGuard Products Inc. | CONAWAY, JERI LYN | AMENDMENT #4 | 54341 High Ridge Road | | | Bellaire | Ohio | 43906 | United States | $0.00 |
| AssetGuard Products Inc. | DAVISON ELECTRIC CO INC | LEASE AGREEMENT | ATTN DAVID E DEFELICE, PRESIDENT | 66167 MCGREGOR HILL RD | | BELLAIRE | OH | 43906 | | $0.00 |
| AssetGuard Products Inc. | DAVISON ELECTRIC CO INC | LEASE AGREEMENT AMENDMENT #2 | ATTN DAVID E DEFELICE, PRESIDENT | 8080 SE WATERWAY DR | | HOBE SOUND | FL | 33455 | | $0.00 |

CARBO Ceramics, Inc., et al
Assumed Contract Cure Schedule

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Est. Cure Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| AssetGuard Products Inc. | DAVISON ELECTRIC CO INC | LEASE AGREEMENT REGARDING THE LEASING OF LAND AT BELLAIRE OHIO AMENDMENT | ATTN DAVID E DEFELICE, PRESIDENT | 8080 SE WATERWAY DR | | HOBE SOUND | FL | 33455 | | $0.00 |
| AssetGuard Products Inc. | DAVISON ELECTRIC CO INC | TRANSFER AGREEMENT REGARDING THE LEASING OF LAND | ATTN DAVID E DEFELICE, PRESIDENT | 8080 SE WATERWAY DR | | HOBE SOUND | FL | 33455 | | $0.00 |
| AssetGuard Products Inc. | DAVISON ELECTRIC CO INC | LEASE AGREEMENT REGARDING THE LEASING OF LAND AT BELLAIRE OHIO AMENDMENT #2 | ATTN DAVID E DEFELICE, PRESIDENT | 8080 SE WATERWAY DR | | HOBE SOUND | FL | 33455 | | $0.00 |
| AssetGuard Products Inc. | EVERBANK COMMERCIAL FINANCE INC | LEASE AGREEMENT FOR 60 MONTH LEASE OF OFFICE EQUIPMENT | 10 WATERVIEW BLVD | | | PARSIPPANY | NJ | 07054 | | $0.00 |
| AssetGuard Products Inc. | EVERBANK COMMERCIAL FINANCE INC | LEASE AGREEMENT FOR 39 MONTH LEASE OF OFFICE EQUIPMENT | 10 WATERVIEW BLVD | | | PARSIPPANY | NJ | 07054 | | $0.00 |
| AssetGuard Products Inc. | EVERBANK COMMERCIAL FINANCE INC | MAINTENANCE AGREEMENT FOR OFFICE EQUIPMENT | 10 WATERVIEW BLVD | | | PARSIPPANY | NJ | 07054 | | $0.00 |
| AssetGuard Products Inc. | EXODUS MOVING & STORAGE INC | STANDARD CONTRACT TERMS AND CONDITIONS FOR MERCHANDISE WAREHOUSEMEN | 1730 E PROSPECT RD, STE 102 | | | FORT COLLINS | CO | 80553 | | $0.00 |
| AssetGuard Products Inc. | GAS FIELD SPECIALISTS INC | STANDARD TERMS AGREEMENT | 2107 PA-44 | | | SHINGLEHOUSE | PA | 16748 | | $0.00 |
| AssetGuard Products Inc. | GROUND WATER PROTECTION COUNCIL INC | LIMITED USE LICENSE | 13308 N MACARTHUR BLVD | | | OKLAHOMA CITY | OK | 73142 | | $0.00 |
| AssetGuard Products Inc. | GUARDIAN STORAGE SOLUTIONS | SELF STORAGE LEASE AGREEMENT DTD 8/30/2010 | 350 OLD HAYMAKER RD | | | MONROEVILLE | PA | 15146 | | $0.00 |
| AssetGuard Products Inc. | GUIA, ANTONIO R | COMMERCIAL CONTRACT UNIMPROVED PROPERTY | 612 W BRADY | | | DECATUR | TX | 76234 | | $0.00 |
| AssetGuard Products Inc. | HARTFORD FIRE INSURANCE CO | WAGE COLLECTION SURVEY BOND | ATTN D N BROYLES, ATTORNEY-IN-FACT | ONE HARTFORD PLAZA | | HARTFORD | CT | 06155 | | $0.00 |
| AssetGuard Products Inc. | HENNESSEY GROUP, THE | LEASE AGREEMENT DTD 2/28/2017 | 2706 W WALL ST | | | MIDLAND | TX | 79701 | | $0.00 |
| AssetGuard Products Inc. | HYDRAFAB | LIMITED WARRANTY FOR TANKGUARD ETC | 14490 WAGG WAY ROAD | | | HOUSTON | TX | 77041 | | $0.00 |
| AssetGuard Products Inc. | IRONSHORE SPECIALTY INSURANCE CO | CERTIFICATE OF LIABILITY INSURANCE DTD 9/11/2018 | ONE RIVERWAY, STE 400 | | | HOUSTON | TX | 77056 | | $0.00 |
| AssetGuard Products Inc. | K&G RENTAL SERVICES INC | STANDARD TERMS AGREEMENT | 4310 SOUTH STATE HIGHWAY 349 | | | MIDLAND | TX | 79706 | | $0.00 |
| AssetGuard Products Inc. | KEDERIKE LEMAY LLC | LEASE AGREEMENT FOR CERTAIN PREMISES | ATTN KENNETH E DELINE | PO BOX 2410 | | DENVER | CO | 80201 | | $0.00 |
| AssetGuard Products Inc. | KEDERIKE LEMAY LLC | ESTOPPEL STATEMENT DTD 7/6/2017 | ATTN KENNETH E DELINE | PO BOX 2410 | | DENVER | CO | 80201 | | $0.00 |
| AssetGuard Products Inc. | LEMON, JUDY | LEASE AGREEMENT | 6411 SEA GULL CIRCLE | | | LOVELAND | CO | 80538 | | $0.00 |
| AssetGuard Products Inc. | LIBERTY MUTUAL FIRE INSURANCE COMPANY | CERTIFICATE OF LIABILITY INSURANCE DTD 9/11/2018 | 11524 KLUKHOHN ST | | | STITZER | WI | 53825 | | $0.00 |
| AssetGuard Products Inc. | LIME ROCK RESOURCES II-A, LP | CERTIFICATE OF LIABILITY INSURANCE DTD 9/11/2018 | 1111 BAGBY ST, STE 4600 | | | HOUSTON | TX | 77002 | | $0.00 |
| AssetGuard Products Inc. | LIME ROCK RESOURCES II-C LP | CERTIFICATE OF LIABILITY INSURANCE DTD 9/11/2018 | 1111 BAGBY ST, STE 4600 | | | HOUSTON | TX | 77002 | | $0.00 |

CARBO Ceramics, Inc., et al
Assumed Contract Cure Schedule

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Est. Cure Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| AssetGuard Products Inc. | LIME ROCK RESOURCES III-A LP | MASTER SERVICE AGREEMENT FOR CONTRACTING WORK | ATTN C TIM MILLER | 1111 BAGBY ST, 46TH FL | | HOUSTON | TX | 77002 | | $0.00 |
| AssetGuard Products Inc. | LIME ROCK RESOURCES III-C LP | CERTIFICATE OF LIABILITY INSURANCE DTD 9/11/2018 | ATTN C TIM MILLER | 1111 BAGBY ST, 46TH FL | | HOUSTON | TX | 77002 | | $0.00 |
| AssetGuard Products Inc. | LIME ROCK RESOURCES IV-A LP | MASTER SERVICE AGREEMENT FOR CONTRACTING WORK | ATTN C TIM MILLER | 1111 BAGBY ST, 46TH FL | | HOUSTON | TX | 77002 | | $0.00 |
| AssetGuard Products Inc. | LM INSURANCE COMPANY | CERTIFICATE OF LIABILITY INSURANCE DTD 9/11/2018 | 175 BERKELEY STREET | | | BOSTON | MA | 02116 | | $0.00 |
| AssetGuard Products Inc. | LRR ENERGY LP | CERTIFICATE OF LIABILITY INSURANCE DTD 9/11/2018 | 1111 BAGBY ST, STE 4600 | | | HOUSTON | TX | 77002 | | $0.00 |
| AssetGuard Products Inc. | MANNHART HOLDINGS LTD | OFFICE/WAREHOUSE LEASE | 905 EMERALD BLVD | | | SOUTHLAKE | TX | 76092 | | $0.00 |
| AssetGuard Products Inc. | MODSPACE SERVICE CENTER | OPERATING LEASE OFFER DTD 9/4/2014 | 1020 ROBB HILL RD | | | OAKDALE | PA | 15071 | | $0.00 |
| AssetGuard Products Inc. | NEW MEXICO RENTALS LLC | STANDARD TERMS AGREEMENT | 1619 MAIN ST | | | EUNICE | NM | 88231 | | $0.00 |
| AssetGuard Products Inc. | OASIS AT PAVAILION PARKWAY, THE | APARTMENT LEASE CONTRACT DTD 9/20/2018 | 110 PAVILION PKWY | | | MIDLAND | TX | 79705 | | $0.00 |
| AssetGuard Products Inc. | PARADIGM MIDSTREAM SERVICES - ST LLC | MASTER SERVICE AGREEMENT DTD 7/1/2014 | 545 E. John Carpenter Freeway | Suite 800 | | 0 IRVING | TX | | 75062 United States | $0.00 |
| AssetGuard Products Inc. | PARAGON ERP MIDLAND LLC | AMENDMENT #1 | C/O HALEY NWC PROPERTY MANAGEMENT CO LLC | 400 W ILLINOIS AVE, STE 1630 | | MIDLAND | TX | 79701 | | $0.00 |
| AssetGuard Products Inc. | PARAGON ERP MIDLAND LLC | NOTICE TO TENANT - CHANGE OF LANDLORD DTD 9/25/2014 | C/O HALEY PROPERTY MANAGEMENT CO II LLC | ATTN WENDELL BROWN | 400 W ILLINOIS AVE, STE 1630 | MIDLAND | TX | 79701 | | $0.00 |
| AssetGuard Products Inc. | PARAGON ERP MIDLAND LLC | NOTICE TO TENANT - CHANGE OF LANDLORD DTD 9/25/2014 | C/O HALEY PROPERTY MANAGEMENT CO II LLC | ATTN WENDELL BROWN | 400 W ILLINOIS AVE, STE 1630 | MIDLAND | TX | 79701 | | $0.00 |
| AssetGuard Products Inc. | PARAGON ERP MIDLAND LLC | LEASE AMENDMENT #1 (9115 WCR 1270) DTD 2/1/2017 | C/O HALEY-NWC PROPERTY MANAGEMENT CO LLC | 400 W ILLINOIS AVE, STE 1630 | | MIDLAND | TX | 79701 | | $0.00 |
| AssetGuard Products Inc. | PITNEY BOWES GLOBAL FINANCIAL SERVICES LLC | TIER 1 SERVICE LEVEL AGREEMENT | 3001 SUMMER ST | | | STANFORD | CT | 06905 | | $50.65 |
| AssetGuard Products Inc. | PRECISIONWORKS MANUFACTURING | ESTOPPEL STATEMENT DTD 7/6/2017 | 463 N DENVER AVE | | | LOVELAND | CO | 80537 | | $0.00 |
| AssetGuard Products Inc. | PRECISIONWORKS MFG LLC | SUBLEASE AGREEMENT DTD 9/24/2015 | C/O ROBERT SMITH &/OR GREG GERNERT | 320 GATEWAY DR | | BERTHOUD | CO | 80513 | | $0.00 |
| AssetGuard Products Inc. | PRECISIONWORKS MFG LLC | SUBLEASE AGREEMENT | C/O ROBERT SMITH &/OR GREG GERNERT | 320 GATEWAY DR | | BERTHOUD | CO | 80513 | | $0.00 |
| AssetGuard Products Inc. | RAJWINDER KAUR SAINI AND MANJIT KAUR | SETTLEMENT STATEMENT (HUD1) | 7404 SIENNA RIDGE LN | | | FORTH WORTH | TX | 76131 | | $0.00 |
| AssetGuard Products Inc. | REALTYUSA.COM | ENGAGEMENT LETTER DTD 5/29/2014 | ATTN CLAY AMBROSE | 215 W CHURCH ST | | ELMIRA | NY | 14901 | | $0.00 |
| AssetGuard Products Inc. | SHARP ELECTRONICS CORPORATION | VALUE LEASE AGREEMENT | 100 PARAGON DR. | | | MONTVALE | NJ | 07645-1779 | | $161.48 |
| AssetGuard Products Inc. | SNELLING EMPLOYMENT LLC | WORKFORCE SOLUTION SERVICES AGREEMENT DTD 7/27/2015 | 4055 VALLEY VIEW LN #700 | | | DALLAS | TX | 75244 | | $0.00 |

CARBO Ceramics, Inc., et al
Assumed Contract Cure Schedule

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Est. Cure Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| AssetGuard Products Inc. | SOUTHERN TIER COMMERCE CENTER LLC | LICENSE AGREEMENT DTD 9/15/2010 | ATTN ADAM P MEINSTEIN, MGR | 1 W 1ST AVE, STE 315 | | CONSHOHOCKEN | PA | 19428 | | $0.00 |
| AssetGuard Products Inc. | STEPHENS INSURANCE LLC | CERTIFICATE OF LIABILITY INSURANCE DTD 9/11/2018 | ATTN MIKE FABIAN | 9 GREENWAY PLZ, STE 1200 | | HOUSTON | TX | 77079 | | $0.00 |
| AssetGuard Products Inc. | T & C TANK RENTALS AND ANCHOR SERVICE CORPORATION | SUBCONTRACTOR FOR SERVICES | ATTN MARK SPOLTON | PO BOX 1197 | | DENVER CITY | TX | 792323 | | $0.00 |
| AssetGuard Products Inc. | TEXAN RENTALS & LEASE SERVICES LLC | STANDARD TERMS AGREEMENT | 19901 SOUTHWEST FREEWAY | | | SUGARLAND | TX | 77479 | | $0.00 |
| AssetGuard Products Inc. | THE OASIS AT PAVILION PARKWAY | APARTMENT LEASE CONTRACT DTD 10/30/2017 | 110 PAVILION PKWY | | | MIDLAND | TX | 79705 | | $0.00 |
| AssetGuard Products Inc. | THE OASIS AT PAVILION PARKWAY | APARTMENT LEASE CONTRACT 9/20/2018 | 110 PAVILION PKWY | | | MIDLAND | TX | 79705 | | $0.00 |
| AssetGuard Products Inc. | WELLS FARGO BANK NA | AMENDMENT TO WELLSONE COMMERCIAL CARD AGREEMENT | 14241 DALLAS PKWY, STE 900 | | | DALLAS | TX | 75254 | | $0.00 |
| AssetGuard Products Inc. | WELLS FARGO BANK NA | DEED OF TRUST AND ASIGNMENT OF RENTS AND LEASES | 1700 LINCOLN ST, 5TH FL | MAC C7300-05 | | DENVER | CO | 80209 | | $0.00 |
| AssetGuard Products Inc. | WEST VIRGINIA DIVISION OF LABOR | WAGE COLLECTION SURVEY BOND | CAPITOL COMPLEX | BLDG 6 RM B-749 | | CHARLESTON | WV | 25305 | | $0.00 |
| AssetGuard Products Inc. | WOODLAWN PROPERTIES LLC | GUARANTY ON PROPERTY LEASE | ATTN JEFFREY B STREETER, PRES | 101 E WOODLAWN AVE | | ELMIRA | NY | 14901 | | $0.00 |
| AssetGuard Products Inc. | WOODLAWN PROPERTIES LLC | GUARANTY | ATTN JEFFREY B STREETER, PRES | 101 E WOODLAWN AVE | | ELMIRA | NY | 14901 | | $0.00 |
| AssetGuard Products Inc. | WOODLAWN PROPERTIES LLC | LEASE DTD 7/27/2011 | ATTN JEFFREY B STREETER, PRES | 101 E WOODLAWN AVE | | ELMIRA | NY | 14901 | | $0.00 |
| AssetGuard Products Inc. | WOODLAWN PROPERTIES LLC | LEASE AGREEMENT DTD 7/27/2011 | ATTN JEFFREY B STREETER, PRES | 101 E WOODLAWN AVE | | ELMIRA | NY | 14901 | | $0.00 |
| AssetGuard Products Inc. | WOODLAWN PROPERTIES LLC | LICENSE AGREEMENT DTD 6/10/2011 | ATTN JEFFREY B STREETER, PRES | 101 E WOODLAWN AVE | | ELMIRA | NY | 14901 | | $0.00 |
| AssetGuard Products Inc. | WOODLAWN PROPERTIES LLC | LICENSE AGREEMENT DTD 6/10/2011 | ATTN JEFFREY B STREETER, PRES | 101 E WOODLAWN AVE | | ELMIRA | NY | 14901 | | $0.00 |
| AssetGuard Products Inc. | WOODLAWN PROPERTIES LLC | AMENDMENT NOTICE DTD 11/1/2011 | ATTN JEFFREY B STREETER, PRES | 101 E WOODLAWN AVE | | ELMIRA | NY | 14901 | | $0.00 |
| AssetGuard Products Inc. | WOODLAWN PROPERTIES LLC | AMENDMENT LEASE LETTER DTD 11/1/2011 | ATTN JEFFREY B STREETER, PRES | 101 E WOODLAWN AVE | | ELMIRA | NY | 14901 | | $0.00 |
| AssetGuard Products Inc. | WRIGHT EXPRESS CORPORATION | TELEMATICS CUSTOMER AGREEMENT | 1 Hancock Street | | | Portland | ME | 04101 | | $0.00 |
| AssetGuard Products Inc. | WRIGHT EXPRESS FINANCIAL SERVICES CORP | FLEET BUSINESS CHARGE CARD AGREEMENT | 7090 S UNION PARK CENTER, STE 350 | | | MIDVALE | UT | 84047 | | $0.00 |
| AssetGuard Products Inc. | XTO ENERGY INC | MASTER SERVICE AGREEMENT DTD 5/31/2018 | ATTN SUE KING | 810 HOUSTON ST | | FORTH WORTH | TX | 76102 | | $0.00 |
| CARBO Ceramics, Inc. | 300 HOUSTON | GROUP EVENT CONTRACT | 925 Bunker Hill Rd | | | Houston | TX | 77024 | | $0.00 |
| CARBO Ceramics, Inc. | 892552 ALBERTA LTD | FIRST AMENDMENT | 17311 80TH AVE | | | EDMONTON | AB | T5T 0B4 | CANADA | $0.00 |

CARBO Ceramics, Inc., et al
Assumed Contract Cure Schedule

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Est. Cure Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| CARBO Ceramics, Inc. | 892552 ALBERTA LTD | STORAGE FACILITY MANAGEMENT AGREEMENT | 17311 80TH AVE | | | EDMONTON | AB | T5T 0B4 | CANADA | $0.00 |
| CARBO Ceramics, Inc. | ADCO COMPANIES LTD | LEASE / RENTAL AGREEMENT DTD 7/21/2014 | 3657 PINE LN | | | BESSEMER | AL | 35022 | | $0.00 |
| CARBO Ceramics, Inc. | ADP INC | STREETLINK SERVICE AMMENDMENT | 51 MERCEDES WAY | | | EDGEWOOD | NY | 11717 | | $0.00 |
| CARBO Ceramics, Inc. | ADP INC | SIDE LETTER TO PROVIDE NOTIFICATION TO TERMINATE SERVICES | 51 MERCEDES WAY | | | EDGEWOOD | NY | 11717 | | $0.00 |
| CARBO Ceramics, Inc. | ADP INC | MAJOR ACCOUNTS AGREEMENT DTD 5/25/2011 | ONE ADP BLVD | | | ROSELAND | NJ | 07068 | | $0.00 |
| CARBO Ceramics, Inc. | ADP LLC | AMENDMENT TO MASTER SERVICES AGREEMENT | ONE ADP BLVD | | | ROSELAND | NJ | 07068 | | $0.00 |
| CARBO Ceramics, Inc. | AEP TEXAS CENTRAL COMPANY | EASEMENT AND RIGHT OF WAY DTD 6/4/2012 | PO BOX 2121 | | | CORPUS CHRISTI | TX | 78403 | | $0.00 |
| CARBO Ceramics, Inc. | AGGREKO | VENUE RENTAL AGREEMENT | ATTN MONICA SAGGE, HR GENERALIST | 4701 W ADMIRAL DOYLE DR | | NEW IBERIA | LA | 70560 | | $0.00 |
| CARBO Ceramics, Inc. | AGILEPOINT INC | END USER LICENSE AGREEMENT | 1916C OLD MIDDLEFIELD WAY | | | MOUNTAIN VIEW | CA | 94043 | | $0.00 |
| CARBO Ceramics, Inc. | AIRWATCH | TERMS AND CONDITIONS DTD 11/19/2013 | 1155 Perimeter Center West | Suite 100 | | Atlanta | GA | 30338 | | $0.00 |
| CARBO Ceramics, Inc. | ALABAMA POWER COMPANY | CONTRACT FOR ELECTRIC SERVICES | ATTN KEN NOVAK, VP SOUTHEAST DIVISION | 9 STAFFORD RD | | PHENIX CITY | AL | 36870 | | $384,183.24 |
| CARBO Ceramics, Inc. | ALABAMA POWER COMPANY | CONTRACT FOR ELECTRIC SERVICE | ATTN ARLEN ADAMS | 9 STAFFORD RD | | PHENIX CITY | AL | 36870 | | $0.00 |
| CARBO Ceramics, Inc. | ALABAMA POWER COMPANY | LETTER OF INTENT DTD 3/27/2014 | ATTN ARLEN ADAMS | 9 STAFFORD RD | | PHENIX CITY | AL | 36870 | | $0.00 |
| CARBO Ceramics, Inc. | ALABAMA POWER COMPANY | CONTRACT FOR ELECTRIC SERVICE | ATTN ARLEN ADAMS | 9 STAFFORD RD | | PHENIX CITY | AL | 36870 | | $0.00 |
| CARBO Ceramics, Inc. | ALABAMA POWER COMPANY | ELECTRIC SYSTEM LEASE AGREEMENT DTD 9/23/2016 | ATTN ARLEN ADAMS | 9 STAFFORD RD | | PHENIX CITY | AL | 36870 | | $0.00 |
| CARBO Ceramics, Inc. | ALABAMA POWER COMPANY | ELECTRIC SYSTEM LEASE AGREEMENT | ATTN KEN NOVAK, VP SOUTHEAST DIVISION | 9 STAFFORD RD | | PHENIX CITY | AL | 36870 | | $0.00 |
| CARBO Ceramics, Inc. | ALABAMA POWER COMPANY | ROW CROSSING LICENSE AGREEMENT | ATTN SAM VANN BRANNON | 205 E BARBOUR ST | | EUFAULA | AL | 36027 | | $0.00 |
| CARBO Ceramics, Inc. | ALABAMA POWER COMPANY | ROW CROSSING LICENSE AGREEMENT | ATTN SAM VANN BRANNON | PO BOX 2641 | | BIRMINGHAM | AL | 35291 | | $0.00 |
| CARBO Ceramics, Inc. | ALABAMA POWER COMPANY | ROW CROSSING LICENSE AGREEMENT | ATTN SAM VANN BRANNON | 205 E BARBOUR ST | | EUFAULA | AL | 36027 | | $0.00 |
| CARBO Ceramics, Inc. | ALAR LEASING CORPORATION | LEASE | ATTN VICKEY L HANSEN, PRESIDENT | 9651 W 196TH ST | | MOKENA | IL | 60448 | | $0.00 |
| CARBO Ceramics, Inc. | ALL POINTS CAPITAL CORP | AMENDMENT TO LEASE DTD 6/22/2013 | ATTN PAUL SOTTNIK | C/O CAPITAL ONE EQUIPMENT LEASING & FINANCE | 275 BROAD HOLLOW RD | MELVILLE | NY | 11747 | | $0.00 |

CARBO Ceramics, Inc., et al
Assumed Contract Cure Schedule

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Est. Cure Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| CARBO Ceramics, Inc. | ALL POINTS CAPITAL CORP | PARTIAL ASSIGNMENT AND ASSUMPTION AGREEMENT | ATTN STEVEN RATNER, SVP/CATHERINE WILINSKI, SVP | 275 BROADHOLLOW RD | | MELVILLE | NY | 11747 | | $0.00 |
| CARBO Ceramics, Inc. | ALLUMS, BRANDON S | MINERAL LEASE AGREEMENT DTD 3/24/2014 | 101 WESLEY DR | | | ABBEVILLE | AL | 36310 | | $0.00 |
| CARBO Ceramics, Inc. | ALLUMS, KRISTIE CARTER & BRANDON S | MINERAL LEASE AGREEMENT DTD 3/24/2014 | 101 WESLEY DR | | | ABBEVILLE | AL | 36310 | | $0.00 |
| CARBO Ceramics, Inc. | ANDERSON, MABLE | ADDENDUM TO OPTION-LEASE AGREEMENT DTD 6/21/2016 | Section 5 Township 8 North Range 28, Henry County | | | N/A | Alabama | N/A | United States | $0.00 |
| CARBO Ceramics, Inc. | ANDERSONS INC, THE | LETTER OF INTENT DTD 3/19/2014 | ATTN CHUCK BROWN, VP SALES | PO BOX 119 | | MAUMEE | OH | 43537 | | $0.00 |
| CARBO Ceramics, Inc. | APPLE INC | REMOTE CONTROL SUPPLEMENT TO CONTRACT | 1 INFINITE LOOP | | | CUPERTINO | CA | 95104 | | $0.00 |
| CARBO Ceramics, Inc. | ARAMACO SERVICE COMP | JOINT RESEARCH AGREEMENT | ATTN SILVIA WALLANCE | 1200 SMITH ST, 27TH FL MAIL CENTER | | HOUSTON | TX | 77002 | | $0.00 |
| CARBO Ceramics, Inc. | ARAMACO SERVICE COMP | ASC CONTRACT NO A-0442-2018 AMENDMENT 02 | ATTN SILVIA WALLANCE | 1200 SMITH ST, 27TH FL MAIL CENTER | | HOUSTON | TX | 77002 | | $0.00 |
| CARBO Ceramics, Inc. | ARAMACO SERVICE COMP | ASC CONTRACT NO A-0442-2018 AMENDMENT 01 | ATTN SILVIA WALLANCE, ACCOUNTS PAYABLE | PO BOX 4313 | | HOUSTON | TX | 77210-4313 | | $0.00 |
| CARBO Ceramics, Inc. | ARAMARK UNIFORM SERVICES | UNIFORM SERVICE AGREEMENT | 115 N. FIRST STREET | | | BURBANK | CA | 91502 | | $0.00 |
| CARBO Ceramics, Inc. | ARAMCO SERVICES CO | AMENDMENT 1 | ATTN SILVIA WALLACE | PO BOX 4313 | | HOUSTON | TX | 77210-4313 | | $0.00 |
| CARBO Ceramics, Inc. | ARAMCO SERVICES CO | AMENDMENT 2 | ATTN SILVIA WALLACE | PO BOX 4313 | | HOUSTON | TX | 77210-4313 | | $0.00 |
| CARBO Ceramics, Inc. | ARAMCO SERVICES CO | JOINT RESEARCH AGREEMENT | ATTN SILVIA WALLACE | 2 ALLEN CTR, 1200 SMITH ST | 27TH FL MAIL CTR | HOUSTON | TX | 77002 | | $0.00 |
| CARBO Ceramics, Inc. | ARCILLA MINING & LAND COMPANY LLC | Mining Agreement | ATTN: TED S SMITH, PRESIDENT/CEO | 9474 HWY 57 | | MCINTYRE | GA | 31054 | | $0.00 |
| CARBO Ceramics, Inc. | ARCILLA MINING & LAND COMPANY LLC | Letter of Intent | ATTN: TED S SMITH, PRESIDENT/CEO | 9474 HWY 57 | | MCINTYRE | GA | 31054 | | $0.00 |
| CARBO Ceramics, Inc. | ARCILLA MINING & LAND COMPANY LLC | Pricing Letter Agreement | ATTN: TED S SMITH, PRESIDENT/CEO | 9474 HWY 57 | | MCINTYRE | GA | 31054 | | $0.00 |
| CARBO Ceramics, Inc. | ARCILLA MINING & LAND COMPANY LLC | Amended and Restated Mining Agreement | ATTN: TED S SMITH, PRESIDENT/CEO | 9474 HWY 57 | | MCINTYRE | GA | 31054 | | $0.00 |
| CARBO Ceramics, Inc. | ARCILLA MINING & LAND COMPANY LLC | Carriage Agreement | ATTN: TED S SMITH, PRESIDENT/CEO | 9474 HWY 57 | | MCINTYRE | GA | 31054 | | $0.00 |
| CARBO Ceramics, Inc. | ARCILLA MINING & LAND COMPANY LLC | Raw Materials - Amendment No 1 | ATTN: TED S SMITH, PRESIDENT/CEO | 9474 HWY 57 | | MCINTYRE | GA | 31054 | | $0.00 |
| CARBO Ceramics, Inc. | ARCILLA MINING & LAND COMPANY LLC | Raw Materials Agreement | ATTN: TED S SMITH, PRESIDENT/CEO | 9474 HWY 57 | | MCINTYRE | GA | 31054 | | $0.00 |

CARBO Ceramics, Inc., et al
Assumed Contract Cure Schedule

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Est. Cure Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| CARBO Ceramics, Inc. | ARCILLA MINING & LAND COMPANY LLC | Sublease of Mineral Rights | ATTN: TED S SMITH, PRESIDENT/CEO | 9474 HWY 57 | | MCINTYRE | GA | 31054 | | $0.00 |
| CARBO Ceramics, Inc. | ARKANSAS OKLAHOMA RAILROAD INC | AMENDMENT# 1 TO LEASE DTD 1/1/2016 | PO BOX 366 | | | WILBURTON | OK | 74578 | | $0.00 |
| CARBO Ceramics, Inc. | AT&T CORP | ADDENDUM TO MASTER AGREEMENT #8 | 55 CORPORATE DR | | | BRIDGEWATER | NJ | 08807 | | $1,414.25 |
| CARBO Ceramics, Inc. | AT&T CORP | MASTER AGREEMENT | 1 AT&T WAY | | | BEDMINSTER | NJ | 07921-0752 | | $0.00 |
| CARBO Ceramics, Inc. | AT&T CORP | MASTER AGREEMENT | 55 CORPORATE DR | | | BRIDGEWATER | NJ | 08807 | | $0.00 |
| CARBO Ceramics, Inc. | AT&T CORP | CORPORATE DIGITAL ADVANTAGE AGREEMENT | 55 CORPORATE DR | | | BRIDGEWATER | NJ | 08807 | | $0.00 |
| CARBO Ceramics, Inc. | AT&T MOBILITY | Law Agreement | P.O. BOX 9004 | | | CAROL STREAM | IL | 60197 | | $4,558.97 |
| CARBO Ceramics, Inc. | ATLANTA GAS LIGHT CO | NON-RESIDENTIAL GAS EXTENSION CONTRACT DTD 1/15/2004 | C/O LOCATION 1355 | PO BOX 4569 | | ATLANTA | GA | 30302-4569 | | $0.00 |
| CARBO Ceramics, Inc. | BABAR, ASIF | MASTER INDEPENDENT CONTRACTOR AGREEMENT | 1015 RABBIT ROVE PAGE | | | RICHMOND | TX | 77406 | | $0.00 |
| CARBO Ceramics, Inc. | BABAR, ASIF | AMENDMENT #1 TO AGREEMENT | 1015 RABBIT ROVE PAGE | | | RICHMOND | TX | 77406 | | $0.00 |
| CARBO Ceramics, Inc. | BANK OF AMERICA NA | SUBORDINATION NON DISTURBANCE & ATTORNMENT AGREEMENT | ATTN REAL ESTATE LOAN ADMINISTRATION | IL4-135-10-63 | 135 S LASALLE, 10 FL | CHICAGO | IL | 60603 | | $0.00 |
| CARBO Ceramics, Inc. | BANK OF MONTREAL | IRREVOCABLE STANDBY LETTER OF CREDIT DTD 1/6/2014 | 234 SIMCOE ST, 3RD FL | | | TORONTO | ON | M5T 1T4 | CANADA | $0.00 |
| CARBO Ceramics, Inc. | BEASLEY, RICKEY | WAREHOUSE LEASE AGREEMENT | 113 RIDGE RD | | | EUFAULA | AL | 36027 | | $0.00 |
| CARBO Ceramics, Inc. | BEASLEY, RICKEY | AMENDMENT NO 1 TO WAREHOUSE LEASE AGREEMENT | 113 RIDGE RD | | | EUFAULA | AL | 36027 | | $0.00 |
| CARBO Ceramics, Inc. | BELL, ALBERT | ADDENDUM TO OPTION-LEASE AGREEMENT DTD 6/21/2016 | Section 5 Township 8 North Range 28, Henry County | 0 | 0 N/A | Alabama | N/A | United States | | $0.00 |
| CARBO Ceramics, Inc. | BELL, WINSTON | ADDENDUM TO OPTION-LEASE AGREEMENT DTD 6/21/2016 | Section 5 Township 8 North Range 28, Henry County | 0 | 0 N/A | Alabama | N/A | United States | | $0.00 |
| CARBO Ceramics, Inc. | BELTWAY 8 #5 LP | LEASE AGREEMENT | C/O PANATTONI DEVELOPMENT COMPANY INC | ATTN DONALD E DENNIS JR | 10120 NORTWEST FWY, STE 250 | HOUSTON | TX | 77092 | | $0.00 |
| CARBO Ceramics, Inc. | BELTWAY 8 #5 LP | 1ST AMENDMENT TO LEASE AGREEMENT | C/O PANATTONI DEVELOPMENT COMPANY INC | ATTN DONALD E DENNIS JR | 10120 NORTWEST FWY, STE 250 | HOUSTON | TX | 77092 | | $0.00 |
| CARBO Ceramics, Inc. | BELTWAY 8 #5 LP | ESTOPPEL CERTIFICATE | C/O PANATTONI DEVELOPMENT COMPANY INC | ATTN DONALD E DENNIS JR | 10120 NORTWEST FWY, STE 250 | HOUSTON | TX | 77092 | | $0.00 |
| CARBO Ceramics, Inc. | BELTWAY 8 #5 LP | 1ST AMENDMENT TO LEASE AGREEMENT | C/O PANATTONI DEVELOPMENT COMPANY INC | ATTN DONALD E DENNIS JR | 10120 NORTWEST FWY, STE 250 | HOUSTON | TX | 77092 | | $0.00 |
| CARBO Ceramics, Inc. | BELTWAY 8 #5 LP | LEASE AGREEMENT, MULTI-TENANT FACILITY, BELTWAY 8 CORPORATE CENTRE | C/O PANATTONI DEVELOPMENT COMPANY INC | ATTN DONALD E DENNIS JR | 10120 NORTWEST FWY, STE 250 | HOUSTON | TX | 77092 | | $0.00 |
| CARBO Ceramics, Inc. | BELTWAY 8 HOUSTON #8 LLC | LEASE TERMINATION AGREEMENT | C/O PANATTONI DEVELOPMENT COMPANY INC | ATTN TODD D KING | 10681 HADDINGTON, STE 190 | HOUSTON | TX | 77043 | | $0.00 |

CARBO Ceramics, Inc., et al
Assumed Contract Cure Schedule

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Est. Cure Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| CARBO Ceramics, Inc. | BELTWAY 8 HOUSTON #8 LLC | OFFICE LEASE DTD | C/O PANATTONI DEVELOPMENT COMPANY INC | ATTN TODD D KING | 10681 HADDINGTON, STE 190 | HOUSTON | TX | 77043 | | $0.00 |
| CARBO Ceramics, Inc. | BELTWAY 8 HOUSTON #8 LLC | LEASE TERMINATION AGREEMENT DTD 9/28/2015 | C/O PANATTONI DEVELOPMENT COMPANY INC | ATTN TODD D KING | 10681 HADDINGTON, STE 190 | HOUSTON | TX | 77043 | | $0.00 |
| CARBO Ceramics, Inc. | BELTWAY 8 HOUSTON #8 LLC | OFFICE LEASE AGREEMENT DTD 12/10/2014 | C/O PANATTONI DEVELOPMENT COMPANY INC | ATTN TODD D KING | 10681 HADDINGTON, STE 190 | HOUSTON | TX | 77043 | | $0.00 |
| CARBO Ceramics, Inc. | BELTWAY 8 HOUSTON #8 LLC | 1ST AMENDMENT TO LEASE | C/O PANATTONI DEVELOPMENT COMPANY INC | ATTN TODD D KING | 10681 HADDINGTON, STE 190 | HOUSTON | TX | 77043 | | $0.00 |
| CARBO Ceramics, Inc. | BLUE CROSS AND BLUE SHIELD OF TEXAS | ADMINISTRATIVE SERVICES AGREEMENT | ATTN SONYA WILLIAMS | 1800 WEST LOOP S, STE 600 | | HOUSTON | TX | 77027 | | $0.00 |
| CARBO Ceramics, Inc. | BLUE CROSS AND BLUE SHIELD OF TEXAS | ADMINISTRATIVE SERVICES AGREEMENT | ATTN SONYA WILLIAMS | 1800 WEST LOOP S, STE 600 | | HOUSTON | TX | 77027 | | $0.00 |
| CARBO Ceramics, Inc. | BOND SAFEGUARD INSURANCE CO | GENERAL AGREEMENT OF INDEMNITY | 900 SOUTH FRONTAGE ROAD, SUITE 250 | | | WOODRIDGE | IL | 60517 | | $0.00 |
| CARBO Ceramics, Inc. | BOSTON INDEMNITY CO | GENERAL AGREEMENT OF INDEMNITY | 4 HIGH ST | | | NORTH ANDOVER | MA | 01845 | | $0.00 |
| CARBO Ceramics, Inc. | BRIAN HEUROHR | FARMLAND OCCUPANCY/LEASE AGREEMENT DYD 6/10/2011 | 3836 100TH AVE SW | PO BOX 80284 | | GLADSTONE | ND | 58630 | | $0.00 |
| CARBO Ceramics, Inc. | BRIDGE CAPITAL LEASING INC | NOTICE AND ACKNOWLEDGEMENT DTD 9/19/2014 | ATTN LEASE SERVICING | 7815 NW 148TH ST, 3-CMCRE | | LAKE OSWEGO | FL | 33016 | | $0.00 |
| CARBO Ceramics, Inc. | BUSINESS INTELLIGENCE ASSOCIATES INC | TOTAL DISCOVERY END USER LICENSE AGREEMENT | ATTN SHELLEY BARTLETT | 39 BROADWAY, 26TH FL | | NEW YORK | NY | 10006 | | $0.00 |
| CARBO Ceramics, Inc. | CADDO-BOSSIER PARISHES PORT COMMISSION | SERVICE AGREEMENT DTD 3/28/2008 | D/B/A PORT OF SHREVEPORT-BOSSIER | ATTN ERIC D ENGLAND, EXEC PORT DIR | PO BOX 52071 | SHREVEPORT | LA | 71135-2071 | | $0.00 |
| CARBO Ceramics, Inc. | CALFRAC WELL SERVICES LTD | SILO LEASE AND TRANSLOAD SERVICES AGREEMENT | 717 17TH ST, STE 1445 | | | DENVER | CO | 80202 | | $0.00 |
| CARBO Ceramics, Inc. | CANON FINANCIAL SERVICES INC | FAXABLE LEASE AGREEMENT | 14904 COLLECTIONS CENTER DR | | | CHICAGO | IL | 60693 | | $0.00 |
| CARBO Ceramics, Inc. | CANON FINANCIAL SERVICES INC | COPIER LEASE AGREEMENT | 158 GAITHER DR, STE 200 | | | MT LAUREL | NJ | 08054 | | $0.00 |
| CARBO Ceramics, Inc. | CAPITAL ONE EQUIPMENT FINANCE CORP | LEASE AGREEMENT DTD 7/29/2016 | 275 BROAD HOLLOW ROAD | | | MELVILLE | NY | 11747 | | $0.00 |
| CARBO Ceramics, Inc. | CAPITAL ONE EQUIPMENT FINANCE CORP | TRANSFER NOTICE DTD 10/4/2017 | 275 BROAD HOLLOW ROAD | | | MELVILLE | NY | 11747 | | $0.00 |
| CARBO Ceramics, Inc. | CAPITAL ONE EQUIPMENT FINANCE CORP | AMENDMENT TO LEASE DTD 6/22/2013 | 275 BROAD HOLLOW ROAD | | | MELVILLE | NY | 11747 | | $0.00 |
| CARBO Ceramics, Inc. | CAPITAL SERVICES INC | UCC FINANCING STATEMENT & ADDENDUM | PO BOX 1831 | | | AUSTIN | TX | 78767 | | $0.00 |
| CARBO Ceramics, Inc. | CAPITOL SERVICES | UCC FINANCING STATEMENT | 2094 MYRTLEWOOD DR | | | MONTGOMERY | AL | 36111 | | $0.00 |
| CARBO Ceramics, Inc. | CARLTON PHILIP COKER | EXPLORATION | 112 SALEM CHURCH RD | | | DAWSONVILLE | GA | 30534-5176 | | $0.00 |
| CARBO Ceramics, Inc. | CARTER, ANDREA | MINERAL LEASE AGREEMENT DTD 5/24/2013 | 6690 STATE HWY 95N | PO BOX 276 | | ABBEVILLE | AL | 36310 | | $0.00 |
| CARBO Ceramics, Inc. | CARTER, ANDREA | MEMORANDUM OF MINERAL LEASE | 6690 STATE HWY 95N | PO BOX 276 | | ABBEVILLE | AL | 36310 | | $0.00 |

CARBO Ceramics, Inc., et al
Assumed Contract Cure Schedule

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Est. Cure Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| CARBO Ceramics, Inc. | CARTER, JOHN F | ADDENDUM TO MINERAL-LEASE AGREEMENT DTD 3/13/2014 | 6690 STATE HWY 95N | | | Abbeville | AL | 36310 | United States | $0.00 |
| CARBO Ceramics, Inc. | CARTER, MICHAEL KEITH | ADDENDUM TO MINERAL-LEASE AGREEMENT DTD 3/13/2014 | 6690 STATE HWY 95N | | | ABBEVILLE | AL | 36310 | | $0.00 |
| CARBO Ceramics, Inc. | CARTER, MICHAEL KEITH | MEMORANDUM OF MINERAL LEASE | 6690 STATE HWY 95N | | | ABBEVILLE | AL | 36310 | | $0.00 |
| CARBO Ceramics, Inc. | CARTER, MICHAEL KEITH & KENNEDY, ANDREA CARTER | MINERAL LEASE AGREEMENT DTD 5/24/2013 | 6600 STATE HWY 95N | | | ABBEVILLE | AL | 36310 | | $0.00 |
| CARBO Ceramics, Inc. | CATERPILLAR FINANCIAL SERVICES CORP | FINANCE LEASE #2558438 | ATTN APRILLE PERRY, VARIABLE CONTRACTS ANALYST | 2120 W END AVE | | NASHVILLE | TN | 37203 | | $0.00 |
| CARBO Ceramics, Inc. | CATERPILLAR FINANCIAL SERVICES CORP | FINANCE LEASE #2165379 | ATTN ASHLIE M JOHNSON, DOC MGR | 2120 W END AVE | | NASHVILLE | TN | 37203 | | $0.00 |
| CARBO Ceramics, Inc. | CATERPILLAR FINANCIAL SERVICES CORP | FINANCE LEASE #2173624 | ATTN ASHLIE M JOHNSON, DOC MGR | 2120 W END AVE | | NASHVILLE | TN | 37203 | | $0.00 |
| CARBO Ceramics, Inc. | CATERPILLAR FINANCIAL SERVICES CORP | TAX LEASE #2206513 | ATTN MARCUS LOUPE, DOC MGR | 2120 W END AVE | | NASHVILLE | TN | 37203 | | $0.00 |
| CARBO Ceramics, Inc. | CELLENCOR | Microwave Rental Agreement | 2701 SE CONVENIENCE BLVD, STE 4 | | | ANKENY | IA | 50021 | | $0.00 |
| CARBO Ceramics, Inc. | CENTRAL OF GEORGIA RAILROAD CO | SIDING AGREEMENT | ATTN DIVISION SUPERINTENDENT | 1200 PEACHTREE ST NE, 12TH FL | | ATLANTA | GA | 30309-3579 | | $0.00 |
| CARBO Ceramics, Inc. | CENTRAL OF GEORGIA RAILROAD CO | LEASE DTD 5/16/2013 | ATTN DIVISION SUPERINTENDENT | 1200 PEACHTREE ST NE, 12TH FL | | ATLANTA | GA | 30309-3579 | | $0.00 |
| CARBO Ceramics, Inc. | CENTRAL OF GEORGIA RAILROAD CO | SIDING AGREEMENT | NORFOLK SOUTHERN RAILWAY CO | ATTN DIV SUPERINTENDENT | 1200 PEACHTREE ST NE, 12TH FL | ATLANTA | GA | 30309-3579 | | $0.00 |
| CARBO Ceramics, Inc. | CFR CHEMICALS | EQUIPMENT LEASE | 1920 525 8TH AVE SW | | | CALGARY | AB | T2P 1G1 | CANADA | $0.00 |
| CARBO Ceramics, Inc. | CHAMPION RESOURCES LLC | AMENDMENT #1 TO THE LEASE AGREEMENT | ATTN ROY J POCHE & RODNEY J VERRET | PO BOX 28 | | ST MARTINVILLE | LA | 70582 | | $7,754.88 |
| CARBO Ceramics, Inc. | CHAMPION RESOURCES LLC | AMENDMENT #1 TO THE LEASE AGREEMENT | ATTN ROY J POCHE & RODNEY J VERRET | PO BOX 28 | | ST MARTINVILLE | LA | 70582 | | $0.00 |
| CARBO Ceramics, Inc. | CHICAGO TITLE INSURANCE COMPANY | OWNERS POLICY OF TITLE INSURANCE DTD 9/7/2012 | ATTN CLAIMS DEPARTMENT | PO BOX 45023 | | JACKSONVILLE | FL | 32232-5023 | | $0.00 |
| CARBO Ceramics, Inc. | CIGNA LIFE INSURANCE COMPANY | ADOPTION AGREEMENT#001-03 | PO BOX 2975 | | | HARTFORD | CT | 06104 | | $0.00 |
| CARBO Ceramics, Inc. | CITY OF LEDUC, THE | RAILWAY JOINT LEAD TRACKAGE AGREEMENT & PRIVATE SIDING AGREEMENT | C/O PLANNING AND ENGINEERING SERVICES | # 1 ALEXANDER PARK | | LEDUC | AB | T9E 4C4 | CANADA | $47.42 |
| CARBO Ceramics, Inc. | CLNA CAROLINA COASTAL RAILWAY INC | NON-HAZARDOUS EMPTY CAR STORAGE AGREEMENT | ATTN DOUG GOLDEN, PRES | 116N BELLEVUE AVE, STE 206 | | LANGHORNE | PA | 19047 | | $0.00 |
| CARBO Ceramics, Inc. | COKER, CARLTON PHILIP | EXPLORATION PURCHASE AGREEMENT | 112 SALEM CHURCH RD | | | DAWSONVILLE | GA | 30534-5176 | | $0.00 |

CARBO Ceramics, Inc., et al
Assumed Contract Cure Schedule

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Est. Cure Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| CARBO Ceramics, Inc. | COLUMBUS & OHIO RIVER RAIL ROAD COMPANY, THE | CONTRACTOR RIGHT OF ENTRY LICENSE AGREEMENT | ATTN JOHN HILBORN | 4349 EASTON WAY, STE 110 | | COLUMBUS | OH | 43219 | | $0.00 |
| CARBO Ceramics, Inc. | COLUMBUS & OHIO RIVER RAIL ROAD COMPANY, THE | PRIVATE SIDETRACK AGREEMENT | C/O GENESSE & WYOMING RAILROAD SERVICES INC | ATTN REAL ESTATE DEPT | 13901 SUTTON PARK DR, STE 160 | JACKSONVILLE | FL | 32224 | | $0.00 |
| CARBO Ceramics, Inc. | CONTINENTAL RAIL LEASING CORP | LEASE PROPOSAL DTD 4/1/2014 | 2929 E. Commercial Blvd. | Suite PH-D | | Fort Lauderdale | FL | 33308 | United States | $0.00 |
| CARBO Ceramics, Inc. | COOPER, FRED M AND DONNA | MINERAL LEASE AGREEMENT DTD 9/2/2014 | 214 COOPER RD | | | CLAYTON | AL | 36016 | | $0.00 |
| CARBO Ceramics, Inc. | CPA GLOBAL LLC | FOUNDATIONSHIP ORDER | ATTN ALEX CREGAN, PRES | 2318 MILL RD, STE 1200 | | ALEXANDRIA | VA | 22314 | | $6,481.28 |
| CARBO Ceramics, Inc. | CRAWFORD GRADING & PIPELINE INC | SUBLEASE AGREEMENT DTD 3/14/2016 | 1505 DUNLAP RD | | | LUTHERSVILLE | GA | 30251 | | $0.00 |
| CARBO Ceramics, Inc. | CREDANT TECHNOLOGIES INC | END USER LICENSE AGREEMENT | ATTN DOUG LINEBARGER, GEN COUNSEL | 15303 DALLAS PKWY, STE 1420 | | ADDISON | TX | 75001 | | $0.00 |
| CARBO Ceramics, Inc. | DE LAGE LANDEN FINANCIAL SERVICES INC | EQUIPMENT LEASE AGREEMENT | 1111 OLD EAGLE RD | | | WAYNEE | PA | 19087 | | $0.00 |
| CARBO Ceramics, Inc. | DEVELOPMENT AUTHORITY OF WILKINSON COUNTY | BOND PURCHASE LOAN AGREEMENT | ATTN PRESIDENT | PO BOX 413 | | IRWINTON | GA | 31042 | | $0.00 |
| CARBO Ceramics, Inc. | DEVELOPMENT AUTHORITY OF WILKINSON COUNTY | AGENCY AGREEMENT | ATTN PRESIDENT | PO BOX 413 | | IRWINTON | GA | 31042 | | $0.00 |
| CARBO Ceramics, Inc. | DEVELOPMENT AUTHORITY OF WILKINSON COUNTY | DEED TO SECURE DEBT, ASSIGNMENT OF RENTS AND LEASES AND SECURITY AGREEMENT | ATTN PRESIDENT | PO BOX 413 | | IRWINTON | GA | 31042 | | $0.00 |
| CARBO Ceramics, Inc. | DEVELOPMENT AUTHORITY OF WILKINSON COUNTY | OPTION AGREEMENT | ATTN PRESIDENT | PO BOX 413 | | IRWINTON | GA | 31042 | | $0.00 |
| CARBO Ceramics, Inc. | DEVELOPMENT AUTHORITY OF WILKINSON COUNTY | SECOND AMENDED AND RESTATED MEMORANDUM OF UNDERSTANDING | ATTN PRESIDENT | PO BOX 413 | | IRWINTON | GA | 31042 | | $0.00 |
| CARBO Ceramics, Inc. | DEVELOPMENT AUTHORITY OF WILKINSON COUNTY | BOND PURCHASE LOAN AGREEMENT | ATTN PRESIDENT | PO BOX 413 | | IRWINTON | GA | 31042 | | $0.00 |
| CARBO Ceramics, Inc. | DEVELOPMENT AUTHORITY OF WILKINSON COUNTY | DEED TO SECURE DEBT ASSIGNMENT OF RENTS AND LEASES AND SECURITY AGREEMENT | ATTN PRESIDENT | PO BOX 413 | | IRWINTON | GA | 31042 | | $0.00 |
| CARBO Ceramics, Inc. | DEVELOPMENT AUTHORITY OF WILKINSON COUNTY | 2ND AMENDED AND RESTATED MEMORANDUM OF UNDERSTANDING | ATTN PRESIDENT | PO BOX 413 | | IRWINTON | GA | 31042 | | $0.00 |
| CARBO Ceramics, Inc. | DEVELOPMENT AUTHORITY OF WILKINSON COUNTY | 2ND AMENDED & RESTATED MEMORANDUM OF UNDERSTANDING | ATTN PRESIDENT | PO BOX 413 | | IRWINTON | GA | 31042 | | $0.00 |
| CARBO Ceramics, Inc. | DISCOVERY BENEFITS INC | BUSINESS ASSOCIATE AGREEMENT | 4321 20TH AVE S | | | FARGO | ND | 58103 | | $0.00 |
| CARBO Ceramics, Inc. | DIXIE INVESTMENTS, L.P. | LETTER OF INTENT FOR LEASE DTD 3/4/2014 | ATTN RICK BEASLEY | 113 RIDGE RD | Not Execcutory | EUFAULA | AL | 36027 | | $0.00 |
| CARBO Ceramics, Inc. | DIXIE INVESTMENTS, L.P. | PROPOSAL FOR TERM EXTENTION OF LEASE AGREEMENT DTD 2/16/2016 | ATTN RICK BEASLEY | 113 RIDGE RD | Not Execcutory | EUFAULA | AL | 36027 | | $0.00 |
| CARBO Ceramics, Inc. | DIXIE INVESTMENTS, L.P. | WAREHOUSE LEASE AGREEMENT EXTENSION | ATTN RICK BEASLEY | 113 RIDGE RD | Not Execcutory | EUFAULA | AL | 36027 | | $0.00 |
| CARBO Ceramics, Inc. | DUN & BRADSTREET INC | CREDIT MONITORING LICENSE AGREEMENT | ATTN LESLEE ZIPPER | 103 JFK PKWY | | SHORT HILLS | NJ | 07078 | | $0.00 |

CARBO Ceramics, Inc., et al
Assumed Contract Cure Schedule

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Est. Cure Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| CARBO Ceramics, Inc. | EMC CORP | BASIC EVALUATION AGREEMENT | ATTN CHANTAL VANLEDE LYON, SR DIR MANAGING COUNSEL | 176 S ST | | HOPKINTON | MA | 01748 | | $0.00 |
| CARBO Ceramics, Inc. | ENERGY INTELLIGENCE GROUP INC | GLOBAL ENTERPRISE LICENSE AGREEMENT | ATTN DEBORAH BROWN | 5 EAST 37TH ST, 5TH FLR | | NEW YORK | NY | 10016 | | $0.00 |
| CARBO Ceramics, Inc. | EPCO INC | MINING & STOCKPILING AGREEMENT | ATTN HAL JONES | PO BOX 278 | | EUFAULA | AL | 36072 | | $0.00 |
| CARBO Ceramics, Inc. | EVERYTHINGBENEFITS | SUBSCRIPTION AGREEMENT DTD 3/16/2020 | 1253 SPRINGFIELD AVE., #350 | | | NEW PROVIDENCE | NJ | 07974 | | $0.00 |
| CARBO Ceramics, Inc. | FIBERTOWN DC LLC | CO-LOCATION LICENSE AGREEMENT | ATTN BUSINESS OFFICE | 2501 EARL RUDDER FRWY S | Not Executory | COLLEGE STATION | TX | 77845 | | $10,786.84 |
| CARBO Ceramics, Inc. | FIBERTOWN DC LLC | DATA CENTER SERVICES AMENDMENT DTD 2/3/2015 | ATTN AMY BAXTER | 2501 EARL RUDDER FRWY S | Not Executory | COLLEGE STATION | TX | 77845 | | $0.00 |
| CARBO Ceramics, Inc. | FIRST AMERICAN TITLE INSURANCE CO | AGREEMENT FOR SERVICES DTD 9/8/2016 | 666 THIRD AVE 5TH FLOOR | | | NEW YORK | NY | 10017 | | $0.00 |
| CARBO Ceramics, Inc. | FIRST AMERICAN TITLE INSURANCE CO | AGREEMENT FOR SERVICES DTD 9/1/2016 | 666 THIRD AVE 5TH FLOOR | | | NEW YORK | NY | 10017 | | $0.00 |
| CARBO Ceramics, Inc. | FIRST AMERICAN TITLE INSURANCE CO | LOAN POLICY OF TITLE INSURANCE DTD 12/19/2016 | 666 THIRD AVE 5TH FLOOR | | | NEW YORK | NY | 10017 | | $0.00 |
| CARBO Ceramics, Inc. | FIRST AMERICAN TITLE INSURANCE CO | OWNERS TITLE INSURANCE POLICY | ATTN CLAIMS NATIONAL INTAKE CENTER | 1 FIRST AMERICAN WAY | | SANTA ANA | CA | 92707 | | $0.00 |
| CARBO Ceramics, Inc. | FIRST AMERICAN TITLE INSURANCE CO | ALTA OWNERS POLICY DTD 5/19/2006 | ATTN CLAIMS NATIONAL INTAKE CENTER | 1 FIRST AMERICAN WAY | | SANTA ANA | CA | 92707 | | $0.00 |
| CARBO Ceramics, Inc. | FIRST AMERICAN TITLE INSURANCE CO | SURVEY CERTIFICATE DTD 4/11/2006 | ATTN G K PRATT MUNSON | 306 WEST MAIN ST | | NEW IBERIA | LA | 70560 | | $0.00 |
| CARBO Ceramics, Inc. | FIRST AMERICAN TITLE INSURANCE CO | COMMITEMENT FOR TITLE INSURANCE | C/O BADGER TITLE | 114 S CENTRAL AVE | | MARSHFIELD | WI | 54449 | | $0.00 |
| CARBO Ceramics, Inc. | FLEXERA SOFTWARE LLC | MASTER SOFTWARE LICENSE & SERVICES AGREEMENT | ATTN LEGAL DEPT | 300 PARK BLVD, STE 500 | | ITASCA | IL | 60143 | | $0.00 |
| CARBO Ceramics, Inc. | FORBES INC | SMALL COMPANIES LOGO LICENCING AGREEMENT | ATTN FAIZA JAVAID | 60 FIFTH AVE | | NEW YORK | NY | 10011 | | $0.00 |
| CARBO Ceramics, Inc. | FOX RUN TRANSPORT LLC | STORAGE FACILITY AND TRANSLOADING SERVICES AGREEMENT | ATTN DAN NORWOOD | 11202 38TH ST S | | HORACE | ND | 58047 | | $0.00 |
| CARBO Ceramics, Inc. | FRANCIS PROPERTY MANAGEMENT INC | APARTMENT LEASE CONTRACT DTD 1/7/2015 | D/B/A SAN BRISAS APARTMENT HOMES | ATTN GRACE ROCHA | 2020 ELDRIDGE PKWY | HOUSTON | TX | 77077 | | $0.00 |
| CARBO Ceramics, Inc. | FRANCIS PROPERTY MANAGEMENT INC | APARTMENT LEASE CONTRACT DTD 8/11/2015 | D/B/A SAN BRISAS APARTMENT HOMES | ATTN GRACE ROCHA | 2020 ELDRIDGE PKWY | HOUSTON | TX | 77077 | | $0.00 |
| CARBO Ceramics, Inc. | FRANCIS PROPERTY MANAGEMENT INC | APARTMENT LEASE CONTRACT DTD 7/8/2016 | D/B/A SAN BRISAS APARTMENT HOMES | ATTN GRACE ROCHA | 2020 ELDRIDGE PKWY | HOUSTON | TX | 77077 | | $0.00 |
| CARBO Ceramics, Inc. | FRANCIS PROPERTY MANAGEMENT INC | APARTMENT LEASE CONTRACT DTD 2/1/2016 | D/B/A SAN BRISAS APARTMENT HOMES | ATTN GRACE ROCHA | 2020 ELDRIDGE PKWY | HOUSTON | TX | 77077 | | $0.00 |

CARBO Ceramics, Inc., et al
Assumed Contract Cure Schedule

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Est. Cure Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| CARBO Ceramics, Inc. | FRANCIS PROPERTY MANAGEMENT INC | APARTMENT LEASE CONTRACT DTD 1/7/2015 | D/B/A SAN BRISAS APARTMENT HOMES | ATTN GRACE ROCHA | 2020 ELDRIDGE PKWY | HOUSTON | TX | 77077 | | $0.00 |
| CARBO Ceramics, Inc. | FRANCIS PROPERTY MANAGEMENT INC | APARTMENT LEASE CONTRACT DTD 10/2/2013 | D/B/A SAN BRISAS APARTMENT HOMES | ATTN GRACE ROCHA | 2020 ELDRIDGE PKWY | HOUSTON | TX | 77077 | | $0.00 |
| CARBO Ceramics, Inc. | FRANCIS PROPERTY MANAGEMENT INC | APARTMENT LEASE CONTRACT DTD 8/11/2015 | D/B/A SAN BRISAS APARTMENT HOMES | ATTN GRACE ROCHA | 2020 ELDRIDGE PKWY | HOUSTON | TX | 77077 | | $0.00 |
| CARBO Ceramics, Inc. | GEORGIA DEPT OF NATURAL RESOURSES | SURFACE MINING LAND USE APPLICATION APPROVAL LETTER DTD 6/2/2015 | ENVIRONMENTAL PROTECTION DIV | SURFACE MINING UNIT | 4244 INTERNATIONAL PKWY, STE 104 | ATLANTA | GA | 30354 | | $0.00 |
| CARBO Ceramics, Inc. | GLOBAL SOFTWARE INC | PERPETUAL LICENSE AGREEMENT | 3201 BEECHLEAF CT, STE 170 | | | RALEIGH | NC | 27604 | | $0.00 |
| CARBO Ceramics, Inc. | GRAINGER | Supplier Agreement | P.O. BOX 419267 | | | KANSAS CITY | MO | 64141 | 0 | $13,604.86 |
| CARBO Ceramics, Inc. | GRAINGER | NDA | P.O. BOX 419267 | | | KANSAS CITY | MO | 64141 | 0 | $3,149.26 |
| CARBO Ceramics, Inc. | GREEN UNION I TRUST | AMENDMENT TO LEASE DTD 6/22/2013 | C/O WELLS FARGO DELAWARE TRUST CO NA, TRUSTEE | 919 NORTH MARKET ST, STE 1600 | | WILMINGTON | DE | 19801 | | $0.00 |
| CARBO Ceramics, Inc. | GREEN UNION IV TRUST | NOTICE AND ACKNOWLEDGEMENT DTD 8/28/2014 | C/O WELLS FARGO DELAWARE TRUST CO NA, TRUSTEE | 919 NORTH MARKET ST, STE 1600 | | WILMINGTON | DE | 19801 | | $0.00 |
| CARBO Ceramics, Inc. | GREENBRIER MANAGEMENT SERVICES LLC (Logistics) | LOGISTICS SERVICES AGREEMENT | ATTN DAN WEILER | ONE CENTERPOINTE DR, STE 200 | Not Executory | LAKE OSWEGO | OR | 97035 | | $0.00 |
| CARBO Ceramics, Inc. | GRIER, JOE | OPTION-LEASE AGREEMENT DTD 9/18/2012 | 205 LEE RD | | | EUFAULA | GA | 36027 | | $0.00 |
| CARBO Ceramics, Inc. | HALLIBURTON ARGENTINA SA | PURCHASE AGREEMENT | ATTN JULIAN MARQUINEZ | CALLE MAIPU 942, 14 FL | | BUENOS AIRES | | | ARGENTINA | $0.00 |
| CARBO Ceramics, Inc. | HALLIBURTON ENERGY SERVICES INC | PROPPANT SUPPLY AGREEMENT | ATTN CATEGORY MGR-PROPPANTS | 10200 BELLAIRE BLVD, STE 2NE | | HOUSTON | TX | 77072 | | $0.00 |
| CARBO Ceramics, Inc. | HALLIBURTON ENERGY SERVICES INC | MASTER PURCHASE AGREEMENT FOR GOODS AND SERVICES | ATTN DIRECTOR OF PRODUCTION ENHANCEMENT SUPPLY CHAIN | 3000 N SAM HOUSTON PKWY EAST | | HOUSTON | TX | 77032 | | $0.00 |
| CARBO Ceramics, Inc. | HALLIBURTON ITALIANA SRL A SOCIO UNICO | AFFILIATE ADDENDUM TO MASTER PURCHASE AGREEMENT (PROPPANT SUPPLY AGREEMENT) | ATTN EVASIO D'ANCONA, OPERATIONS MGR | C DA S ELENA | | ORTONA | | 66026 | ITALY | $0.00 |
| CARBO Ceramics, Inc. | HALLIBURTON SERVICOS LTDA | CONSIGNMENT AGREEMENT DTD 1/1/2004 | RUA DA ASSEMBLEIA #66 CENTRO | | | RIO DE JANEIRO | | | BRAZIL | $0.00 |
| CARBO Ceramics, Inc. | HALLIBURTON WORLDWIDE LTD | DEFERRED PAYMENT AGREEMENT | PO BOX 2721 | | | RUWI | | 112 | OMAN | $0.00 |
| CARBO Ceramics, Inc. | HALLIBURTON WORLDWIDE LTD | CONSIGNMENT AGREEMENT | PO BOX 2721 | | | RUWI | | 112 | OMAN | $0.00 |

CARBO Ceramics, Inc., et al
Assumed Contract Cure Schedule

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Est. Cure Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| CARBO Ceramics, Inc. | HAN KUN LAW OFFICES | Law Agreement | STE 906 1 EAST CHANG AN AVENUE | | | BEIJING | | 100738 | CHINA | $5,356.02 |
| CARBO Ceramics, Inc. | HANOVER INSURANCE COMPANY | GENERAL AGREEMENT OF INDEMNITY | ATTN BOND DEPT | 440 LINCOLN ST | | WORCESTER | MA | 01653 | | $0.00 |
| CARBO Ceramics, Inc. | HANOVER INSURANCE COMPANY | FINANCIAL GUARANTEE BOND #1974911 | ATTN BOND DEPT | 440 LINCOLN ST | | WORCESTER | MA | 01653 | | $0.00 |
| CARBO Ceramics, Inc. | HANOVER INSURANCE COMPANY | FINANCIAL GUARANTEE BOND #1974909 | ATTN BOND DEPT | 440 LINCOLN ST | | WORCESTER | MA | 01653 | | $0.00 |
| CARBO Ceramics, Inc. | HENSLEY, CAROL | AMENDMENT NO 1 TO WAREHOUSE LEASE AGREEMENT | ATTN RICKEY BEASLEY | 113 RIDGE RD | | EUFAULA | AL | 36027 | | $0.00 |
| CARBO Ceramics, Inc. | HENSLEY, CAROL | AMENDMENT #1 | ATTN RICKEY BEASLEY | 113 RIDGE RD | | EUFAULA | AL | 36027 | | $0.00 |
| CARBO Ceramics, Inc. | HOLCH, STEEN | APPROVAL OF ASSIGNMENT DTD 12/15/1998 | NIRO A/S GLADSAXEVEJ 305 KD-2860 | | | SOEBORG | | | DENMARK | $0.00 |
| CARBO Ceramics, Inc. | IBERIA PARISH AIRPORT AUTHORITY | LEASE AGREEMENT | ATTN AIRPORT DIR | 1404 HANGAR DR | | NEW IBERIA | LA | 70560 | | $0.00 |
| CARBO Ceramics, Inc. | IC STAFFING SOLUTIONS LLC | TEMPORARY TO PERMANENT PLACEMENT SERVICES AGREEMENT | C/O ARA INC | PO BOX 603739 | | CHARLOTTE | NC | 28260-3739 | | $0.00 |
| CARBO Ceramics, Inc. | IMERYS OILFIELD MINERALS INC | SETTLEMENT AGREEMENT | ATTN ROXANE E CENATEMPO, GLOBAL CHIEF IP OFFICER | 100 MANSELL CT E, STE 300 | | ROSWELL | GA | 30076 | | $0.00 |
| CARBO Ceramics, Inc. | IRONSHORE INDEMNITY INC | GENERAL AGREEMENT OF INDEMNITY | PO BOX 3407 | | | NEW YORK | NY | 10008 | | $0.00 |
| CARBO Ceramics, Inc. | IRONSHORE SPECIALTY INSURANCE CO | GENERAL AGREEMENT OF INDEMNITY | ONE RIVERWAY, STE 400 | | | HOUSTON | TX | 77056 | | $0.00 |
| CARBO Ceramics, Inc. | JAIX LEASING COMPANY | MASTER RAILCAR LEASE AGREEMENT | TWO N RIVERSIDE PLAZA, STE 1300 | | | CHICAGO | IL | 60606 | | $0.00 |
| CARBO Ceramics, Inc. | JENKINS COUNTY GEORGIA | ECONOMIC DEVELOPMENT AGREEMENT DTD 11/1/2012 | ATTN EXECUTIVE DIRECTOR | 584 COTTON AVE | | MILLEN | GA | 30442 | | $0.00 |
| CARBO Ceramics, Inc. | JENKINS COUNTY GEORGIA | MEMORANDIUM OF UNDERSTANDING | ATTN EXECUTIVE DIRECTOR | 584 COTTON AVE | | MILLEN | GA | 30442 | | $0.00 |
| CARBO Ceramics, Inc. | JESSIE MAC VICKERS & BRENDA VICKERS | MINERAL LEASE AGREEMENT DTD 7/30/2014 | 2712 HWY 131 | | | CLAYTON | AL | 36016 | | $0.00 |
| CARBO Ceramics, Inc. | JGS ALL AMERICAN CONSTRUCTION LLC | SUBLEASE AGREEMENT | ATTN GABRIEL SOLIS | 4416 BRIARWOOD AVE, STE 110 PMB 200 | | MIDLAND | TX | 79707 | | $0.00 |
| CARBO Ceramics, Inc. | JONES, LELAGENE W | MINERAL LEASE AGREEMENT | 507 ST. FRANCES RD | | | EUFAULA | AL | 36027 | | $0.00 |
| CARBO Ceramics, Inc. | JONES, LELAGENE W | MEMORANDUM OF MINERAL-LEASE | 507 ST. FRANCES RD | | | EUFAULA | AL | 36027 | | $0.00 |
| CARBO Ceramics, Inc. | JP MORGAN CHASE | MERCHANT APPLICATION AND AGREEMENT | ATTN: JULIE ALFONSO | 712 MAIN ST | | HOUSTON | TX | 77002 | | $0.00 |
| CARBO Ceramics, Inc. | KENNEDY, ANDREA C | MINERAL LEASE AGREEMENT | 6690 STATE HWY 95N | | | ABBEVILLE | AL | 36310 | | $0.00 |
| CARBO Ceramics, Inc. | KENTICO SOFTWARE LLC | LICENSE AGREEMENT | ATTN ERIC C WEBB, VP GLOBAL SALES | 379 AMHERST ST, #375 | | NASHUA | NH | 03063 | | $0.00 |
| CARBO Ceramics, Inc. | KOMATSU FINANCIAL LP | ADVANTAGE MASTER EQUIPMENT LEASE | 1701 W GOLF | | | ROLLING MEADOWS | IL | 60008 | | $0.00 |
| CARBO Ceramics, Inc. | KRISTIE CARTER ALLUMS | MINERAL LEASE AGREEMENT DTD 3/24/2014 | 100 WESLEY DR | | | ABBEVILLE | AL | 36310 | | $0.00 |

CARBO Ceramics, Inc., et al
Assumed Contract Cure Schedule

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Est. Cure Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| CARBO Ceramics, Inc. | KRONOS SAASHR INC | ORDER FORM FOR BENEFITS CENTER DTD 6/26/2019 | 3040 ROUTE 22 WEST, STE 200 | | | BRANCHBURG | NJ | 08876 | | $0.00 |
| CARBO Ceramics, Inc. | LeaseQuery | Subscription Agreement | 3 Ravinia Dr. NE | Suite P7 | | Atlanta | GA | 30346 | | $0.00 |
| CARBO Ceramics, Inc. | LEVEL 3 COMMUNICATIONS LLC | WAN Network | P.O. BOX 910182 | | | DENVER | CO | 80291-0182 | | $9,304.13 |
| CARBO Ceramics, Inc. | LEWIS RESOURCE MANAGEMENT LLC | AMENDMENT #2 TO SUBLEASE AGREEMENT | 10101 REUNION PL, STE 1000 | | | SAN ANTONIO | TX | 78216 | | $0.00 |
| CARBO Ceramics, Inc. | LEWIS RESOURCE MANAGEMENT LLC | SUBLEASE AGREEMENT | 10101 REUNION PL, STE 1000 | | | SAN ANTONIO | TX | 78216 | | $0.00 |
| CARBO Ceramics, Inc. | LEXON INSURANCE CO | GENERAL AGREEMENT OF INDEMNITY | 12890 LEBANON ROAD | | | MOUNT JULIET | TN | 37122 | | $0.00 |
| CARBO Ceramics, Inc. | LEXON INSURANCE CO | SURETY BOND | 12890 LEBANON ROAD | | | MOUNT JULIET | TN | 37122 | | $0.00 |
| CARBO Ceramics, Inc. | LIANG GUO PING (ROBIN LIANG) | Independent Contractor Agreement | ROOM 2-2-1601, RUN FU GUO JI HUA | | | CHENGDU CITY | | 610094 | CHINA | $25,256.86 |
| CARBO Ceramics, Inc. | LOCKTON FINANCIAL ADVISORS LLC | CONSULTING SERVICES AGREEMENT | 444 WEST 47TH STREET, SUITE 900 | | | KANSAS CITY | MO | 64112 | | $0.00 |
| CARBO Ceramics, Inc. | LOWE, LOUSIE | ADDENDUM TO OPTION-LEASE AGREEMENT DTD 6/21/2016 | Section 5 Township 8 North Range 28, Henry County | | | N/A | Alabama | N/A | United States | $0.00 |
| CARBO Ceramics, Inc. | MAGNUM, JOE O | WARRANTY DEED | 111 W WASHINGTON ST | PO BOX 1327 | | MILLEDGEVILLE | GA | 31059-1327 | | $0.00 |
| CARBO Ceramics, Inc. | MARIETTA INDUSTRIAL ENTERPRISES ICN | FINANCING AGREEMENT DTD 8/8/2017 | ATTN SCOTT ELLIOT | 17943 OH-7 | | MARIETTA | OH | 45750 | | $0.00 |
| CARBO Ceramics, Inc. | METABANK | SUBORDINATION AND NONDISTURBANCE AGREEMENT DTD 8/14/2015 | ATTN MARK A HEFFERNAN | 4848 86TH ST | | URBANDALE | IA | 503222 | | $0.00 |
| CARBO Ceramics, Inc. | MINERACAO CURIMBABA LTDA | SETTLEMENT AGREEMENT | ATTN SEBASTIAO CURIMBABA | POCOS DE CALDAS MG | | | | | BRAZIL | $0.00 |
| CARBO Ceramics, Inc. | MIXON, WILLIAM M SR & RB JR | ASSIGNMENT, ASSUMPTION, CONSENT AND RELEASE AGREEMENT DTD 8/10/2015 | 227 Dedrick Rd. | | | McIntyre | GA | 31054 | United States | $0.00 |
| CARBO Ceramics, Inc. | NANODYNAMICS INC | MATERIAL TRANSFER, DEVELOPMENT AND PROPRIETARY RIGHTS AGREEMENT | ATTN KEITH A BLAKELY, CEO | 901 FUHRMANN BLVD | | BUFFALO | NY | 14203 | | $0.00 |
| CARBO Ceramics, Inc. | NATIONAL TECHNOLOGY & ENGINEERING SOLUTIONS OF SANDIA LLC | PATENT AND SOFTWARE LICENSE# 18-11290 | ATTN LICENSING AGREEMENTS ADMINISTRATOR | PO BOX 5800, MS 0114 | | ALBUQUERQUE | NM | 87185-0114 | | $0.00 |
| CARBO Ceramics, Inc. | NATIONAL TECHNOLOGY & ENGINEERING SOLUTIONS OF SANDIA LLC | PATENT AND SOFTWARE LICENSE #18-11290 | F/K/A SANDIA CORPORATION | ATTN ROBERT WESTERVELT | PO BOX 5800, MS 0114 | ALBUQUERQUE | NM | 87185 | | $0.00 |
| CARBO Ceramics, Inc. | NAVPORT LLC | SOFTWARE SUBSCRIPTION DTD 12/15/2015 | ATTN CODY BAUER | 4000 CHEMICAL RD, STE 420 | | PLYMOUTH MEETING | PA | 19462 | | $0.00 |
| CARBO Ceramics, Inc. | NELSON FAMILY PARTNERS | WAREHOUSE LEASE AGREEMENT | ATTN RICKEY BEASLEY | 113 RIDGE RD | | EUFAULA | AL | 36027 | | $0.00 |
| CARBO Ceramics, Inc. | NELSON FAMILY PARTNERS | AMENDMENT #1 | ATTN RICKEY BEASLEY | 113 RIDGE RD | | EUFAULA | AL | 36027 | | $0.00 |
| CARBO Ceramics, Inc. | NELSON FAMILY PARTNERS | AMENDMENT NO 1 TO WAREHOUSE LEASE AGREEMENT | ATTN RICKEY BEASLEY | 113 RIDGE RD | | EUFAULA | AL | 36027 | | $0.00 |

CARBO Ceramics, Inc., et al
Assumed Contract Cure Schedule

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Est. Cure Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| CARBO Ceramics, Inc. | NEOPOST | IS 280 IMETER RENTAL AGREEMENT | ATTN CHRISTINA CHAVERS | 478 WHEELERS FARMS RD | | MILFORD | CT | 06461 | | $0.00 |
| CARBO Ceramics, Inc. | NEUROHR, BRIAN | FARM LAND OCCUPANCY LEASE AGREEMENT | 3836 100M AVE SW | | | GLADSTONE | ND | 58630 | | $0.00 |
| CARBO Ceramics, Inc. | NGUYEN, DUY | MASTER INDEPENDENT CONTRACTOR AGREEMENT | 13511 VERBANA LANE | | | HOUSTON | TX | 77083 | | $0.00 |
| CARBO Ceramics, Inc. | NICHE SOFTWARE SOLUTIONS INC | MASTER INDEPENDENT CONTRACTOR AGREEMENT | 9450 SW GEMINI DR, STE 24295 | | | BEAVERTON | OR | 97008 | | $0.00 |
| CARBO Ceramics, Inc. | NORM-E-LANE, INC | FARM LAND OCCUPANCY/LEASE AGREEMENT | W267 PANTHER CREEK ROAD | | | CHILI | WI | 54420 | | $0.00 |
| CARBO Ceramics, Inc. | NORTH DAKOTA GUARANTY & TITLE CO, THE | OWNER'S POLICY DTD 1/14/2014 | D/B/A MINOT GUARANTY & ESCROW CO | 1829 SOUTH BROADWAY, STE 1 | | MINOT | ND | 58701 | | $0.00 |
| CARBO Ceramics, Inc. | OCONEE ELECTRIC MEMBERSHIP | Electric Service Agreement | ATTN MARTY SMITH, CEO | 3445 HWY 80 W | | DUDLEY | GA | 31022-0037 | | $202,988.93 |
| CARBO Ceramics, Inc. | OCONEE ELECTRIC MEMBERSHIP | Carbo-Oconee Electric Service Facilities Agreement | ATTN MARTY SMITH, CEO | 3445 HWY 80 W | | DUDLEY | GA | 31022-0037 | | $0.00 |
| CARBO Ceramics, Inc. | PANAYA LTD | MASTER SUBSCRIPTION AGREEMENT | 14 HACHAROSHET ST | | | RAANANA | | | ISRAEL | $0.00 |
| CARBO Ceramics, Inc. | PARAGON ERP MIDLAND LLC | NOTICE TO TENANT - CHANGE OF LANDLORD DTD 9/25/2014 | C/O HALEY PROPERTY MANAGEMENT CO II LLC | ATTN WENDELL BROWN | 400 W ILLINOIS AVE, STE 1630 | MIDLAND | TX | 79701 | | $0.00 |
| CARBO Ceramics, Inc. | PARAGON ERP MIDLAND LLC | NOTICE TO TENANT - CHANGE OF LANDLORD DTD 9/25/2014 | C/O HALEY PROPERTY MANAGEMENT CO II LLC | ATTN WENDELL BROWN | 400 W ILLINOIS AVE, STE 1630 | MIDLAND | TX | 79701 | | $0.00 |
| CARBO Ceramics, Inc. | PEWETE EVOLUTION LTD | PATENT AND KNOW-HOW USE LICENSE AGREEMENT | 195 ARCH MAKARIOS III AVE, NEOCLEOUS HOUSE | | | LIMASSOL | | 3030 | CYPRUS | $0.00 |
| CARBO Ceramics, Inc. | PIONEER NATURAL RESOURCES | AMENDED AND RESTATED MASTER SERVICE/SALES AGREEMENT DTD 9/17/2015 | PUMPING SERVICES LLC | ATTN KIMBERLY BURKE | 5205 N OCONNOR BLVD, STE 200 | IRVING | TX | 75039 | | $0.00 |
| CARBO Ceramics, Inc. | PITNEY BOWES GLOBAL | TIER 1 SERVICE LEVEL AGREEMENT | 3001 SUMMER ST | | | STANFORD | CT | 06905 | | $172.67 |
| CARBO Ceramics, Inc. | PITNEY BOWES PURCHASE | TIER 1 SERVICE LEVEL AGREEMENT | 3001 SUMMER ST | | | STANFORD | CT | 06905 | | $50.27 |
| CARBO Ceramics, Inc. | PLUM CREEEK TIMBERLANDS LP | EXPLORATION LICENSE AGREEMENT DTD 7/11/2014 | ATTN KENDALL B. FOUNTAIN | FIVE CONCOURSE PKWY NE STE 1650 | | ATLANTA | GA | 30328 | | $0.00 |
| CARBO Ceramics, Inc. | PRECISIONWORKS MFG LLC | SUBLEASE AGREEMENT | 320 GATEWAY DRIVE | | | BERTHOUD | CO | 80513 | | $0.00 |
| CARBO Ceramics, Inc. | PRECISIONWORKS MFG LLC | NET LEASE AGREEMENT | C/O ROBERT SMITH &/OR GREG GERNERT | 320 GATEWAY DR | | BERTHOUD | CO | 80513 | | $0.00 |
| CARBO Ceramics, Inc. | REGUS | ACCOMODATION AGREEMENT | LICHTENAUERLAA N 102-120 | | | ROTTERDAM | | 3062 ME | NETHERLANDS | $0.00 |
| CARBO Ceramics, Inc. | REPUBLIC SERVICES | NOTICE REGARDING DISPOSAL SITE DTD 11/15/2018 | ATTN REBEKAH SEGOVIA | 4542 SE LOOP 410 | | SAN ANTONIO | TX | 78222 | | $911.21 |
| CARBO Ceramics, Inc. | REYNOLDS METAL CO | LETTER OF INTENT AND TERM SHEET DTD 9/7/2010 | 201 ISABELLA ST | | | PITTSBURGH | PA | 15212 | | $0.00 |

CARBO Ceramics, Inc., et al
Assumed Contract Cure Schedule

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Est. Cure Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| CARBO Ceramics, Inc. | REYNOLDS METAL CO | SITE ACCESS AGREEMENT | 201 ISABELLA ST | | | PITTSBURGH | PA | 15212-5858 | | $0.00 |
| CARBO Ceramics, Inc. | REYNOLDS METAL CO | MINING LEASE DTD 8/13/2007 | 201 ISABELLA ST | | | PITTSBURGH | PA | 15212 | | $0.00 |
| CARBO Ceramics, Inc. | REYNOLDS PIPING SERVICES INC | LIEN RELEASE AND CANCELLATION DTD 2/26/2008 | ATTN BRAIN J PASSANTE ESQ | 4009 B VINEVILLE AVE | | MACON | GA | 31210 | | $0.00 |
| CARBO Ceramics, Inc. | RICOH USA INC | IMAGE PLUS AGREEMENT | 70 VALLEY STREAM PKWY | | | MALVERN | PA | 19355 | | $0.00 |
| CARBO Ceramics, Inc. | RICOH USA INC | AMENDMENT | 70 VALLEY STREAM PKWY | | | MALVERN | PA | 19355 | | $0.00 |
| CARBO Ceramics, Inc. | ROBERTSON, JOHN F | RE: TITLE OPINION INCLUDING MINERAL RIGHTS DTD 1/24/2014 | 1 NERN ST | | | CLAYTON | AL | 36027 | | $0.00 |
| CARBO Ceramics, Inc. | SANDBOX LOGISTICS LLC | WAIVER LETTER DTD 8/28/2018 | ATTN JOHN W PUCKETT | 18515 ALDINE WFIELD | | HOUSTON | TX | 77019 | | $0.00 |
| CARBO Ceramics, Inc. | SANDIA CORP | PATENT, SOFTWARE, COPYRIGHT LICENSE #10467 | ATTN LICENSING AGREEMENTS ADMIN | PO BOX 5800 MAILSTOP 0114 | REF LICENSE #10467 INVOICE # | ALBUQUERQUE | NM | 87185-0114 | | $0.00 |
| CARBO Ceramics, Inc. | SCARBOROUGH, GAYLE | WAREHOUSE LEASE AGREEMENT | 113 RIDGE RD | | | EUFAULA | AL | 36027 | | $0.00 |
| CARBO Ceramics, Inc. | SCARBOROUGH, GAYLE | AMENDMENT NO 1 TO WAREHOUSE LEASE AGREEMENT | 113 RIDGE RD | | | EUFAULA | AL | 36027 | | $0.00 |
| CARBO Ceramics, Inc. | SCARBOROUGH, GAYLE | AMENDMENT #1 | 113 RIDGE RD | | | EUFAULA | AL | 36027 | | $0.00 |
| CARBO Ceramics, Inc. | SCARBOROUGH, GAYLE | LEASE AGREEMENT | ATTN RICKEY BEASLEY | 113 RIDGE RD | | EUFAULA | AL | 36027 | | $0.00 |
| CARBO Ceramics, Inc. | SE MINERAL CORP OF AMERICA | MEMORANDUM OF SUBLEASE | ATTN JIM BEVILL | 1880 DENT RD | | TOOMSBORO | GA | 31090 | | $0.00 |
| CARBO Ceramics, Inc. | SE MINERAL CORP OF AMERICA | MEMORANDIUM OF SUBLEASE DTD 5/24/1963 | ATTN JIM BEVILL | 1880 DENT RD | | TOOMSBORO | GA | 31090 | | $0.00 |
| CARBO Ceramics, Inc. | SE MINERAL CORP OF AMERICA | WARRANTY DEED | ATTN JIM BEVILL | 1880 DENT RD | | TOOMSBORO | GA | 31090 | | $0.00 |
| CARBO Ceramics, Inc. | SE MINERAL CORP OF AMERICA | SUBLEASE OF MINING LEASE AGREEMENT | ATTN TED & ASHLEY SMITH | 9474 HWY 57 | | MCINTYRE | GA | 31054 | | $0.00 |
| CARBO Ceramics, Inc. | Seagate Terminals Savannah, LLC | Lease Agreement | 1600 E President St | | | SAVANNAH | GA | 31404 | | $5,612.90 |
| CARBO Ceramics, Inc. | SERVICIOS HALLIBURTON DE VENEZUELA | CONSIGNMENT AGREEMENT DTD 7/11/1996 | ATTN MATERIALS SUPERVISOR | AV BOLIVAR TORRE TERMINI, PISO #3 EDO MONAGAS | | MATURIN | | | VENEZUELA | $0.00 |
| CARBO Ceramics, Inc. | SGS GALSON LABORATORIES INC | EQUIPMENT RENTAL FREEPUMPLOAN & FREESAMPLINGBADGES 3IN1 AGREEMENT | ATTN KEVIN KUPPEL, DIRECTOR OF FINANCE | 6601 KIRKVILLE RD | | EAST SYRACUSE | NY | 13057 | | $0.00 |
| CARBO Ceramics, Inc. | SHIELDS, VIRGINIA W | MEMORANDUM OF MINERAL-LEASE DTD 11/31/2018 | 228 ABERT ST | | | EUFAULA | AL | 36027 | | $0.00 |
| CARBO Ceramics, Inc. | SHIELDS, VIRGINIA W | MINERAL LEASE AGREEMENT DTD 1/31/2013 | 228 ABERT ST | | | EUFAULA | AL | 36027 | | $0.00 |
| CARBO Ceramics, Inc. | SHIELDS, VIRGINIA W | MINERAL LEASE AGREEMENT | 507 ST. FRANCES RD | | | EUFAULA | AL | 36027 | | $0.00 |
| CARBO Ceramics, Inc. | SHIELDS, VIRGINIA W | MINERAL LEASE AGREEMENT | 507 ST. FRANCES RD | | | EUFAULA | AL | 36027 | | $0.00 |
| CARBO Ceramics, Inc. | SHIELDS, VIRGINIA W | MINERAL LEASE AGREEMENT LEASE #A-005 DTD 1/31/2013 | 507 ST. FRANCES RD | | | EUFAULA | AL | 36027 | | $0.00 |
| CARBO Ceramics, Inc. | SHIELDS, VIRGINIA W | MEMORANDUM OF MINERAL-LEASE | 507 ST. FRANCES RD | | | EUFAULA | AL | 36027 | | $0.00 |

CARBO Ceramics, Inc., et al
Assumed Contract Cure Schedule

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Est. Cure Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| CARBO Ceramics, Inc. | SIMON AND SIMON | SURVEY CERTIFICATE DTD 4/11/2006 | ATTN G K PRATT MUNSON | 306 WEST MAIN ST | | NEW IBERIA | LA | 70505 | | $0.00 |
| CARBO Ceramics, Inc. | Sizemore, Inc. d/b/a Sizemore | Security Contract | P.O. Box 555 | | | Augusta | GA | 30903 | | $6,193.20 |
| CARBO Ceramics, Inc. | SOO LINE RAILROAD COMPANY | AGREEMENT FOR PRIVATE SIDING | D/B/A CANADIAN PACIFIC RAILWAY | ATTN CHARLES D WEISE | 501 MARGUETTE AVE S, STE 804 | MINNEAPOLIS | MN | 55402 | | $0.00 |
| CARBO Ceramics, Inc. | SOO LINE RAILROAD COMPANY | AGREEMENT FOR PRIVATE SIDING | D/B/A CANADIAN PACIFIC RAILWAY | ATTN CHARLES D WEISE | 501 MARGUETTE AVE S, STE 804 | MINNEAPOLIS | MN | 55402 | | $0.00 |
| CARBO Ceramics, Inc. | SOO LINE RAILROAD COMPANY | QUIT CLAIM DEED DTD 3/24/2010 | D/B/A CANADIAN PACIFIC RAILWAY | ATTN CHARLES D WEISE | 501 MARGUETTE AVE S, STE 804 | MINNEAPOLIS | MN | 55402 | | $0.00 |
| CARBO Ceramics, Inc. | SOURCE ENERGY SERVICES PROPPANTS LP | SUBLEASE AGREEMENT | ATTN JAROD PICK | 3430 OAKWOOD MALL DR, STE 300 | | EAU CLAIRE | WI | 54701 | | $0.00 |
| CARBO Ceramics, Inc. | SOURCE ENERGY SERVICES PROPPANTS LP | CONSENT TO SUBLEASE | ATTN JAROD PICK | 3430 OAKWOOD MALL DR, STE 300 | | EAU CLAIRE | WI | 54701 | | $0.00 |
| CARBO Ceramics, Inc. | SOURCE ENERGY SERVICES PROPPANTS LP | AMENDMENT #1 TO SUBLEASE AGREEMENT | ATTN JAROD PICK | 3430 OAKWOOD MALL DR, STE 300 | | EAU CLAIRE | WI | 54701 | | $0.00 |
| CARBO Ceramics, Inc. | SOURCE ENERGY SERVICES PROPPANTS LP | AMENDMENT #3 TO SUBLEASE AGREEMENT | ATTN JAROD PICK | 3430 OAKWOOD MALL DR, STE 300 | | EAU CLAIRE | WI | 54701 | | $0.00 |
| CARBO Ceramics, Inc. | SOURCE ENERGY SERVICES PROPPANTS LP | AMENDMENT #1 TO SUBLEASE AGREEMENT | ATTN JAROD PICK | 3430 OAKWOOD MALL DR, STE 300 | | EAU CLAIRE | WI | 54701 | | $0.00 |
| CARBO Ceramics, Inc. | SOURCE ENERGY SERVICES PROPPANTS LP | AMENDMENT #1 TO SUBLEASE AGREEMENT | ATTN JAROD PICK | 3430 OAKWOOD MALL DR, STE 300 | | EAU CLAIRE | WI | 54701 | | $0.00 |
| CARBO Ceramics, Inc. | SOURCE ENERGY SERVICES PROPPANTS LP | AMENDMENT #2 TO SUBLEASE AGREEMENT | ATTN JAROD PICK | 3430 OAKWOOD MALL DR, STE 300 | | EAU CLAIRE | WI | 54701 | | $0.00 |
| CARBO Ceramics, Inc. | SOURCE ENERGY SERVICES PROPPANTS LP | AMENDMENT #2 TO SUBLEASE AGREEMENT | ATTN JAROD PICK | 3430 OAKWOOD MALL DR, STE 300 | | EAU CLAIRE | WI | 54701 | | $0.00 |
| CARBO Ceramics, Inc. | SOURCE ENERGY SERVICES PROPPANTS LP | AMENDMENT #3 TO SUBLEASE AGREEMENT | ATTN JAROD PICK | 3430 OAKWOOD MALL DR, STE 300 | | EAU CLAIRE | WI | 54701 | | $0.00 |
| CARBO Ceramics, Inc. | SOURCE ENERGY SERVICES PROPPANTS LP | SUBLEASE AGREEMENT | ATTN JOE JACKSON | 770 TECHNOLOGY WAY | | CHIPPEWA FALLS | WI | 54729 | | $0.00 |
| CARBO Ceramics, Inc. | SOURCE ENERGY SERVICES PROPPANTS LP | SUBLEASE AGREEMENT | ATTN JOE JACKSON | 770 TECHNOLOGY WAY | | CHIPPEWA FALLS | WI | 54729 | | $0.00 |
| CARBO Ceramics, Inc. | SOUTHEAST GAS | Amended and Restated Price Agreement | 445 DEXTER AVENUE | 5TH FL | | MONTGOMERY | AL | 36104 | | $99,164.70 |
| CARBO Ceramics, Inc. | SOUTHEAST GAS | Gas Contract Amendment | 445 DEXTER AVENUE | 5TH FL | | MONTGOMERY | AL | 36104 | | $0.00 |
| CARBO Ceramics, Inc. | SOUTHERN STATES TOYOTALIFT | EQUIPMENT LEASE AGREEMENT DTD 2/5/2018 | 4700 PIO NONO AVE. | | | MACON | GA | 31206-5066 | | $0.00 |
| CARBO Ceramics, Inc. | STANFORD, BLANCHE M | ADDENDUM TO OPTION-LEASE AGREEMENT DTD 6/21/2016 | Section 5 Township 8 North Range 28, Henry County | | | N/A | Alabama | N/A | United States | $0.00 |

CARBO Ceramics, Inc., et al
Assumed Contract Cure Schedule

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Est. Cure Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| CARBO Ceramics, Inc. | STEMCOR CORPORATION | LICENSE AGREEMENT FOR TRADEMARKED NAME | PO BOX 156 | | | NIGARA FALLS | NY | | | $0.00 |
| CARBO Ceramics, Inc. | STEPHENS INSURANCE LLC | CONSULTING SERVICES AGREEMENT | 111 CENTER ST | | | LITTLE ROCK | AR | 72201 | | $0.00 |
| CARBO Ceramics, Inc. | STEPHENS INSURANCE LLC | SURETY BOND | 111 CENTER ST | | | LITTLE ROCK | AR | 72201 | | $0.00 |
| CARBO Ceramics, Inc. | STEPHENS INSURANCE LLC | BUSINESS ASSOCIATE AGREEMENT | ATTN MELISSA KREBS | 111 CENTER ST, STE 100 | | LITTLE ROCK | AR | 72201 | | $0.00 |
| CARBO Ceramics, Inc. | SUNSHINE SYSTEMS, INC. | PROFESSIONAL SERVICES AGREEMENT DTD 1/24/2020 | 38 MUNROE ST. | | | NEWBURYPORT | MA | 01950 | | $0.00 |
| CARBO Ceramics, Inc. | SVF ENERGY CENTER HOUSTON LLC | NOTICE OF SALE ENERGY CENTER II | 575 N Dairy Ashford Rd | | | Houston | TX | 77079 | United States | $0.00 |
| CARBO Ceramics, Inc. | TC HOUSTON INC | NOTICE OF SALE ENERGY CENTER II | 700 LOUISIANA ST | | | HOUSTON | TX | 77002 | | $0.00 |
| CARBO Ceramics, Inc. | TCH #2 INC | NOTICE OF SALE ENERGY CENTER II | 6980 SIERRA CENTER PKWY STE 160 | | | RENO | NV | 89511 | | $0.00 |
| CARBO Ceramics, Inc. | TEXAS MEXICAN RAILWAY COMPANY, THE | INDUSTRY TRACK AGREEMENT DTD 8/23/2007 | ATTN KCS REAL ESTATE DPT | 427 W 12TH ST | | KANSAS CITY | MO | 64105 | | $0.00 |
| CARBO Ceramics, Inc. | TEXAS MEXICAN RAILWAY COMPANY, THE | AMENDMENT DTD 5/2/2013 | ATTN KCS REAL ESTATE DPT | 427 W 12TH ST | | KANSAS CITY | MO | 64105 | | $0.00 |
| CARBO Ceramics, Inc. | TEXAS-LEHIGH CEMENT COMPANY | BILL OF SALE AND GENERAL ASSIGNMENT DTD 3/7/1994 | PO BOX 610 | | | BUDA | TX | 78610 | | $0.00 |
| CARBO Ceramics, Inc. | THE OASIS AT PAVILION PARKWAY | APARTMENT LEASE CONTRACT DTD 9/13/2018 | 110 PAVILION PKWY | | | MIDLAND | TX | 79705 | | $0.00 |
| CARBO Ceramics, Inc. | THE WATER WORKS & SEWER BOARD OF | FINANCIAL GUARANTEE BOND #1974911 | THE CITY OF EUFAULA | ATTN DARYL BAKER, GM | 840 W WASHINGTON ST | EUFAULA | AL | 36027 | | $21,712.65 |
| CARBO Ceramics, Inc. | THE WATER WORKS & SEWER BOARD OF | FINANCIAL GUARANTEE BOND #1974909 | THE CITY OF EUFAULA | ATTN JOY WHITE, TREAS | 205 E BARBOUR ST | EUFAULA | AL | 36027 | | $0.00 |
| CARBO Ceramics, Inc. | THE WATER WORKS & SEWER BOARD OF | LETTER OF INTENT & REQUEST FOR WASTEWATER MANAGEMENT SERVICES DTD 11/6/2014 | THE CITY OF EUFAULA | 840 WEST WASHINGTON ST | PO BOX 26 | EUFAULA | AL | 36072 | | $0.00 |
| CARBO Ceramics, Inc. | THE WATER WORKS & SEWER BOARD OF | AGREEEMENT FOR PROVISION OF WATEWATER SERVICES DTD 3/13/2015 | THE CITY OF EUFAULA | ATTN JACK B TIBBS JR CHAIRMAN | 840 W WASHINGTON ST | EUFAULA | AL | 36072 | | $0.00 |
| CARBO Ceramics, Inc. | TINDALL RECORD STORAGE LTD | CARTON MANAGEMENT AND STORE AGREEMENT | 930 METROMEDIA PL | | | DALLAS | TX | 75247-4731 | | $0.00 |
| CARBO Ceramics, Inc. | TINDALL RECORD STORAGE LTD | CONFIDENTIALITY ADDENDUM TO CARTON MANAGEMENT AND STORE AGREEMENT | ATTN J SCOTT TINDALL, CHAIRMAN | 930 METROMEDIA PL | | DALLAS | TX | 75247-4731 | | $0.00 |
| CARBO Ceramics, Inc. | TJD ENERGY SERVICES, LLC | Subcontract for Services | ATTN TANNER DUFRENE | 2000 PARK PL DR, STE 215 | | WASHINGTON | PA | 15301 | | $10,630.50 |
| CARBO Ceramics, Inc. | TJD ENERGY SERVICES, LLC | Addendum to Subcontract for Services | ATTN TANNER DUFRENE | 2000 PARK PL DR, STE 215 | | WASHINGTON | PA | 15301 | | $0.00 |
| CARBO Ceramics, Inc. | TOWN OF ROCK WI | DEVELOPER AGREEMENT | ATTN TOWN OF ROCK CHAIRPERSON | 10970 COUNTY RD N | | MARSHFIELD | WI | 54449-9790 | | $0.00 |
| CARBO Ceramics, Inc. | TOYOTA INDUSTRIES | Equipment Schedule #3 to Master Lease Agreement | P.O. BOX 660926 | | | DALLAS | TX | 75266-0926 | | $11,182.68 |
| CARBO Ceramics, Inc. | TOYOTA INDUSTRIES | Equipment Schedule #4 to Master Lease Agreement | P.O. BOX 660926 | | | DALLAS | TX | 75266-0926 | | $0.00 |
| CARBO Ceramics, Inc. | TRACE INTERNATIONAL INC | TRACE MEMBERSHIP AGREEMENT DTD 6/19/2015 | ATTN ALEXANDRA A WRAGE | 151 WEST ST | | ANNAPOLIS | MD | 21401 | | $0.00 |

CARBO Ceramics, Inc., et al
Assumed Contract Cure Schedule

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Est. Cure Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| CARBO Ceramics, Inc. | TRINITY INDUSTRIES LEASING COMPANY | RAILROAD CAR LEASE AGREEMENT INQUIRY DTD 9/8/2016 | ATTN JARED S RICHARDSON, VP AND GENERAL COUNSEL | 2525 STEMMONS FWY | | DALLAS | TX | 75207 | | $0.00 |
| CARBO Ceramics, Inc. | TRINITY INDUSTRIES LEASING COMPANY | RAILROAD CAR LEASE AGREEMENT | ATTN THOMAS C JARDINE, VP | 2525 STEMMONS FWY | | DALLAS | TX | 75207 | | $0.00 |
| CARBO Ceramics, Inc. | TRINITY INDUSTRIES LEASING COMPANY | RIDER #1 TO RAILROAD CAR LEASE AGREEMENT | ATTN THOMAS C JARDINE, VP | 2525 STEMMONS FWY | | DALLAS | TX | 75207 | | $0.00 |
| CARBO Ceramics, Inc. | TRINITY INDUSTRIES LEASING COMPANY | LETTER OF TERMINATION DTD 12/1/2016 | ATTN THOMAS C JARDINE, VP | 2525 STEMMONS FWY | | DALLAS | TX | 75207 | | $0.00 |
| CARBO Ceramics, Inc. | TRINITY RAIL | LETTER OF PROPOSAL DTD 5/30/2014 | 2525 STEMMONS FWY | | | DALLAS | TX | 75207 | | $0.00 |
| CARBO Ceramics, Inc. | TYR LOGISTICS, LLC | LEASE AGREEMENT DTD 6/23/2019 | ATTN: DAVID TANG | 645 BRONCO ROAD | | CORPUS CHRISTI | TX | 78409 | | $0.00 |
| CARBO Ceramics, Inc. | UNION BANK AND TRUST CO | SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT AND ESTOPPEL CERTIFICATE DTD 2/27/2015 | ATTN TOM WEINANDT, FIRST VP | 2720 S 177TH ST | | OMAHA | NE | 68154 | | $0.00 |
| CARBO Ceramics, Inc. | UNION TANK CAR COMPANY | CAR SERVICE AGREEMENT | 16225 PARK TEN PLACE, STE 135 | | | HOUSTON | TX | 77084 | | $0.00 |
| CARBO Ceramics, Inc. | UNIVERAL UNDERSTANDINGS LLC | MINERAL LEASE AGREEMENT DTD 9/20/2013 | ATTN DONALD HILL, MANAGING PARNTER | 14352 79 COURT N | | LOXAHATCHEE | FL | 33470 | | $0.00 |
| CARBO Ceramics, Inc. | UNIVERSAL UNDERSTANDINGS LLC | MEMORANDUM OF MINERAL LEASE | ATTN DONALD HILL | 14352 79 CT N | | LOXAHATCHEE | FL | 33470 | | $0.00 |
| CARBO Ceramics, Inc. | US SILICA COMP | CARBO PATENTS LICENSE AGREEMENT | ATTN GENERAL COUNSEL | 24275 KATY FWY, STE 600 | | KATY | TX | 77494 | | $0.00 |
| CARBO Ceramics, Inc. | US SILICA COMP | CARBO PATENTS LICENSE AGREEMENT | ATTN GENERAL COUNSEL | 24275 KATY FWY, STE 600 | | KATY | TX | 77494 | | $0.00 |
| CARBO Ceramics, Inc. | USA TANK SALES & ERECTION CO INC | RELEASE OF CLAIM OF LIEN ON LEASEHOLD IMPROVEMENT DTD 6/23/2015 | 5897 STATE HWY 59 | | | GOODMAN | MO | 64843 | | $0.00 |
| CARBO Ceramics, Inc. | UTICA LEASECO LLC | FINANCING AGREEMENT DTD 8/8/2017 | ATTN DAVID K LEVY, PRES | 905 S BLVD EAST | | ROCHESTER HILLS | MI | 48307 | | $0.00 |
| CARBO Ceramics, Inc. | VERIZON WIRELESS | Service Agreement | P.O. BOX 660108 | | | DALLAS | TX | 75266 | | $11,219.24 |
| CARBO Ceramics, Inc. | VICKERS, JESSIE MAC & BRENDA | MINERAL LEASE AGREEMENT | 2712 HIGHWAY 131 | | | CLAYTON | AL | 36016 | | $0.00 |
| CARBO Ceramics, Inc. | VICKERS, JESSIE MAC & BRENDA | MINERAL LEASE AGREEMENT DTD 7/30/2014 | 2712 HIGHWAY 131 | | | CLAYTON | AL | 36016 | | $0.00 |
| CARBO Ceramics, Inc. | VICKERS, JESSIE MAC & BRENDA | MEMORANDUM OF MINERAL-LEASE | 2712 HIGHWAY 131 | | | CLAYTON | AL | 36016 | | $0.00 |
| CARBO Ceramics, Inc. | WASHINGTON, ALICE | ADDENDUM TO OPTION-LEASE AGREEMENT DTD 6/21/2016 | Section 5 Township 8 North Range 28, Henry County | | | N/A | Alabama | N/A | United States | $0.00 |
| CARBO Ceramics, Inc. | WAYFINDER CORPORATION | LEASE AGREEMENT DTD 12/23/2019 | #305, 4311 - 12 STREET NE | | | CALGARY | AB | T2E 4P9 | CANADA | $0.00 |
| CARBO Ceramics, Inc. | WELLS FARGO BANK NA | COPYRIGHT SECURITY AGREEMENT DTD 12/20/2016 | 1000 LOUISIANA ST, 9TH FL | | | HOUSTON | TX | 77079 | | $0.00 |
| CARBO Ceramics, Inc. | WELLS FARGO BANK NA | WELLSONE COMMERCIAL CARD AGREEMENT | 14241 DALLAS PKWY, STE 900 | | | DALLAS | TX | 75254 | | $0.00 |
| CARBO Ceramics, Inc. | WELLS FARGO BANK NA | ADDENDUM TO WELLSONE COMMERCIAL CARD | 14241 DALLAS PKWY, STE 900 | | | DALLAS | TX | 75254 | | $0.00 |

CARBO Ceramics, Inc., et al
Assumed Contract Cure Schedule

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Est. Cure Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| CARBO Ceramics, Inc. | WELLS FARGO BANK NA | AMENDMENT TO WELLSONE COMMERCIAL CARD AGREEMENT | 14241 DALLAS PKWY, STE 900 | | | DALLAS | TX | 75254 | | $0.00 |
| CARBO Ceramics, Inc. | WELLS FARGO BANK NA | AMENDMENT TO WELLSONE COMMERCIAL CARD AGREEMENT | 14241 DALLAS PKWY, STE 900 | | | DALLAS | TX | 75254 | | $0.00 |
| CARBO Ceramics, Inc. | WELLS FARGO BANK NA | AMENDED AND RESTATED CONTINUED GUARANTY | 14241 DALLAS PKWY, STE 900 | | | DALLAS | TX | 75254 | | $0.00 |
| CARBO Ceramics, Inc. | WILKS BROTHERS LLC | MORTGAGE & ASSIGNMENT OF RENTS & LEASES & FIXTURE FILING | 17010 IH-20 | | | CISCO | TX | 76437 | | $0.00 |
| CARBO Ceramics, Inc. | WILSON JR, D M | MINERAL LEASE AGREEMENT | 507 ST. FRANCES RD | | | EUFAULA | AL | 36027 | | $0.00 |
| CARBO Ceramics, Inc. | WILSON MINING COMPANY INC | Mining & Stockpiling Agreement | ATTN JOEL WILSON SR, PRES | 507 ST. FRANCES RD | | EUFAULA | AL | 36027-8810 | | $27,167.05 |
| CARBO Ceramics, Inc. | WILSON SR, JOEL A | MEMORANDUM OF MINERAL-LEASE | 507 ST. FRANCES RD | | | EUFAULA | AL | 36027 | | $0.00 |
| CARBO Ceramics, Inc. | XEROX | LEASE AGREEMENT | ATTN MARK JARRELL | 45 GLOVER AVE. | | NORWALK | CT | 06850 | | $5,885.55 |
| CARBO Ceramics, Inc. | XTIVIA INC | Database Support (Annual Cotnract) | ATTN ERIC ROBINSON | 2035 LINCOLN HWY STE 1010 | | EDISON | NJ | 08817 | | $1,090.00 |
| CARBO Ceramics, Inc. | ZURICH AMERICAN INSURANCE COMPANY | RISK MANAGEMENT INFORMATION SYSTEMS SERVICE AND LICENSE AGREEMENT | ATTN CUSTOMER INFORMATION SERVICES | ZURICH TOWERS | 1400 AMERICAN LN | SCHAUMBURG | IL | 60196 | | $0.00 |
| StrataGen Inc. | 3 WAY ENERGY CONSULTING LLC | SOFTWARE ACCESS AGREEMENT | 276363 BRONCHO RD | | | MARLOW | OK | 73055 | | $0.00 |
| StrataGen Inc. | 4JLJ LLC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | 4631 DANIEL DR | | Confirming with Jamie E | ROBSTOWN | TX | 78380 | | $0.00 |
| StrataGen Inc. | 88 ENERGY LTD | SOFTWARE ACCESS AGREEMENT | LEVEL 2, 5 ORD ST | | | WEST PERTH, WA | | 6005 | AUSTRALIA | $0.00 |
| StrataGen Inc. | ABRAJ ENERGY SERVICES SAOC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | AL-ASSALAH TOWERS BLDG #223, 3RD FL | WAY # 3701, GHUBRAH MUSCAT | Not Executory | AZAIBA | | 130 | OMAN | $0.00 |
| StrataGen Inc. | ACB ENERGY INC | SOFTWARE ACCESS AGREEMENT | 4185 FM 1002 S | | | BIG SANDY | TX | 75755 | | $0.00 |
| StrataGen Inc. | AGH UNIVERSITY OF SCIENCE & TECHNOLOGY | SOFTWARE LICENSE AGREEMENT | ATTN ANDRZEJ GONET, DEAN | AL MICKIEWICZA 30 | | KRAKOW | | 30-059 | POLAND | $0.00 |
| StrataGen Inc. | AKROS LLC | SOFTWARE LICENSE & MAINTENANCE AGREEMENT | ATTN ANDREY KOROLEV, GM | AKADEMIC VOLGIN ST, 2B, BLDG 2 | | MOSCOW | | 117485 | RUSSIA | $0.00 |
| StrataGen Inc. | ALAMO PRESSURE PUMPING LLC | AMENDMENT #1 TO SOFTWARE LICENSE & MAINTENANCE AGREEMENT | ATTN TIM ONDRAK, PRESIDENT / CFO | 1101 N LITTLE SCHOOL RD | | ARLINGTON | TX | 76017 | | $0.00 |
| StrataGen Inc. | ALAMO PRESSURE PUMPING LLC | SOFTWARE LICENSE & MAINTENANCE AGREEMENT | ATTN TIM ONDRAK, PRESIDENT / CFO | 1101 N LITTLE SCHOOL RD | | ARLINGTON | TX | 76017 | | $0.00 |
| StrataGen Inc. | ALLIED ENERGY SERVICES LLC | SOFTWARE LICENSE & MAINTENANCE AGREEMENT | ATTN GABRIEL SEKIAS, MGR SUPPLY CHAIN | 1000 LOUISIANA ST, STE 3850 | | HOUSTON | TX | 77002 | | $0.00 |
| StrataGen Inc. | ALMANSOORI PRODUCTION SERVICES | SOFTWARE LICENSE & MAINTENANCE AGREEMENT | ATTN GENERAL MANAGER | 6TH ST, 17 FL MANSOORI TOWER, SALAM ST | | ABU DHABI | | | UAE | $0.00 |

CARBO Ceramics, Inc., et al
Assumed Contract Cure Schedule

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Est. Cure Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| StrataGen Inc. | ARAMCO OVERSEAS CO BV | ACKNOWLEDGEMENT OF ARAMCO OVERSEAS CO BV | SCHEVENINGSEWE G 62-66 | | | THE HAGUE | | 2517 KX | THE NETHERLANDS | $0.00 |
| StrataGen Inc. | ARCHER PRESSURE PUMPING LLC | AMENDMENT #1 TO CONSULTANCY AGREEMENT | ATTN JOE HARPER, ENGINEERING MGR | 10613 W SAM HOUSTON PKWY N, STE 600 | | HOUSTON | TX | 77064 | | $0.00 |
| StrataGen Inc. | ARCHER PRESSURE PUMPING LLC | AMENDMENT #4 SOFTWARE LICENSE MAINTENANCE AGREEMENT | ATTN JOE HARPER, ENGINEERING MGR | 10613 W SAM HOUSTON PKWY N, STE 600 | | HOUSTON | TX | 77064 | | $0.00 |
| StrataGen Inc. | ARCHER PRESSURE PUMPING LLC | AMENDMENT #5 SOFTWARE LICENSE MAINTENANCE AGREEMENT | ATTN JOE HARPER, ENGINEERING MGR | 10613 W SAM HOUSTON PKWY N, STE 600 | | HOUSTON | TX | 77064 | | $0.00 |
| StrataGen Inc. | BAYOU WELL SERVICES LLC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | 800 GESSNER, STE 1000 | | | HOUSTON | TX | 77024 | | $0.00 |
| StrataGen Inc. | BEIJING HEYUAN TECHNOLOGIES CO LTD | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | ROOM 3605, NO 09 AN NING ZHUANG XI SAN TIAO | HAIDIAN DISTRICT, 10085 | | BEIJING P R | | | CHINA | $0.00 |
| StrataGen Inc. | BG INTERNATIOAL LIMITED | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | C/O PETROTECH | 100 THAMES VALLEY PARK DR | | READING | | RG6 1PT | UNITED KINGDOM | $0.00 |
| StrataGen Inc. | BIOCOMP SYSTEMS INC | SOFTWARE LICENSE AGREEMENT | 7825 WASHINGTON AVE S, STE 500 | | | MINNEAPOLIS | 55439 | | | $0.00 |
| StrataGen Inc. | BNK PETROLEUM INC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | 760 PASEO CAMARILLO, STE 350 | | | CAMARILLO | CA | 93010 | | $0.00 |
| StrataGen Inc. | BOARD OF REGENTS OF THE UNIVERSITY OF OKLAHOMA | AMENDMENT #2 TO SOFTWARE LICENSE & MAINTENANCE AGREEMENT | ATTN CRAIG SISCO | 1101 LINCOLN AVE | | NORMAN | OK | 73069 | | $0.00 |
| StrataGen Inc. | BOURGOYNE ENTERPRISES INC | SOFTWARE ACCESS AGREEMENT | ATTN ADAM T BOURGOYNE JR, PRESIDENT | 6006 BOONE DR | | BATON ROUGE | LA | 70808 | | $0.00 |
| StrataGen Inc. | BP - NAG | SOFTWARE LICENSE & MAINTENANCE AGREEMENT | ATTN ALBERTO CASERO, COMPLETION MGR | 501 WESTLAKE PARK BLVD | | HOUSTON | TX | 77079 | | $0.00 |
| StrataGen Inc. | BRANCH OF OMV RUSSIA UPSTREAM GMBH | FRACPRO SOFTWARE LICENSE TERMS | PETROGRADSKAYA EMB, BLDG A | HOUSE NO 20 | | ST PETERSBURG | | 197046 | RUSSIA | $0.00 |
| StrataGen Inc. | C&J SPECIALITY SERVICES | AMENDMENT #6 TO SOFTWARE LICENSE & MAINTENANCE AGREEMENT | ATTN STAFF ENGINEER | 4460 N HWY 77 | | ROBSTOWN | TX | 78380 | | $0.00 |
| StrataGen Inc. | CAIRN INDIA LTD | SOFTWARE LICENSE & MAINTENANCE AGREEMENT | ATTN ANWAR HUSEN, PETROLEUM ENGINEERING | 3RD &4TH FL, VIPUL PLAZA | SECTOR 54, SUN CITY, | GURGAON | | 122 022 | INDIA | $0.00 |
| StrataGen Inc. | CALFRAC DE MEXICO SA DE CV | SOFTWARE LICENSE & MAINTENANCE AGREEMENT | ATTN MARCO A ARANGUIZEN, COUNTRY MGR | CARRETERA MEXICO TUXPAN KM 192.3 | | TIHUATLAN, VERACRUZ | | CP 92917 | MEXICO | $0.00 |

CARBO Ceramics, Inc., et al
Assumed Contract Cure Schedule

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Est. Cure Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| StrataGen Inc. | CALFRAC WELL SERVICES LTD | AMENDMENT #1 TO SOFTWARE LICENSE & MAINTENANCE AGREEMENT | ATTN TYLER ELGAR, ENGINEERING MGR, CPV DIV | 411 8TH AVE SW | | CALGARY | AB | T2B 1E3 | CANADA | $0.00 |
| StrataGen Inc. | CAPITAN ENERGY INC | SOFTWARE ACCESS AGREEMENT | ATTN DYLAN GARRETT, COMPLETION OPS MGR | 413 CORRINE PL | | CARLSBAD | NM | 88220 | | $0.00 |
| StrataGen Inc. | CEPSA EP SA | SOFTWARE LICENSE & MAINTENANCE AGREEMENT | ATTN LUIS TRAVESEDO, CEO | RIBERA DEL LOIRA 50 | | MADRID | | 28042 | SPAIN | $0.00 |
| StrataGen Inc. | CHASM VIEW LLC | SOFTWARE ACCESS AGREEMENT | ATTN RON FINCH, OWNER | 4741 ELDORADO SPRING DR | | BOULDER | CO | 80303 | | $0.00 |
| StrataGen Inc. | CIMARRON ACID INC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | ATTN TRENT WATKINS | RR2 BOX 29 | | FAIRVIEW | OK | 73737 | | $0.00 |
| StrataGen Inc. | CIRCLE Z PRESSURE PUMPING LLC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | ATTN CHAD POWELL OWNER | 6664 HWY 149 | | TATUM | TX | 75671 | | $0.00 |
| StrataGen Inc. | COMPREHENSIVE PRODUCTION SERVICES LLC | SOFTWARE ACCESS AGREEMENT DTD 6/6/2013 | ATTN JOSH MERRITT | 600 17TH ST STE 2800 SOUTH | | DENVER | CO | 80202 | | $0.00 |
| StrataGen Inc. | COMPREHENSIVE PRODUCTION SERVICES LLC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | ATTN SHAWN REED VP | 5749 NW 132 ND | | OKLAHOMA CITY | OK | 73142 | | $0.00 |
| StrataGen Inc. | CONDOR ENERGY SERVICES LTD | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | ATTN ELHAM SAMARI | LEVEL 4, 15 OGILVIE RD, MOUNT PLEASANT | | APPLECROSS | | 6153 | AUSTRALIA | $0.00 |
| StrataGen Inc. | CRC SERVICES LLC | ASSIGNMENT OF LICENSES, MAINTENANCE AND SUPUPORT SERVICES | 813 WILLIAMS STREET, SUITE 212 | | | LONGMEADOW | MA | 01106 | | $0.00 |
| StrataGen Inc. | CRC SERVICES LTD | SOFTWARE MAINTENANCE AGREEMENT | 27200 Tourney Road | Suite 200 | | 0 Santa Clarita | CA | 91355 | United States | $0.00 |
| StrataGen Inc. | CUDD ENERGY SERVICES | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT AMENDMENT # 28 | ATTN JOHN ENGELS, SERVICE LINE TECH MANAGER | 3990 ROGERDALE | | HOUSTON | TX | 77042 | | $0.00 |
| StrataGen Inc. | CURTIN UNIVERSITY SARAWAK, MALAYSIA | SOFTWARE LICENSE AGREEMENT | ATTN MIAN UMER SHAFIQ, ASSOC LECTURER | CDT 250, 98009 MIRI | | SARAWAK | | | MALAYSIA | $0.00 |
| StrataGen Inc. | DEGOLYER AND MACNAUGHTON | SOFTWARE ACCESS AGREEMENT | ATTN JEFFREY J ENYART, VP | 5001 SPRING VALLEY RD, STE 800 E | | DALLAS | TX | 75244 | | $0.00 |
| StrataGen Inc. | DOWNHOLE SERVICE SUB COMPANY OF DAQING OILFIELD LTD | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT AMENDMENT #1 | LONGNANLONGSHI RD | | | DAQING CITY | | 163453 | CHINA | $0.00 |
| StrataGen Inc. | DRAGON OIL TECHNOLOGIES PERU SAC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | 165 PARQUE MELITON PORRAS | | | LIMA | | | PERU | $0.00 |
| StrataGen Inc. | DRILTEK INC | SOFTWARE ACCESS AGREEMENT | 901 TOWER WAY, STE 102 | | | BAKERSFIELD | CA | 93309 | | $0.00 |
| StrataGen Inc. | ECOPETROL AMERICA INC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT DTD 11/17/2014 | 2800 POST OAK BLVD, STE 5110 | | | HOUSTON | TX | 77056 | | $0.00 |

CARBO Ceramics, Inc., et al
Assumed Contract Cure Schedule

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Est. Cure Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| StrataGen Inc. | ECOPETROL S A | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT DTD 2/17/2011 | CALLE 37 #7 43 ED GUADALUPE PISO 9 | | | BOGOTA | | | COLOMBIA | $0.00 |
| StrataGen Inc. | ECOSTIM ENERGY SOLUTIONS INC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT AMENDMENT #2 | 2930 W SAM HOUSTON PKWY N, STE 275 | | | HOUSTON | TX | 77043 | | $0.00 |
| StrataGen Inc. | EL PASO ENERGY SERVICE COMPANY | SOFTWARE MAINTENANCE AGREEMENT | 1001 LOUISIANA ST | | | HOUSTON | TX | 77002 | | $0.00 |
| StrataGen Inc. | ELITE WELL SERVICES LLC | AMENDMENT NO 6 TO SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | ATTN ABRAHAM KAPLAN | 11368 LOVINGTON HWY | | ARTESIA | NM | 88211 | | $0.00 |
| StrataGen Inc. | ELITE WELL SERVICES LLC | AMENDMENT NO 6 TO SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | ATTN ABRAHAM KAPLAN | 11368 LOVINGTON HWY | | ARTESIA | NM | 88211 | | $0.00 |
| StrataGen Inc. | ELITE WELL SERVICES LLC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT #5 | ATTN ABRAHAM KAPLAN | 11368 LOVINGTON HWY | | ARTESIA | NM | 88211 | | $0.00 |
| StrataGen Inc. | EMAS ENERGY SERVICES (THAILAND) LIMITED | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | RASA TOWER II, 11TH FL, # 1104 | 555 PHAHOLYOTHIN RD | CHATUCHAK | BANGKOK | | 10900 | THAILAND | $0.00 |
| StrataGen Inc. | EP ENERGY CORPORATION | SOFTWARE MAINTENANCE AGREEMENT | 1001 LOUISIANA STREET | | | HOUSTON | TX | 77002 | | $0.00 |
| StrataGen Inc. | EQUIPMENT SERVICES LTD LLP | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | ATTN MIRBEK ABYLAY | INDUSTRIAL ZONE NO 4, PLANT NO 90, MANGISTAUSKAYA OBLAST | MUNAILY DISTRICT - 3 VILLAGE | MANGISTAU | | 130000 | KAZAKHSTAN | $0.00 |
| StrataGen Inc. | EVOLUTION WELL SERVICES OPERATING LLC | AMENDMENT NO 1 TO SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | ATTN BEN BODISHBAUGH | 1780 HUGHES LANDING BLVD, STE 100 | | THE WOODLANDS | TX | 77380 | | $0.00 |
| StrataGen Inc. | EVOLUTION WELL SERVICES OPERATING LLC | AMENDMENT NO 2 TO SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | ATTN BEN BODISHBAUGH | 1780 HUGHES LANDING BLVD, STE 100 | | THE WOODLANDS | TX | 77380 | | $0.00 |
| StrataGen Inc. | EVOLUTION WELL SERVICES OPERATING LLC | AMENDMENT NO 3 TO SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | ATTN BEN BODISHBAUGH | 1780 HUGHES LANDING BLVD, STE 100 | | THE WOODLANDS | TX | 77380 | | $0.00 |
| StrataGen Inc. | EVOLUTION WELL SERVICES OPERATING LLC | AMENDMENT NO 4 TO SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | ATTN BEN BODISHBAUGH | 1780 HUGHES LANDING BLVD, STE 100 | | THE WOODLANDS | TX | 77380 | | $0.00 |
| StrataGen Inc. | EVOLUTION WELL SERVICES OPERATING LLC | AMENDMENT NO 5 TO SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | ATTN BEN BODISHBAUGH | 1780 HUGHES LANDING BLVD, STE 100 | | THE WOODLANDS | TX | 77380 | | $0.00 |
| StrataGen Inc. | EXXONMOBIL UPSTREAM RESEARCH COMPANY | SOFTWARE LICENSE & MAINTENANCE AGREEMENT | ATTN HENRIQUE BADOCH, SAM SUPERVISOR | 22777 SPRINGWOODS VILLAGE PKWY (SCIENCE 1) | | SPRING | TX | 77389 | | $0.00 |
| StrataGen Inc. | FANGMANN HOLDING GMBH & CO KG | SOFTWARE LICENSE & MAINTENANCE AGREEMENT | ATTN ANJA WINTERHOFF | BRIETZER WEG 10 | | ALZWEDEL | | 29410 | GERMANY | $0.00 |

CARBO Ceramics, Inc., et al
Assumed Contract Cure Schedule

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Est. Cure Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| StrataGen Inc. | FIDELITY EXPLORATION AND PRODUCTION COMPANY | SOFTWARE LICENSE & MAINTENANCE AGREEMENT | ATTN DEAN GIMBEL | 1700 LINCOLN ST, STE 2800 | | DENVER | CO | 80203 | | $0.00 |
| StrataGen Inc. | FIDELITY EXPLORATION AND PRODUCTION COMPANY | AMENDMENT #1 TO SOFTWARE LICENSE & MAINTENANCE AGREEMENT | ATTN JIM HARRINGTON, IT ADMIN MGR | 1700 LINCOLN ST, STE 2800 | | DENVER | CO | 80203 | | $0.00 |
| StrataGen Inc. | FLOTEK INDUSTRIES | SOFTWARE ACCESS AGREEMENT | ATTN GARY FLOCK | 10603 W SAM HOUSTON PKWY N, STE 300 | | HOUSTON | TX | 77064 | | $0.00 |
| StrataGen Inc. | FOREST OIL CORPORATION | SOFTWARE LICENSE & MAINTENANCE AGREEMENT | ATTN BOB KILLINGSWORTH | 707 17TH ST, STE 3600 | | DENVER | CO | 80202 | | $0.00 |
| StrataGen Inc. | GASFRAC ENERGY SERVICES INC | TRANSFER OF FRACPRO LICENSES FROM GASFRAC ENERGY SERVICES INC TO STEP ENERGY SERVICES DTD 5/7/2015 | ATTN DARREN HARRIS, IT MGR | 1900, 801 6 AVE SW | | CALGARY | AB | T2P 3W2 | CANADA | $0.00 |
| StrataGen Inc. | GASFRAC ENERGY SERVICES INC | SOFTWARE LICENSE AND MAINTENANCE AMENDMENT# 6 | ATTN JIM HILL | 801 6 AVE SW | | CALGARY | AB | T2D 3W2 | CANADA | $0.00 |
| StrataGen Inc. | GENE KUBELKA | SOFTWARE ACCESS AGREEMENT AGREEMENT# 20150441130 | ATTN GENE KUBELKA | 4822 PALMETTO | | BELLAIRE | TX | 77401 | | $0.00 |
| StrataGen Inc. | GMX RESOURCES INC | SOFTWARE ACCESS AGREEMENT AGREEMENT# 2010040790 | ATTN BILLY PETERS | 9400 N BROADWAY, STE 600 | | OKLAHOMA CITY | OK | 73114 | | $0.00 |
| StrataGen Inc. | GOFRAC LLC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT AGREEMENT# 2012050783 | ATTN ADRIAN DRUBA | 7000 CALMONT AVE, STE 310 | | FT WORTH | TX | 76116 | | $0.00 |
| StrataGen Inc. | GOFRAC LLC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT# 2012050783 AMENDMENT# 2 | ATTN MATT CORCORAN | 7000 CALMONT AVE, STE 310 | | FT WORTH | TX | 76116 | | $0.00 |
| StrataGen Inc. | GOFRAC LLC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT# 2012050783 AMENDMENT# 3 | ATTN MATT CORCORAN | 7000 CALMONT AVE, STE 310 | | FT WORTH | TX | 76116 | | $0.00 |
| StrataGen Inc. | GORE NITROGEN PUMPING SERVICES LLC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT# 2010020722 | ATTN GARY GORE | PO BOX 65 | | SEILING | OK | 73663 | | $0.00 |
| StrataGen Inc. | GREAT WHITE PRESSURE PUMPING | SOFTWARE ACCESS AGREEMENT# 2010100746 | ATTN WILL HALEY | 14201 CALIBER WAY, STE 300 | | OKLAHOMA CITY | OK | 73134 | | $0.00 |
| StrataGen Inc. | GREAT WHITE PRESSURE PUMPING | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT# 2010100746 AMENDMENT# 1 | ATTN WILLIAM E HALEY | 14201 CALIBER WAY, STE 300 | | OKLAHOMA CITY | OK | 73134 | | $0.00 |
| StrataGen Inc. | GROUPEMENT ISARENE | SOFTWARE LICENSE & MAINTENANCE AGREEMENT | ATTN FAKIR AMZAL, DRILLING DEPT MGR | REDMED BASE, ROUTE DE IN-AMENAS | | HASSI-MESSAOUD | | | ALGERIA | $0.00 |
| StrataGen Inc. | GROUPEMENT ISARENE | SERVICE AGREEMENT FOR SOFTWARE LICENSE SUPPLY & MAINTENANCE | ATTN TAHAR BOUASLA, CO-ADMIN | REDMED BASE DE VIE, BP 509 | ROUTE DE IN-AMENAS, HASSI-MESSAOUD | WILAYA DE OUARGIA | | 30500 | ALGERIA | $0.00 |

CARBO Ceramics, Inc., et al
Assumed Contract Cure Schedule

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Est. Cure Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| StrataGen Inc. | GROUPEMENT TFT | SOFTWARE LICENSE & MAINTENANCE AGREEMENT | ATTN JP ZUNDEL, ADMINISTRATOR | ZONE DU 24 FEVRIER BP 518 | HASSI-MESSAOUD | W. OUARGLA | | | ALGERIA | $0.00 |
| StrataGen Inc. | GRUP SERVICII PERTROLIERE SA | SOFTWARE LICENSE & MAINTENANCE AGREEMENT | ATTN JON HANSEN | CONSTANTA PORT, BERTH 34 | | CONSTANTA | | 900900 | ROMANIA | $0.00 |
| StrataGen Inc. | GRUPO LOGARDI SA DE CV | SOFTWARE LICENSE & MAINTENANCE AGREEMENT | ATTN RUBEN GUEL GUDINO | CALLE PRIMERA 400, COLONIA LONGORIA | | REYNOSA, TAMAULIPAS | | CP 88660 | MEXICO | $0.00 |
| StrataGen Inc. | HALLIBURTON ENERGY SERVICES INC | TEMPORARY SOFTWARE LICENSE AGREEMENT | ATTN AHMED MAMDOUH, PE OPS MGR | 2600 S 2ND ST | | DUNCAN | OK | 73533-0440 | | $0.00 |
| StrataGen Inc. | HALLIBURTON ENERGY SERVICES INC | PATENT ASSIGNMENT NUNC PRO TUNC | ATTN DON P CONKLE, VP | 10200 BELLAIRE BLVD, STE 2NE | | HOUSTON | TX | 77072 | | $0.00 |
| StrataGen Inc. | HALLIBURTON ENERGY SERVICES INC | SOFTWARE LICENSE & MAINTENANCE AGREEMENT | ATTN JOHNNIE MUNDY | 10200 BELLAIRE BLVD | | HOUSTON | TX | 77072 | | $0.00 |
| StrataGen Inc. | HALLIBURTON ENERGY SERVICES INC | AMENDMENT #1 TO SOFTWARE LICENSE & MAINTENANCE AGREEMENT | ATTN RICK JACOBI, SALES MGR | 10200 BELLAIRE BLVD | | HOUSTON | TX | 77072 | | $0.00 |
| StrataGen Inc. | HARMONIA PETROLEUM CORPORATION | SOFTWARE ACCESS AGREEMENT | ATTN ROBERT REYES, GM | 24 SMITH RD, STE 200 | | MIDLAND | TX | 79705 | | $0.00 |
| StrataGen Inc. | HESS CORPORATION | AMENDMENT #1 TO SOFTWARE LICENSE & MAINTENANCE AGREEMENT | ATTN HONG CHEW, MGR ENGINEERING SYSTEMS | 500 DALLAS ST | | HOUSTON | TX | 77002 | | $0.00 |
| StrataGen Inc. | HIGHLANDS NATURAL RESOURCES PLC | SOFTWARE ACCESS AGREEMENT | ATTN ROBERT B PRICE, CHARIMAN/CEO | 50 S STEELE ST, STE 600 | | DENVER | CO | 80209 | | $0.00 |
| StrataGen Inc. | HIRAM OIL LLC | SOFTWARE ACCESS AGREEMENT #2016120805 | 528 S CASINO CENTER DR | | | LAS VEGAS | NV | 89109 | | $0.00 |
| StrataGen Inc. | HUSKY OIL OPERATIONS LTD | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT #2013050845 | ATTN ANDREW MONTES | 235 WATER ST, SCOTIA CENTRE, STE 901 | | ST JOHN'S | NL | A1C 1B6 | CANADA | $0.00 |
| StrataGen Inc. | INDIAN SCHOOL OF MINES | SOFTWARE LICENSE AGREEMENT #2013080951 | ATTN DEPT OF PETROLEUM ENG | POLICE LINE ROAD, MAIN CAMPUS IIT | | DHANBAD | | 826004 | INDIA | $0.00 |
| StrataGen Inc. | INTEGRADORES DE TECNOLOGIA SA DE CV | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT #2013090731 | CAMINO AL DESIERTO DE LAS LEONES #35 | COL SAN ANGEL INN ALVARO OBREGON | | CIUDAD DE MEXICO | | CP 01060 | MEXICO | $0.00 |
| StrataGen Inc. | IRON HORSE ENERGY SERVICES INC | SOFTWARE ACCESS AGREEMENT #2015100964 | ATTN TOM COOLEN | 47 E 3RD AVE | | DUNMORE | AB | T1B0J9 | CANADA | $0.00 |
| StrataGen Inc. | JAPAN OIL DEVELOPMENT CO LTD, ABU DHABI BRANCH | SOFTWARE ACCESS AGREEMENT #2012091011 | ETIHAD TOWERS, TOWER 3, FL 10 | PO BOX 2659 | | ABU DHABI | | | UAE | $0.00 |
| StrataGen Inc. | JAPAN OIL, GAS AND METALS NATIONAL CORP | SOFTWARE MAINTENANCE AGREEMENT #2014071090 | 2-2 HAMADA 1 CHROME MIHAMA-KU | CHIBA-SHI | | CHIBA | | 261-0025 | JAPAN | $0.00 |
| StrataGen Inc. | JAPAN OIL, GAS AND METALS NATIONAL CORP | SOFTWARE MAINTENANCE AGREEMENT #2011031049 | 2-2 HAMADA 1 CHROME MIHAMA-KU | CHIBA-SHI | | CHIBA | | 261-0025 | JAPAN | $0.00 |
| StrataGen Inc. | JOEL FIELD | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | 205 W 1ST ST | | | CAMP WOOD | TX | 78833 | | $0.00 |

CARBO Ceramics, Inc., et al
Assumed Contract Cure Schedule

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Est. Cure Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| StrataGen Inc. | JX NIPPON OIL & GAS EXPLORATION | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | 6-3 OTEMACHI 2-CHOME | CHIYODA-KU | | TOKYO | | 100-8163 | JAPAN | $0.00 |
| StrataGen Inc. | KEANE GROUP INC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT AMENDMENT #4 | 5825 N SAM HOUSTON PKWY W, STE 600 | | | HOUSTON | TX | 77086 | | $0.00 |
| StrataGen Inc. | KEY ENERGY SERVICES DE MEXICO S DE RL DE CV | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | CALLE NICARAGUA SIN NUMERO | COL 27 DE SEPTIEMBRE | | POZA RICA, VERACRUZ | | 93320 | MEXICO | $0.00 |
| StrataGen Inc. | KIND SAUD UNIVERSITY | SOFTWARE LICENSE AGREEMENT | ATTN DR MUSAED AL-AWAD, CHAIRMAN | KING KHALID RD | | RIYADH | | 11421 | SAUDI ARABIA | $0.00 |
| StrataGen Inc. | KOSTER COMPLETIONS ENGINEERING | SOFTWARE ACCESS AGREEMENT | 565 E 70TH AVE, UNIT 5W | | | DENVER | CO | 80229 | | $0.00 |
| StrataGen Inc. | KRUSE, GUSTAVO | SOFTWARE ACCESS AGREEMENT | AV LAS HERAS 1649 2 10 | | | BUENOS AIRES | | 1018 | ARGENTINA | $0.00 |
| StrataGen Inc. | L-3 APPLIED TECHNOLOGIES DIVISION JAYCOR INC | SOFTWARE LICENSING AGREEMENT | ATTN SANDI QUINTERO | 10770 WATERIDGE CIR, STE 200 | | SAN DIEGO | CA | 92121 | | $0.00 |
| StrataGen Inc. | LARSEN & TOUBRO HEAVY ENGINEERING | SOFTWARE LICENSING AGREEMENT | HAZIRA MANUFACTURING COMPLEX | | | SURAT | | 394 510 | INDIA | $0.00 |
| StrataGen Inc. | LEGADO RESOURCES LLC | SOFTWARE AND MAINTENANCE AGREEMENT | ATTN DEREK MEASE | 10003 WOODLOCH FOREST DR, STE 900 | | THE WOODLANDS | TX | 77380 | | $0.00 |
| StrataGen Inc. | LEGEND ENERGY SERVICES | SOFTWARE ACCESS AGREEMENT | 5801 BROADWAY EXT | STE 210 | | OKLAHOMA CITY | OK | 73118 | | $0.00 |
| StrataGen Inc. | LH OIL DE MEXICO | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | CAMINO A BATERIA MACATEPEC | CARRETERA FEDERAL EJIDO RECARDO FLORES MAGON | POZA RICA | VERACRUZ | | 92917 | MEXICO | $0.00 |
| StrataGen Inc. | LIME ROCK RESOURCES IV-A LP | MASTER SERVICE AGREEMENT DTD 8/15/2016 | ATTN C TIM MILLER | 1111 BAGBY ST, 46TH FL | | HOUSTON | TX | 77002 | | $0.00 |
| StrataGen Inc. | MANEK ENERGY | SOFTWARE LICENSE & MAINTENANCE AGREEMENT | ATTN KENT GOOGANS | 2870 N HARVEY MITCHELL PKWY, STE 700 | | BRYAN | TX | 77807 | | $0.00 |
| StrataGen Inc. | MOL PAKISTAN OIL & GAS CO BV | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT DTD 5/28/2014 | PLOT NO 5/A, CROWN PLAZA, F-7 MARKAZ | PO BOX 1562 | | ISLAMABAD | | 44000 | PAKISTAN | $0.00 |
| StrataGen Inc. | MUREX PETROLEUM CORP | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT DTD 11/6/2013 | PO BOX 7 | | | HUMBLE | TX | 77347 | | $0.00 |
| StrataGen Inc. | NATIONAL PETROLEUM SERVICES CO (KSC) | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT DTD 3/16/2018 | SHUAIBA W INDUSTRIAL AREA, BLOCK 3, PLOT 76 | INTEGRATION RD MA10 WITH M6 | | MINA ABDULLAH | | | KUWAIT | $0.00 |
| StrataGen Inc. | NATIONWIDE REFERRAL CO | APARTMENT & RELOCATION CENTER CONTRACT FOR OCCUPANCY | 3903 SE Military Drive | #8304 | | 0 San Antonio | Texas | 78223 | United States | $0.00 |
| StrataGen Inc. | NOV COMPLETION & PRODUCTION SOLUTIONS | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | 10353 RICHMOND AVE | | | HOUSTON | TX | 77042 | | $0.00 |

CARBO Ceramics, Inc., et al
Assumed Contract Cure Schedule

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Est. Cure Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| StrataGen Inc. | OIL AND NATURAL GAS CORPORATION LTD | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | AHMEDABA 380 005 | | | GUJARAT | | | INDIA | $0.00 |
| StrataGen Inc. | OILSERV FZCO | AMENDMENT NO 4 TO SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | OFFICE NO LB03014 | JEBEL ALI | | DUBAI | | | UAE | $0.00 |
| StrataGen Inc. | OILSERVE HOLDING LTD | AMENDMENT NO 3 TO SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | OFFICE NO LB03014 | JEBEL ALI | | DUBAI | | | UAE | $0.00 |
| StrataGen Inc. | OILSERVE HOLDING LTD | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | SOUTH INDUSTRIAL AREA | OLD KIRKUK RD | | ERBIL | | | IRAQ | $0.00 |
| StrataGen Inc. | OJSC SURGUTNEFTEGAS | CONFIDENTIAL USE AND MAINTENANCE OF SOFTWARE LICENSE AGREEMENT | ATTN BESPALOV VG | TYUMENSKAYA OBLAST, SURGUT, UI | GRIGORIYA KUKUYEVITSKOGO , 1 | OKRUGYUGRA | | | RUSSIAN FEDERATION | $0.00 |
| StrataGen Inc. | OMV SOLUTIONS GMBH | AMENDMENT NO 5 TO SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | TRABRENNSTRASSE 6-8 | | | VIENNA | | A-1020 | AUSTRIA | $0.00 |
| StrataGen Inc. | OMV SOLUTIONS GMBH | AMENDMENT NO 6 TO SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | TRABRENNSTRASSE 6-8 | | | VIENNA | | A-1020 | AUSTRIA | $0.00 |
| StrataGen Inc. | ORLEN UPSTREAM SP Z OO | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | ATTN WIESLAW PRUGAR, PRES | UL PRZYOKOKOPOWA 31 | | WARSZAWA | | 01-208 | POLAND | $0.00 |
| StrataGen Inc. | OXY INC | ASSIGNMENT OF LICENSES, MAINTENANCE AND SUPUPORT SERVICES | 5 GREENWAY PLAZA, STE 100 | | | HOUSTON | TX | 77046-0521 | | $0.00 |
| StrataGen Inc. | PACKERS PLUS ENERGY SERVICES INC USA | SOFTWARE AND MAINTENANCE AGREEMENT | 4606 FM 1960 W, STE 220 | | | HOUSTON | TX | 77079 | | $0.00 |
| StrataGen Inc. | PAN AMERICAN ENERGY LLC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | LEANDRO N ALEM 1180 | | | BUENOS AIRES | | C1001AAS | ARGENTINA | $0.00 |
| StrataGen Inc. | PGNIG SA | SOFTWARE AND LICENSE MAINTENANCE AGREEMENT | ATTN PRZEMYSLAW OSINIAK | 25 M KASPRZAKA ST | | WARSAW | | 01-224 | POLAND | $0.00 |
| StrataGen Inc. | PGNIG SA W WARSZAWIE | SOFTWARE AND LICENSE MAINTENANCE AGREEMENT #2006121602 AMENDMENT NO 1 | 25 KASPRZAKA ST | | | WARSAW | | 01-224 | POLAND | $0.00 |
| StrataGen Inc. | PIONEER NATURAL RESOURCES | AMENDMENT #1 TO SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | PUMPING SERVICES LLC | ATTN KYLE ZEMLAK | 5205 N OCONNOR BLVD, STE 200 | IRVING | TX | 75039 | | $0.00 |
| StrataGen Inc. | PIONEER NATURAL RESOURCES | AMENDMENT #2 TO SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | PUMPING SERVICES LLC | ATTN KYLE ZEMLAK | 5205 N OCONNOR BLVD, STE 200 | IRVING | TX | 75039 | | $0.00 |
| StrataGen Inc. | PIONEER NATURAL RESOURCES | AMENDMENT #3 TO SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | PUMPING SERVICES LLC | ATTN KYLE ZEMLAK | 5205 N OCONNOR BLVD, STE 200 | IRVING | TX | 75039 | | $0.00 |

CARBO Ceramics, Inc., et al
Assumed Contract Cure Schedule

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Est. Cure Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| StrataGen Inc. | PIONEER NATURAL RESOURCES | AMENDMENT #4 TO SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | PUMPING SERVICES LLC | ATTN KYLE ZEMLAK | 5205 N OCONNOR BLVD, STE 200 | IRVING | TX | 75039 | | $0.00 |
| StrataGen Inc. | PIONEER NATURAL RESOURCES | AMENDMENT #5 TO SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | PUMPING SERVICES LLC | ATTN KYLE ZEMLAK | 5205 N OCONNOR BLVD, STE 200 | IRVING | TX | 75039 | | $0.00 |
| StrataGen Inc. | PIONEER NATURAL RESOURCES | AMENDED AND RESTATED MASTER SERVICE/SALES AGREEMENT DTD 9/17/2015 | PUMPING SERVICES LLC | ATTN KIMBERLY BURKE | 5205 N OCONNOR BLVD, STE 200 | IRVING | TX | 75039 | | $0.00 |
| StrataGen Inc. | PIONEER NATURAL RESOURCES USA | ADDENDUM #6 TO SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | ATTN CAROL TESSLER | 5205 N OCONNOR BLVD, STE 200 | | IRVING | TX | 75039 | | $0.00 |
| StrataGen Inc. | PLATINUM ENERGY SOLUTIONS INC | SETTLEMENT AND RELEASE AGREEMENT | ATTN JOSHUA VERDE, PRESIDENT | 2100 W LOOP S, STE 1601 | | HOUSTON | TX | 77027 | | $0.00 |
| StrataGen Inc. | PLATINUM ENERGY SOLUTIONS INC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | ATTN MIKE WHITE | 2100 W LOOP S, STE 1601 | | HOUSTON | TX | 77027 | | $0.00 |
| StrataGen Inc. | POSTROCK ENERGY CORPORATION | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | ATTN JAVIER SANTOS CABRERA, STIMULATION ENGINEER | 210 PARK AVE, STE 2750 | | OKLAHOMA | OK | 73102 | | $0.00 |
| StrataGen Inc. | PRAXAIR SERVICES INC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | ATTN TYRELL JONES, PROCUREMENT ASSOCIATE IV | 1585 SAWDUST RD, STE 300 | | THE WOODLANDS | TX | 77380 | | $0.00 |
| StrataGen Inc. | PRECISION PETROLEUM SOLUTIONS LLC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | ATTN STEVE FOWLER, OWNER | 621 ROLLINGBROOK DR | | BAYTOWN | TX | 77521 | | $0.00 |
| StrataGen Inc. | PREMIER PRESSURE PUMPING LLC | AMENDMENT #1 TO SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | ATTN RYAN DOWLING, ENGINEERING MGR | 2310 INDUSTRIAL AVE | | KILGORE | TX | 75662 | | $0.00 |
| StrataGen Inc. | PREMIER PRESSURE PUMPING LLC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | ATTN THOMAS BUFKIN, MANAGER | 2310 INDUSTRIAL AVE | | KILGORE | TX | 75662 | | $0.00 |
| StrataGen Inc. | PRODUCTION SOLUTIONS INTERNATIONAL LTD | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | ATTN JOE CUSINANO, CIO | THISTLE HOUSE, 4 BURNABY ST | | HAMILTON HM 11 | | | BERMUDA | $0.00 |
| StrataGen Inc. | PROPETRO SERVICES INC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT #2011051651 | ATTN ADAM MUNOZ | 1706 S MIDKIFF, BLDG B | | MIDLAND | TX | 79701 | | $0.00 |
| StrataGen Inc. | PROPETRO SERVICES INC | TECHNICAL AND ECONOMICAL PROPOSAL DTD 3/13/2019 | ATTN ADAM MUNOZ | 1706 S MIDKIFF, BLDG B | | MIDLAND | TX | 79701 | | $0.00 |
| StrataGen Inc. | PROPETRO SERVICES INC | AMENDMENT #11 TO SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | ATTN DAVID HALL, LEAD ENGINEER | 4 S INDUSTRIAL LOOP | | MIDLAND | TX | 79702 | | $0.00 |
| StrataGen Inc. | PROPETRO SERVICES INC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT #2011051651 AMENDMENT #12 | ATTN DAVID HALL, LEAD ENGINEER | 4 S INDUSTRIAL LOOP | | MIDLAND | TX | 79702 | | $0.00 |

CARBO Ceramics, Inc., et al
Assumed Contract Cure Schedule

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Est. Cure Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| StrataGen Inc. | PROPETRO SERVICES INC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT #2011051651 AMENDMENT #13 | ATTN DAVID HALL, LEAD ENGINEER | 4 S INDUSTRIAL LOOP | | MIDLAND | TX | 79702 | | $0.00 |
| StrataGen Inc. | PROPETRO SERVICES INC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT #2011051651 AMENDMENT #14 | ATTN DAVID HALL, LEAD ENGINEER | 4 S INDUSTRIAL LOOP | | MIDLAND | TX | 79702 | | $0.00 |
| StrataGen Inc. | PROPETRO SERVICES INC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT #2011051651 AMENDMENT #15 | ATTN DAVID HALL, LEAD ENGINEER | 4 S INDUSTRIAL LOOP | | MIDLAND | TX | 79702 | | $0.00 |
| StrataGen Inc. | PROPETRO SERVICES INC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT #2011051651 AMENDMENT #16 | ATTN DAVID HALL, LEAD ENGINEER | 4 S INDUSTRIAL LOOP | | MIDLAND | TX | 79702 | | $0.00 |
| StrataGen Inc. | PROPETRO SERVICES INC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT #2011051651 AMENDMENT #17 | ATTN DAVID HALL, LEAD ENGINEER | 4 S INDUSTRIAL LOOP | | MIDLAND | TX | 79702 | | $0.00 |
| StrataGen Inc. | PROPETRO SERVICES INC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT #2011051651 AMENDMENT #18 | ATTN DAVID HALL, LEAD ENGINEER | 4 S INDUSTRIAL LOOP | | MIDLAND | TX | 79702 | | $0.00 |
| StrataGen Inc. | PROPETRO SERVICES INC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT #2011051651 AMENDMENT #10 | ATTN DAVID HALL, LEAD ENGINEER | 4 S INDUSTRIAL LOOP | | MIDLAND | TX | 79702 | | $0.00 |
| StrataGen Inc. | PROVEEDORA DE FLUIDOS | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT #2018091633 | MEXICANOS SA DE CV | 4A ENTRE MATAMOROS Y BRAVO | #180 ZONA CENTRO | TAMAULIPAS | | CP/ZC 87300 | MEXICO | $0.00 |
| StrataGen Inc. | PT ELNUSA TBK | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT #2014060594 | ATTN ARY WIJAYA, VP | GRAHA ELNUSA, LANTAI 16 | Jl TB SIMATUPANG KAV 1B | JAKARTA | | 12560 | INDONESIA | $0.00 |
| StrataGen Inc. | PTT EXPLORATION AND PRODUCTION PCL | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT #2013061659 | ATTN KIATISAK KUNTAWANG, VP | PTTEP OFFICE BLDG | 555 VIBHAVADI-RANGSIT RD | CHATUCHAK, BANGKOK | | 10900 | THAILAND | $0.00 |
| StrataGen Inc. | PUMPCO ENERGY SERVICES INC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT #2017111615 AMENDMENT #1 | ATTN LAURA SCHILLING, PRESIDENT | 1001 LOUISIANA ST, STE 2900 | | HOUSTON | TX | 77002 | | $0.00 |
| StrataGen Inc. | PUMPCO ENERGY SERVICES INC | SOFTWARE ACCESS AGREEMENT #2017011600 | ATTN RONNIE D HUGHES, VP OF ASSET MGMT | 117 ELM GROVE RD | | VALLEY VIEW | TX | 76272 | | $0.00 |
| StrataGen Inc. | PUMPCO ENERGY SERVICES INC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT AMENDMENT #1 | ATTN RONNIE HUGHES | 117 ELM GROVE RD | | VALLEY VIEW | TX | 76272 | | $0.00 |
| StrataGen Inc. | PUMPCO ENERGY SERVICES INC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT #2017111615 | ATTN: RONNIE D HUGHES, VP OF ASSET MGMT | 117 ELM GROVE RD | | VALLEY VIEW | TX | 76272 | | $0.00 |
| StrataGen Inc. | QARUN PETROLEUM COMPANY | TEMPORARY SOFTWARE LICENSE AGREEMENT | ATTN AHMED A HAMID, ENGINEER | 1 ROAD 315, NEW MAADI | | CAIRO | | | EGYPT | $0.00 |
| StrataGen Inc. | QES/CONSOLIDATED OIL WELL SERVICES LLC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | ATTN JON D KLUGH | 1322 S GRANT | | CHANUTE | KS | 66720 | | $0.00 |

CARBO Ceramics, Inc., et al
Assumed Contract Cure Schedule

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Est. Cure Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| StrataGen Inc. | QUASAR ENERGY SERVICES INC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | 3288 FM 51 | | | GAINSVILLE | TX | 76240 | | $0.00 |
| StrataGen Inc. | QUIMICA APOLLO SA DE CV | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | BLVD MIGUEL ALEMAN VALDEZ NO 206 | PARQUE INDUSTRIAL EXPORTEC II | | TOLUCA | | | MEXICO | $0.00 |
| StrataGen Inc. | RAG ROHOL AUFSUCHUNGS | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT AMENDMENT #1 | AKTLENGESELLSCHAFT | ATTN JOHANN DRUML | SCHWARZMOOS 28 | GAMPERN | | A-4851 | AUSTRIA | $0.00 |
| StrataGen Inc. | RAG ROHOL AUFSUCHUNGS | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | AKTLENGESELLSCHAFT | ATTN ROLAND BERGMANN | SCHWARZMOOS 28 | GAMPERN | | A-4851 | AUSTRIA | $0.00 |
| StrataGen Inc. | REFINERY SPECIALTIES INC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | 38106 FM 3346 | | | HEMPSTEAD | TX | 77445 | | $0.00 |
| StrataGen Inc. | REPSOL SA | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | 22 AVE DE LA INDUSTRIA | 28760 TRES CANTOS | | MADRID | | | SPAIN | $0.00 |
| StrataGen Inc. | RN GRP LLC | AMENDMENT #2 TO SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | BUILDING 11 PAV 1 | S INDUSTRIAL ZONE | | RADUZHNY | | 628464 | RUSSIA | $0.00 |
| StrataGen Inc. | ROCKPILE ENERGY SERVICES LLC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT AMENDMENT #3 | ATTN ALLEN CRUM | 1660 WYNKOOP ST, STE 900 | | DENVER | CO | 80202 | | $0.00 |
| StrataGen Inc. | S&B DICKINSON APARTMENTS I LLC | APARTMENT LEASE CONTRACT FOR APT # 933 | 3900 EDISON LAKES PKWY | | | MISHAWAKA | IN | 46546 | | $0.00 |
| StrataGen Inc. | S&B DICKINSON APARTMENTS I LLC | APARTMENT LEASE CONTRACT FOR APT # 932 | 3901 EDISON LAKES PKWY | | | MISHAWAKA | IN | 46546 | | $0.00 |
| StrataGen Inc. | SANCHEZ OIL AND GAS CORP | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | ATTN CHRISTOPHER BERNARD | 1000 MAIN ST, STE 3000 | | HOUSTON | TX | 77002 | | $0.00 |
| StrataGen Inc. | SANDRIDGE ENERGY INC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT AMENDMENT NO 1 | 123 ROBERT S KERR AVE | | | OKLAHOMA CITY | OK | 73102 | | $0.00 |
| StrataGen Inc. | SANJEL CORPORATION | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT AMENDMENT NO 18 | 622 5TH AVE SW | | | CALGARY | AB | T2P0M6 | CANADA | $0.00 |
| StrataGen Inc. | SENERGY HOLDINGS LTD | SOFTWARE ACCESS AGREEMENT NO 2017031940 | 2/3 QUEENS TERRACE | | | ABERDEEN | | AB10 1XL | UNITED KINGDOM | $0.00 |
| StrataGen Inc. | SERVICIOS INTEGRALES SANJEL S DE RL D CV | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT AMENDMENT NO 16 | HIDALGO #1150 LOCAL D | COL. CENTRO CP | | REYNOSA, TAMPS | | 88500 | MEXICO | $0.00 |
| StrataGen Inc. | SETEGAP VENTURES PETROLEUM SDN BHD | SOFTWARE LICENSE AGREEMENT AND MAINTENANCE AGREEMENT AMENDMENT NO 1 | NO. 68 & 70, FRASER BUSINESS PARK | JALAN METRO PUDU 2 | | KUALA LUMPUR | | 55200 | MALAYSIA | $0.00 |
| StrataGen Inc. | SETEGAP VENTURES PETROLEUM SDN BHD | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT NO 2017031935 | NO. 68 & 70, FRASER BUSINESS PARK | JALAN METRO PUDU 2 | | KUALA LUMPUR | | 55200 | MALAYSIA | $0.00 |

CARBO Ceramics, Inc., et al
Assumed Contract Cure Schedule

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Est. Cure Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| StrataGen Inc. | SEVENTH SENSE ENGINEERING INC | SOFTWARE ACCESS AGREEMENT NO 2012051933 | 3539 QUIVAS ST | PO BOX 11857 | | DENVER | CO | 80211 | | $0.00 |
| StrataGen Inc. | SICARD PETROLEUM CONSULTANTS LLC | SOFTWARE ACCESS AGREEMENT NO 2018091935 | 173 TIMBERCREEK DR | | | ORANGE GROVE | TX | 783723630 | | $0.00 |
| StrataGen Inc. | SINOPEC ARGENTINA EXPLORATION AND PRODUCTION INC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | ATTN ZHAI HUIHAI | MANUELA SAENZ 323, 1ER PISO | | BUENOS AIRES | | C1107BPA | ARGENTINA | $0.00 |
| StrataGen Inc. | SM ENERGY | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT AMENDMENT #3 | ATTN DUSTIN MOBLEY, SR SYSTEMS ANALYST | 6120 S YALE ST | | TULSA | OK | 74136 | | $0.00 |
| StrataGen Inc. | SOLARIUM OIL SOLUTIONS | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | ATTN JOEGE VIVAS, MGR | CALLE MANZANO #125 | FRACC HERBERTO KEHOE | VILLAHERMOSA, TABASCO | | | MEXICO | $0.00 |
| StrataGen Inc. | SPRINT OIL AND GAS SERVICES | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | ATTN SHAHBAZ KHAN, SUPPLY CHAIN OFFICER | HAMRIYAH FREE ZONE | | SHARJAH | | 41777 | UAE | $0.00 |
| StrataGen Inc. | STATOIL GULF SERVICES LLC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT AMENDMENT #1 | ATTN MARCOS A MARTINEZ, CONSULTANT BUSINESS SUPPORT | 2103 CITY WEST BLVD, BLDG 4, 8TH FL | | HOUSTON | TX | 77042 | | $0.00 |
| StrataGen Inc. | STATOIL TEXAS GULF SERVICES LLC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | ATTN JOHN PASPISIL, LEADER PROC BUSINESS SUPPORT | 2103 CITY WEST BLVD, BLDG 4, 8TH FL | | HOUSTON | TX | 77042 | | $0.00 |
| StrataGen Inc. | STEP ENERGY SERVICES INC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT AMENDMENT # 1 | ATTN BAILEY EPP, VP ENGINEERING & TECH | 300, 503 3RD ST SW | | CALGARY | AB | T2P 3E6 | CANADA | $0.00 |
| StrataGen Inc. | STEP ENERGY SERVICES INC | TRANSFER OF FRACPRO LICENSES FROM GASFRAC ENERGY SERVICES INC TO STEP ENERGY SERVICES DTD 5/7/2015 | ATTN CHANDRA MUGFORD, BUSINESS SYSTEM ANALYST | 300, 505 3RD ST SW | | CALGARY | AB | T2P 3E6 | CANADA | $0.00 |
| StrataGen Inc. | STEP ENERGY SERVICES INC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | ATTN ROBERT SPINKHUYSEN, CFO | 300, 503 3RD ST SW | | CALGARY | AB | T2P 3E6 | CANADA | $0.00 |
| StrataGen Inc. | STEWART & STEVENSON MANUFACTURING TECHNOLOGIES LLC | CONFIDENTIAL USE AND MAINTENANCE OF SOFTWARE LICENSE AGREEMENT | ATTN KELLY LAMONT, VP | 1000 LOUISIANA, STE 5900 | | HOUSTON | TX | 77002 | | $0.00 |
| StrataGen Inc. | STINGRAY PRESSURE PUMPING LLC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | 14313 N MAY AVE | | | OKLAHOMA CITY | OK | 73134 | | $0.00 |
| StrataGen Inc. | STRATAGEN DELFT BV | LOAN AGREEMENT | KALFJESLAAN 54 | | | DELFT | | 2623 AJ | NETHERLANDS | $0.00 |
| StrataGen Inc. | STRATAGEN DELFT BV | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | KALFJESLAAN 54 | | | DELFT | | 2623 AJ | NETHERLANDS | $0.00 |
| StrataGen Inc. | STRATAGEN DELFT BV | SOFTWARE LICENSE & MAINTENANCE AGREEMENT | KALFJESLAAN 54 | | | DELFT | | 2623 AJ | NETHERLANDS | $0.00 |
| StrataGen Inc. | SWN WELL SERVICES LLC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | 2350 N SAM HOUSTON PKWY E, STE 125 | | | HOUSTON | TX | 77032 | | $0.00 |

CARBO Ceramics, Inc., et al
Assumed Contract Cure Schedule

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Est. Cure Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| StrataGen Inc. | SYFAN ENGINEERING LLC | SOFTWARE ACCESS AGREEMENT | 309 W 7TH ST, STE 500 | | | FORT WORTH | TX | 76102 | | $0.00 |
| StrataGen Inc. | TECPETROL | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | 2200 WEST LOOP SOUTH, STE 400 | | | HOUSTON | TX | 77027 | | $0.00 |
| StrataGen Inc. | TEHNOLOGICAL ENERGY HOLDING SIA | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | PATVERMLES 19-3 | | | RIGA | | LV-1050 | LATVIA | $0.00 |
| StrataGen Inc. | TENDEKA | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | 15995 N BARKERS LANDING, STE 305 | | | HOUSTON | TX | 77079 | | $0.00 |
| StrataGen Inc. | TIPTOP ENERGY PRODUCTION US LLC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | 101 N ROBINSON AVE | | | OKLAHOMA CITY | OK | 73102 | | $0.00 |
| StrataGen Inc. | TOPS WELL SERVICES LLC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | 15046 49TH ST NW | | | WILLISTON | ND | 58801 | | $0.00 |
| StrataGen Inc. | TORQUED-UP ENERGY SERVICES | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | 110 N COLLEGE AVE STE 1000 | | | TYLER | TX | 75702 | | $0.00 |
| StrataGen Inc. | TORRES, JASON | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT #2017051995 | 12503 RANCH SUMMIT | | | SAN ANTONIO | TX | 78245 | | $0.00 |
| StrataGen Inc. | TUCKER ENERGY SERVICES INC | AMENDMENT #3 TO SOFTWARE LICENSE & MAINTENANCE AGREEMENT | ATTN JOHN POKORNY | 400 N SAM HOUSTON PKWY E #300 | | HOUSTON | TX | 77060 | | $0.00 |
| StrataGen Inc. | TUCKER ENERGY SERVICES INC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | ATTN SHAWN TUCKER | 411 N SAM HOUSTON PKWY E #300 | | HOUSTON | TX | 77060 | | $0.00 |
| StrataGen Inc. | TUCKER ENERGY SERVICES INC | AMENDMENT #1 TO SOFTWARE LICENSE & MAINTENANCE AGREEMENT | ATTN SHAWN TUCKER | 400 N SAM HOUSTON PKWY E #300 | | HOUSTON | TX | 77060 | | $0.00 |
| StrataGen Inc. | TUCKER ENERGY SERVICES INC | AMENDMENT #2 TO SOFTWARE LICENSE & MAINTENANCE AGREEMENT | ATTN SHAWN TUCKER | 400 N SAM HOUSTON PKWY E #300 | | HOUSTON | TX | 77060 | | $0.00 |
| StrataGen Inc. | TURKISH PETROLEUM CORPORATION | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | ATTN MEHMET BULBUL | SOGUTOZU MAHALLESI, 2180 CADDE, NO 86 06100 | | CANKAYA, ANKARA | | | TURKEY | $0.00 |
| StrataGen Inc. | UNCONVENTIONAL RESOURCES LLC | SOFTWARE ACCESS AGREEMENT | ATTN BRAD WOLTERS | 2425 EARL RUDDER FREEWAY | | COLLEGE STATION | TX | 77845 | | $0.00 |
| StrataGen Inc. | UNITED ENERGY PAKISTAN LIMITED | SOFTWARE ACCESS AGREEMENT | ATTN ABDULLAH FAROOQ | 4 FL BAHRIA COMPLEX 1 | MT KHAN RD | KARACHI | | | PAKISTAN | $0.00 |
| StrataGen Inc. | UNITED OILFIELD SERVICES SP Z00 | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | ATTN DENNIS MCKEE | MILLENIUM PLAZA, AL. JEROZOLIMSKIE 123A | | WARSAW | | 02-017 | POLAND | $0.00 |
| StrataGen Inc. | UNIVERISTY OF TEXAS PERMIAN BASIN | SOFTWARE LICENSE AGREEMENT | COLLLEGE OF BUSINESS & ENGINEERING | ATTN AHMED KAMEL, ASSOC PROFESSOR | 4901 E UNIVERISTY BLVD IT 108 | ODESSA | TX | 79762-0001 | | $0.00 |
| StrataGen Inc. | UNIVERSITY OF ALASKA FAIRBANKS | SOFTWARE LICENSE AGREEMENT | ATTN SCOTT A SNEDDEN | 425 DUCKERING BUILDING | PO BOX 755880 | FAIRBANKS | AK | 99775-5880 | | $0.00 |

**CARBO Ceramics, Inc., et al**
**Assumed Contract Cure Schedule**

| Contract Debtor | Contract Counterparty Name | Contract Description | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Est. Cure Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| StrataGen Inc. | UNIVERSITY OF ALBERTA | SOFTWARE LICENSE AGREEMENT | ATTN ALIREZA NOURI, PHD, PENG | 9105 116TH ST | | EDMONTON | AB | T6G 2W2 | CANADA | $0.00 |
| StrataGen Inc. | UNIVERSITY OF AUCKLAND | SOFTWARE LICENSE AGREEMENT | ATTN SADIG ZARROUK | PRIVATE BAG 92019 | | AUCKLAND | | | NEW ZEALAND | $0.00 |
| StrataGen Inc. | UNIVERSITY OF TEXAS PERMIAN BASIN | SOFTWARE LICENSE AGREEMENT | ATTN AHMED KAMEL PHD | 4901 E UNIVERSITY BLVD IT 108 | | ODESSA | TX | 79762-0001 | | $0.00 |
| StrataGen Inc. | US WELL SERVICES | AMENDMENT #3 TO SOFTWARE LICENSE & MAINTENANCE AGREEMENT | ATTN BRIAN STEWART, PRESIDENT | 533 INDUSTRIAL PARK DR | | JANE LEW | WV | 26379 | | $0.00 |
| StrataGen Inc. | US WELL SERVICES | AMENDMENT #5 | ATTN BRIAN STEWART, PRESIDENT | 533 INDUSTRIAL PARK DR | | JANE LEW | WV | 26379 | | $0.00 |
| StrataGen Inc. | US WELL SERVICES | AMENDMENT #7 | ATTN BRIAN STEWART, PRESIDENT | 533 INDUSTRIAL PARK DR | | JANE LEW | WV | 26379 | | $0.00 |
| StrataGen Inc. | US WELL SERVICES | AMENDMENT #8 | ATTN BRIAN STEWART, PRESIDENT | 533 INDUSTRIAL PARK DR | | JANE LEW | WV | 26379 | | $0.00 |
| StrataGen Inc. | VIDAL, CESAR | SOFTWARE ACCESS AGREEMENT | 23615 OAKHILL PL | | | BULLARD | TX | 75757 | | $0.00 |
| StrataGen Inc. | VIKING INTL PETROLEUM LLC | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | 4801 GAILLARDIA PKWY, STE 225 | | | OKLAHOMA | OK | 73142 | | $0.00 |
| StrataGen Inc. | WELLS FARGO BANK NA | AMENDMENT TO WELLSONE COMMERCIAL CARD AGREEMENT | 14241 DALLAS PKWY, STE 900 | | | DALLAS | TX | 75254 | | $0.00 |
| StrataGen Inc. | WEST VIRGINIA UNIVERSITY | SOFTWARE LICENSE AGREEMENT | PO BOX 6070 | | | MORGANTOWN | WV | 26506-6070 | | $0.00 |
| StrataGen Inc. | WINTERSHALL HOLDING GMBH | AMENDMENT #3 | FRIEDRICH-EBERT-STRABE 160 | | | KASSEL | | 34119 | GERMANY | $0.00 |
| StrataGen Inc. | ZAKLAD ROBOT GORNICZYCH KROSNO SP ZOO | SOFTWARE LICENSE AND MAINTENANCE AGREEMENT | IGNACEGO ŁUKASIEWICZA 93 | | | KROSNO | | 38-400 | POLAND | $0.00 |

**<u>Exhibit G</u>**

**Form of Exit Facility Credit Agreement**

US 7087371

**AMENDED AND RESTATED CREDIT AGREEMENT**

**dated as of [__], 2020**

**Among**

**CARBO CERAMICS INC.**
**as Borrower,**

**The Guarantors Party Hereto,**

**and**

**WILKS BROTHERS, LLC,**
**as Lender,**

**and**

**The Other Lenders Party Hereto**
**as Lenders**

**$15,000,000**

ARTICLE 1 DEFINITIONS AND ACCOUNTING TERMS ..................................................................... 2

    Section 1.1    Terms Defined Above ............................................................................... 2

    Section 1.2    Certain Defined Terms .............................................................................. 2

    Section 1.3    Computation of Time Periods ................................................................ 18

    Section 1.4    Accounting Terms; Changes in GAAP .................................................. 18

    Section 1.5    Miscellaneous ........................................................................................ 19

    Section 1.6    Divisions ................................................................................................ 19

ARTICLE 2 CREDIT FACILITIES .................................................................................................... 19

    Section 2.1    Commitments ......................................................................................... 19

    Section 2.2    Loans ...................................................................................................... 19

    Section 2.3    Reserved ................................................................................................. 20

    Section 2.4    Termination and Reduction of Commitments ....................................... 20

    Section 2.5    Prepayments ........................................................................................... 20

    Section 2.6    Repayment ............................................................................................. 21

    Section 2.7    Fees ........................................................................................................ 21

    Section 2.8    Interest. .................................................................................................. 21

    Section 2.9    Reserved. ................................................................................................ 22

    Section 2.10    Reserved. .............................................................................................. 22

    Section 2.11    Increased Costs. .................................................................................... 22

    Section 2.12    Payments and Computations. ................................................................ 22

    Section 2.13    Taxes. .................................................................................................... 23

    Section 2.14    Replacement of Lenders ....................................................................... 25

ARTICLE 3 CONDITIONS OF EFFECTIVENESS ............................................................................. 26

    Section 3.1    Conditions to Effectiveness .................................................................. 26

    Section 3.2    Reserved ................................................................................................. 28

    Section 3.3    Reserved. ................................................................................................ 28

    Section 3.4    Post-Closing Requirements ................................................................... 28

ARTICLE 4 REPRESENTATIONS AND WARRANTIES ..................................................................... 28

    Section 4.1    Organization .......................................................................................... 29

    Section 4.2    Authorization ......................................................................................... 29

    Section 4.3    Enforceability ........................................................................................ 29

    Section 4.4    Financial Condition ............................................................................... 29

Section 4.5    Ownership and Liens; Real Property ................................................... 29

Section 4.6    True and Complete Disclosure ........................................................... 30

Section 4.7    Litigation ........................................................................................ 30

Section 4.8    Compliance with Agreements ............................................................ 30

Section 4.9    Pension Plans .................................................................................. 30

Section 4.10   Environmental Condition .................................................................. 31

Section 4.11   Subsidiaries .................................................................................... 32

Section 4.12   Investment Company Act .................................................................. 32

Section 4.13   Taxes ............................................................................................. 32

Section 4.14   Permits, Licenses, etc. ..................................................................... 32

Section 4.15   Use of Proceeds .............................................................................. 32

Section 4.16   Condition of Property; Casualties ...................................................... 32

Section 4.17   Insurance ........................................................................................ 33

Section 4.18   Compliance with Laws ...................................................................... 33

Section 4.19   Security Interest .............................................................................. 33

Section 4.20   FCPA; Sanctions .............................................................................. 33

Section 4.21   Deposit Accounts ............................................................................. 34

Section 4.22   EEA Financial Institutions ................................................................. 34

ARTICLE 5 AFFIRMATIVE COVENANTS ................................................................... 34

Section 5.1    Organization ................................................................................... 34

Section 5.2    Reporting ....................................................................................... 34

Section 5.3    Insurance ........................................................................................ 37

Section 5.4    Compliance with Laws ...................................................................... 37

Section 5.5    Reserved .......................................................................................... 38

Section 5.6    Material Domestic Subsidiaries .......................................................... 38

Section 5.7    Records; Inspection .......................................................................... 38

Section 5.8    Maintenance of Property .................................................................... 39

Section 5.9    Security ........................................................................................... 39

Section 5.10   Further Assurances; Cure of Title Defects ........................................... 40

Section 5.11   FCPA; Sanctions .............................................................................. 40

Section 5.12   Reserved .......................................................................................... 40

Section 5.13   Payment of Obligations .................................................................... 40

Section 5.14   Performance of Obligations under Credit Documents ........................... 41

ARTICLE 6 NEGATIVE COVENANTS ........................................................................ 41

Section 6.1   Reserved ............................................................................................ 41

Section 6.2   Debt.................................................................................................... 41

Section 6.3   Liens ................................................................................................... 42

Section 6.4   Investments ........................................................................................ 43

Section 6.5   Acquisitions ........................................................................................ 44

Section 6.6   Agreements Restricting Liens.............................................................. 44

Section 6.7   Use of Proceeds .................................................................................. 44

Section 6.8   Corporate Actions ............................................................................... 44

Section 6.9   Dispositions ........................................................................................ 45

Section 6.10  Restricted Payments............................................................................ 45

Section 6.11  Affiliate Transactions .......................................................................... 46

Section 6.12  Line of Business.................................................................................. 46

Section 6.13  Hazardous Materials ........................................................................... 46

Section 6.14  Compliance with ERISA ...................................................................... 46

Section 6.15  Limitation on Hedging ......................................................................... 47

Section 6.16  Minimum Liquidity .............................................................................. 47

ARTICLE 7 DEFAULT AND REMEDIES ....................................................................... 47

Section 7.1   Events of Default ................................................................................ 47

Section 7.2   Optional Acceleration of Maturity........................................................ 49

Section 7.3   Automatic Acceleration of Maturity ..................................................... 49

Section 7.4   Prepayment Fee................................................................................... 50

Section 7.5   Remedies Cumulative, No Waiver ....................................................... 50

Section 7.6   Application of Payments....................................................................... 50

Section 7.7   Lenders May File Proofs of Claim........................................................ 50

ARTICLE 8 RESERVED ................................................................................................ 51

ARTICLE 9 MISCELLANEOUS .................................................................................... 51

Section 9.1   Costs and Expenses ............................................................................. 51

Section 9.2   Indemnification; Waiver of Damages.................................................... 51

Section 9.3   Waivers and Amendments .................................................................... 53

Section 9.4   Severability ......................................................................................... 53

Section 9.5   Survival of Representations and Obligations.......................................... 53

Section 9.6   Binding Effect...................................................................................... 53

Section 9.7   Lender Assignments and Participations.................................................. 54

Section 9.8      Confidentiality ........................................................................................... 55

Section 9.9      Notices, Etc ............................................................................................... 56

Section 9.10     Business Loans .......................................................................................... 56

Section 9.11     Usury Not Intended ................................................................................... 56

Section 9.12     Usury Recapture ....................................................................................... 56

Section 9.13     Governing Law; Waiver of Jury Trial ....................................................... 57

Section 9.14     Amended and Restated .............................................................................. 58

Section 9.15     Reaffirmation and Grant of Security Interests ......................................... 58

Section 9.16     Submission to Jurisdiction ........................................................................ 59

Section 9.17     Execution in Counterparts ........................................................................ 59

Section 9.18     Reserved .................................................................................................... 59

Section 9.19     Acknowledgement and Consent to Bail-In of EEA Financial Institutions .......... 59

Section 9.20     USA Patriot Act ........................................................................................ 60

Section 9.21     No Oral Agreements .................................................................................. 60

Section 9.22     No Third Party Beneficiaries ..................................................................... 60

ANNEXES
        Annex I               – Commitments

EXHIBITS:
        Exhibit A           – Form of Assignment and Acceptance
        Exhibit B           – Form of Compliance Certificate
        Exhibit C           – Form of Guaranty
        Exhibit D           – Form of Note
        Exhibit E           – Reserved
        Exhibit F           – Reserved
        Exhibit G           – Reserved

SCHEDULES:
        Schedule I          – Contact Information
        Schedule 1.2       – Existing Letters of Credit
        Schedule 4.1       – Organizational Information
        Schedule 4.7       – Litigation
        Schedule 4.8       – Compliance with Agreements
        Schedule 4.10     – Environmental Conditions
        Schedule 4.11     – Subsidiaries
        Schedule 4.13     – Waivers of Tax Statute of Limitations
        Schedule 4.20     – Sanctions
        Schedule 4.21     – Deposit Accounts
        Schedule 5.9(d)   – Real Property
        Schedule 6.2(f)    – Purchase Money Debt and Capital Leases
        Schedule 6.2(k)    – Outstanding Debt
        Schedule 6.2(m)   – Existing Corporate Credit Card Services
        Schedule 6.4(a)    – Investments
        Schedule 6.9(a)(iii) – Specified Dispositions

This AMENDED AND RESTATED CREDIT AGREEMENT dated as of [__], 2020 (this "Agreement") is among (a) CARBO Ceramics Inc., a Delaware corporation, as reorganized pursuant to the Plan of Reorganization (defined below) (the "Borrower"), (b) the Guarantors from time to time party hereto, (c) Wilks Brothers, LLC, as a Lender (as defined below), and (d) the other Lenders from time to time party hereto.

## RECITALS

A.       On March 29, 2020 (the "Petition Date"), the Borrower, Asset Guard (defined below) and StrataGen (defined below) each commenced a voluntary case (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), and the Chapter 11 Cases are being jointly administered in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court").

B.       The Borrower, Asset Guard and StrataGen, collectively as guarantors, and lenders from time to time party thereto (the "DIP Lenders") entered into that certain Senior Secured Super Priority Debtor-in-Possession Credit Agreement, dated as of March 30, 2020 (the "DIP Credit Agreement"), pursuant to which the DIP Lenders made certain post-petition debtor-in-possession loans and other extensions of credit to the Borrower which remain outstanding as of the Effective Date (the "DIP Facility").

C.       In order to secure the full and punctual payment and performance of the obligations under the DIP Credit Agreement, the Borrower, Asset Guard and StrataGen executed and delivered, among other things, collateral assignments, security agreements, pledge agreements and financing statements in favor of the DIP Lenders (collectively, as amended, restated, supplemented and/or modified from time to time immediately prior to giving effect to this Agreement, and as amended, restated, amended and restated, supplemented and/or modified from time to time after this Agreement becomes effective and/or in connection with this Agreement becoming effective, the "DIP Security Instruments") granting, among other things, a continuing security interest in and to the collateral described in such DIP Security Instruments to secure the payment and performance of the obligations and indebtedness of the Borrower, Asset Guard and StrataGen arising under the DIP Credit Agreement and the DIP Security Instruments.

D.       The Borrower, Asset Guard and StrataGen have filed a Debtor's Joint Chapter 11 Plan of Reorganization, dated as of [____], 2020, (as may be amended or supplemented from time to time prior to the date hereof and together with all exhibits and schedules thereto, the "Plan of Reorganization") with the Bankruptcy Court, which was confirmed pursuant to the Confirmation Order entered by the Bankruptcy Court on [____], 2020 (the "Confirmation Order").  Pursuant to the Plan of Reorganization, the Borrower, Asset Guard and StrataGen reorganized and emerged from bankruptcy on the date hereof when the Plan of Reorganization was consummated.

E.       Pursuant to and upon consummation of the Plan of Reorganization, the Borrower, the Guarantors and the Lenders desire to (i) amend and restate (but not extinguish) the DIP Credit Agreement in its entirety as hereinafter set forth through the execution of this Agreement, which includes, among other things, the extension to the Borrower of a new term loan facility in an aggregate outstanding principal amount of $15,000,000 (the "Exit Facility"), and (ii) have the Obligations (as defined in the DIP Credit Agreement) of the Borrower and the Guarantors hereunder continue to be outstanding as "Obligations", as applicable, hereunder and be secured by the liens and security interests created under the Security Documents (and the DIP Security Instruments, if applicable), except as otherwise provided in this Agreement and/or the other Credit Documents.

F.      It is the intention of the parties hereto that this Agreement is an amendment and restatement of the DIP Credit Agreement, and is not a new or substitute credit agreement or novation of the DIP Credit Agreement.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, the Credit Parties and the Lenders do hereby further agree as follows:

# ARTICLE 1

## DEFINITIONS AND ACCOUNTING TERMS

Section 1.1      Terms Defined Above.  As used in this Agreement, each term defined above has the meaning indicated above.

Section 1.2      Certain Defined Terms.  The following terms shall have the following meanings (unless otherwise indicated, such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Acceptable Security Interest" means a security interest which (a) exists in favor of the Lenders and the other Secured Parties, (b) is superior to all other security interests (other than certain of the Permitted Liens), (c) secures the Obligations, and (d) is perfected and enforceable against the Credit Party which created such security interest.

"Account Control Agreement" and "Control Agreement" each means, with respect to any deposit account or securities account, an agreement, in form and substance reasonably satisfactory to the Lenders, among the Lenders, the financial institution or other Person at which such account is maintained and the Credit Party maintaining such account or owning such entitlement, effective to grant "control" (as defined in the UCC (as defined in the Security Agreement), as applicable) over such account to the Lenders.

"Account Debtor" means an account debtor as defined in the Uniform Commercial Code, as in effect in the State of Texas.

"Acquisition" means the purchase by any Credit Party of any business, including the purchase of associated assets or operations or the Equity Interests of a Person.

"Affiliate" means, as to any Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person or any Subsidiary of such Person.  The term "control" (including the terms "controlled by" or "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership, by contract, or otherwise.

"Aggregate Commitment" at any time shall equal the sum of the Commitments of all of the Lenders, as increased or reduced from time to time pursuant to the terms and conditions hereof.

"Agreement" is defined in the introductory paragraph hereof.

"Anti-Corruption Laws" means all laws, rules, and regulations of any jurisdiction applicable to the Borrower or any of its Subsidiaries  from time to time concerning or relating to bribery or corruption.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Asset Guard" means Asset Guard Products Inc., a Delaware corporation, formerly known as Falcon Technologies and Services, Inc., as reorganized pursuant to the Plan of Reorganization.

"Assignment and Acceptance" means an assignment and acceptance executed by a Lender and an Eligible Assignee and accepted by the Lenders, in substantially the same form as Exhibit A.

"ASTM E 1527-13" means the American Society of Testing and Materials Practice E 1527-13 Standard Practice for Environmental Site Assessments: Phase I Environmental Site Assessment Process (ASTM E 1527-13).

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code" has the meaning set forth in the Recitals hereto.

"Bankruptcy Court" has the meaning set forth in the Recitals hereto.

"Bankruptcy Event" means, with respect to any Person, when such Person becomes the subject of a voluntary or involuntary bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business, appointed for it, or, in the good faith determination of the Lenders, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment or has had any order for relief in such proceeding entered in respect thereof, provided that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof, unless such ownership interest results in or provides such Person with immunity from the jurisdiction of courts within the U.S. or from the enforcement of judgments or writs of attachment on its assets or permits such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"Borrower" means CARBO Ceramics Inc., a Delaware corporation, as reorganized pursuant to the Plan of Reorganization.

"Building" has the meaning assigned to such term in the applicable Flood Insurance Regulation.

"Business Day" means a day other than a Saturday, Sunday, or other day on which the Lenders are authorized to close under the laws of, or is in fact closed in, Houston, Texas.

"Capital Leases" means, for any Person, any lease of any Property by such Person as lessee which would, in accordance with GAAP, be required to be classified and accounted for as a capital lease on the balance sheet of such Person.

"Casualty Event" means the damage, destruction or condemnation, as the case may be, of property of the Borrower or any Subsidiary, including by process of eminent domain or any Disposition of property in lieu of condemnation.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, state and local analogs, and all rules and regulations and requirements thereunder in each case as now or hereafter in effect.

"Change in Control" means the occurrence of any of the following events:

(a)     the Borrower ceases to own, either directly or indirectly, 100% of the Equity Interest in any Guarantor other than as a result of transaction permitted under Section 6.8 or Section 6.9; and

(b)     any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act, but excluding any employee benefit plan of such person or its subsidiaries, any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan), becomes a "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act, except that a person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire (such right, an "option right"), whether such right is exercisable immediately or only after the passage of time), directly or indirectly, of 50% or more of the Equity Interests of the Borrower entitled to vote for members of the board of directors or equivalent governing body of the Borrower on a fully-diluted basis (and taking into account all such securities that such person or group has the right to acquire pursuant to any option right);

(c)     substantially all of the Credit Parties' property and assets are sold, transferred and/or are Disposed of (in one sale, transfer or Disposition or a series of sales, transfers and/or Dispositions);

(d)     the merger or consolidation of the Borrower with or into any other Person or group, to the extent that the Borrower is not the surviving entity; and

(e)     adoption of a plan of liquidation or dissolution in regards to the Borrower.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority.

"Chapter 11 Cases" has the meaning set forth in the Recitals hereto.

"Closing Fee" has the meaning set forth in Section 2.7(b).

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" means all property of the Credit Parties which is "Collateral" (as defined in the Security Agreement) and other similar terms referred to in the Security Documents (including without limitation, the Mortgages) and all of the other property that is or is intended under the terms of the Security Documents to be subject to Liens in favor of the Lenders for the benefit of the Secured Parties.

"Collateral Access Agreement" means a landlord lien waiver or subordination agreement, bailee letter or any other similar agreement, in any case, in form and substance reasonably acceptable to the Lenders and executed by the parties thereto.

"Collateral Assignment" means that certain Collateral Assignment of Bond and Deed to Secure Debt dated as of the date hereof and granted by the Borrower in favor of the Lenders.

"Commitments" means, with respect to each Lender, the commitment of such Lender to make Loans pursuant to Section 2.1 in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Annex I hereto, as such commitment may be modified from time to time pursuant to assignments by or to such Lender pursuant to Section 9.7, as such amount may be adjusted from time to time in accordance with this Agreement.

"Compliance Certificate" means a compliance certificate executed by a Responsible Officer of the Borrower or such other Person as required by this Agreement in substantially the same form as Exhibit B.

"Confirmation Order" has the meaning set forth in the Recitals hereto.

"Consolidated Net Tangible Assets" means, as of any date of determination, an amount equal to the aggregate book value of the tangible assets of the Borrower and the other Credit Parties and, to the extent of the ownership interest of the Borrower and the other Credit Parties therein, any Non-Guarantor Subsidiaries and joint ventures at such time, minus the liabilities of the Borrower and the other Credit Parties, all as determined on a consolidated basis in accordance with GAAP based on the most recent quarterly or annual consolidated financial statements of the Borrower referred to in Section 4.4 or delivered as provided in Section 5.2, as the case may be (for the avoidance of doubt, Consolidated Net Tangible Assets shall not include goodwill, trade names, patents, unamortized debt discount and expense or any other like intangibles).

"Controlled Group" means all members of a controlled group of corporations and all businesses (whether or not incorporated) under common control which, together with the Borrower, any Guarantor or any Subsidiary, are treated as a single employer under Section 414 of the Code.

"Credit Documents" means this Agreement, the Notes, the Guaranties, the Security Documents, and each other agreement, instrument, or document executed at any time in connection with this Agreement.

"Credit Parties" means the Borrower and the Guarantors.

"Debt" means, for any Person, without duplication:  (a) indebtedness of such Person for borrowed money, including the face amount of any letters of credit supporting the repayment of indebtedness for borrowed money issued for the account of such Person; (b) to the extent not covered under clause (a) above, obligations under letters of credit and agreements relating to the issuance of letters of credit or acceptance financing; (c) obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, or upon which interest payments are customarily made; (d) obligations of such Person under conditional sale or other title retention agreements relating to any Properties purchased by such Person (other than customary reservations or retentions of title under agreements with suppliers entered into in the ordinary course of business); (e) obligations of such Person to pay the deferred purchase price of property, services, or Acquisitions (including, without limitation, any earn-out obligations, contingent obligations, or other similar obligations associated with such purchase, and including obligations that are non-recourse to the credit of such Person but are secured by the assets of such Person); (f) obligations of such Person as lessee under Capital Leases and obligations of such Person in respect of synthetic leases; (g) obligations of such Person under any Hedging Arrangement; (h) obligations of such Person owing in respect of redeemable preferred stock or other preferred Equity Interest of such Person if such redeemable preferred stock or other preferred Equity Interest is redeemable

at the option of the holders thereof, or mandatorily redeemable by the issuer, in each case prior to the Maturity Date; (i) the Debt of any partnership or unincorporated joint venture in which such Person is a general partner or a joint venturer, but only to the extent to which there is recourse to such Person for the payment of such Debt; (j) obligations of such Person under direct or indirect guaranties in respect of, and obligations (contingent or otherwise) of such Person to purchase or otherwise acquire, or otherwise to assure a creditor against loss in respect of, indebtedness or obligations of others of the kinds referred to in clauses (a) through (i) above; (k) indebtedness or obligations of others of the kinds referred to in clauses (a) through (j) secured by any Lien on or in respect of any Property of such Person, and (l) all liabilities of such Person in respect of unfunded vested benefits under any Plan.

"Debt Incurrence" means any incurrence, issuance or sale by the Borrower or any of its Subsidiaries of any Debt after the Effective Date other than Permitted Debt.

"Debt Incurrence Proceeds" means, with respect to any Debt Incurrence, all cash and Liquid Investments received by the Borrower or any of its Subsidiaries from such Debt Incurrence after payment of, or provision for, all underwriter fees and expenses, original issue discount, SEC and blue sky fees, printing costs, fees and expenses of accountants, lawyers and other professional advisors, brokerage commissions, Taxes paid or payable in connection with such Debt Incurrence and other out-of-pocket fees and expenses actually incurred in connection with such Debt Incurrence; provided that, an original issue discount shall not reduce the amount of such Debt Incurrence Proceeds unless such discount is due and payable at or immediately following the closing of such Debt Incurrence and such discount has not already been taken into account to reduce the amount of proceeds received by the Borrower or such Subsidiary from such Debt Incurrence.

"Debtor Relief Laws" means (a) the Bankruptcy Code of the United States of America, and (b) all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"Default" means (a) an Event of Default or (b) any event or condition which with notice or lapse of time or both would, unless cured or waived, become an Event of Default.

"Deposit Account" means any operating, administrative, cash management, collection activity, demand, time, savings, passbook or other deposit account maintained with a bank or other financial institution.

"DIP Credit Agreement" has the meaning set forth in the Recitals hereto.

"DIP Facility" has the meaning set forth in the Recitals hereto.

"DIP Lenders" has the meaning set forth in the Recitals hereto.

"DIP Security Instruments" has the meaning set forth in the Recitals hereto.

"Disposition" means any sale, lease, license, transfer, assignment, conveyance, or other disposition of any Property; "Dispose" or similar terms shall have correlative meanings.

"Dollars" and "$" means lawful money of the United States of America.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of the United States, any state thereof or the District of Columbia.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent;

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" has the meaning given thereto in section 3.1.

"Eligible Assignee" means (a) a Lender, (b) any Affiliate of a Lender approved by the Lenders, (c) any Approved Fund approved by the Lenders or (d) any other Person (other than a natural Person) approved by Lenders and, unless an Event of Default has occurred and is continuing at the time any assignment is effected in accordance with Section 9.7, the Borrower.

"Environment" or "Environmental" has the meanings set forth in 42 U.S.C. 9601(8) (1988).

"Environmental Claim" means any third party (including governmental agencies and employees) action, lawsuit, claim, demand, regulatory action or proceeding, order, decree, consent agreement or notice of potential or actual responsibility or violation (including claims or proceedings under the Occupational Safety and Health Acts or similar laws or requirements relating to health or safety of employees) which seeks to impose liability under any Environmental Law.

"Environmental Law" means all federal, state, and local laws, rules, regulations, ordinances, orders, decisions, agreements, and other requirements, including common law theories, now or hereafter in effect and relating to, or in connection with the Environment, health, or safety, including without limitation CERCLA, relating to (a) pollution, contamination, injury, destruction, loss, protection, cleanup, reclamation or restoration of the air, surface water, groundwater, land surface or subsurface strata, or other natural resources; (b) solid, gaseous or liquid waste generation, treatment, processing, recycling, reclamation, cleanup, storage, disposal or transportation; (c) exposure to pollutants, contaminants, hazardous, medical infections, or toxic substances, materials or wastes; (d) the safety or health of employees; or (e) the manufacture, processing, handling, transportation, distribution in commerce, use, storage or disposal of hazardous, medical infections, or toxic substances, materials or wastes.

"Environmental Permit" means any permit, license, order, approval, registration or other authorization under Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Equipment" of any Person means all equipment (as defined in the UCC) owned by such Person, wherever located.

"Equity Interest" means with respect to any Person, any shares, interests, participation, or other equivalents (however designated) of corporate stock, membership interests or partnership interests (or any other ownership interests) of such Person.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Eurocurrency Liabilities" has the meaning assigned to that term in Regulation D of the Federal Reserve Board as in effect from time to time.

"Event of Default" has the meaning specified in Section 7.1.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Account" means any deposit account or securities account in which funds are maintained and used solely for (a) the payment of salaries, wages and payroll tax, workers' compensation, and 401K, health and welfare plans, (b) petty cash with a balance less than $25,000 individually or in the aggregate for all such petty cash accounts, at all times, or (c) cash or securities on deposit that are subject to a Lien permitted under Section 6.3(i).

"Excluded Collateral" means:

(a)       any contracts, instruments, licenses, license agreements or other documents (or any rights thereunder), to the extent (and only to the extent) that the grant of a security interest would (i) constitute a violation of a restriction in favor of, or requires a consent not obtained prior to the Effective Date of, a third party on such grant, (ii) give any other party to such contract, instrument, license, license agreement or other document the right to terminate its obligations thereunder, or (iii) violates any law or requires the consent not obtained prior to the Effective Date of any Governmental Authority; provided that the limitation set forth in this clause (a) above shall not affect, limit, restrict or impair the grant by a Credit Party of a security interest pursuant to the Security Agreement in any such right, to the extent that an otherwise applicable prohibition or restriction on such grant is rendered ineffective by any applicable law, including the UCC or the Bankruptcy Code;

(b)       any application to register any trademark or service mark prior to the filing under applicable law of a verified statement of use (or the equivalent) for such trademark or service mark to the extent the creation of a security interest therein or the grant of a mortgage thereon would void or invalidate such trademark or service mark; and

(c)       any Excluded Accounts.

"Excluded Swap Obligation" means, with respect to any Guarantor, any Hedge Obligation if, and to the extent that, all or a portion of the guaranty of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Hedge Obligation (or any guaranty thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the guaranty of such Guarantor or the grant of such security interest becomes effective with respect to such Hedge Obligation. If a Hedge Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Hedge Obligation that is attributable to swaps for which such guaranty or security interest is or becomes illegal.

"Excluded Taxes" has the meaning specified in Section 2.13(a).

"Existing Letters of Credit" means those letters of credit set forth on Schedule 1.2.

"Exit Facility" has the meaning set forth in the Recitals hereto.

"Extraordinary Receipts" means any proceeds resulting from a Casualty Event, including any insurance proceeds, less any Taxes paid or payable in connection with such Casualty Event.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future Treasury Regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"FCPA" has the meaning set forth in Section 4.20(a).

"Federal Flood Insurance" means federally backed Flood Insurance available under the National Flood Insurance Program to owners of real property improvements located in Special Flood Hazard Areas in a community participating in the National Flood Insurance Program.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System or any of its successors.

"FEMA" means the Federal Emergency Management Agency, a component of the United States Department of Homeland Security that administers the National Flood Insurance Program, or any of its successors.

"Flood Insurance" means, for any owned real property located in a Special Flood Hazard Area, Federal Flood Insurance or private insurance that meets or exceeds the requirements set forth by FEMA in its Mandatory Purchase of Flood Insurance Guidelines.

"Flood Insurance Regulations" means (a) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (b) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (c) the National Flood Insurance Reform Act of 1994 (amending 42 USC § 4001, et seq.), as the same may be amended or recodified from time to time, and (d) the Flood Insurance Reform Act of 2004 and any regulations promulgated thereunder.

"Foreign Subsidiary" means any Subsidiary of Borrower that is a "controlled foreign corporation" as defined in Section 957 of the Code.

"FSHCO" means any Subsidiary substantially all of whose assets consist of Equity Interests and/or indebtedness of one or more Foreign Subsidiaries.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"GAAP" means United States of America generally accepted accounting principles as in effect from time to time, applied on a basis consistent with the requirements of Section 1.4.

"<u>Governmental Authority</u>" means, with respect to any Person, any foreign governmental authority, the United States of America, any state of the United States of America, the District of Columbia, and any subdivision of any of the foregoing, and any agency, department, commission, board, authority or instrumentality, bureau or court having jurisdiction over such Person.

"<u>Guarantors</u>" means any Person that now or hereafter executes a Guaranty, including (a) Asset Guard, (b) StrataGen, and (c) each Material Domestic Subsidiary or other Subsidiary that becomes a guarantor of all or a portion of the Obligations and which has entered into either a joinder agreement substantially in the form attached to the Guaranty or a new Guaranty; provided, however, that the Guarantors shall not include any Foreign Subsidiary, FSHCO or any Subsidiary of a Foreign Subsidiary or FSHCO.

"<u>Guaranty</u>" means the Amended and Restated Guaranty Agreement executed in substantially the same form as <u>Exhibit C</u>.

"<u>Hazardous Substance</u>" means any substance or material identified as such pursuant to CERCLA and those regulated under any other Environmental Law, including without limitation pollutants, contaminants, petroleum, petroleum products, radionuclides, and radioactive materials.

"<u>Hazardous Waste</u>" means any substance or material regulated or designated as such pursuant to any Environmental Law, including without limitation, pollutants, contaminants, flammable substances and materials, explosives, radioactive materials, oil, petroleum and petroleum products, chemical liquids and solids, polychlorinated biphenyls, asbestos, toxic substances, and similar substances and materials.

"<u>Hedge Obligation</u>" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"<u>Hedging Arrangement</u>" means a hedge, call, swap, collar, floor, cap, option, forward sale or purchase or other contract or similar arrangement (including any obligations to purchase or sell any commodity or security at a future date for a specific price) which is entered into to reduce or eliminate or otherwise protect against the risk of fluctuations in prices or rates, including interest rates, foreign exchange rates, commodity prices and securities prices.

"<u>Inventory</u>" of any Person means all Property of such Person which would, in accordance with GAAP, be required to be classified and accounted for as inventory on the balance sheet of such Person.

"<u>Legal Requirement</u>" means, with respect to any Person, (a) the charter, articles or certificate of organization or incorporation and bylaws or operating, management or partnership agreement, or other organizational or governing documents of such Person and (b) any statute, law (including common law), treaty, rule, regulation, code, ordinance, order, decree, writ, judgment, injunction or determination of any arbitrator or court or other Governmental Authority (including, without limitation, Environmental Laws, Regulations T, U and X, and the terms of any license or permit issued by any Governmental Authority), in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"<u>Lenders</u>" means the Persons listed on the signature pages hereto as Lenders, any other Person that shall have become a Lender hereto pursuant to <u>Section 2.14</u>, and any other Person that shall have become a Lender hereto pursuant to an Assignment and Acceptance, but in any event, excluding any such Person that ceases to be a party hereto pursuant to an Assignment and Acceptance.

"Lending Office" means, as to any Lender, the office or offices of such Lender described on Schedule I, or such other office or offices as a Lender may from time to time notify the Borrower.

"Lien" means any mortgage, lien, pledge, charge, deed of trust, security interest, or encumbrance to secure or provide for the payment of any obligation of any Person, whether arising by contract, operation of law, or otherwise (including the interest of a vendor or lessor under any conditional sale agreement, Capital Lease, or other title retention agreement).

"Liquid Investments" means (a) readily marketable direct full faith and credit obligations of the United States of America or obligations unconditionally guaranteed by the full faith and credit of the United States of America; (b) commercial paper issued by (i) any Lender or any Affiliate of any Lender or (ii) any commercial banking institutions or corporations rated at least P-2 by Moody's or A-2 by S&P; (c) certificates of deposit, time deposits, and bankers' acceptances issued by (i) any of the Lenders or (ii) any other commercial banking institution which is a member of the Federal Reserve System and has a combined capital and surplus and undivided profits of not less than $250,000,000 and rated Aa by Moody's or AA by S&P; (d) repurchase agreements which are entered into with any of the Lenders or any major money center banks included in the commercial banking institutions described in clause (c) and which are secured by readily marketable direct full faith and credit obligations of the government of the United States of America or any agency thereof; (e) investments in any money market fund which holds investments substantially of the type described in the foregoing clauses (a) through (d); (f) other investments made through the Lenders or their Affiliates and approved by the Lenders; and (g) deposit accounts and securities accounts (solely to the extent that such securities accounts only hold the invests described in the foregoing clauses (a) through (f)), subject to the terms and conditions of Section 5.9(c) of this Agreement.  All the Liquid Investments described in clauses (a) through (d) above shall have maturities of not more than 365 days from the date of issue.

"Liquidity" means, at any time, the aggregate amount of all cash and cash equivalents on the consolidated balance sheet of the Borrower and its Subsidiaries at such time that is not "restricted" for purposes of GAAP or otherwise encumbered (other than by a Lien granted under a Security Document).

"Loans" means any and all term loans made, or to be made, to the Borrower by the Lenders pursuant to Section 2.1.

"Manufactured (Mobile) Home" has the meaning assigned to such term in the applicable Flood Insurance Regulation.

"Material Adverse Change" means a material adverse change (a) in the business, financial condition, properties or results of operations of the Borrower and its Subsidiaries, taken as a whole; (b) on the validity or enforceability of this Agreement or any of the other Credit Documents; or (c) on any Credit Party's ability to perform its obligations under this Agreement, any Note, the Guaranties or any other Credit Document; provided that none of the following shall be taken into account in determining whether there has been a Material Adverse Change: (i) changes or conditions generally affecting the economy or the financial markets in the United States or globally or (ii) changes or conditions generally affecting the industries in which the Credit Parties operate.

"Material Domestic Subsidiary" means, (a) as of any fiscal quarter end, any Domestic Subsidiary that (i) has operating income equal to or greater than 10% of the Borrower's consolidated operating income, in each case, for the four-fiscal quarter period then ended, or (ii) has book value of total assets equal to or greater than 10% of the Borrower's consolidated book value of total assets, in each case under clauses (i) and (ii) above, as established in accordance with GAAP and as reflected in the financial

statements covering such fiscal quarter and delivered to the Lenders pursuant hereto, (b) Asset Guard and (c) StrataGen.

"Maturity Date" means the earliest of (a) the Scheduled Maturity Date; (b) the closing of any sale of assets, which when taken together with all asset sales completed since the Effective Date, constitutes a sale of all or substantially all of the assets of the Borrower and the Guarantors; and (c) the date on which all Loans become due and payable and the Commitments are terminated under the Credit Documents, whether by acceleration or otherwise.

"Maximum Rate" means the maximum nonusurious interest rate under applicable law.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto which is a nationally recognized statistical rating organization.

"Mortgage" means each mortgage or deed of trust in form reasonably acceptable to the Lenders executed by any Credit Party to secure all or a portion of the Obligations.

"Mortgaged Property" means any real Property owned by any Loan Party that is subject to a Mortgage.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which the Borrower or any member of the Controlled Group is making or accruing an obligation to make contributions.

"National Flood Insurance Program" means the program created by any Governmental Authority of the United States pursuant to the Flood Insurance Regulations, that mandates the purchase of flood insurance to cover real property improvements located in Special Flood Hazard Areas in participating communities and provides protection to property owners through a federal insurance program.

"Net Cash Proceeds" means, with respect to any Disposition, all cash and Liquid Investments received from such Disposition after (a) payment of, or provision for, all reasonable brokerage and transaction commissions, marketing costs, restoration and refurbishment expenses, and other reasonable out of pocket fees and expenses actually incurred in connection with such Disposition; (b) payment of any outstanding obligations (permitted hereunder) secured by the Property that is being Disposed (other than the Obligations); (c) all Taxes paid or payable by such Person, any Subsidiary of such Person or any member of the Tax Group of such Person in connection with such Disposition; and (d) the amount of reserves recorded in accordance with GAAP for indemnity or similar obligations of the Person making such Disposition and its Affiliates directly related to such Disposition.

"Non-Material Domestic Subsidiary" means any Domestic Subsidiary other than a Material Domestic Subsidiary.

"Notes" has the meaning set forth in Section 2.2(b).

"Obligations" means all principal, interest (including, without limitation, any post-petition interest and any Prepayment Fees), fees, reimbursements, indemnifications, and other amounts now or hereafter owed by any of the Credit Parties to the Lenders under this Agreement and the other Credit Documents, and any increases, extensions, and rearrangements of those obligations under any amendments, restatements, supplements, and other modifications of the documents and agreements creating those obligations.

"OFAC" has the meaning set forth in Section 4.20(b).

"Other Taxes" has the meaning set forth in Section 2.13(b).

"Paid in Full" or "Payment in Full" means (a) the indefeasible payment in full in cash of the accrued and unpaid fees, including the applicable Prepayment Fee, if any, (b) the indefeasible payment in full in cash of all reimbursable expenses and other Obligations (other than contingent indemnification obligations for which no claim has been asserted and other obligations expressly stated to survive such payment and termination of this Agreement), together with accrued and unpaid interest thereon, and (c) the termination of all Commitments.

"Participant Register" has the meaning set forth in Section 9.7(d).

"Patriot Act" means the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"Payment Date" means (a) the last day of each calendar month, provided, however, that if any such day is not a Business Day, such Payment Date shall be the next succeeding Business Day, and (b) the Termination Date.

"PBGC" means the Pension Benefit Guaranty Corporation or any entity succeeding to any or all of its functions under ERISA.

"Permitted Debt" has the meaning set forth in Section 6.2.

"Permitted Investments" has the meaning set forth in Section 6.4.

"Permitted Liens" has the meaning set forth in Section 6.3.

"Person" means an individual, partnership, corporation (including a business trust), joint stock company, trust, limited liability company, limited liability partnership, unincorporated association, joint venture, or other entity, or a government or any political subdivision or agency thereof, or any trustee, receiver, custodian, or similar official.

"Petition Date" has the meaning set forth in the Recitals hereto.

"Plan" means an employee benefit plan (other than a Multiemployer Plan) maintained for employees of the Borrower or any member of the Controlled Group and covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Code.

"Plan of Reorganization" has the meaning set forth in the Recitals hereto.

"Prepayment Fee" means a fee payable to the Lenders upon the occurrence of a Prepayment Fee Event in an amount equal to the sum of the aggregate principal amount of the Loans being repaid upon the occurrence of such Prepayment Fee Event, *multiplied by* (i) 4% if such Prepayment Fee Event occurs prior to the first anniversary of the Effective Date, (ii) 3% if such Prepayment Fee Event occurs on or after the first but prior to the second anniversary of the Effective Date, (iii) 2% if such Prepayment Fee Event occurs on or after the second but prior to the third anniversary of the Effective Date and (iv) 1% if such Prepayment Fee Event occurs on or after the third but prior to the fourth anniversary of the Effective Date, which percentage premiums (1) are additional consideration for providing the Commitments (2) constitute reasonable liquidated damages to compensate the applicable Lenders for (and are a

proportionate quantification of) the actual loss of the anticipated stream of interest payments upon early prepayment of the Loans (such damages being otherwise impossible to ascertain or even estimate for various reasons, including, without limitation, because such damages would depend on, among other things, (x) when the Commitments might otherwise be terminated, and (y) future changes in interest rates which are not readily ascertainable on the Effective Date), and (3) are not a penalty to punish the Borrower for its early termination of the Commitments or for the occurrence of any Event of Default or the occurrence of any other Prepayment Fee Event, as the case may be.

"Prepayment Fee Event" means any permanent reduction or termination in whole or in part of Commitments for any reason and at any time, including, without limitation, whether such reduction or termination is (a) voluntary or mandatory, (b) made when a Default or Event of Default is then outstanding, (c) made in connection with the sale during any Event of Default or foreclosure upon the Collateral, (d) the result of or subsequent to the termination of the Commitments for any reason at any time, including, without limitation, as a result of the occurrence of any Event of Default and, in the case of insolvency, reorganization or like proceeding, whether or not a claim for the Prepayment Fee is allowed in such proceeding, (e) made pursuant to, or as the consequence of, any regulatory or judicial enforcement or other actions from any Governmental Authority or (f) made pursuant to, or as the consequence of, any Bankruptcy Event, whether or not a claim for the Prepayment Fee is allowed in such proceeding.

"Previously Absent Covenant" means, at any time (x) any negative or financial covenant that is not included in this Agreement at such time and (y) any negative or financial covenant in any other Debt that is included in this Agreement at such time but with covenant levels that are more restrictive to the Borrower and its Subsidiaries than the covenant levels included in this Agreement at such time.

"Property" of any Person means any property or assets (whether real, personal, or mixed, tangible or intangible) of such Person.

"Pro Rata Share" means, at any time with respect to any Lender, (a) the ratio (expressed as a percentage) of such Lender's outstanding Loans at such time to the aggregate Loans of all Lenders outstanding at such time.

"Qualified Equity Interests" means preferred Equity Interests issued by a Person the terms of which are the same as those applicable to any class of units or common Equity Interests issued by such Person other than that such preferred Equity Interests (a) may be provided a preference over any class of units or the common Equity Interests in liquidation or payment of dividends or distributions, (b) may be convertible or exchangeable at the option of the holder but only into any common Equity Interests, (c) may have customary class voting rights, and (d) may have a fixed or variable dividend or distribution rate; provided that, in no event shall such units or such other preferred Equity Interests have any "debt"-like features such as (but not limited to) (i) a scheduled maturity, any amortization, any scheduled prepayments or any other prepayment terms (except that such preferred Equity Interests may have a scheduled maturity date that is no earlier than 180 days after the scheduled Maturity Date), (ii) any required cash interest payments, coupons, dividends or any other payments (other than conversions or exchanges into common Equity Interests or PIK dividends in additional Qualified Equity Interests or any principal payments at such scheduled maturity date), or (iii) any financial or other type of covenants other than covenants that are customary to common Equity Interests).

"Receivables" of any Person means, at any date of determination thereof, all Property of such Person which would, in accordance with GAAP, be required to be classified and accounted for as accounts receivable on the balance sheet of such Person.

"Redemption" means, with respect to any Debt, the repurchase, redemption, prepayment, repayment, defeasance or any other acquisition or retirement for value (or the segregation of funds with respect to any of the foregoing) of such Debt. "Redeem" has the correlative meaning thereto.

"Refinancing Debt" means, with respect to any Person, Debt issued, incurred or otherwise obtained in exchange for, or to extend, renew, replace or refinance, in whole or part, any Debt of such Person (solely for purposes of this definition, "Refinanced Debt"); provided that (a) such Debt has a later maturity than and a weighted average life to maturity equal to or greater than the Refinanced Debt, (b) except as otherwise permitted hereunder (subject to dollar-for-dollar reduction of any applicable basket) such Debt shall not have a greater principal amount than the principal amount of the Refinanced Debt plus accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the refinancing (provided that the principal amount of such Debt shall not include any principal constituting interest paid in kind), (c) such Refinanced Debt shall be repaid, defeased or satisfied and discharged on a dollar-for-dollar basis, and all accrued interest, fees and premiums (if any) in connection therewith shall be paid (by way of defeasance, discharge or otherwise), substantially concurrently with the incurrence of such Refinancing Debt, (d) such Debt shall not at any time be guaranteed by any Persons other than Persons that are guarantors of the Refinanced Debt, and the terms of such guarantee, taken as a whole, shall be no more favorable to the secured parties in respect of such Debt than the terms of the guarantee of the Refinanced Debt, taken as a whole, (e) if the Refinanced Debt is secured, the terms and conditions relating to collateral for such Debt , taken as a whole, shall be no more favorable to the secured parties in respect of such Debt than the terms and conditions with respect to the collateral for the Refinanced Debt (and the Liens on any Collateral securing such Debt shall have the same (or lesser) priority as the Refinanced Debt relative to the Liens on the Collateral securing the Obligations), (f) if the Refinanced Debt is subordinated in right of payment to the Obligations, such Debt shall be subordinated in right of payment to the Obligations on terms at least as favorable to the Lenders as the subordination terms applicable to the Refinanced Debt, (g) the terms and conditions of any such modified, refinanced, refunded, renewed, replaced, exchanged or Debt (other than interest, fees, premiums, funding discounts, optional prepayment/redemption provisions (including any premiums related thereto), guarantees, collateral, and subordination are, either (i) substantially identical to or less favorable to the investors providing such Refinancing Debt, taken as a whole, than the terms and conditions of the Debt being modified, refinanced, refunded, renewed, replaced, exchanged or extended or (ii) when taken as a whole, not more restrictive to the Borrower and/or its Subsidiaries, as applicable, than those set forth in this Agreement (after giving effect to the addition of the Previously Absent Covenant pursuant to the immediately following proviso in this clause (g)) or are customary for similar Debt in light of the then current market conditions; provided that to the extent the documentation governing such Debt includes a Previously Absent Covenant, the Lenders shall be given prompt written notice thereof and this Agreement shall be amended to include such Previously Absent Covenant for the benefit of this Agreement; provided further that a certificate of a Responsible Officer of the Borrower shall be delivered to the Lenders in good faith at least five Business Days prior to the incurrence of such Debt, together with a reasonably detailed description of the material terms and conditions of such Debt or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the requirement set out in this clause (g) and (h) at the time thereof, no Default or Event of Default shall have occurred and be continuing.

"Register" has the meaning set forth in Section 9.7(b).

"Regulations T, U, and X" means Regulations T, U, and X of the Federal Reserve Board, as each is from time to time in effect, and all official rulings and interpretations thereunder or thereof.

"Release" has the meaning set forth in CERCLA or under any other Environmental Law.

-15-

"Response" has the meaning set forth in CERCLA or under any other Environmental Law.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA (other than any such event not subject to the provision for 30-day notice to the PBGC under the regulations issued under such section).

"Responsible Officer" means (a) with respect to any Person that is a corporation, such Person's chief financial officer, treasurer or controller, (b) with respect to any Person that is a limited liability company, if such Person has officers, then such Person's chief financial officer, treasurer or controller, and if such Person is managed by members, then a chief financial officer, treasurer or controller of such Person's managing member, and if such Person is managed by managers, then a manager (if such manager is an individual) or a Responsible Officer of such manager (if such manager is an entity), and (c) with respect to any Person that is a general partnership, limited partnership or a limited liability partnership, the Responsible Officer of such Person's general partner or partners.

"Restricted Payment" means, with respect to any Person, (a) any direct or indirect dividend or distribution (whether in cash, securities or other Property) or any direct or indirect payment of any kind or character (whether in cash, securities or other Property) in consideration for or otherwise in connection with any Equity Interest of such Person, including in connection with any retirement, purchase, redemption or other acquisition of such Equity Interest, or any options, warrants or rights to purchase or acquire any such Equity Interest or (b) principal or interest payments (in cash, Property or otherwise) on, or redemption of, debt of such Person contractually subordinated to the Obligations; provided that the term "Restricted Payment" shall not include any dividend, distribution, repurchase or redemption payable solely in common Equity Interests or Qualified Equity Interests or from the proceeds of the contemporaneous issuance of additional common Equity Interests of such Person or warrants, options or other rights to purchase such common Equity Interests.

"S&P" means Standard & Poor's Rating Agency Group, a division of McGraw-Hill Companies, Inc., or any successor thereof which is a national credit rating organization.

"Sanctions" has the meaning set forth in Section 4.20(b).

"Scheduled Maturity Date" means the date that is five (5) years after the Effective Date.

"SEC" means, the Securities and Exchange Commission.

"Secured Parties" means the Lenders.

"Security Agreement" means the Amended and Restated Security Agreement of even date herewith among the Credit Parties and the Lenders in such form acceptable to the Lenders.

"Security Documents" means, collectively, the Security Agreement, the Collateral Assignment, any Account Control Agreement, the Mortgages, and any and all other instruments, documents or agreements, now or hereafter executed by any Credit Party or any other Person as security for the payment or performance of the Obligations, the Notes or this Agreement, as such agreements may be amended, modified, supplemented or restated from time to time.

"Solvent" means, as to any Person, on the date of any determination (a) the fair value of the Property of such Person is greater than the total amount of debts and other liabilities (including without limitation, contingent liabilities) of such Person, (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its

debts and other liabilities (including, without limitation, contingent liabilities) as they become absolute and matured, (c) such Person is able to realize upon its assets and pay its debts and other liabilities (including, without limitation, contingent liabilities) as they mature in the normal course of business, (d) such Person does not intend to, and does not believe that it will, incur debts or liabilities (including, without limitation, contingent liabilities) beyond such Person's ability to pay as such debts and liabilities mature, (e) such Person is not engaged in, and is not about to engage in, business or a transaction for which such Person's Property would constitute unreasonably small capital, and (f) such Person has not transferred, concealed or removed any Property with intent to hinder, delay or defraud any creditor of such Person.

"Special Flood Hazard Area" means an area that FEMA's current flood maps indicate has at least a one percent (1%) chance of a flood equal to or exceeding the base flood elevation (a 100-year flood) in any given year.

"Specified Dispositions" means the sale by any Credit Party of the assets or Equity Interests set out on Schedule 6.9(a)(iii) hereto.

"StrataGen" means StrataGen, Inc., a Delaware corporation, as reorganized pursuant to the Plan of Reorganization.

"Subject Lender" has the meaning set forth in Section 2.14.

"Subsidiary" means, with respect to any Person (the "holder") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the holder in the holder's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity, a majority of whose outstanding Voting Securities shall at any time be owned by the holder or one more Subsidiaries of the holder. Unless expressly provided otherwise, all references herein and in any other Credit Document to any "Subsidiary" or "Subsidiaries" means a Subsidiary or Subsidiaries of the Borrower or any other Credit Party.

"Survey" means a survey of the real Property listed on Schedule 5.9(d), prepared by a land surveyor duly licensed and registered in the state in which such real property is located, and in form, scope and substance sufficient to cause all standard survey exceptions to be deleted from title policy and otherwise reasonably satisfactory to the Lenders, and duly certified to the Borrower by a form of certification customarily used by surveyors of similar property in similar locations or as is otherwise reasonably acceptable to Lenders.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Tax Group" has the meaning set forth in Section 4.13.

"Termination Date" means the earliest of (a) the Maturity Date, and (b) at the election of the Lenders, the date on which any Event of Default is continuing.

"Termination Event" means (a) a Reportable Event with respect to a Plan, (b) the withdrawal of the Borrower or any member of the Controlled Group from a Plan during a plan year in which it was a "substantial employer" as defined in Section 4001(a)(2) of ERISA, (c) the filing of a notice of intent to terminate a Plan or the treatment of a Plan amendment as a termination under Section 4041(c) of ERISA,

(d) the institution of proceedings to terminate a Plan by the PBGC, or (e) any other event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"Voting Securities" means (a) with respect to any corporation, capital stock of the corporation having general voting power under ordinary circumstances to elect directors of such corporation (irrespective of whether at the time stock of any other class or classes shall have or might have special voting power or rights by reason of the happening of any contingency), (b) with respect to any partnership, any partnership interest or other ownership interest having general voting power to elect the general partner or other management of the partnership or other Person, and (c) with respect to any limited liability company, membership certificates or interests having general voting power under ordinary circumstances to elect managers of such limited liability company.

"Wells Fargo" means Wells Fargo Bank, National Association.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.3    Computation of Time Periods.  In this Agreement in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding".

Section 1.4    Accounting Terms; Changes in GAAP.

(a)    All accounting terms not specifically defined in this Agreement shall be construed in accordance with GAAP applied on a consistent basis with those applied in the preparation of the financial statements delivered to the Lenders for the fiscal year ending December 31, 2019 as required under Section 5.2.

(b)    Unless otherwise indicated, all financial statements of the Borrower, all calculations for compliance with covenants in this Agreement, and all calculations of any amounts to be calculated under the definitions in Section 1.2 shall be based upon the consolidated accounts of the Borrower and its Subsidiaries in accordance with GAAP and consistent with the principles of consolidation applied in preparing the Borrower's financial statements referred to in Section 4.4.

(c)    If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Credit Document, and either the Borrower or the Lenders shall so request, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

Section 1.5    Miscellaneous.    Article, Section, Schedule, and Exhibit references are to this Agreement, unless otherwise specified.    All references to instruments, documents, contracts, and agreements (including this Agreement) are references to such instruments, documents, contracts, and agreements as the same may be amended, supplemented, restated and otherwise modified from time to time, unless otherwise specified and shall include all schedules and exhibits thereto unless otherwise specified.    Any reference herein to any law shall be construed as referring to such law as amended, modified, codified or reenacted, in whole or in part, and in effect from time to time.    Any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to the restrictions contained herein).    The words "hereof", "herein", and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.    The term "including" means "including, without limitation,".    Paragraph headings have been inserted in this Agreement as a matter of convenience for reference only and it is agreed that such paragraph headings are not a part of this Agreement and shall not be used in the interpretation of any provision of this Agreement.

Section 1.6    Divisions.    For all purposes under the Credit Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

## ARTICLE 2

## CREDIT FACILITIES

Section 2.1    Commitments.    Subject to the terms and conditions of this Agreement, each Lender hereby agrees, severally and not jointly, to make term Loans to the Borrower on the Effective Date in an amount equal to such Lender's Commitment, and an aggregate principal amount not to exceed $15,000,000.    The aggregate principal amount of all Loans advanced to the Borrower pursuant to this Section 2.1 shall not exceed the Commitments of all Lenders.    Amounts paid or prepaid in respect of any Loans may not be reborrowed.    Upon disbursement of each Loan by a Lender on the Effective Date, the amount of such Lender's Commitment shall be reduced by the amount of such Loan so disbursed. Nothing herein shall be deemed to obligate any Lender to obtain the funds for its Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for its Loan in any particular place or manner.

Section 2.2    Loans.

(a)    Loans; Several Obligations.    Each Loan shall be made on the Effective Date consisting of Loans made by the Lenders ratably in accordance with their respective Commitments.    The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; provided that the Commitments are several and no Lender shall be responsible for any other Lender's failure to make Loans as required.

(b)    Notes.    If requested by a Lender, the Loans made by such Lender shall be evidenced by a single promissory note of the Borrower in substantially the form of Exhibit D (each a "Note" and collectively referred to herein as the "Notes"), dated, in the case of (i) any Lender party hereto as of the date of this Agreement, as of the date of this Agreement or (ii) any Lender that becomes a party hereto pursuant to an Assignment and Acceptance, as of the effective date of the Assignment and Acceptance, payable to such Lender in a principal amount equal to its Commitment as in effect on such

date, and otherwise duly completed. In the event that any Lender's Commitment increases or decreases for any reason (whether pursuant to Section 9.7 or otherwise), the Borrower shall deliver or cause to be delivered, to the extent such Lender is then holding a Note, on the effective date of such increase or decrease, a new Note payable to such Lender in a principal amount equal to its Commitment after giving effect to such increase or decrease, and otherwise duly completed, and each Lender shall return to the Borrower the Note so replaced. The date, amount and interest rate of each Loan made by each Lender, and all payments made on account of the principal thereof, shall be recorded by such Lender on its books for its Note. Failure to make any such recordation shall not affect any Lender's or the Borrower's rights or obligations in respect of such Loans or affect the validity of such transfer by any Lender of its Note.

Section 2.3     Reserved.

Section 2.4     Termination of Commitments.  Unless previously terminated, the Commitments shall terminate at 5:00 p.m. (Houston, Texas time) on the Effective Date.

Section 2.5     Prepayments.

(a)     Optional Prepayments.  The Borrower shall have the right at any time and from time to time to prepay any Loan in whole or in part, subject to prior notice in accordance with Section 2.5(b) and, if applicable, payment of any Prepayment Fee under Section 2.7.

(b)     Notice and Terms of Optional Prepayment.  The Borrower shall notify the Lenders by telephone (confirmed by facsimile) of any prepayment hereunder not later than 12:00 noon, Houston, Texas time, 3 Business Days before the date of prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Loan or portion thereof to be prepaid; provided that a notice of prepayment may state that such notice is conditioned upon the effectiveness of other financing transactions (solely to the extent that the proceeds of such financing transaction(s) will be used to fund such prepayment), in which case such notice may be revoked by the Borrower (by notice to the Lenders on or prior to 12:00 noon, Houston, Texas time, on the specified prepayment date) if such condition is not satisfied.  Each partial prepayment of any Loan shall be in an aggregate amount not less than $1,000,000 and integral multiples of $100,000 in excess thereof.  Each prepayment of a Loan shall be applied ratably to the Loans included in the prepaid Loan.  Prepayments shall be accompanied by accrued interest to the extent required by Section 2.8.

(c)     Mandatory.

(i)     If the Borrower or any Subsidiary receives Debt Incurrence Proceeds, then not later than two Business Days following the receipt of such proceeds, the Borrower shall prepay the Loans in an amount equal to 100% of such Debt Incurrence Proceeds.

(ii)     If any Credit Party completes a Disposition permitted under Section 6.9(a)(v), then the Borrower shall, no later than three Business Days following the completion of such Disposition and in an amount equal to 100% of the Net Cash Proceeds received from such Disposition, prepay the outstanding principal amount of the Loans until such time as the Loans are repaid in full.

(iii)     If the Borrower or any Subsidiary receives any Extraordinary Receipts (whether from a single Casualty Event or related series of Casualty Events and whether as one payment or a series of payments) in excess of $250,000 in the aggregate since the Effective Date, then the Borrower shall, no later than five Business Days following the receipt of such Extraordinary Receipts and in an amount equal to 100% of the amount of such excess Extraordinary Receipts, prepay the outstanding principal amount of the Loans until such time as the Loans are repaid in full.

(d)      Interest; Costs.    Each prepayment pursuant to this Section 2.5 shall be accompanied by accrued interest on the amount prepaid to the date of such prepayment.

Section 2.6      Repayment.

(a)      The Borrower hereby unconditionally promises to pay to each Lender the aggregate outstanding principal amount of all Loans of such Lender on the Maturity Date.

(b)      Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Debt of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

Section 2.7      Fees.

(a)      Prepayment Fee.  Upon the occurrence of a Prepayment Fee Event, the Borrower shall pay to the Lenders, ratably among the Lenders in accordance with their respective Commitments, an amount equal to the Prepayment Fee.  The parties hereto acknowledge and agree that the Prepayment Fee referred to in the first sentence of this Section 2.7(a) (i) is additional consideration for providing the Commitments, (ii) constitutes reasonable liquidated damages to compensate the applicable Lenders for (and is a proportionate quantification of) the actual loss of the anticipated stream of interest payments upon an early termination of the Commitments (such damages being otherwise impossible to ascertain or even estimate for various reasons, including, without limitation, because such damages would depend on, among other things, (x) when the Commitments might otherwise be terminated, and (y) future changes in interest rates which are not readily ascertainable on the Effective Date), and (iii) is not a penalty to punish the Borrower for its early termination of the Commitments or for the occurrence of any Event of Default or the occurrence of any other Prepayment Fee Event, as the case may be.

(b)      Closing Fee.  On the Effective Date, the Borrower agrees to pay to each Lender a fee (the "Closing Fee") in an amount equal to 2.00% of such Lender's Commitment in immediately available funds.  Such Closing Fee is fully earned as of the Effective Date and shall be payable on the initial funding of the Loans under this Agreement.

(c)      Reserved.

(d)      Generally.  All such fees shall be paid on the dates due, in immediately available Dollars to the Lenders. Once paid, absent manifest error, none of these fees shall be refundable under any circumstances.

Section 2.8      Interest.

(a)      Except as otherwise set forth herein, each Loan shall bear interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) at a rate per annum equal to seven percent (7.00%).

(b)      Accrued interest on each Loan shall be payable in arrears on each Payment Date for such Loan and upon the Termination Date; provided that (i) interest accrued pursuant to paragraph (c) of this Section shall be payable on demand and (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(c)     Notwithstanding the foregoing, if any Event of Default has occurred and is continuing, all Loans outstanding shall automatically bear interest, after as well as before judgment, at a rate per annum equal to two percent (2%) plus the rate applicable to the Loans, but in no event to exceed the Maximum Rate.

Section 2.9     Reserved.

Section 2.10     Reserved.

Section 2.11     Increased Costs.

(a)     Capital Adequacy; Taxes.  If, after the Effective Date, any Lender shall have determined that any Change in Law affecting such Lender or any lending office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on the capital of financial institutions generally, including such Lender or any corporation controlling such Lender, as a consequence of such Lender's obligations hereunder to a level below that which such Lender or such corporation could have achieved but for such Change in Law (taking into consideration its policies with respect to capital adequacy), then from time to time within three Business Days after written demand by such Lender, as the case may be, the Borrower shall pay to such Lender such additional amount or amounts as such Lender determines in good faith to be necessary to compensate such Lender for such reduction.  If, after the Effective Date, any Lender shall have determined that (i) any Change in Law affecting such Lender or any lending office of such Lender or such Lender's holding company, if any, shall subject such Lender to any additional Taxes (other than Indemnified Taxes, Other Taxes and Excluded Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto, then from time to time within three Business Days after written demand by such Lender, as the case may be, the Borrower shall pay to such Lender such additional amount or amounts as such Lender determines in good faith to be necessary to compensate such Lender for such Taxes.

(b)     Mitigation.  Each Lender shall promptly notify the Borrower of any event of which it has knowledge, occurring after the Effective Date, which will entitle such Lender to compensation pursuant to this Section 2.11 and will designate a different Lending Office if such designation will avoid the need for, or reduce the amount of, such compensation and will not, in the reasonable judgment of such Lender, be otherwise disadvantageous to it.  Any Lender claiming compensation under this Section 2.11 shall furnish to the Borrower a statement setting forth the additional amount or amounts to be paid to it hereunder which shall be determined by such Lender in good faith and which shall be conclusive in the absence of manifest error.  In determining such amount, such Lender may use any reasonable averaging and attribution methods.

(c)     Delay in Requests.  Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.11 shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender pursuant to this Section 2.11 for any increased costs incurred or reductions suffered more than one year prior to the date that such Lender, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the one-year period referred to above shall be extended to include the period of retroactive effect thereof).

Section 2.12     Payments and Computations.

(a)     _Payments_.  All payments of principal, interest, and other amounts to be made by the Borrower under this Agreement and other Credit Documents shall be made to each Lender in Dollars and in immediately available funds, without setoff, deduction, or counterclaim.

(b)     _Payment Procedures_. The Borrower shall make each payment under this Agreement and under the Notes not later than 12:00 noon, Houston, Texas time, on the day when due in Dollars to each Lender at the location referred to in the Notes or herein (or such other location as the Lenders shall designate in writing to the Borrower) in same day funds in accordance with each Lender's applicable Pro Rata Share for the account of their respective applicable Lending Offices, and like funds relating to the payment of any other amount payable to any Lender to such Lender for the account of its applicable Lending Office, in each case to be applied in accordance with the terms of this Agreement.

(c)     _Non-Business Day Payments_.  Whenever any payment shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest or fees, as the case may be.

(d)     _Computations_.  All computations of interest shall be made by the Lenders on the basis of a year of 365/366 days, in each case for the actual number of days (including the first day, but excluding the last day) occurring in the period for which such interest or fees are payable.  Each determination by the Lenders of an amount of interest or fees shall be conclusive and binding for all purposes, absent manifest error.

(e)     _Sharing of Payments, Etc_.  If any Lender shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) on account of the Loans made by it in excess of its Pro Rata Share of payments on account of the Loans obtained by the Lenders, such Lender shall notify the other Lenders and forthwith purchase from the other Lenders such participations in the Loans made by it as shall be necessary to cause such purchasing Lender to share the excess payment ratably with the other Lenders; _provided_ that if all or any portion of such excess payment is thereafter recovered from such purchasing Lender, such purchase from the other Lenders shall be rescinded and each such Lender shall repay to the purchasing Lender the purchase price to the extent of such Lender's Pro Rata Share, but without interest.  The Borrower agrees that any Lender so purchasing a participation from another Lender pursuant to this _Section 2.12(e)_ may, to the fullest extent permitted by law, exercise all its rights of payment (including the right of set-off) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.

Section 2.13     _Taxes_.

(a)     _No Deduction for Certain Taxes_.  Any and all payments by any Credit Party under any of the Credit Documents to a Lender shall be made, in accordance with _Section 2.12_, free and clear of and without deduction for any Taxes, excluding, in the case of a Lender, (i) Taxes imposed on or measured by its net income (however denominated), franchise Taxes and branch profits Taxes, in each case imposed as a result of such Lender being organized under the laws of, or having its principal office or, in the case of any Lender, having its applicable Lending Office located in the jurisdiction (or any political subdivision thereof) imposing such Tax, (ii) in the case of a Lender, any United States federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in an Obligation, if and to the extent such United States federal withholding Taxes are in effect on the date a Lender becomes a Lender hereunder (other than pursuant to an assignment request by the Borrower under _Section 2.14_), (iii) Taxes attributable to such Lender's failure to comply with _Section 2.13(e)_, and (iv) any Taxes imposed under FATCA (the Taxes described in clauses (i) through (iv) being hereinafter referred to as "_Excluded Taxes_" and all such Taxes, other than Excluded Taxes,

imposed on or with respect to any payment by or on account of any obligation of the Borrower under any Credit Document being hereinafter referred to as "Indemnified Taxes"). If any Credit Party shall be required by law to deduct any Indemnified Taxes from or in respect of any sum payable to any Lender, (i) the sum payable shall be increased as may be necessary so that, after making all required deductions (including deductions of Indemnified Taxes applicable to additional sums payable under this Section 2.13), such Lender receives an amount equal to the sum it would have received had no such deductions been made; (ii) such Credit Party shall make such deductions; and (iii) such Credit Party shall pay the full amount deducted to the relevant Governmental Authority or other authority in accordance with applicable law.

(b)     Other Taxes.  In addition, the Borrower agrees to pay, or at the option of the Lenders timely reimburse it for the payment of, any present or future stamp, court or documentary, intangible, recording, filing or similar Taxes which arise from any payment made under any Credit Document or from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, this Agreement, the Notes, or the other Credit Documents, except any Taxes that are (i) Excluded Taxes or (ii) imposed with respect to any assignment (other than an assignment request by the Borrower under Section 2.14) (hereinafter referred to as "Other Taxes").

(c)     Indemnification.  THE BORROWER AND EACH OTHER CREDIT PARTY SHALL INDEMNIFY EACH LENDER FOR THE FULL AMOUNT OF INDEMNIFIED TAXES OR OTHER TAXES (INCLUDING, WITHOUT LIMITATION, ANY INDEMNIFIED TAXES OR OTHER TAXES IMPOSED ON AMOUNTS PAYABLE UNDER THIS SECTION 2.13) PAID BY SUCH LENDER AND ANY REASONABLE EXPENSES ARISING THEREFROM OR WITH RESPECT THERETO, WHETHER OR NOT SUCH TAXES OR OTHER TAXES WERE CORRECTLY OR LEGALLY ASSERTED.  A CERTIFICATE AS TO THE AMOUNT OF SUCH PAYMENT OR EXPENSES DELIVERED TO THE BORROWER BY A LENDER SHALL BE CONCLUSIVE ABSENT MANIFEST ERROR.

(d)     Evidence of Tax Payments.  As soon as practicable after any payment of Indemnified Taxes or Other Taxes by any Credit Party to a Governmental Authority, the Borrower shall deliver to the Lenders the original or a certified copy of any receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Lenders.

(e)     Lender Withholding Exemption.  Each Lender that is a U.S. Person shall deliver to the Borrower on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower), an executed copy of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding Tax. Each Lender that is not a U.S. Person and that is entitled to an exemption from or reduction of United States withholding Tax with respect to payments under this Agreement under applicable law or any treaty to which the United States is a party shall deliver to the Borrower on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower),  such properly completed and executed documentation (including an applicable Internal Revenue Service Form W-8BEN or W-8ECI) prescribed by applicable law or reasonably requested by the Borrower as will permit such payments to be made without withholding or at a reduced rate of withholding. Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower in writing of its legal inability to do so.

(f)     Reserved.

(g)    Mitigation.  Each Lender shall use reasonable efforts (consistent with its internal policies and legal and regulatory restrictions) to select a jurisdiction for its applicable Lending Office or change the jurisdiction of its applicable Lending Office, as the case may be, so as to avoid the imposition of any Indemnified Taxes or Other Taxes or to eliminate or reduce the payment of any additional sums under this Section 2.13; provided, that no such selection or change of jurisdiction for its applicable Lending Office shall be made if, in the reasonable judgment of such Lender, such selection or change would be disadvantageous to such Lender.  Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(h)    Tax Refunds.  If any Lender determines, in its sole discretion exercised in good faith, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section, it shall pay to the Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such Lender, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Borrower, upon the request of such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Lender in the event such Lender is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (h), in no event will any Lender be required to pay any amount to a Borrower pursuant to this paragraph (h) the payment of which would place a Lender in a less favorable net after-Tax position than the applicable Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This subsection shall not be construed to require any Lender to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to any Borrower or any other Person.

(i)    Payment.  If any Lender becomes entitled to receive payment of Indemnified Taxes, Other Taxes or additional sums pursuant to this Section 2.13, it shall give notice and demand thereof to the Borrower, and the Borrower (unless such Lender shall withdraw such notice and demand or the Borrower is not obligated to pay such amounts) shall pay such Indemnified Taxes, Other Taxes or additional sums within 10 days after the Borrower's receipt of such notice and demand.

Section 2.14    Replacement of Lenders.  If the Borrower is required pursuant to Section 2.11 or 2.13 to make any additional payment to any Lender or to any Governmental Authority for the account of any Lender pursuant to Section 2.13, and, with respect to a payment pursuant to Section 2.13, such Lender has declined or is unable to designate a different lending office in accordance with Section 2.13(g) (any such Lender being a "Subject Lender"), the Borrower may, upon notice to the Subject Lender and the Lenders and at the Borrower's sole cost and expense, require such Subject Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 9.7), all of its interests, rights and obligations under this Agreement and the related Credit Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that, in any event:

(a)    as to assignments requested by the Borrower, the Borrower shall have paid to the Lenders the assignment fee specified in Section 9.7;

(b)    such Subject Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to

it hereunder and under the other Credit Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts, if applicable);

(c)      in the case of any such assignment resulting from a claim for compensation under Section 2.13, such assignment will result in a reduction in such compensation or payments thereafter; and

(d)      such assignment does not conflict with applicable Legal Requirements.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

## ARTICLE 3

## CONDITIONS OF EFFECTIVENESS

Section 3.1      Conditions to Effectiveness.  This Agreement will become effective and the obligations of Lenders to make the Loans will occur on the date (the "Effective Date") on which the following conditions precedent are satisfied or waived:

(a)      Payment of Fees.  The Lenders shall have received all commitment, arrangement, upfront, facility and agency fees and all other fees and amounts due and payable by the Credit Parties on or prior to the Effective Date pursuant to Section 9.1 or any other provision of a Credit Document, including reimbursement or payment of all reasonable and documented (in summary form) out-of-pocket fees and expenses required to be reimbursed or paid by the Borrower (including the fees and expenses of Norton Rose Fulbright US LLP, as counsel to the Lenders, and Ankura Consulting Group, LLC, financial advisor to the Lenders).

(b)      Documentation.  The Lenders shall have received the following, duly executed by all the parties thereto, in form and substance reasonably satisfactory to the Lenders:

(i)      this Agreement (and all attached Exhibits and Schedules), the Security Agreement, to the extent requested by any Lender, a Note payable to such Lender, the Collateral Assignment and all other applicable Credit Documents;

(ii)      certificates of insurance in compliance with Section 5.3(b) of this Agreement;

(iii)      a certificate from an authorized officer of each of the Credit Parties dated as of the Effective Date stating that as of such date (A) all representations and warranties of such Credit Party set forth in this Agreement and the Credit Documents are true and correct in all material respects, (B) such Credit Party shall have performed and complied with all covenants and conditions required herein to be performed or complied with by it prior to the date hereof and (C) no Default then exists;

(iv)      a secretary's certificate from each Credit Party certifying such Credit Party's (A) officers' incumbency, (B) authorizing resolutions, (C) organizational documents, and (D) governmental approvals, if any, with respect to the Credit Documents to which the Borrower is a party;

(v)     certificates of good standing for each Credit Party in the state in which each such Person is incorporated or organized, which certificates shall be dated a date not earlier than 30 days prior to the Effective Date; and

(vi)    such other documents, governmental certificates, agreements, and lien searches as any Lender may reasonably request.

(c)     <u>Consents; Authorization; Conflicts.</u>   The Borrower shall have received any consents, licenses and approvals required in accordance with applicable law, or in accordance with any document, agreement, instrument or arrangement to which the Borrower, or any Subsidiary is a party, in connection with the execution, delivery, performance, validity and enforceability of this Agreement and the other Credit Documents.  In addition, the Credit Parties and the Subsidiaries shall have all such material consents, licenses and approvals required in connection with the continued operation of the Credit Parties and the Subsidiaries, and such approvals shall be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority which would restrain, prevent or otherwise impose adverse conditions on this Agreement and the actions contemplated hereby.

(d)     <u>Representations and Warranties.</u>  The representations and warranties contained in Article 4 and in each other Credit Document shall be true and correct on and as of the Effective Date.

(e)     <u>Other Proceedings.</u>  No action, suit, investigation or other proceeding (including, without limitation, the enactment or promulgation of a statute or rule) by or before any arbitrator or any Governmental Authority shall be pending or, to the knowledge of Borrower, threatened and no preliminary or permanent injunction or order by a state or federal court shall have been entered (i) in connection with this Agreement, any other credit agreement or any transaction contemplated hereby or thereby or (ii) which, in any case, in the judgment of the Lenders, could reasonably be expected to result in a Material Adverse Change.

(f)     <u>Other Reports.</u>  Subject to <u>Section 3.1(b)</u>, the Lenders shall have received, in form and substance reasonably satisfactory to it, all environmental reports, and such other reports, audits or certifications as it may reasonably request, which reports the Lenders acknowledge they has received as of the date of this Agreement.

(g)     <u>Reserved.</u>

(h)     <u>No Default.</u>  No Default then exists.

(i)     <u>Solvency.</u>  The Lenders shall have received a certificate in form and substance reasonably satisfactory to the Lenders from a senior financial officer of the Borrower and each Guarantor certifying that the Borrower and each such Guarantor is Solvent (assuming with respect to each Guarantor, that the fraudulent conveyance savings language contained in the Guaranty applicable to such Guarantor will be given full effect).

(j)     <u>Reserved.</u>

(k)     <u>Due Diligence Information.</u> The Lenders shall have received, and satisfactorily completed their review of, all due diligence information regarding the Credit Parties as it shall have requested including, without limitation, information regarding litigation, tax matters, accounting matters, insurance matters, labor matters, pension liabilities (actual or contingent), real property title information,

environmental conditions, real estate leases, material contracts, debt agreements, property ownership, contingent liabilities and other legal matters of the Borrower and its Subsidiaries.

(l)     KYC Information; Patriot Act.  The Lenders shall have received at least three (3) Business Days prior to the Effective Date, and be reasonably satisfied in form and substance with, all documentation, including a duly executed W-9 tax form (or such other applicable IRS tax form) of the Borrower, and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including but not restricted to the Patriot Act, in each case to the extent requested at least ten (10) days prior to the Effective Date.

(m)     Control Agreements.  Notwithstanding the generality of Section 5.9(a) below, the Lenders shall have received fully executed control agreement(s) covering each of the deposit accounts of the Credit Parties listed on Schedule 4.21 hereof (other than any Excluded Accounts).

(n)     Reserved.

(o)     Reserved.

(p)     Confirmation Order.  The Bankruptcy Court shall have entered the Confirmation Order and all conditions to the Effective Date (as defined in the Plan of Reorganization) of the Plan of Reorganization shall have been satisfied (or will be satisfied upon the occurrence of the Effective Date of this Agreement) or waived in accordance with the terms of the Plan of Reorganization.

(q)     Additional Information.  The Lenders shall have received any other information (financial or otherwise) reasonably requested by the Lenders, which information shall be in form and substance reasonably satisfactory to the Lenders.

Section 3.2     Reserved.

Section 3.3     Reserved.

Section 3.4     Post-Closing Requirements.

(a)     Mortgages; Title Information; Surveys.     Notwithstanding the generality of Section 5.9(a) below, the Borrower shall promptly, and in no event later than 90 days after the Effective Date (or such later date as may be agreed by the Lenders in their sole discretion), deliver or cause to be delivered to the Lenders, with respect to each parcel of real Property which is required to be subject to a Lien in favor of the Lenders, (i) each Mortgage and the related title information required to be provided pursuant to Section 5.9(d) below, and (ii) each Survey required to be provided pursuant to Section 5.9(e) below.

(b)     Collateral Access Agreements.  Notwithstanding the generality of Section 5.9(a) below, the Borrower shall use commercially reasonable efforts to promptly, and in no event later than 90 days after the Effective Date (or such later date as may be agreed by the Lenders in their sole discretion), deliver or cause to be delivered to the Lenders each Collateral Access Agreement required to be provided pursuant to Section 5.9(g) below.

# ARTICLE 4

# REPRESENTATIONS AND WARRANTIES

99718855.10

Each Credit Party hereto represents and warrants as follows:

Section 4.1    Organization.  Each Credit Party is duly and validly organized and existing and in good standing under the laws of its jurisdiction of incorporation or formation and is authorized to do business and is in good standing in all jurisdictions in which such qualifications or authorizations are necessary except where the failure to be so qualified or authorized could not reasonably be expected to result in a Material Adverse Change.  As of the Effective Date, each Credit Party's type of organization and jurisdiction of incorporation or formation are set forth on Schedule 4.1.

Section 4.2    Authorization.  The execution, delivery, and performance by each Credit Party of each Credit Document to which such Credit Party is a party and the consummation of the transactions contemplated thereby (a) are within such Credit Party's powers, (b) have been duly authorized by all necessary corporate, limited liability company or partnership action, (c) do not contravene any articles or certificate of incorporation or bylaws, partnership or limited liability company agreement binding on or affecting such Credit Party, (d) do not contravene any law or any contractual restriction binding on or affecting such Credit Party, (e) do not result in or require the creation or imposition of any Lien prohibited by this Agreement, and (f) do not require any authorization or approval or other action by, or any notice or filing with, any Governmental Authority.  The borrowing of the Loans and the use of the proceeds thereof are within the Borrower's corporate power, have been duly authorized by all necessary action, do not contravene (i) the Borrower's certificate or articles of incorporation or bylaws, or (ii) any Legal Requirement or any material contractual restriction binding on or affecting the Borrower, will not result in or require the creation or imposition of any Lien prohibited by this Agreement, and do not require any authorization or approval or other action by, or any notice or filing with, any Governmental Authority.

Section 4.3    Enforceability.  The Credit Documents have each been duly executed and delivered by each Credit Party that is a party thereto and each Credit Document constitutes the legal, valid, and binding obligation of each Credit Party that is a party thereto enforceable against such Credit Party in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws at the time in effect affecting the rights of creditors generally and by general principles of equity whether applied by a court of law or equity.

Section 4.4    Financial Condition.

(a)    The Borrower has delivered to the Lenders the income statements and balance sheets for the Credit Parties and their Subsidiaries dated as of December 31, 2019 for the fiscal quarter ending thereon.  The income statements and balance sheets referred to in the preceding sentence have been prepared in accordance with GAAP and present fairly the consolidated financial condition of the aforementioned Persons as of the respective dates thereof; provided that, notwithstanding the foregoing, such income statements and balance sheets do not reflect expected material impairments and are otherwise not complete in all respects as a result of the impact of the Chapter 11 Cases.  As of the date of the aforementioned income statements and balance sheets, there were no material contingent obligations, liabilities for Taxes, unusual forward or long-term commitments, or unrealized or anticipated losses of the applicable Persons, except as disclosed therein and adequate reserves for such items have been made in accordance with GAAP.

(b)    Since the entry of the Confirmation Order, no event or condition has occurred that could reasonably be expected to result in Material Adverse Change.

Section 4.5    Ownership and Liens; Real Property.  Each Credit Party (a) has good and defensible title to, or a valid and subsisting leasehold interest in, all real property, and good title to all

personal Property, used in its business, and (b) none of the Property owned or leased by the Borrower or a Subsidiary of the Borrower is subject to any Lien except Permitted Liens.

Section 4.6     <u>True and Complete Disclosure</u>.     All written factual information (whether delivered before or after the date of this Agreement) prepared by or on behalf of any Credit Party and its Subsidiaries and furnished to the Lenders for purposes of or in connection with this Agreement, any other Credit Document or any transaction contemplated hereby or thereby does not contain any material misstatement of fact or omits to state any material fact necessary to make the statements therein not misleading.  There is no fact known to any officer of any Credit Party on the date of this Agreement that has not been disclosed to the Lenders that could reasonably be expected to result in a Material Adverse Change.  All projections, estimates, budgets, and pro forma financial information furnished by any Credit Party or any of its Subsidiaries (or on behalf of any such Credit Party or any such Subsidiary), were prepared on the basis of assumptions, data, information, tests, or conditions (including current and reasonably foreseeable business conditions) believed to be reasonable at the time such projections, estimates, and pro forma financial information were furnished.

Section 4.7     <u>Litigation</u>.   Except as set forth in <u>Schedule 4.7</u>, there are no actions, suits, or proceedings pending or, to any Credit Party's knowledge, threatened against any Credit Party or any Subsidiary, at law, in equity, or in admiralty, or by or before any Governmental Authority, which could reasonably be expected to result in a Material Adverse Change.  Additionally, except as disclosed in writing to the Lenders and other than the Chapter 11 Cases, there is no pending or, to the knowledge of any Credit Party, threatened action or proceeding instituted against any Credit Party or any Subsidiary which seeks to adjudicate the Borrower or any Subsidiary as bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee or other similar official for it or for any substantial part of its Property.

Section 4.8     <u>Compliance with Agreements</u>.

(a)     No Credit Party nor any Subsidiary is a party to any indenture, loan or credit agreement or any lease or any other types of agreement or instrument or subject to any charter or corporate restriction or provision of applicable law or governmental regulation the performance of or compliance with which could reasonably be expected to cause a Material Adverse Change.  Neither the Borrrower nor any of its Subsidiaries is in default under or with respect to any contract, agreement, lease or any other types of agreement or instrument to which any Credit Party or such Subsidiary is a party and which could reasonably be expected to cause a Material Adverse Change.  To the best knowledge of the Credit Parties, except as set forth on <u>Schedule 4.8</u>, no Credit Party or any Subsidiary is in default under, or has received a notice of default under, any contract, agreement, lease or any other document or instrument to which any Credit Party or its Subsidiaries is a party which is continuing and which, if not cured, could reasonably be expected to cause a Material Adverse Change.

(b)     No Default has occurred and is continuing.

Section 4.9     <u>Pension Plans</u>.  (a) Except for matters that could not reasonably be expected to result in a Material Adverse Change, all Plans are in compliance with all applicable provisions of ERISA, (b) no Termination Event has occurred with respect to any Plan that would result in an Event of Default under <u>Section 7.1(i)</u>, and, except for matters that could not reasonably be expected to result in a Material Adverse Change, each Plan has complied with and been administered in accordance with applicable provisions of ERISA and the Code, (c) no "accumulated funding deficiency" (as defined in Section 302 of ERISA) has occurred, and for plan years after December 31, 2007, no unpaid minimum required

contribution exists, and there has been no excise Tax imposed under Section 4971 of the Code, (d) to the knowledge of Credit Parties, no Reportable Event has occurred with respect to any Multiemployer Plan, and each Multiemployer Plan has complied with and been administered in accordance with applicable provisions of ERISA and the Code in all material respects, (e) the present value of all benefits vested under each Plan (based on the assumptions used to fund such Plan) did not, as of the last annual valuation date applicable thereto, exceed the value of the assets of such Plan allocable to such vested benefits in an amount that could reasonably be expected to result in a Material Adverse Change, (f) neither the Borrower nor any member of the Controlled Group has had a complete or partial withdrawal from any Multiemployer Plan for which there is any unsatisfied withdrawal liability that could reasonably be expected to result in a Material Adverse Change or an Event of Default under <u>Section 7.1(i)</u>, and (g) except for matters that could not reasonably result in a Material Adverse Change, as of the most recent valuation date applicable thereto, neither the Borrower nor any member of the Controlled Group would become subject to any liability under ERISA if the Borrower or any Subsidiary has received notice that any Multiemployer Plan is insolvent or in reorganization.  Based upon GAAP existing as of the date of this Agreement and current factual circumstances, no Credit Party has any reason to believe that the annual cost during the term of this Agreement to the Borrower or any Subsidiary for post-retirement benefits to be provided to the current and former employees of the Borrower or any Subsidiary under Plans that are welfare benefit plans (as defined in Section 3(1) of ERISA) could, in the aggregate, reasonably be expected to cause a Material Adverse Change.

Section 4.10     <u>Environmental Condition</u>.

(a)     <u>Permits, Etc</u>.  Except as set forth on <u>Schedule 4.10</u> hereto, each Credit Party and its Subsidiaries (i) has obtained all material Environmental Permits necessary for the ownership and operation of its Properties and the conduct of its businesses; (ii)  is in material compliance with all terms and conditions of such Permits and with all other material requirements of applicable Environmental Laws; (iii) has not received written notice of any material violation or alleged material violation of any Environmental Law or Environmental Permit that has not been resolved; and (iv) is not subject to any actual or contingent Environmental Claim which could reasonably be expected to cause a Material Adverse Change.

(b)     <u>Certain Liabilities</u>.  To the Credit Parties' best knowledge, none of the present or previously owned or operated Property of any Credit Party or of any Subsidiary thereof, wherever located, (i) has been placed on or proposed to be placed on the National Priorities List, the Comprehensive Environmental Response Compensation Liability Information System list, or their state or local analogs, or have been otherwise investigated, designated, listed, or identified as a potential site for removal, remediation, cleanup, closure, restoration, reclamation, or other response activity under any Environmental Laws; (ii) is subject to a Lien, arising under or in connection with any Environmental Laws, that attaches to any revenues or to any Property owned or operated by any Credit Party, wherever located, which could reasonably be expected to cause a Material Adverse Change; or (iii) has been the site of any Release of Hazardous Substances or Hazardous Wastes from present or past operations which has caused at the site or at any third-party site any condition that has resulted in or could reasonably be expected to result in the need for Response that could cause a Material Adverse Change.

(c)     <u>Certain Actions</u>.  Without limiting the foregoing, (i) all necessary material notices have been properly filed, and no further action is required under current applicable Environmental Law as to each Response undertaken by the Borrower, any of its Subsidiaries or any of the Borrower's or such Subsidiary's former Subsidiaries on any of their presently or formerly owned or operated Property and (ii) to the Credit Parties' knowledge, the present and future liability, if any, of the Borrower or of any Subsidiary which could reasonably be expected to arise in connection with requirements under Environmental Laws will not result in a Material Adverse Change.

Section 4.11    Subsidiaries.  As of the Effective Date, the Credit Parties have no Subsidiaries other than those listed on Schedule 4.11.  Each Material Domestic Subsidiary of the Borrower (including any such Material Domestic Subsidiary formed or acquired subsequent to the Effective Date) has complied with the requirements of Section 5.6.

Section 4.12    Investment Company Act.  No Credit Party nor any Subsidiary is an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended.  Neither the Borrower nor any Subsidiary is subject to regulation under any Federal or state statute, regulation or other Legal Requirement which limits its ability to incur Debt.

Section 4.13    Taxes.  To the extent that failure to do so could reasonably, either individually or in the aggregate, be expected to result in a Material Adverse Change, proper and accurate, federal, state, local and foreign Tax returns, reports and statements required to be filed (after giving effect to any extension granted in the time for filing) by any Credit Party and each Subsidiary or any member of the affiliated group as determined under Section 1504 of the Code or similar combined, consolidated or unitary group (hereafter collectively called the "Tax Group") have been filed with the appropriate Governmental Authorities, and all Taxes and other impositions due and payable have been timely paid prior to the date on which any fine, penalty, interest, late charge or loss may be added thereto for non-payment thereof except Taxes for which payment is stayed or excused under the Bankruptcy Code or that are being contested in good faith by appropriate proceeding and for which adequate reserves have been established in compliance with GAAP.  Except as set forth in Schedule 4.13, no Credit Party nor any member of the Tax Group has given, or been requested to give, a waiver of the statute of limitations relating to the payment of any federal, state, local or foreign Taxes or other impositions.  Proper and accurate amounts have been withheld by the Credit Parties and all other members of the Tax Group from their employees for all periods to comply in all material respects with the Tax, social security and unemployment withholding provisions of applicable federal, state, local and foreign law.

Section 4.14    Permits, Licenses, etc.  Each Credit Party and its Subsidiaries possesses all permits, licenses, patents, patent rights or licenses, trademarks, trademark rights, trade names rights, and copyrights which are material to the conduct of its business.  Each Credit Party and its Subsidiaries manages and operates its business in accordance with all applicable Legal Requirements except where the failure to so manage or operate could not reasonably be expected to result in a Material Adverse Change; provided that this Section 4.14 does not apply with respect to Environmental Permits or Legal Requirements of Environmental Law.

Section 4.15    Use of Proceeds.  The proceeds of the Loans shall be used to refinance Debt owed to the DIP Lenders under the DIP Credit Agreement, respectively, and for working capital and general corporate purposes, in each case, as permitted under this Agreement and in accordance with the Section 6.7.  No Credit Party is engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U).  No proceeds of any Loan will be used to purchase or carry any margin stock in violation of Regulation T, U or X.  No part of the proceeds of any Loan will be used for any purpose which violates the provisions of Regulations T, U or X.

Section 4.16    Condition of Property; Casualties.  The material Properties used or to be used in the continuing operations of each Credit Party and each Subsidiary, are in good working order and condition, normal wear and tear excepted.  Neither the business nor the material Properties of each Credit Party or any Subsidiary has been affected as a result of any fire, explosion, earthquake, flood, drought, windstorm, accident, strike or other labor disturbance, embargo, requisition or taking of Property or cancellation of contracts, permits or concessions by a Governmental Authority, riot, activities of armed

forces or acts of God or of any public enemy, which effect could reasonably be expected to cause a Material Adverse Change.

Section 4.17    Insurance.  Each Credit Party and its Subsidiaries carry insurance (which may be carried by each Credit Party on a consolidated basis) with reputable insurers in respect of such of their respective Properties, in such amounts and against such risks as is customarily maintained by other Persons of similar size engaged in similar businesses, or self-insure to the extent customary for persons of similar size engaged in similar businesses.  No Credit Party owns any material Building or material Manufactured (Mobile) Home, in either case subject to a Mortgage, for which such Credit Party has not delivered to the Lenders evidence or confirmation reasonably satisfactory to the Lenders that (i) such Credit Party maintains Flood Insurance for such Building or Manufactured (Mobile) Home in accordance with Section 5.3 or (ii) such Building or Manufactured (Mobile) Home is not located in a Special Flood Hazard Area.

Section 4.18    Compliance with Laws.  Each Credit Party and each of the Subsidiaries is in compliance with all laws, rules, regulations and orders of any Governmental Authority applicable to them or their Property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change, or where non-compliance therewith is permitted by any applicable Governmental Authority; provided that, this Section 4.18 shall not apply with respect to any requirement under Environmental Laws.

Section 4.19    Security Interest.  Each Credit Party has authorized, or hereby authorizes, the filing of financing statements (and amendments to existing financing statements) sufficient when filed to perfect (and maintain the perfection of) the Lien created by the Security Documents.  When such financing statements and amendments to existing financing statements are filed in the offices noted therein, the Lenders will have a valid and perfected security interest in all Collateral that is capable of being perfected by filing financing statements under Article 9 of the UCC.

Section 4.20    FCPA; Sanctions.

(a)    No Credit Party nor any Subsidiaries nor, to the knowledge of the Borrower, any director, officer, agent, employee or other person acting on behalf of any Credit Party or any Subsidiaries has taken any action, directly or indirectly, that would result in a violation in any material respect by such persons of the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder (the "FCPA") or any other applicable Anti-Corruption Law; and the Credit Parties have instituted and maintain policies and procedures designed to promote and achieve continued compliance therewith.

(b)    Except as set forth on Schedule 4.20, none of the Credit Parties, any of their Subsidiaries or any director, officer, employee, or, to the knowledge of Borrower, agent, or affiliate of the Credit Parties or any of their Subsidiaries is an individual or entity that is, or is owned or controlled by Persons that are: (i) the target of any sanctions administered or enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), the U.S. Department of State, the United Nations Security Council, the European Union,  or Her Majesty's Treasury  (collectively, "Sanctions"), or (ii) located, organized or resident in a country or territory that is, or whose government is, the subject of Sanctions, including, without limitation currently, Cuba, Iran, North Korea, Sudan and Syria.

(c)    No Loan, use of proceeds thereof or other transaction contemplated by this Agreement will violate any Anti-Corruption Law or applicable Sanctions.

Section 4.21    Deposit Accounts.  Schedule 4.21 (as amended or supplemented from time to time with the prior written consent of the Lenders) lists all Deposit Accounts maintained by or for the benefit of the Credit Parties or any Subsidiary.

Section 4.22    EEA Financial Institutions.  No Credit Party is an EEA Financial Institution.

## ARTICLE 5

## AFFIRMATIVE COVENANTS

So long as any Obligation shall remain unpaid, each Credit Party agrees to comply with the following covenants.

Section 5.1    Organization.  Each Credit Party shall, and shall cause each of its respective Subsidiaries to, preserve and maintain its partnership, limited liability company or corporate existence, rights, franchises and privileges in the jurisdiction of its organization, and qualify and remain qualified as a foreign business entity in each jurisdiction in which qualification is necessary or desirable in view of its business and operations or the ownership of its Properties and where failure to qualify could reasonably be expected to cause a Material Adverse Change; provided, however, that nothing herein contained shall prevent any transaction permitted by Section 6.8 or Section 6.9.

Section 5.2    Reporting.

(a)    Annual Financial Reports.  The Borrower shall provide, or shall cause to be provided, to the Lenders, as soon as available, but in any event within 90 days after the end of each fiscal year of the Borrower (commencing with the fiscal year ending December 31, 2020), a consolidated and consolidating balance sheet of each Credit Party and its Subsidiaries (excluding, in the case of Foreign Subsidiaries, consolidating balance sheets) as at the end of such fiscal year, and the related consolidated and consolidating statements of income or operations for such fiscal year (excluding,  in the case of Foreign Subsidiaries, consolidating statements of income or operations), setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail, such consolidated statements to be certified by the chief executive officer, chief financial officer, treasurer or controller of each Credit Party as fairly presenting the financial condition, results of operations, shareholders' equity and cash flow of such Credit Party and its Subsidiaries in accordance with GAAP, and such consolidated statements to be audited and accompanied by a report and opinion of an independent certified public accountant of nationally recognized standing reasonably acceptable to the Lenders, which report and opinion shall be prepared in accordance with GAAP and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit.

(b)    Quarterly Financials.  The Borrower shall provide, or shall cause to be provided, to the Lenders, as soon as available, but in any event within 45 days after the end of each of the first three fiscal quarters of each fiscal year of the Borrower (commencing with the fiscal quarter ended June 30, 2020), a consolidated and consolidating balance sheet of each Credit Party and its Subsidiaries (excluding, in the case of Foreign Subsidiaries, consolidating balance sheets) as at the end of such fiscal quarter, and the related consolidated and consolidating statements of income or operations for such fiscal quarter and for the portion of each such Credit Party's fiscal year then ended (excluding, in the case of Foreign Subsidiaries, consolidating statements of income or operations), setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail, such consolidated statements to be certified by the chief executive officer, chief financial officer, treasurer or controller of each Credit Party as fairly presenting the financial condition, results of operations, shareholders' equity and cash flow

of such Credit Party and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes.

(c)     Reserved.

(d)     Compliance Certificate.    Concurrently with the delivery of the financial statements referred to in Section 5.2(a), (b) and (c) above, the Borrower shall provide to the Lenders a duly completed Compliance Certificate signed by the chief executive officer, chief financial officer, treasurer or controller of the Borrower.

(e)     Reserved.

(f)     Defaults.  The Credit Parties shall provide to the Lenders promptly, but in any event within five (5) Business Days after the occurrence thereof, a notice of each Default or Event of Default known to any Credit Party or to any Subsidiary, together with a statement of an officer of the Borrower setting forth the details of such Default or Event of Default and the actions which the Credit Parties have taken and proposes to take with respect thereto.

(g)     Other Creditors.  The Credit Parties shall provide to the Lenders promptly after the giving or receipt thereof, copies of any default notices given or received by any Credit Party or by any Subsidiary pursuant to the terms of any indenture, loan agreement, credit agreement, notes, or similar agreement.

(h)     Litigation.  The Credit Parties shall provide to the Lenders promptly after the commencement thereof, notice of all actions, suits, and proceedings before any Governmental Authority, affecting any Credit Party or any Subsidiary that would reasonably be expected to result in at least $1,000,000 of liability to the Credit Parties (including, without limitation, damages, penalties, fines, legal fees, costs and/or other expenses).

(i)     Environmental Notices.    Promptly upon, and in any event no later than 3 Business Days after, the receipt thereof, or the acquisition of knowledge thereof, by any Credit Party, the Credit Parties shall provide the Lenders with a copy of any form of request, claim, complaint, order, notice, summons or citation received from any Governmental Authority or any other Person, (i) concerning violations or alleged violations of Environmental Laws that seeks to impose liability therefor in excess of $2,000,000, (ii) concerning any action or omission on the part of any of the Credit Parties or any of their former Subsidiaries in connection with Hazardous Waste or Hazardous Substances that could reasonably be expected to result in the imposition of liability in excess of $2,000,000 or requiring that action be taken to respond to or clean up a Release of Hazardous Substances or Hazardous Waste into the environment and such action or clean-up could reasonably be expected to exceed $2,000,000, including without limitation any information request related to, or notice of, potential responsibility under CERCLA, or (iii) concerning the filing of a Lien arising under Environmental Law upon, against or in connection with the Borrower, any Subsidiary, or any of their respective former Subsidiaries, or any of their leased or owned Property, wherever located.

(j)     Material Changes.  The Borrower will promptly furnish to the Lenders (and in any event within three Business Days) written notice of the following:

(i)     the occurrence of a Material Adverse Change;

(ii)     a breach of or noncompliance with any material term, condition, or covenant of any material contract to which any Credit Party or any Subsidiary is a party or by which their

Properties may be bound which breach or noncompliance could reasonably be expected to result in a Material Adverse Change; and

(iii)     the occurrence of any Default.

Each notice delivered under this <u>Section 5.2(j)</u> shall be accompanied by a statement of a Responsible Officer setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

(k)     <u>Termination Events</u>.  As soon as possible and in any event (i) within thirty (30) days after the Borrower or any member of the Controlled Group knows or has reason to know that any Termination Event described in clause (a) of the definition of Termination Event with respect to any Plan has occurred, and (ii) within 10 days after the Borrower or any member of the Controlled Group knows or has reason to know that any other Termination Event with respect to any Plan has occurred, the Credit Parties shall provide to the Lenders a statement of a Responsible Officer of the Borrower describing such Termination Event and the action, if any, which the Borrower or any Affiliate of the Borrower proposes to take with respect thereto;

(l)     <u>Termination of Plans</u>.  Promptly and in any event within seven (7) Business Days after receipt thereof by the Borrower or any member of the Controlled Group from the PBGC, the Credit Parties shall provide to the Lenders copies of each notice received by the Borrower or any such member of the Controlled Group of the PBGC's intention to terminate any Plan or to have a trustee appointed to administer any Plan;

(m)     <u>Other ERISA Notices</u>.  Promptly and in any event within seven (7) Business Days after receipt thereof by the Borrower or any member of the Controlled Group from a Multiemployer Plan sponsor, the Credit Parties shall provide to the Lenders a copy of each notice received by the Borrower or any member of the Controlled Group concerning the imposition or amount of withdrawal liability imposed on the Borrower or any member of the Controlled Group pursuant to Section 4202 of ERISA;

(n)     <u>Other Governmental Notices</u>.  Promptly and in any event within five (5) Business Days after receipt thereof by any Credit Party or any Subsidiary, the Credit Parties shall provide to the Lenders a copy of any notice, summons, citation, or proceeding seeking to modify in any material respect, revoke, or suspend any material contract, license, permit, or agreement with any Governmental Authority;

(o)     <u>Disputes; etc</u>.  The Credit Parties shall provide to the Lenders prompt written notice of any claims, legal or arbitration proceedings, proceedings before any Governmental Authority, or disputes, or to the knowledge of any Credit Party, any such actions threatened, or affecting any Credit Party or any Subsidiary, which, if adversely determined, could reasonably be expected to cause the Credit Parties to incur at least $1,000,000 of liability (including, without limitation, damages, penalties, fines, legal fees, costs and/or other expenses), or any material labor controversy of which the Borrower or any of its Subsidiaries has knowledge resulting in or reasonably considered to be likely to result in a strike against the Borrower or any Subsidiary;

(p)     <u>Securities Law Filings and other Public Information</u>.  Promptly after the same are available, the Credit Parties shall provide to the Lenders copies of each annual report, proxy or financial statement or other report or communication sent to the stockholders of the Borrower, and copies of all annual, regular, periodic and special reports and registration statements which the Borrower may file or be required to file with the SEC under Section 13 or 15(d) of the Exchange Act or any other securities Governmental Authority, and not otherwise required to be delivered to the Lenders pursuant hereto

(provided that a notice and link posted to the Borrower's main company website of any such document or information shall be deemed a satisfaction of the covenant in this clause (p)).

(q)     Other Information.  Subject to the confidentiality provisions of Section 9.8, the Credit Parties shall provide to the Lenders such other information respecting the business, operations, or Property of any Credit Party or any Subsidiary, financial or otherwise, as any Lender may reasonably request.

(r)     Accounting Changes.  No Credit Party shall make a change in the method of accounting employed in the preparation of the financial statements referred to in Section 4.4 or change the fiscal year end of the Borrower unless required to conform to GAAP or approved in writing by the Lenders.

Section 5.3     Insurance.

(a)     Each Credit Party shall, and shall cause each of its Subsidiaries to, carry insurance in such amounts and against such risks as is customarily maintained by other Persons of similar size engaged in similar businesses and with sound and reputable insurers, or self-insure to the extent customary for persons of similar size engaged in similar businesses and only to the extent the maximum liability under such self- insurance is less than $5,000,000.

(b)     Certificates of all insurance policies covering the property or business of the Credit Parties, and the renewals thereof, shall be delivered by Borrower to the Lenders. All certificates of insurance shall set forth the coverage, the limits of liability, the name of the carrier, the policy number, and the period of coverage.  All such policies shall contain a provision that notwithstanding any contrary agreements between any such Credit Party, its Subsidiaries, and the applicable insurance company, such policies will not be canceled or allowed to lapse without renewal without at least 30 days' (or 10 days' with respect to cancellation due to any failure to pay premiums or other amounts due under such policies, or, in either case, such shorter period as may be accepted by the Lenders) prior written notice to the Lenders.  All policies of property insurance with respect to the Collateral either shall have attached thereto a lender's loss payable endorsement in favor of the Lenders for its benefit and the ratable benefit of the Secured Parties or name the Lenders as loss payees for its benefit and the ratable benefit of the Secured Parties, in either case, in form reasonably satisfactory to the Lenders, and all policies of liability insurance shall name the Lenders as additional insureds and shall provide for a waiver of subrogation in favor of the Lenders.  All such policies shall contain a provision that notwithstanding any contrary agreements between any such Credit Party, its Subsidiaries, and the applicable insurance company, such policies will not be canceled or allowed to lapse without renewal without at least 30 days' (or 10 days' with respect to cancellation due to any failure to pay premiums or other amounts due under such policies, or, in either case, such shorter period as may be accepted by the Lenders) prior written notice to the Lenders.

(c)     If at any time the area in which any real Property constituting Collateral (to the extent any Building or Manufactured (Mobile) Home is situated on such real Property) is located is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), the Borrower shall, and shall cause each other Credit Party to, obtain Flood Insurance in such total amount and on such terms as the applicable Flood Insurance Regulations may require and otherwise in form and substance satisfactory to the Lenders, and otherwise comply with Flood Insurance Regulations.

Section 5.4     Compliance with Laws.  Each Credit Party shall, and shall cause each of its Subsidiaries to, comply with all federal, state, and local laws and regulations (including Environmental

Laws) which are applicable to the operations and Property of any Credit Party and maintain all related permits necessary for the ownership and operation of each Credit Party's Property and business, except in any case where the failure to so comply could not reasonably be expected to result in a Material Adverse Change.

Section 5.5    Reserved.

Section 5.6    Material Domestic Subsidiaries.  The Borrower shall notify the Lenders promptly after, and in any event no later than three (3) days after, the formation or acquisition of any Subsidiary formed or acquired by the Borrower or any Credit Party after the Effective Date.  Upon the request of a Lender, the Borrower shall cause each Material Domestic Subsidiary, whether existing on the Effective Date or created or acquired after the Effective Date, to, within 30 days of creation or acquisition (or such later date as the Lenders shall agree), execute and deliver to the Lenders (A) a joinder to the Guaranty or otherwise deliver a Guaranty (and a joinder to this Agreement), in each case, in any event, in form and substance satisfactory to the Lenders and (B) a joinder to the Security Agreement or otherwise deliver a security agreement, in any event, in form and substance satisfactory to the Lenders and (C) take all actions necessary to perfect each Lender's lien in the Collateral of such Subsidiary, consistent with the provisions of the Security Agreement. Furthermore, if, as of any fiscal quarter end, the Non-Material Domestic Subsidiaries collectively (a) have operating income equal to or greater than 10% of the Borrower's consolidated operating income for the four fiscal quarter period then ended, or (b) have a total book value of total assets equal to or greater than 10% of the Borrower's consolidated book value of total assets, in either case under clause (a) or (b), as established in accordance with GAAP and as reflected in the financial statements covering such fiscal quarter and delivered to the Lenders pursuant hereto, then, within 30 days of delivery of such financial statements and the accompanying Compliance Certificate required under Section 5.2(d) above, the Borrower shall cause such Non-Material Domestic Subsidiaries to execute and deliver to the Lenders (x) a joinder to the Guaranty or otherwise deliver a Guaranty (and a joinder to this Agreement), in each case, in any event, in form and substance satisfactory to the Lenders and (y) a joinder to the Security Agreement or otherwise deliver a security agreement, in any event, in form and substance satisfactory to the Lenders, but only to the extent necessary in order to result in (i) operating income of all Non-Material Domestic Subsidiaries that are not Guarantors and Grantors under the Security Agreement to be less than 10% of the Borrower's consolidated operating income for the four fiscal quarter period then ended, and (ii) total book value of total assets of all Non-Material Domestic Subsidiaries that are not Guarantors and Grantors under the Security Agreement to be less than 10% of the Borrower's consolidated book value of total assets, in either case under clause (i) or (ii), as established in accordance with GAAP and as reflected in the financial statements covering such fiscal quarter and delivered to the Lenders pursuant hereto. Furthermore, concurrently with the delivery of each financial statement as required in Sections 5.2(a), (b) and (c) and the accompanying Compliance Certificate required under Section 5.2(d), the Borrower may request that the Lenders release, and within 30 days of such request, the Lenders shall release, any Domestic Subsidiary from its Guaranty as requested by the Borrower, so long as no Default then exists and after giving effect to such release, the Borrower is in compliance with this Section 5.6. For the avoidance of doubt, no Foreign Subsidiary, FSCHO or any Subsidiary of a Foreign Subsidiary or FSHCO shall be required to become a Guarantor hereunder.

Section 5.7    Records; Inspection.  Each Credit Party shall, and shall cause each of its Subsidiaries to maintain proper, complete and consistent, in all material respects, books of record with respect to such Person's operations, affairs, and financial condition.  From time to time upon reasonable prior notice, each Credit Party shall permit any Lender and shall cause each of its Subsidiaries to permit any Lender, at such reasonable times and intervals and to a reasonable extent and under the reasonable guidance of officers of or employees delegated by officers of such Credit Party or such Subsidiary, to, subject to any applicable confidentiality considerations, examine and copy the books and records of such Credit Party or such Subsidiary, to visit and inspect the Property of such Credit Party or such Subsidiary

at the Borrower's sole cost and expense, and to discuss the business operations and Property of such Credit Party or such Subsidiary with the officers and directors thereof; provided that, if no Event of Default has occurred and is continuing only two such inspections shall be at the Borrower's sole cost and expense.

Section 5.8    Maintenance of Property.  Each Credit Party shall, and shall cause each of its Subsidiaries to maintain its owned, leased, or operated Property in good condition and repair, normal wear and tear excepted; and shall abstain from, and cause each of its Subsidiaries to abstain from, knowingly or willfully permitting the commission of waste or other injury, destruction, or loss of natural resources, or the occurrence of pollution, contamination, or any other condition in, on or about the owned or operated Property involving the Environment that could reasonably be expected to result in Response activities and that could reasonably be expected to cause a Material Adverse Change.

Section 5.9    Security.

(a)    Each Credit Party agrees that at all times before the termination of this Agreement and payment in full of the Obligations, the Lenders shall have an Acceptable Security Interest in the Collateral to secure the performance and payment of the Obligations.  Upon the request of the Lenders, each Credit Party shall, and shall cause each of its Subsidiaries to, promptly grant to each Lender a Lien in any Collateral of such Credit Party or such Subsidiary now owned or hereafter acquired (other than leased real property) and to take such actions as may be requested by the Lenders or otherwise required under the Security Documents to ensure that each Lender has an Acceptable Security Interest in such Collateral.

(b)    Within 30 days after opening a deposit account or securities account (other than an Excluded Account), or such greater period of time as may be approved by the Lenders, the applicable Credit Party shall execute and deliver and shall cause to be delivered to the Lenders an Account Control Agreement from the bank maintaining such deposit account or securities account and take any steps which may reasonably be requested by the Lenders to perfect their security interest in such account.

(c)    Except as expressly contemplated by Section 5.9(b), all deposit accounts and securities accounts (in each case, other than Excluded Accounts) owned or held by a Credit Party shall be subject to an Account Control Agreement at all times.

(d)    Mortgages and Title Information.  Notwithstanding the generality of Section 5.9(a) above, with respect to the real Property set forth on Schedule 5.9(d), the Credit Parties shall provide the following to the Lenders as soon as is practicable but in no event later than 90 days after the Effective Date (or such later date as may be agreed by the Lenders in their sole discretion):

(i)    executed Mortgages covering [the real Property listed on Schedule 5.9(d)][1] hereto;

(ii)    such customary endorsements and affirmative assurances to each mortgagee title insurance policy with respect to the Mortgaged Property as the Lenders shall reasonably request and which are reasonably obtainable from the applicable title company issuing such policy in the state where such real property interest is located; and

(iii)    legal opinions of local counsel to the Credit Parties in each relevant jurisdiction in which the Mortgages described in the preceding clause (i) will be filed with respect to the

---

[1] NTD:  Borrower/VE to confirm the listing of real property on Schedule 5.9(d).

Mortgages described in the immediately preceding clause (i) above, in form and substance reasonably acceptable to the Lenders.

(e)    <u>Survey</u>.  The Borrower shall promptly, and in no event later than 90 days after the Effective Date (or such later date as may be agreed by the Lenders in their sole discretion), deliver or cause to be delivered to the Lenders a Survey, with respect to the real Property listed on <u>Schedule 5.9(d)</u>.

(f)    <u>Environmental Report</u>.  Upon the request of the Lenders, the Borrower shall promptly, and in no event later than 60 days following date of such request (or such later date as may be agreed by the Lenders in their sole discretion), deliver or cause to be delivered to the Lenders a Phase I Environmental Site Assessment Report completed by an independent environmental consultant with respect to the real Property listed on <u>Schedule 5.9(d)</u>.  In the event that such Phase I Environmental Site Assessment Report identify any "recognized environmental conditions," "controlled recognized environmental conditions," or "historical recognized environmental conditions" as defined in the ASTM E 1527-13, Borrower shall also provide to Lenders within a reasonable time thereafter copies of any and all environmental activities and/or reports, as applicable,  reasonably required to ensure that the applicable real Property is in compliance with Environmental Laws in all material respects.

(g)    <u>Collateral Access Agreements</u>.  The Borrower shall use commercially reasonable efforts to promptly, and in no event later than 90 days after the Effective Date (or such later date as may be agreed by the Lenders in their sole discretion), deliver or cause to be delivered to the Lenders Collateral Access Agreements in favor of the Lenders with respect to the leased real property locations described on <u>Schedule 5.9(d)</u> as the Lenders require in their sole discretion.

Section 5.10    <u>Further Assurances; Cure of Title Defects</u>.Each Credit Party shall, and shall cause each Subsidiary to, cure promptly any defects in the execution and delivery of the Credit Documents.  The Credit Parties hereby authorize each Lender to file any (x) financing statements to the extent permitted by applicable Legal Requirements in order to perfect or maintain the perfection of any security interest granted under any of the Credit Documents and/or (y) any amendments to the existing financing statements to reflect the terms of the Credit Documents.  Each Credit Party at its expense will, and will cause each Subsidiary to, promptly execute and deliver to the Lenders upon reasonable request by the Lenders all such other documents, agreements and instruments to comply with or accomplish the covenants and agreements of any Credit Party or Subsidiary, as the case may be, in the Credit Documents, or to further evidence and more fully describe the collateral intended as security for the Obligations, or to correct any omissions in the Security Documents, or to state more fully the security obligations set out herein or in any of the Security Documents, or to perfect, protect or preserve any Liens created pursuant to this Agreement or any of the Security Documents or the priority thereof, or to make any recordings, to file any notices or obtain any consents, all as may be necessary or appropriate in connection therewith or to enable the Lenders to exercise and enforce its rights and remedies with respect to any Collateral.

Section 5.11    <u>FCPA; Sanctions</u>.  Each Credit Party will maintain in effect policies and procedures designed to promote compliance by such Credit Party, its Subsidiaries, and their respective directors, officers, employees, and agents with the FCPA and any other applicable Anti-Corruption Laws and all applicable Sanctions.

Section 5.12    <u>Reserved</u>.

Section 5.13    <u>Payment of Obligations</u>.  The Borrower will, and will cause each Subsidiary to, pay its material obligations, including material Tax liabilities of the Borrower and all of its Subsidiaries, before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) the Borrower or such Subsidiary has set

aside on its books adequate reserves with respect thereto in accordance with GAAP and (c) the failure to make payment pending such contest would not reasonably be expected to result in a Material Adverse Change or result in the seizure or levy of any Mortgaged Property or any other material Property of the Borrower or any Subsidiary.

Section 5.14    <u>Performance of Obligations under Credit Documents</u>.  The Borrower will pay the Notes according to the reading, tenor and effect thereof, and the Borrower will, and will cause each Subsidiary to, do and perform every act and discharge all of the obligations to be performed and discharged by them under the Credit Documents, including this Agreement.

**ARTICLE 6**

**NEGATIVE COVENANTS**

So long as any Obligation shall remain unpaid, the Credit Parties agree to comply with the following covenants.

Section 6.1    <u>Reserved</u>.

Section 6.2    <u>Debt</u>.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, create, assume, incur, suffer to exist, or in any manner become liable, directly, indirectly, or contingently in respect of, any Debt other than the following (collectively, the "<u>Permitted Debt</u>"):

(a)    the Obligations;

(b)    Reserved;

(c)    Reserved;

(d)    intercompany Debt incurred in the ordinary course of business owed by any Credit Party to any other Credit Party provided that if such Debt constitutes an investment, such investment is also permitted under <u>Section 6.4</u>;

(e)    Debt in the form of accounts payable to trade creditors for goods or services and current operating liabilities (other than for borrowed money) which in each case are not more than 90 days past due, in each case incurred in the ordinary course of business, as presently conducted, unless contested in good faith and by appropriate proceedings;

(f)    (i) purchase money indebtedness and Capital Leases in effect on the Effective Date and set forth in <u>Schedule 6.2(f)</u> and (ii) such other purchase money indebtedness or Capital Leases incurred after the Effective Date; provided that, the aggregate outstanding principal amount of such purchase money indebtedness and Capital Leases incurred after the Effective Date shall not exceed $10,000,000 at any time;

(g)    Debt in respect of Hedging Arrangements;

(h)    (i) the Existing Letters of Credit, in effect as of the Effective Date, so long as the face amount of the Existing Letters of Credit is not increased after the Effective Date, and (ii) other letters of credit issued by Wells Fargo or other commercial banks reasonably satisfactory to the Borrower in the ordinary course of business provided that no more than an aggregate of $1,000,000 of letters of credit may be outstanding at any time pursuant to this <u>Section 6.2(h)</u>;

(i)       Debt incurred pursuant to one or more loan agreements between the Borrower and LLC CARBO International Eurasia, a company duly organized and existing under the laws of Russia; provided that (i) such Debt is unsecured, (ii) the aggregate principal amount of such Debt outstanding at any time shall not to exceed $300,000.00, and (iii) such Debt is subordinated to the Debt under this Agreement and the other Credit Documents on terms reasonably acceptable to the Lenders;

(j)       Debt in the form of insurance premium financings incurred in the ordinary course of business;

(k)       all Debt outstanding as of the Effective Date, which is described on Schedule 6.2(k);

(l)       all refinancings or replacements of any of the Debt permitted under the foregoing clauses (a)-(k) provided that any such refinanced or replaced Debt in excess of $5,000,000 on an individual basis and $10,000,000 in the aggregate constitutes Refinancing Debt;

(m)       Debt incurred pursuant to the existing corporate credit card services provided to Borrower by Wells Fargo and described on Schedule 6.2(m), provided that the aggregate principal amount of such Debt outstanding pursuant to this Section 6.2(m) shall not exceed $315,000.00 at any time; and

(n)       without duplication, other unsecured subordinated Debt, provided that on the date such unsecured subordinated Debt is incurred the aggregate principal amount of such Debt and any other Debt previously incurred under this clause (n) shall not exceed the greater of $10,000,000.

Section 6.3       Liens.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, create, assume, incur, or suffer to exist any Lien on the Property of any Credit Party or any Subsidiary, whether now owned or hereafter acquired, or assign any right to receive any income, other than the following (collectively, the "Permitted Liens"):

(a)       Liens securing the Obligations pursuant to the Security Documents;

(b)       Liens imposed by law, such as materialmen's, mechanics', carriers', workmen's, landlords' and repairmen's liens, and other similar liens arising in the ordinary course of business securing obligations which are not overdue for a period of more than 30 days or are being contested in good faith by appropriate procedures or proceedings and for which adequate reserves have been established;

(c)       Liens arising in the ordinary course of business out of pledges or deposits under workers compensation laws, unemployment insurance, old age pensions, or other social security or retirement benefits, or similar legislation to secure public or statutory obligations;

(d)       Liens for Taxes, assessment, or other governmental charges which are not yet due and payable or which are being actively contested in good faith by appropriate proceedings and for which adequate reserves have been established in compliance with GAAP;

(e)       Liens securing purchase money debt or Capital Lease obligations permitted under Section 6.2(f); provided that each such Lien encumbers only the Property purchased in connection with the creation of any such purchase money debt or the subject of any such Capital Lease and the amount secured thereby is not increased;

99718855.10

(f)        Liens arising from precautionary UCC financing statements regarding operating leases to the extent such operating leases are permitted hereby;

(g)        encumbrances consisting of minor easements, zoning restrictions, or other restrictions on the use of real property that do not (individually or in the aggregate) materially affect the value of the assets encumbered thereby or materially impair the ability of any Credit Party to use such assets in its business, and none of which is violated in any material aspect by existing or proposed structures or land use;

(h)        Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies and burdening only deposit accounts or other funds maintained with a depository institution;

(i)        Liens on cash or securities pledged to secure (i) letters of credit permitted under Section 6.2(h), (ii) Hedging Arrangements permitted under Section 6.1(g) provided that the amount of cash and/or securities pledged to secure such Hedging Arrangements that do not constitute Obligations shall not exceed $1,000,000 at any time, (iii) performance of tenders, surety and appeal bonds, government contracts, performance and return of money bonds, bids, trade contracts, leases, statutory obligations, regulatory obligations and other obligations of a like nature incurred in the ordinary course of business, and (iv) corporate credit card services permitted under Section 6.2(m), provided that the amount of such cash or securities pledges to secure such corporate credit card services shall not exceed $315,000.00 at any time; and

(j)        judgment and attachment Liens not giving rise to an Event of Default, provided that (i) any appropriate legal proceedings which may have been duly initiated for the review of such judgment shall not have been finally terminated or the period within which such proceeding may be initiated shall not have expired and (ii) no action to enforce such Lien has been commenced.

Section 6.4        Investments.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, make or hold any direct or indirect investment in any Person, including capital contributions to the Person, investments in or the acquisition of the debt or equity securities of the Person, or any loans, guaranties, trade credit, or other extensions of credit to any Person, other than the following (collectively, the "Permitted Investments"):

(a)        Investments made prior to the Effective Date which are disclosed to the Lenders in Schedule 6.4(a);

(b)        investments in the form of trade credit to customers of a Credit Party arising in the ordinary course of business and represented by accounts from such customers;

(c)        Liquid Investments, provided that all such Liquid Investments shall be subject to a first priority, perfected Lien and security interest in favor of the Lenders;

(d)        loans, advances, or capital contributions to, or investments in, or purchases or commitments to purchase any stock or other securities or evidences of indebtedness of or interests in any Subsidiary that is not a Credit Party as permitted by Section 6.2(n), including any travel advances or travel loans to officers and employees; provided that on the date any such loans, advances, capital contributions, investments, purchases and commitments are made, the aggregate amount of such loans, advances, capital contributions, investments, purchases and commitments together with any other loans, advances contributions, investments, purchases and commitments (other than appreciation) then outstanding under this clause (d) shall not exceed $1,000,000;

99718855.10

(e)  loans and advances by a Credit Party to any other Credit Party;

(f)  investments in the form of Acquisitions permitted by Section 6.5; provided that, if such Acquisition is of an equity interest or other securities in a Person (that is not a Credit Party and does not become a Credit Party), such investments shall also be permitted under clause (c) above;

(g)  creation of any additional Subsidiaries; provided that in connection with any such creation of an additional Subsidiary the Borrower shall comply with the terms and conditions in Section 5.6; and

(h)  the Wilkinson Bonds.

Section 6.5  Acquisitions.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, make an Acquisition in a transaction or related series of transactions for cash consideration that exceeds $10,000,000 unless (i) the assets, operations or business purchased in connection with such transaction become Collateral and subject to the first priority Lien in favor of each Lender, and (ii) the transaction is otherwise acceptable to the Lenders; provided that in no event shall the cash consideration for any Acquisition exceed $20,000,000.

Section 6.6  Agreements Restricting Liens.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, create, incur, assume or permit to exist any contract, agreement or understanding (other than (i) this Agreement and the other Credit Documents, (ii)  documents creating Liens which are described in clauses (c) and (g) of Section 6.3, but then only with respect to the Property that is the subject of the applicable lease or document described in such clause (c) or (g), (iii) in connection with any sale or other disposition of Property permitted under this Agreement, restrictions on such Property during the pendency of such sale or other disposition imposed under the agreements governing such sale or disposition, and (iv) anti-assignment provisions in Excluded Contracts (as defined in the Security Agreement)) which in any way prohibits or restricts the granting, conveying, creation or imposition of any Lien on any of its Property, whether now owned or hereafter acquired, to secure the Obligations or restricts any Subsidiary from paying Restricted Payments to the Borrower, or which requires the consent of or notice to other Persons in connection therewith.

Section 6.7  Use of Proceeds.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, use the proceeds of the Loans for any purposes other than as permitted by Section 4.15 hereof.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, use any part of the proceeds of Loans for any purpose which violates, or is inconsistent with, Regulations T, U, or X.  No part of the proceeds of the Loans will be used, directly or indirectly, in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of the FCPA or any other applicable anticorruption law.  The Borrower will not, directly or indirectly, use the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any subsidiary, or, to its knowledge, to any joint venture partner or other Person, (i) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions only to the extent the funding of such proceeds would violate such Sanctions, or (ii) in any other manner that would result in a violation of Sanctions by the Borrower, any of its Subsidiaries or any Lender.

Section 6.8  Corporate Actions.

(a)  No Credit Party shall, nor shall it permit any of its Subsidiaries to, merge or consolidate with or into any other Person, except that (i) the Borrower may merge with any of its wholly-owned Subsidiaries, (ii) any Credit Party may merge or be consolidated with or into any other Credit

Party, (iii) any Subsidiary of the Borrower that is not a Credit Party may merge or consolidate with any Credit Party or any other Subsidiary of the Borrower that is not a Credit Party, and (iv) any entity may merge or be consolidated with or into any Credit Party; provided that immediately after giving effect to any such proposed transaction no Default would exist and, in the case of any such merger to which (x) the Borrower is a party, the Borrower is the surviving entity, and (y) a Credit Party (other than Borrower) is a party, a Credit Party is the surviving entity.

(b)     No Credit Party shall, nor shall it permit any of its Subsidiaries to, change its name, change its state of incorporation, formation or organization, change its organizational identification number or reorganize in another jurisdiction, or in any manner rearrange its business structure as it exists on the date of this Agreement, provided that a Credit Party may change its name, change its state of incorporation, formation or organization, and change its organizational number provided that such Credit Party has given the Lenders at least ten (10) days' prior notice of such change.

(c)     The Borrower shall not, nor shall it permit any of its Subsidiaries to, modify or change its fiscal year or its method of accounting (other than as may be required to conform to GAAP) without the prior written consent of the Lenders.

Section 6.9     Dispositions.

(a)     No Credit Party shall, nor shall it permit any of its Subsidiaries to, sell, convey, license or otherwise transfer any of its assets except that the Borrower and its Subsidiaries may (i) sell Inventory in the ordinary course of business; (ii) sell, convey, or otherwise transfer of Equipment that is (i) obsolete, worn out, depleted or uneconomic and disposed of in the ordinary course of business, or (ii) contemporaneously replaced by Equipment of at least comparable value and use; provided that no Event of Default shall exist or shall result from such sale, conveyance, or transfer; (iii) consummate the Specified Dispositions; (iv) license or otherwise dispose of Intellectual Property (as such term is defined in the Security Agreement) pursuant to the terms of the Security Agreement; and (v) sell, convey or otherwise transfer assets so long as the Borrower makes any prepayments of the Loans with the Net Cash Proceeds thereof to the extent required under Section 2.5(c)(ii).

(b)     No Credit Party shall, nor shall it permit any of its Subsidiaries to, sell or otherwise dispose of any of its ownership interest in any of its Subsidiaries, or in any manner rearrange its business structure as it exists on the date of this Agreement except that the Borrower and its Subsidiaries may (i) create or acquire new Subsidiaries if such new Subsidiaries comply with Section 5.6 and such transactions otherwise comply with the terms of this Agreement, (ii) transfer, sell or otherwise dispose of such ownership interests in connection with any merger or consolidation permitted under Section 6.8(a) or any dissolution or liquidation of any Subsidiary of the Borrower to the extent that the Borrower has reasonably determined that such Subsidiary is no longer useful in its business so long as the Borrower makes any prepayments of the Loans with the Net Cash Proceeds thereof to the extent required under Section 2.5(c)(ii), (iii) dispose of any of its ownership interests in any of its Subsidiaries provided that no Event of Default shall exist or shall result from such sale, conveyance, or transfer; (iv) consummate the Specified Dispositions; and (v) sell, convey or otherwise transfer assets so long as the Borrower makes any prepayments of the Loans with the Net Cash Proceeds thereof to the extent required under Section 2.5(c)(ii).

Section 6.10     Restricted Payments.

(a)     No Credit Party shall, nor shall it permit any of its Subsidiaries to make any Restricted Payments other than (i) a Restricted Payment to a Credit Party and (ii) a Restricted Payment

from a Subsidiary that is not a Credit Party to a Credit Party or another Subsidiary that is not a Credit Party.

(b)     The Borrower will not, and will not permit any of its Subsidiaries to, prior to the date that is ninety-one (91) days after the Maturity Date, make or offer to make any optional or voluntary Redemption of or otherwise optionally or voluntarily Redeem (whether in whole or in part) any principal in respect of any Debt other than the Obligations, unless approved by the Lenders in writing.

Section 6.11     <u>Affiliate Transactions</u>.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction or series of transactions (including, but not limited to, the purchase, sale, lease or exchange of Property, the making of any investment, the giving of any guaranty, the assumption of any obligation or the rendering of any service) with any of their Affiliates which are not Credit Parties unless such transaction or series of transactions is on terms no less favorable to the Borrower or any Subsidiary, as applicable, than those that could be obtained in a comparable arm's length transaction with a Person that is not an affiliate.

Section 6.12     <u>Line of Business</u>.  No Credit Party shall, and shall not permit any of its Subsidiaries to, change the character of the Borrower's and its Subsidiaries collective business as conducted on or immediately prior to the Effective Date, or engage in any type of business not reasonably related to the Borrower's and its Subsidiaries collective business as of or immediately prior to the Effective Date subject to the Credit Parties rights to consummate Acquisitions or other investments in accordance with the terms of this Agreement.

Section 6.13     <u>Hazardous Materials</u>.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, (a) create, handle, transport, use, or dispose of any Hazardous Substance or Hazardous Waste, except in the ordinary course of its business and except in compliance with Environmental Law other than to the extent that such non-compliance could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change, and (b) Release any Hazardous Substance or Hazardous Waste into the environment or permit any Credit Party's or any Subsidiary's Property to be subjected to any Release of Hazardous Substance or Hazardous Waste, except in compliance with Environmental Law other than to the extent that such non-compliance could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change.

Section 6.14     <u>Compliance with ERISA</u>.  Except for matters that individually or in the aggregate could not reasonably be expected to cause a Material Adverse Change, no Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly: (a) knowingly engage in any transaction in connection with which the Borrower or any Subsidiary could be subjected to either a civil penalty assessed pursuant to section 502(c), (i) or (l) of ERISA or a Tax imposed by Chapter 43 of Subtitle D of the Code; (b) terminate, or permit any member of the Controlled Group to terminate, any Plan in a manner, or take any other action with respect to any Plan, which could result in any liability to the Borrower, any Subsidiary or any member of the Controlled Group to the PBGC; (c) fail to make, or permit any member of the Controlled Group to fail to make, full payment when due of all amounts which, under the provisions of any Plan, agreement relating thereto or applicable law, the Borrower, a Subsidiary or member of the Controlled Group is required to pay as contributions thereto; (d) permit to exist, or allow any Subsidiary or any member of the Controlled Group to permit to exist, any accumulated funding deficiency (or unpaid minimum required contribution for plan years after December 31, 2007) within the meaning of Section 302 of ERISA or section 412 of the Code, whether or not waived, with respect to any Plan; (e) permit, or allow any member of the Controlled Group to permit, the actuarial present value of the benefit liabilities (as "actuarial present value of the benefit liabilities" shall have the meaning specified in section 4041 of ERISA) under any Plan that is regulated under Title IV of ERISA to exceed the current value of the assets (computed on a plan termination basis in accordance with Title IV of

ERISA) of such Plan allocable to such benefit liabilities; (f) contribute to or assume an obligation to contribute to, or permit any member of the Controlled Group to contribute to or assume an obligation to contribute to, any Multiemployer Plan; (g) acquire, or permit any member of the Controlled Group to acquire, an interest in any Person that causes such Person to become a member of the Controlled Group if such Person sponsors, maintains or contributes to, or at any time in the six-year period preceding such acquisition has sponsored, maintained, or contributed to, (1) any Multiemployer Plan, or (2) any other Plan that is subject to Title IV of ERISA under which the actuarial present value of the benefit liabilities under such Plan exceeds the current value of the assets (computed on a plan termination basis in accordance with Title IV of ERISA) of such Plan allocable to such benefit liabilities; (h) incur, or permit any member of the Controlled Group to incur, a liability to or on account of a Plan under sections 515, 4062, 4063, 4064, 4201 or 4204 of ERISA; (i) contribute to or assume an obligation to contribute to any employee welfare benefit plan, as defined in section 3(1) of ERISA, including, without limitation, any such plan maintained to provide benefits to former employees of Borrower or any Subsidiary, that may not be terminated by such entities in their sole discretion at any time without any liability; or (j) amend or permit any member of the Controlled Group to amend, a Plan resulting in a material increase in current liability such that the Borrower, any Subsidiary or any member of the Controlled Group is required to provide security to such Plan under section 401(a)(29) of the Code.

Section 6.15    Limitation on Hedging.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, (a) purchase, assume, or hold a speculative position in any commodities market or futures market or enter into any Hedging Arrangement for speculative purposes; or (b) be party to or otherwise enter into any Hedging Arrangement which is entered into for reasons other than as a part of its normal business operations as a risk management strategy and/or hedge against changes resulting from market conditions related to the Borrower's or its Subsidiaries' operations.

Section 6.16    [Minimum Liquidity.  The Borrower shall not permit the Liquidity to be less than $2,500,000 as of the last day of any calendar month following the Effective Date.][2]

## ARTICLE 7

## DEFAULT AND REMEDIES

Section 7.1    Events of Default.  The occurrence of any of the following events shall constitute an "Event of Default" under this Agreement and any other Credit Document:

(a)    Payment Failure.  Any Credit Party (i) fails to pay any principal when due under this Agreement or (ii) fails to pay, within three Business Days of when due, any other amount due under this Agreement or any other Credit Document, including payments of interest, fees, reimbursements, and indemnifications;

(b)    False Representation or Warranties.  Any representation or warranty made or deemed to be made by any Credit Party or any officer thereof in this Agreement, in any other Credit Document or in any certificate delivered in connection with this Agreement or any other Credit Document is incorrect, false or otherwise misleading in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof)  at the time it was made or deemed made;

(c)    Breach of Covenant.  (i) Any breach by any Credit Party of any of the covenants in  Section 5.1,  Section 5.2(f),  Section 5.2(g),  Section 5.2(j)(iii),  Section 5.2(s),  Section 5.2(t),

---

[2] NTD:  Subject to further discussion.

Section 5.3(a), Section 5.15, Section 5.16 or Article 6 of this Agreement or the corresponding covenants in any Guaranty; or (ii) any breach by any Credit Party of any other covenant contained in this Agreement (other than those specified in Section 7.1(a), Section 7.1(b) or the foregoing clause (i) of this Section 7.1(c)) or any other Credit Document and such breach shall remain unremedied for a period of thirty (30) days after the earlier of (A) the date on which any Credit Party has actual knowledge of such breach and (B) the date written notice of such breach shall have been given to the Borrower by any Lender (such grace period to be applicable only in the event such Default can be remedied by corrective action of a Credit Party or any of its Subsidiaries);

(d)     Guaranties.   Any provisions in the Guaranties shall at any time (before its expiration according to its terms) and for any reason cease to be in full force and effect and valid and binding on the Guarantors party thereto or shall be contested by any party thereto; any Guarantor shall deny it has any liability or obligation under such Guaranties; or any Guarantor shall cease to exist other than as expressly permitted by the terms of this Agreement;

(e)     Cross-Default. (i) The Borrower or any Guarantor shall fail to pay any principal of or premium or interest on its Debt which is outstanding in a principal amount of at least $5,000,000 individually or when aggregated with all such Debt of the Borrower and the Subsidiaries so in default (but excluding Debt evidenced by the Notes) when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt; (ii) any other event shall occur or condition shall exist under any agreement or instrument relating to Debt which is outstanding in a principal amount of at least $5,000,000 individually or when aggregated with all such Debt of the Borrower and the Subsidiaries so in default (other than Debt evidenced by the Notes), and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate, or to permit the acceleration of, the maturity of such Debt prior to the stated maturity thereof; or (iii) any such Debt shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment); provided that, for purposes of this paragraph (e), the "principal amount" of the obligations in respect of Hedging Arrangements at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that would be required to be paid by the applicable Credit Party if such Hedging Arrangements were terminated at such time;

(f)     Bankruptcy and Insolvency.   (i) The Borrower or any other Credit Party shall terminate its existence or dissolve (except in accordance with a transaction otherwise permitted under this Agreement) or (ii) any Credit Party (A) admits in writing its inability to pay its debts generally as they become due; makes an assignment for the benefit of its creditors; consents to or acquiesces in the appointment of a receiver, liquidator, fiscal agent, or trustee of itself or any of its Property; files a petition under bankruptcy or other laws for the relief of debtors; or consents to any reorganization, arrangement, workout, liquidation, dissolution, or similar relief or (B) shall have had, without its consent: any court enter an order appointing a receiver, liquidator, fiscal agent, or trustee of itself or any of its Property; any petition filed against it seeking reorganization, arrangement, workout, liquidation, dissolution or similar relief under bankruptcy or other laws for the relief of debtors and such petition shall not be dismissed, stayed, or set aside for an aggregate of 60 days, whether or not consecutive; provided, however, that the pendency of the Chapter 11 Cases shall not be an Event of Default;

(g)     Adverse Judgment.   The Borrower or any other Credit Party suffers final judgments against any of them since the date of this Agreement in an aggregate amount, less any insurance proceeds covering such judgments which are received or as to which the insurance carriers admit liability, greater than $1,000,000 and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgments or (ii) there shall be any period of 30 consecutive days

99718855.10

during which a stay of enforcement of such judgments, by reason of a pending appeal or otherwise, shall not be in effect;

(h)     <u>Termination Events</u>.  Any Termination Event with respect to a Plan shall have occurred, and, 30 days after notice thereof shall have been given to the Borrower by the Lenders, such Termination Event shall not have been corrected and shall have created and caused to be continuing a material risk of Plan termination or liability for withdrawal from the Plan as a "substantial employer" (as defined in Section 4001(a)(2) of ERISA), which termination could reasonably be expect to result in a liability of, or liability for withdrawal could reasonably be expected to be, greater than $1,000,000;

(i)     <u>Plan Withdrawals</u>.  The Borrower or any member of the Controlled Group as employer under a Multiemployer Plan shall have made a complete or partial withdrawal from such Multiemployer Plan and such withdrawing employer shall have incurred a withdrawal liability in an annual amount exceeding $1,000,000; or

(j)     <u>Change in Control</u>.  The occurrence of a Change in Control.

(k)     <u>Security Documents</u>.  The Security Agreement or any other material Security Document shall at any time and for any reason cease to create an Acceptable Security Interest in all material Property purported to be subject to such agreement (and such Acceptable Security Interest) in accordance with the terms of such agreement or any provisions thereof shall cease to be in full force and effect and valid and binding on the Credit Party that is a party thereto or any such Person shall so state in writing.

Section 7.2     <u>Optional Acceleration of Maturity</u>.  If any Event of Default (other than an Event of Default pursuant to <u>Section 7.1(f)</u>) shall have occurred and be continuing, then, and in any such event,

(a)     the Lenders may, by notice to the Borrower, (i) terminate the Commitments, and thereupon the Commitments shall terminate immediately, (ii) declare the Loans (including, all principal and interest thereon), and all other amounts payable under this Agreement (including, for the avoidance of doubt, any Prepayment Fees) to be forthwith due and payable, whereupon the Loans (including all such principal and interest), and all other amounts payable under this Agreement shall become and be forthwith due and payable in full, without presentment, demand, protest or further notice of any kind (including, without limitation, any notice of intent to accelerate or notice of acceleration), all of which are hereby expressly waived by each of the Credit Parties, and

(b)     the Lenders may proceed to enforce its rights and remedies under the Guaranties or any other Credit Document for the ratable benefit of the Secured Parties by appropriate proceedings.

Section 7.3     <u>Automatic Acceleration of Maturity</u>.  If any Event of Default pursuant to <u>Section 7.1(f)</u> shall occur,

(a)     the Loans, including all principal and interest on the Loans, and all other amounts payable under this Agreement (including, for the avoidance of doubt, any Prepayment Fees) shall immediately and automatically become and be due and payable in full, without presentment, demand, protest or any notice of any kind (including, without limitation, any notice of intent to accelerate or notice of acceleration), all of which are hereby expressly waived by each of the Credit Parties, and

(b)     the Lenders may proceed to enforce its rights and remedies under the Guaranties or any other Credit Document for the ratable benefit of the Secured Parties by appropriate proceedings.

Section 7.4    Prepayment Fee.  The parties hereto acknowledge and agree that the Prepayment Fee referred to in this Article 7 (a) is additional consideration for providing the Commitments, (b) constitutes reasonable liquidated damages to compensate the applicable Lenders for (and is a proportionate quantification of) the actual loss of the anticipated stream of interest payments upon the early termination of the Commitments (such damages being otherwise impossible to ascertain or even estimate for various reasons, including, without limitation, because such damages would depend on, among other things, (x) when Commitments might otherwise be terminated, and (y) future changes in interest rates which are not readily ascertainable on the Effective Date), and (c) is not a penalty to punish the Borrower for its early termination of the Commitments or for the occurrence of any Event of Default or the occurrence of any other Prepayment Fee Event, as the case may be.

Section 7.5    Remedies Cumulative, No Waiver.  No right, power, or remedy conferred to any Lender in this Agreement or the Credit Documents, or now or hereafter existing at law, in equity, by statute, or otherwise shall be exclusive, and each such right, power, or remedy shall to the full extent permitted by law be cumulative and in addition to every other such right, power or remedy.  No course of dealing and no delay in exercising any right, power, or remedy conferred to any Lender in this Agreement and the Credit Documents or now or hereafter existing at law, in equity, by statute, or otherwise shall operate as a waiver of or otherwise prejudice any such right, power, or remedy.  No notice to or demand upon the Borrower or any other Credit Party shall entitle the Borrower or any other Credit Party to similar notices or demands in the future.

Section 7.6    Application of Payments.  Prior to an Event of Default, all payments made hereunder shall be applied by the Lenders as directed by the Borrower, but subject to the terms of this Agreement, including the application of prepayments according to Section 2.5 and Section 2.12.  During the existence of an Event of Default, all payments and collections received by the Lenders shall be applied to the Obligations in accordance with Section 2.12 and otherwise in such manner as determined by the Lenders provided that in the event that the Obligations have been accelerated pursuant to Section 7.2 or any Lender has exercised any remedy set forth in this Agreement or any other Credit Document, all payments received on account of the Obligations and all net proceeds from the enforcement of the Obligations shall be applied by the Lenders as follows:

First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts, including attorney fees, payable to the Lenders in their capacities as such;

Second, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders under the Credit Documents, including attorney fees, ratably among the Lenders in proportion to the respective amounts described in this clause Second payable to them;

Third, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans, ratably among the Lenders in proportion to the respective amounts described in this clause Third payable to them;

Fourth, to payment of all other Obligations ratably among the Secured Parties in proportion to the respective amounts described in this clause Fourth payable to them; and

Last, the balance, if any, after all of the Obligations have been indefeasibly Paid in Full, to the Borrower or as otherwise required by Legal Requirements.

Section 7.7    Lenders May File Proofs of Claim.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Credit Party, each Lender

(irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether any Lender shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

        (a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and their respective agents and counsel and all other amounts due the Lenders) allowed in such judicial proceeding; and

        (b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Lenders.

## ARTICLE 8

## **RESERVED**

## ARTICLE 9

## MISCELLANEOUS

Section 9.1    Costs and Expenses.  The Borrower agrees to pay on demand:

        (a)     all reasonable out-of-pocket costs and expenses of Lenders in connection with the preparation, execution, delivery, administration, modification, and amendment of this Agreement, the Notes, and the other Credit Documents and waivers of the provisions hereunder and thereunder, in each case, whether or not the transactions contemplated hereby or thereby shall be consummated and including reasonable costs associated with field examinations, appraisals, and the reasonable fees and out-of-pocket expenses of outside counsel for Lenders, with respect to advising the Lenders as to its rights and responsibilities under this Agreement, and

        (b)     all out-of-pocket costs and expenses, if any, of each Lender (including outside counsel fees and expenses of each Lender) in connection with the enforcement (whether through negotiations, workout, legal proceedings, or otherwise) of this Agreement, the Notes, and the other Credit Documents.

Section 9.2    Indemnification; Waiver of Damages.

        (a)     INDEMNIFICATION.  EACH CREDIT PARTY HERETO AGREES TO, JOINTLY AND SEVERALLY, INDEMNIFY AND HOLD HARMLESS EACH LENDER AND EACH OF THEIR AFFILIATES AND THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, AND ADVISORS (EACH, AN "INDEMNITEE") FROM AND AGAINST ANY AND ALL CLAIMS, DAMAGES, LOSSES, LIABILITIES, COSTS, AND EXPENSES (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES) THAT MAY BE INCURRED BY OR ASSERTED OR AWARDED AGAINST ANY INDEMNITEE, IN EACH CASE ARISING OUT OF

OR IN CONNECTION WITH OR BY REASON OF (INCLUDING, WITHOUT LIMITATION, IN CONNECTION WITH ANY INVESTIGATION, LITIGATION, OR PROCEEDING OR PREPARATION OF DEFENSE IN CONNECTION THEREWITH) THE CREDIT DOCUMENTS, ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN OR THE ACTUAL OR PROPOSED USE OF THE PROCEEDS OF THE LOANS, **INCLUDING SUCH INDEMNITEE'S OWN NEGLIGENCE,** EXCEPT TO THE EXTENT SUCH CLAIM, DAMAGE, LOSS, LIABILITY, COST, OR EXPENSE IS FOUND IN A FINAL, NON-APPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED FROM SUCH INDEMNITEE'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.   IN THE CASE OF AN INVESTIGATION, LITIGATION OR OTHER PROCEEDING TO WHICH THE INDEMNITY IN THIS <u>SECTION 9.2</u> APPLIES, SUCH INDEMNITY SHALL BE EFFECTIVE WHETHER OR NOT SUCH INVESTIGATION, LITIGATION OR PROCEEDING IS BROUGHT BY ANY CREDIT PARTY, ITS DIRECTORS, SHAREHOLDERS OR CREDITORS OR AN INDEMNITEE OR ANY OTHER PERSON OR ANY INDEMNITEE IS OTHERWISE A PARTY THERETO AND WHETHER OR NOT THE TRANSACTIONS CONTEMPLATED HEREBY ARE CONSUMMATED.  THIS <u>SECTION 9.2</u> SHALL NOT APPLY WITH RESPECT TO ANY TAXES.

        (b)        Waiver of Consequential Damages, Etc.

        (i)        To the fullest extent permitted by applicable law, no Credit Party shall assert, agrees not to assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Credit Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof; provided that nothing contained in this sentence shall limit any Credit Party's indemnification obligations to the extent set forth in clause (a) above to the extent such special, indirect, consequential or punitive damages are included in any third party claim in connection with which such indemnified person is otherwise entitled to indemnification hereunder.  No Indemnitee referred to in <u>subsection (a)</u> above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

        (ii)        To the fullest extent permitted by applicable law, no Indemnitee shall assert, agrees not to assert, and hereby waives, any claim against any Credit Party, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Credit Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof other than for such claims provided for in this Agreement provided that nothing contained in this sentence shall limit any Credit Party's indemnification obligations to the extent set forth in clause (a) above to the extent such special, indirect, consequential or punitive damages are included in any third party claim in connection with which such indemnified person is otherwise entitled to indemnification hereunder.

        (c)        <u>Survival</u>.  Without prejudice to the survival of any other agreement of the Credit Parties hereunder, the agreements and obligations of the Credit Parties contained in this <u>Section 9.2</u> shall survive the termination of this Agreement and the payment in full of the Loans and all other amounts payable under this Agreement.

Section 9.3    Waivers and Amendments.  No amendment or waiver of any provision of this Agreement, the Notes, or any other Credit Document, nor consent to any departure by the Borrower or any Guarantor therefrom, shall in any event be effective unless the same shall be in writing and signed by the Lenders and the Borrower, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided that:

(a)    no amendment, waiver, or consent shall, unless in writing and signed by all the Lenders and the Borrower, do any of the following:  (i)  reduce the principal of, or interest on, the Loans, (ii) postpone or extend any date fixed for any payment of principal of, or interest on, the Loans, including, without limitation, the Maturity Date, or (iii) change the number of Lenders which shall be required for the Lenders to take any action hereunder or under any other Credit Document;

(b)    no amendment, waiver, or consent shall, unless in writing and signed by all the Lenders and the Borrower, do any of the following:  (i) waive any of the conditions specified in Article 3, (ii) reduce any fees or other amounts payable hereunder or under any other Credit Document (other than those specifically addressed above in this Section 9.3), (iii) increase the Aggregate Commitment, (iv) postpone or extend any date fixed for any payment of any fees or other amounts payable hereunder (other than those otherwise specifically addressed in this Section 9.3), (v) amend Section 2.12(e), Section 7.6, this Section 9.3 or any other provision in any Credit Document which expressly requires the consent of, or action or waiver by, all of the Lenders, (vi) release any Guarantor from its obligation under any Guaranty or, except as specifically provided in the Credit Documents and as a result of transactions permitted by the terms of this Agreement, release all or a material portion of collateral, if any, securing the Obligations; or (vii) amend the definitions of "Secured Parties", "Obligations" or "Collateral" in a manner materially adverse to any Secured Party;

(c)    no Commitment of a Lender or any obligations of a Lender may be increased without such Lender's written consent; and

(d)    no amendment, waiver, or consent shall, unless in writing and signed by the Lenders required above to take such action, affect the rights or duties of the Lenders under this Agreement or any other Credit Document.

Section 9.4    Severability.  In case one or more provisions of this Agreement or the other Credit Documents shall be invalid, illegal or unenforceable in any respect under any applicable law, the validity, legality, and enforceability of the remaining provisions contained herein or therein shall not be affected or impaired thereby.

Section 9.5    Survival of Representations and Obligations.  All representations and warranties contained in this Agreement or made in writing by or on behalf of the Credit Parties in connection herewith shall survive the execution and delivery of this Agreement and the other Credit Documents, the making of the Loans and any investigation made by or on behalf of the Lenders, none of which investigations shall diminish any Lender's right to rely on such representations and warranties.  All obligations of the Borrower or any other Credit Party provided for in Sections 2.11, 2.13(c), 9.1 and 9.2 and all of the obligations of the Lenders in Section 8.5 shall survive any termination of this Agreement and repayment in full of the Obligations.

Section 9.6    Binding Effect.  This Agreement shall become effective upon the satisfaction of the conditions set forth in Section 3.1 above, and thereafter shall be binding upon and inure to the benefit of the Borrower and each Lender and their respective successors and assigns, except that neither the Borrower nor any other Credit Party shall have the right to assign its rights or delegate its duties under this Agreement or any interest in this Agreement without the prior written consent of each Lender.

Section 9.7     Lender Assignments and Participations.

(a)     Each Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its Loans); provided, however, that (i) each such assignment shall be to an Eligible Assignee; (ii) except in the case of an assignment to another Lender or an assignment of all of a Lender's rights and obligations under this Agreement, any such partial assignment with respect to the Loans shall be in an amount at least equal to $5,000,000; (iii) each assignment of a Lender's rights and obligations with respect to the Loans shall be of an constant, and not varying percentage of all of its rights and obligations under this Agreement as a Lender (other than rights of reimbursement and indemnity arising before the effective date of such assignment) and shall be of an equal pro rata share of the assignor's interest in the Loans; and (iv) the parties to such assignment shall execute and deliver to the Lenders for its acceptance an Assignment and Acceptance, together with any Notes subject to such assignment (if applicable) and the assignor or assignee Lender shall pay a processing fee of $3,500.  Upon execution, delivery, and acceptance of such Assignment and Acceptance and payment of the processing fee, the assignee thereunder shall be a party hereto and, to the extent of such assignment, have the obligations, rights, and benefits of a Lender hereunder and the assigning Lender shall, to the extent of such assignment, relinquish its rights and be released from its obligations under this Agreement.  Upon the consummation of any assignment pursuant to this Section 9.7, the assignor, the Lenders and the Borrower shall make appropriate arrangements so that, if required, new Notes are issued to the assignor and the assignee.  If the assignee is not incorporated under the laws of the United States of America or a state thereof, it shall deliver to the Borrower and the Lenders certification as to exemption from or reduction of withholding of Taxes in accordance with Section 2.13(e).

(b)     The Lenders, acting as a nonfiduciary agent of the Credit Parties, shall maintain at the addresses referred to in Section 9.9 a copy of each Assignment and Acceptance delivered to and accepted by it and a register for the recordation of the names and addresses of the Lenders and principal amount (and stated interest) of the Loans owing to, each Lender from time to time (the "Register").  The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Credit Parties, the Lenders may treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement.

(c)     Upon its receipt of an Assignment and Acceptance executed by the parties thereto, together with any Notes subject to such assignment (if any) and payment of the processing fee, the Lenders shall, if such Assignment and Acceptance has been completed, (i) accept such Assignment and Acceptance, (ii) record the information contained therein in the Register, and (iii) give prompt notice thereof to the parties thereto.

(d)     Each Lender may sell participations to one or more Persons in all or a portion of its rights, obligations or rights and obligations under this Agreement (including all or a portion of its Loans) provided, however, that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the participant shall be entitled to the benefit of the yield protection provisions including, but not limited to, Section 2.11, (iv) so long as no Event of Default has occurred and is continuing, such Person or Persons to whom any such participation is to be sold must be approved by the Borrower, and (iv) the Borrower shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, and such Lender shall retain the sole right to enforce the obligations of the Borrower relating to its Loans and its Note (if any) and to approve any amendment, modification, or waiver of any provision of this Agreement (other than amendments, modifications, or waivers decreasing the amount of principal of or the rate at which interest is payable on such Loans, or extending any scheduled principal payment date or date fixed for the payment of interest

on such Loans); <u>provided further</u>, however, that such Participant (A) agrees to be subject to the provisions of Section 2.11(b), Section 2.13(e), (f) and (g) and Section 2.14 as if it were an assignee under paragraph (a) of this Section; and (B) shall not be entitled to receive any greater payment under the yield protection provisions, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Credit Documents (the "***Participant Register***"); <u>provided</u> that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Credit Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(e)     Notwithstanding any other provision set forth in this Agreement, any Lender may at any time assign and pledge all or any portion of its Loans to any Federal Reserve Bank as collateral security pursuant to Regulation A and any Operating Circular issued by such Federal Reserve Bank.  No such assignment shall release the assigning Lender from its obligations hereunder.

(f)     Any Lender may furnish any information concerning the Borrower or any of its Subsidiaries in the possession of such Lender from time to time to assignees and participants (including prospective assignees and participants), subject, however, to the provisions of the following paragraph <u>Section 9.8</u>.

Section 9.8     <u>Confidentiality</u>.    Each Lender (each a "<u>Lending Party</u>") agree to keep confidential any information furnished or made available to it by any Credit Party pursuant to this Agreement and identified by such Credit Party in writing as proprietary or confidential; <u>provided</u> that nothing herein shall prevent any Lending Party from disclosing such information (a) to any other Lending Party or any Affiliate of any Lending Party, or any officer, director, employee, agent, or advisor of any Lending Party or Affiliate of any Lending Party for purposes of administering, negotiating, considering, processing, implementing, syndicating, assigning, or evaluating the credit facilities provided herein and the transactions contemplated hereby, (b) to any other Person if directly incidental to the administration of the credit facilities provided herein, (c) as required by any Legal Requirement, (d) upon the order of any court or administrative agency, (e) upon the request or demand of any regulatory agency or authority, (f) that is or becomes available to the public or that is or becomes available to any Lending Party other than as a result of a disclosure by any other Lending Party prohibited by this Agreement, (g) in connection with any litigation relating to this Agreement or any other Credit Document to which such Lending Party or any of its Affiliates may be a party, (h) to the extent necessary in connection with the exercise of any right or remedy under this Agreement or any other Credit Document, and (i) to any actual or proposed participant or assignee, in each case, subject to provisions similar to those contained in this <u>Section 9.8</u>. **NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, nothing in this Agreement shall (a) restrict any Lending Party from providing information to any regulatory or governmental authorities, including the Federal Reserve Board and its supervisory staff; (b) require or permit any Lending Party to disclose to any Credit Party that any information will be or was provided to the Federal Reserve Board or any of its supervisory staff; or (c) require or permit any Lending Party to inform any Credit Party of a current or upcoming Federal Reserve Board examination or any nonpublic Federal Reserve Board supervisory initiative or action.**

Section 9.9    Notices, Etc.  All notices and other communications shall be in writing and hand delivered with written receipt, telecopied, sent by facsimile (with a hard copy sent as otherwise permitted in this Section 9.9), sent by a nationally recognized overnight courier, or sent by certified mail, return receipt requested as follows: if to a Credit Party, as specified on Schedule I and if to any Lender at its credit contact specified under its name on Schedule I.  Each party may change its notice address by written notification to the other parties.  All such notices and communications shall be effective when delivered, except that notices and communications to any Lender pursuant to Article 2 shall not be effective until received and, in the case of telecopy, such receipt is confirmed by such Lender, as applicable, verbally or in writing.

Section 9.10    Business Loans.  Each Credit Party warrants and represents that the Obligations are and shall be for business, commercial, investment or other similar purposes and not primarily for personal, family, household or agricultural use, as such terms are used in Chapter One ("Chapter One") of the Texas Credit Code.  At all such times, if any, as Chapter One shall establish a Maximum Rate, the Maximum Rate shall be the "indicated rate ceiling" (as such term is defined in Chapter One) from time to time in effect.

Section 9.11    Usury Not Intended.  It is the intent of each Credit Party and each Lender in the execution and performance of this Agreement and the other Credit Documents to contract in strict compliance with applicable usury laws, including conflicts of law concepts, governing the Loans of each Lender including such applicable laws of the State of Texas, if any, and the United States of America from time to time in effect.  In furtherance thereof, the Lenders and the Credit Parties stipulate and agree that none of the terms and provisions contained in this Agreement or the other Credit Documents shall ever be construed to create a contract to pay, as consideration for the use, forbearance or detention of money, interest at a rate in excess of the Maximum Rate and that for purposes of this Agreement "interest" shall include the aggregate of all charges which constitute interest under such laws that are contracted for, charged or received under this Agreement; and in the event that, notwithstanding the foregoing, under any circumstances the aggregate amounts taken, reserved, charged, received or paid on the Loans, include amounts which by applicable law are deemed interest which would exceed the Maximum Rate, then such excess shall be deemed to be a mistake and each Lender receiving same shall credit the same on the principal (or if Loans (and all other Obligations) owed to such Lender shall have been paid in full, refund said excess to the Borrower).  In the event that the maturity of the Loans are accelerated by reason of any election of the holder thereof resulting from any Event of Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest may never include more than the Maximum Rate, and excess interest, if any, provided for in this Agreement or otherwise shall be canceled automatically as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited to the Loans (or, if the Loans and all other Obligations shall have been paid in full, refunded to the Borrower of such interest).  In determining whether or not the interest paid or payable under any specific contingencies exceeds the Maximum Rate, the Credit Parties and the Lenders shall to the maximum extent permitted under applicable law amortize, prorate, allocate and spread in equal parts during the period of the full stated term of the Loans all amounts considered to be interest under applicable law at any time contracted for, charged, received or reserved in connection with the Obligations.  The provisions of this Section shall control over all other provisions of this Agreement or the other Credit Documents which may be in apparent conflict herewith.

Section 9.12    Usury Recapture.  In the event the rate of interest chargeable under this Agreement at any time is greater than the Maximum Rate, the unpaid principal amount of the Loans shall bear interest at the Maximum Rate until the total amount of interest paid or accrued on the Loans equals the amount of interest which would have been paid or accrued on the Loans if the stated rates of interest set forth in this Agreement had at all times been in effect. In the event, upon payment in full of the Loans, the total amount of interest paid or accrued under the terms of this Agreement and the Loans is less than

the total amount of interest which would have been paid or accrued if the rates of interest set forth in this Agreement had, at all times, been in effect, then the Borrower shall, to the extent permitted by applicable law, pay ratably among the Lenders an amount equal to the difference between (i) the lesser of (A) the amount of interest which would have been charged on its Loans if the Maximum Rate had, at all times, been in effect and (B) the amount of interest which would have accrued on its Loans if the rates of interest set forth in this Agreement had at all times been in effect and (ii) the amount of interest actually paid under this Agreement on its Loans.  In the event the Lenders ever receive, collect or apply as interest any sum in excess of the Maximum Rate, such excess amount shall, to the extent permitted by law, be applied to the reduction of the principal balance of the Loans, and if no such principal is then outstanding, such excess or part thereof remaining shall be paid to the Borrower.

Section 9.13    Governing Law; Waiver of Jury Trial.

(a)    THIS AGREEMENT, THE NOTES AND THE OTHER CREDIT DOCUMENTS (UNLESS OTHERWISE EXPRESSLY PROVIDED THEREIN) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS WITHOUT REGARD TO ANY CHOICE OF LAW PROVISIONS THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANOTHER JURISDICTION AND EXCEPT TO THE EXTENT THAT UNITED STATES FEDERAL LAW PERMITS ANY LENDER TO CONTRACT FOR, CHARGE, RECEIVE, RESERVE OR TAKE INTEREST AT THE RATE ALLOWED BY THE LAWS OF THE STATE WHERE SUCH LENDER IS LOCATED.  WITHOUT LIMITING THE INTENT OF THE PARTIES SET FORTH ABOVE, (i) CHAPTER 346 OF THE TEXAS FINANCE CODE, AS AMENDED (RELATING TO REVOLVING LOANS AND REVOLVING TRI-PARTY ACCOUNTS (FORMERLY TEX. REV. CIV. STAT. ANN. ART. 5069, CH. 15)), SHALL NOT APPLY TO THIS AGREEMENT, THE NOTES OR THE TRANSACTIONS CONTEMPLATED HEREBY AND (ii) TO THE EXTENT THAT ANY LENDER MAY BE SUBJECT TO TEXAS LAW LIMITING THE AMOUNT OF INTEREST PAYABLE FOR ITS ACCOUNT, SUCH LENDER SHALL UTILIZE THE INDICATED (WEEKLY) RATE CEILING FROM TIME TO TIME IN EFFECT.

(b)    ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THE CREDIT DOCUMENTS SHALL BE BROUGHT IN THE COURTS OF THE STATE OF TEXAS OR OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF TEXAS, IN EITHER CASE LOCATED IN HARRIS COUNTY, TEXAS, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY HEREBY ACCEPTS FOR ITSELF AND (TO THE EXTENT PERMITTED BY LAW) IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS. EACH PARTY HEREBY IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED UNDER APPLICABLE LAW) ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING IN SUCH RESPECTIVE JURISDICTIONS. THIS SUBMISSION TO JURISDICTION IS NON-EXCLUSIVE AND DOES NOT PRECLUDE A PARTY FROM OBTAINING JURISDICTION OVER ANOTHER PARTY IN ANY COURT OTHERWISE HAVING JURISDICTION.

(c)    EACH PARTY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO IT AT THE ADDRESS SPECIFIED IN SECTION 9.9 OR SUCH OTHER ADDRESS AS IS SPECIFIED PURSUANT TO SECTION 9.9 (OR ITS ASSIGNMENT AND ACCEPTANCE), SUCH SERVICE TO BECOME EFFECTIVE THIRTY (30) DAYS AFTER SUCH MAILING. NOTHING HEREIN SHALL AFFECT THE RIGHT OF A PARTY OR ANY HOLDER OF

A NOTE TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANOTHER PARTY IN ANY OTHER JURISDICTION.

(d)     EACH PARTY HEREBY (i) IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN; (ii) IRREVOCABLY WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY SUCH LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES, OR DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES; (iii) CERTIFIES THAT NO PARTY HERETO NOR ANY REPRESENTATIVE OR AGENT OR COUNSEL FOR ANY PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, OR IMPLIED THAT SUCH PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS, AND (iv) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT, THE CREDIT DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS CONTAINED IN THIS SECTION 9.13.

Section 9.14     Amended and Restated. It is the intention of each of the parties hereto that the DIP Credit Agreement be amended and restated so as to preserve the perfection and priority of all security interests and Liens securing all Obligations (as defined in the DIP Credit Agreement) of the Credit Parties under the DIP Credit Agreement (that continue on as Obligations under this Agreement), that all of the Obligations (as defined hereunder) of the Credit Parties be secured by the Liens created by the Credit Documents, that the Obligations be secured by pari passu security interests in and Liens on the Collateral (unless otherwise provided herein) and that this Agreement not constitute a novation of the obligations and liabilities existing under the DIP Credit Agreement.  The parties hereto further acknowledge and agree that this Agreement constitutes an amendment of the DIP Credit Agreement made in accordance with the terms of the DIP Credit Agreement.  In addition, unless specifically amended hereby or amended or amended and restated in connection herewith, each of the Credit Documents (as defined in the DIP Credit Agreement) shall continue in full force and effect and, from and after the Effective Date, all references to the "Agreement" contained therein shall be deemed to refer to this Agreement.

Section 9.15     Reaffirmation and Grant of Security Interests.

(a)     Each Guarantor, subject to the terms and conditions contained herein and in the other Credit Documents, has (i) guarantied the Obligations and (ii) created Liens in favor of the Lenders for the benefit of the Secured Parties on the Collateral to secure the Obligations and all of its other obligations under the Credit Documents.  Each Guarantor hereby acknowledges that it has reviewed the terms and provisions of this Agreement (and the other Credit Documents) and consents to the amendment and restatement of the DIP Credit Agreement effected pursuant to this Agreement (and the amendment and/or the amendment and restatement of any of the other Credit Documents (as defined in the DIP Credit Agreement) in connection with this Agreement) and to the Borrower entering into any other Credit Documents in connection with this Agreement.  Each Credit Party hereby (i) confirms that each Credit Document to which it is a party or is otherwise bound and all Collateral encumbered thereby will continue to guarantee and/or secure, as the case may be, to the fullest extent possible in accordance with such Credit Document, the payment and performance of the Obligations (including the Guaranteed Obligations (as defined in the Guaranty)), as  the case may be, including, without limitation, the payment and performance of all such applicable Obligations that are joint and several obligations of any Credit Party now or hereafter existing, and (ii) grants to the Lenders for the benefit of the Secured Parties a continuing

Lien on and security interest in and to such Credit Party's right, title and interest in, to and under all Collateral as collateral security for the prompt payment and performance in full when due of all Obligations (including the Guaranteed Obligations) subject to the terms and conditions contained herein and in the Credit Documents (whether at stated maturity, by acceleration or otherwise).

(b)     Each Credit Party acknowledges and agrees that the Credit Documents (as amended, restated, amended and restated, supplemented or otherwise modified in connection herewith) to which it is a party or otherwise bound shall continue in full force and effect and that all of its obligations thereunder shall be valid and enforceable and shall not be impaired or limited by the execution or effectiveness of the amendment and restatement of the DIP Credit Agreement.

Section 9.16     <u>Submission to Jurisdiction</u>.  Each Credit Party hereby irrevocably submits to the jurisdiction of any Texas state or federal court sitting in Houston, Texas in any action or proceeding arising out of or relating to this Agreement or the other Credit Documents, and each Credit Party hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such court.  Each Credit Party hereby unconditionally and irrevocably waives, to the fullest extent it may effectively do so, any right it may have to the defense of an inconvenient forum to the maintenance of such action or proceeding.  Each Credit Party hereby agrees that service of copies of the summons and complaint and any other process which may be served in any such action or proceeding may be made by mailing or delivering a copy of such process to such Credit Party at its address set forth in this Agreement.  Each Credit Party hereby agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Section shall affect the rights of any Lender to serve legal process in any other manner permitted by the law or affect the right of any Lender to bring any action or proceeding against any Credit Party or its Property in the courts of any other jurisdiction.

Section 9.17     <u>Execution in Counterparts</u>.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

Section 9.18     <u>Reserved</u>.

Section 9.19     <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>. Notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Credit Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)     the effects of any Bail-in Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of

ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Credit Document; or

(iii) the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

Section 9.20   <u>USA Patriot Act</u>.  Each Lender that is subject to the Patriot Act hereby notifies each Credit Party that pursuant to the requirements of the Patriot Act it is required to obtain, verify and record information that identifies such Credit Party, which information includes the name and address of such Credit Party and other information that will allow such Lender to identify such Credit Party in accordance with the Patriot Act.

Section 9.21   <u>No Oral Agreements</u>.  **PURSUANT TO SECTION 26.02 OF THE TEXAS BUSINESS AND COMMERCE CODE, A LOAN AGREEMENT IN WHICH THE AMOUNT INVOLVED IN THE LOAN AGREEMENT EXCEEDS $50,000 IN VALUE IS NOT ENFORCEABLE UNLESS THE LOAN AGREEMENT IS IN WRITING AND SIGNED BY THE PARTY TO BE BOUND OR THAT PARTY'S AUTHORIZED REPRESENTATIVE.**

**THE RIGHTS AND OBLIGATIONS OF THE PARTIES TO AN AGREEMENT SUBJECT TO THE PRECEDING PARAGRAPH SHALL BE DETERMINED SOLELY FROM THE WRITTEN LOAN AGREEMENT, AND ANY PRIOR ORAL AGREEMENTS BETWEEN THE PARTIES ARE SUPERSEDED BY AND MERGED INTO THE LOAN AGREEMENT. THIS WRITTEN AGREEMENT AND THE CREDIT DOCUMENTS, AS DEFINED IN THIS AGREEMENT, REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES WITH RESPECT TO THE SUBJECT MATTERS SET FORTH HEREIN AND THEREIN AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

Section 9.22   <u>No Third Party Beneficiaries</u>.  This Agreement, the other Credit Documents, and the agreement of the Lenders to make Loans hereunder are solely for the benefit of the Borrower, and no other Person (including any Subsidiary of the Borrower, any obligor, contractor, subcontractor, supplier or materialman) shall have any rights, claims, remedies or privileges hereunder or under any other Credit Document against any Lender for any reason whatsoever. There are no third party beneficiaries.

[Remainder of this page intentionally left blank.  Signature pages follow.]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective authorized officers as of the date first above written.

**BORROWER:**

**CARBO CERAMICS INC.**

By: _____
    Name:
    Title:

**GUARANTORS:**

**ASSET GUARD PRODUCTS INC.**

By: _____
    Name:
    Title:

**STRATAGEN, INC.**

By: _____
    Name:
    Title:

**LENDERS:**

**WILKS BROTHERS, LLC**,
as a Lender


By: _____
    Name:
    Title:


By: _____
    Name:
    Title:

**ANNEX I**

**Commitments[3]**

| Lender | Commitment | Outstanding Principal Amount of Loans | Pro Rata Share |
|---|---|---|---|
| Wilks Brothers, LLC | $15,000,000.00 | $15,000,000.00 | 100% |
| **Total:** | **$15,000,000.00** | **$15,000,000.00** | **100%** |

---

[3] As of the Effective Date of this Agreement.

99718855.10

**SCHEDULE I**

**Contact Information**

| LENDERS | |
|---|---|
| **<u>Wilks Brothers, LLC</u>** | **Address for Notices**:<br><br>Wilks Brothers, LLC<br>17010 IH-20<br>Cisco, TX 76437<br>Attention:    Philip Pecora<br>                Matthew Wilks<br>Facsimile:    (817) 850-3698<br>Email:        philip.pecora@wilksbrothers.com<br>             matt.wilks@profrac.com |
| **CREDIT PARTIES** | |
| **Borrower/Guarantors** | **Address for Notices**:<br><br>Carbo Ceramics Inc.<br>Asset Guard Products Inc.<br>StrataGen, Inc.<br>Energy Center II<br>575 N. Dairy Ashford Rd., Suite 300<br>Houston, TX 77079<br>**Attn:**    Ernesto Bautista III<br>         Chief Financial Officer<br>**Telephone**:    (281) 931-8884<br>**Facsimile:**    (281) 931-8302 |

**EXHIBIT A**
**FORM OF ASSIGNMENT AND ACCEPTANCE**

This Assignment and Acceptance (the "Assignment and Acceptance") is dated as of the Effective Date set forth below and is entered into by and between [the][each][4] Assignor identified in item 1 below ([the][each, an] "Assignor") and [the][each][5] Assignee identified in item 2 below ([the][each, an] "Assignee").  [It is understood and agreed that the rights and obligations of [the Assignors][the Assignees][6] hereunder are several and not joint.][7] Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, restated, amended and restated, supplemented and/or modified from time to time, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by [the][each] Assignee.  The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Acceptance as if set forth herein in full.

For an agreed consideration, [the][each] Assignor hereby irrevocably sells and assigns to [the Assignee][the respective Assignees], and [the][each] Assignee hereby irrevocably purchases and assumes from [the Assignor][the respective Assignors], subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Lenders as contemplated below (i) all of [the Assignor's][the respective Assignors'] rights and obligations in [its capacity as a Lender][their respective capacities as Lenders] under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of [the Assignor][the respective Assignors] under the respective facilities identified below (including without limitation any letters of credit and guarantees included in such facilities) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of [the Assignor (in its capacity as a Lender)][the respective Assignors (in their respective capacities as Lenders)] against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by [the][any] Assignor to [the][any] Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as [the][an] "Assigned Interest").  Each such sale and assignment is without recourse to [the][any] Assignor and, except as expressly provided in this Assignment and Acceptance, without representation or warranty by [the][any] Assignor.

---

[4] For bracketed language here and elsewhere in this form relating to the Assignor(s), if the assignment is from a single Assignor, choose the first bracketed language. If the assignment is from multiple Assignors, choose the second bracketed language.

[5] For bracketed language here and elsewhere in this form relating to the Assignee(s), if the assignment is to a single Assignee, choose the first bracketed language.  If the assignment is to multiple Assignees, choose the second bracketed language.

[6] Select as appropriate.

[7] Include bracketed language if there are either multiple Assignors or multiple Assignees.

99718855.10

1.      Assignor[s]:      _____

_____

2.      Assignee[s]:      _____

_____

[for each Assignee, indicate [Affiliate][Approved Fund] of [*identify Lender*]

3.      Borrower:        CARBO CERAMICS INC.

4.      Lenders:         Wilks Brothers, LLC, as Lender

5.      Credit Agreement:  Amended and Restated Credit Agreement, dated as of [__], 2020, among Borrower, the Lenders party thereto from time to time, the Guarantors party thereto from time to time, and Wilks Brothers, LLC, as Lender.

6.      Assigned Interest[s]:

| Assignor[s] | Assignee[s] | Facility Assigned | Aggregate Amount of Commitments /Advances for all Lenders | Amount of Commitment / Advances Assigned[8] | Percentage Assigned of Commitment / Advances[9] | CUSIP Number |
|---|---|---|---|---|---|---|
|  |  |  | $ | $ | % |  |
|  |  |  | $ | $ | % |  |
|  |  |  | $ | $ | % |  |

7.      Trade Date:      _____[10]

Effective Date: _____, 20___  [TO BE INSERTED BY THE LENDERS AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

---

[8] Amount to be adjusted by the counterparties to take into account any payments or prepayments made between the Trade Date and the Effective Date.

[9] Set forth, to at least 9 decimals, as a percentage of the Commitment / Advances of all Lenders thereunder.

[10] To be completed if the Assignor(s) and the Assignee(s) intend that the minimum assignment amount is to be determined as of the Trade Date.

99718855.10

The terms set forth in this Assignment and Acceptance are hereby agreed to:

ASSIGNOR[S][11]
[NAME OF ASSIGNOR]


By:_____
Name: _____
Title: _____


ASSIGNEE[S]
[NAME OF ASSIGNEE]


By:_____
Name: _____
Title: _____

---

[11] Add additional signature blocks as needed.

99718855.10

[Consented to and]¹² Accepted:

Wilks Brothers, LLC,
as Lender


By:_____
Name: _____
Title: _____


[Consented to:]¹³

CARBO CERAMICS INC.

By:_____
Name: _____
Title: _____

---

¹² To be added only if the consent of the Lenders is required by the terms of the Credit Agreement.
¹³ To be added only if the consents of the Borrower is required by the terms of the Credit Agreement.
99718855.10

Annex 1 To
Exhibit A – Assignment and Acceptance

**STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ACCEPTANCE**

1.      <u>Representations and Warranties</u>.

        1.1     <u>Assignor[s]</u>.  [The][Each] Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of [the][the relevant] Assigned Interest, (ii) [the][such] Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and  Acceptance and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Credit Document, (ii) the execution, legality,  validity, enforceability, genuineness, sufficiency or value of the Credit Documents or any  collateral thereunder, (iii) the financial condition of the Borrower, its Subsidiaries or Affiliates or  any  other Person obligated in respect of any Credit Document or (iv) the performance or observance by the Borrower, its Subsidiaries or Affiliates or any other Person of any of its  obligations under any Credit Document.

        1.2.    <u>Assignee[s]</u>.  [The][Each] Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and  Acceptance and to consummate the transactions contemplated hereby and to become a Lender  under the Credit Agreement, (ii) it meets all the requirements to be an assignee under <u>Section 9.7</u> of the Credit Agreement (subject to such consents, if any, as may be required under <u>Section 9.7</u> of the Credit Agreement), (iii) from and after the Effective Date, it shall be bound by the provisions of the  Credit Agreement as a Lender thereunder and, to the extent of  [the][the relevant] Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is  sophisticated with respect to decisions to acquire assets of the type represented by the Assigned  Interest and either it, or the person exercising discretion in making its decision to acquire the  Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of  the Credit Agreement, and has received or has been accorded the opportunity to receive copies of  the most recent financial statements delivered pursuant to <u>Section 5.2</u> thereof, as applicable, and  such other documents and information as it deems appropriate to make its own credit analysis  and decision to enter into this Assignment and Acceptance and to purchase [the][such] Assigned  Interest, (vi) it has, independently and without reliance upon any  Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Acceptance and to purchase [the][such] Assigned  Interest, and (vii) if it is not incorporated under the laws of the United States of America or a state thereof, attached to the Assignment and Acceptance is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by [the][such] Assignee; and (b) agrees that (i) it will, independently and without reliance on the Lenders, [the][any] Assignor or any other Lender, and  based on such documents and information as it shall deem appropriate at the time, continue to  make its own credit decisions in taking or not taking action under the Credit Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Credit

99718855.10

Documents are required to be performed by it as a Lender.

2.    <u>Payments</u>.    From and after the Effective Date, the Lenders shall make all payments in respect of [the][each] Assigned Interest (including payments of principal, interest, fees and other amounts) to [the][the relevant] Assignee whether such amounts have accrued prior to, on or after the Effective Date. The Assignor[s] and the Assignee[s] shall make all appropriate adjustments in payments by the Lenders for periods prior to the Effective Date or with respect to the making of this assignment directly between themselves.

3.    <u>General Provisions</u>.  This Assignment and Acceptance shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Acceptance may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment and Acceptance by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Acceptance.  This Assignment and Acceptance shall be governed by, and construed in accordance with, the law of the State of Texas.

**EXHIBIT B**
**FORM OF COMPLIANCE CERTIFICATE**

**FOR THE PERIOD FROM _____, 20__ TO _____, 20__**

This certificate dated as of _____, 20__ is prepared pursuant to that certain Amended and Restated Credit Agreement, dated as of [__], 2020 (as amended, restated, amended and restated, supplemented and/or modified from time, the "Credit Agreement") among CARBO Ceramics Inc., a Delaware corporation ("Borrower"), the guarantors party thereto from time to time, the lenders party thereto from time to time (the "Lenders"), and Wilks Brothers, LLC, as Lender. Unless otherwise defined in this certificate, capitalized terms that are defined in the Credit Agreement shall have the meanings assigned to them by the Credit Agreement.

A.     General

The undersigned certifies that:

(a)     the Borrower has delivered the consolidated and consolidating balance sheet and the related consolidated and consolidating statements of income or operations required by Section 5.2[(a) / (b) / (c)] of the Credit Agreement for the [fiscal year / fiscal quarter / month] of the Borrower ended as of the financial statement date of _____, _____. Such consolidated and consolidating balance sheet and statements of income or operations (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present the financial condition of the Borrower and its Subsidiaries as of the date thereof and their results of operations, changes in shareholders' equity and cash flows for the period covered thereby;

(b)     except as otherwise set forth in this certificate, the Borrower and each Credit Party has complied with all the terms, covenants and conditions to be performed or observed by the Borrower contained in the Credit Agreement and any other Credit Document; and

[(c)     that no Default or Event of Default has occurred or is continuing as of the date hereof.]

[(c)     the following Default[s] or Event[s] of Default exist[s] as of the date hereof, if any, and the actions set forth below are being taken to remedy such circumstances:

_____.]

B.     Covenants

**Section 5.6 – Material Domestic Subsidiaries.**

| | | |
|---|---|---|
| (a) | Non-Material Domestic Subsidiaries' collective operating income[14] | $_____ |
| (b) | Borrower's consolidated operating income | $_____ |
| | Operating income test = (a) divided by (b) | _____% |
| (c) | Non-Material Domestic Subsidiaries collective book value of total assets | $_____ |

---

[14] Calculated as of each fiscal quarter end, for the four-fiscal quarter period then ended.

Case 20-31973   Document 414   Filed in TXSB on 05/29/20   Page 149 of 210

(d)      Borrower's consolidated book value of total assets                    $_____

Total book value test = (c) divided by (d)                    _____%

**Is either (a) divided by (b), or (c) divided by (d) equal to or greater than 10%:      Yes      No**

        If the answer to the above question is yes, attached hereto in <u>Annex A</u> is a list of Non-Material Domestic Subsidiaries that will need to execute and deliver to the Lenders a joinder to the Guaranty or otherwise deliver a Guaranty, in any event, in form and substance satisfactory to the Lenders, in order to comply with <u>Section 5.6</u> of the Credit Agreement.

        If the answer to the above question is no, the Borrower may attach hereto as <u>Annex B</u>, a list of Non-Material Domestic Subsidiaries that the Borrower requests to be released from their respective guaranty obligations and a detailed calculation of compliance with the requirements of <u>Section 5.6</u> of the Credit Agreement after giving effect to each such release.


[Remainder of this page intentionally left blank.]

Exhibit B – Form of Compliance Certificate
Page 2

IN WITNESS THEREOF, I have hereto signed my name to this Compliance Certificate as of the date and year first above written.

**CARBO CERAMICS INC.**

By:_____

Name:_____

Title: _____

Annex A to
Exhibit B – Compliance Certificate

**<u>Non-Material Domestic Subsidiaries to Join Guaranty</u>**

[As appropriate.]

Annex B to
Exhibit B – Compliance Certificate

**<u>Non-Material Domestic Subsidiaries to be Released from Guaranty</u>**

[As appropriate.]

**EXHIBIT C**
**FORM OF AMENDED AND RESTATED GUARANTY AGREEMENT**

This Amended and Restated Guaranty Agreement dated as of [__], 2020 (as amended, restated, amended and restated, supplemented and/or modified from time to time, this "Guaranty") is executed by each of CARBO CERAMICS INC., a Delaware corporation, as reorganized pursuant to the Plan of Reorganization (defined below) (the "Borrower"), and each Material Domestic Subsidiary of the Borrower party hereto from time to time (collectively with the Borrower, the "Guarantors" and individually, a "Guarantor"), in favor of WILKS BROTHERS, LLC, as Secured Party (as defined the Credit Agreement), and the other Secured Parties from time to time.

**INTRODUCTION**

A.      Reference is made to that certain Amended and Restated Credit Agreement, dated as of the date hereof, among the Borrower, the Guarantors (as defined therein), the Lenders (as defined therein) from time to time party thereto and the Secured Parties, as Lenders (as amended, restated, amended and restated, supplemented and/or modified from time, the "Credit Agreement").

B.      On March 29, 2020 (the "Petition Date"), the Borrower, Asset Guard (as defined in the Credit Agreement) and StrataGen (as defined in the Credit Agreement) each commenced a voluntary case (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), and the Chapter 11 Cases are being jointly administered in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court").

C.      The Borrower, the Guarantors (as defined therein) and lenders from time to time party thereto (the "DIP Lenders") entered into that certain Senior Secured Super Priority Debtor-in-Possession Credit Agreement, dated as of March 30, 2020 (the "DIP Credit Agreement"), pursuant to which the DIP Lenders made certain post-petition debtor-in-possession loans and other extensions of credit to the Borrower which remain outstanding as of the Effective Date (the "DIP Facility").

D.      In order to secure the full and punctual payment and performance of the obligations under the DIP Credit Agreement, the Borrower and the Guarantors (as defined in the DIP Credit Agreement) executed and delivered, among other things, that certain Guaranty Agreement dated as of March 30, 2020 (as amended, restated, supplemented and/or modified from time to time immediately prior to giving effect to this Guaranty, and as amended, restated, amended and restated, supplemented and/or modified from time to time after this Guaranty becomes effective and/or in connection with this Guaranty becoming effective, the "DIP Guaranty").

E.      The Borrower, Asset Guard and StrataGen have filed a Debtor's Joint Chapter 11 Plan of Reorganization, dated as of [___], 2020, (as may be amended or supplemented from time to time prior to the date hereof and together with all exhibits and schedules thereto, the "Plan of Reorganization") with the Bankruptcy Court, which was confirmed pursuant to the Confirmation

Exhibit C – Form of Guaranty
-1-

Order entered by the Bankruptcy Court on [＿＿＿], 2020.  Pursuant to the Plan of Reorganization, the Borrower, Asset Guard and StrataGen reorganized and emerged from bankruptcy on the date hereof when the Plan of Reorganization was consummated.

F.       Pursuant to and upon consummation of the Plan of Reorganization, the Lenders will, among other things, extend to Borrower a new term loan facility in an aggregate outstanding principal amount of $15,000,000 (the "Exit Facility").

G.       Each Guarantor, other than the Borrower, is a Material Domestic Subsidiary (as defined in the Credit Agreement) of the Borrower and the transactions contemplated by the Credit Agreement and the other Credit Documents (as defined in the Credit Agreement), are (i) in furtherance of such Guarantor's corporate purposes, (ii) necessary or convenient to the conduct, promotion or attainment of such Guarantor's business, and (iii) for such Guarantor's direct or indirect benefit.

H.       As a condition precedent to the effectiveness of the Credit Agreement and the agreement of the Lenders to extend credit to the Borrower under the Exit Facility, the Borrower and each additional Guarantor are required to execute and deliver this Guaranty.

I.       Each Guarantor is executing and delivering this Guaranty (i) to induce the Lenders to provide extensions of credit under the Credit Agreement, and (ii) intending it to be a legal, valid, binding, enforceable and continuing obligation of such Guarantor.

J.       It is the intention of the parties hereto that this Guaranty is an amendment and restatement of the DIP Guaranty, and is not a new or substitute security agreement or novation of the DIP Guaranty.

K.       It is in the best interests of each Guarantor to execute this Guaranty inasmuch as each Guarantor will derive substantial direct and indirect benefits from the transactions contemplated by the Credit Agreement and the other Credit Documents, and each Guarantor is willing to execute, deliver and perform its obligations under this Guaranty to secure the Obligations (as defined in the Credit Agreement).

NOW, THEREFORE, in consideration of the premises, each Guarantor hereby agrees as follows:

Section 1.       Definitions.  All capitalized terms not otherwise defined in this Guaranty that are defined in the Credit Agreement shall have the meanings assigned to such terms by the Credit Agreement.

Section 2.       Guaranty.

(a)       Each Guarantor hereby absolutely, unconditionally and irrevocably guarantees the punctual payment and performance, when due, whether at stated maturity, by acceleration or otherwise, of all Obligations, whether absolute or contingent and whether for principal, interest (including, without limitation, interest that but for the existence of a bankruptcy, reorganization or similar proceeding would accrue), fees, amounts required to be provided as collateral, indemnities, expenses or otherwise (collectively, the "Guaranteed

Obligations"). Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by the Borrower or any Material Domestic Subsidiary of the Borrower to the Secured Parties or any Lender under the Credit Documents but for the fact that they are unenforceable or not allowable due to insolvency or the existence of a bankruptcy, reorganization or similar proceeding involving the Borrower or any Material Domestic Subsidiary of the Borrower.

(b)     In order to provide for just and equitable contribution among the Guarantors, the Guarantors agree that in the event a payment shall be made on any date under this Guaranty by any Guarantor (the "Funding Guarantor"), each other Guarantor (each a "Contributing Guarantor") shall indemnify the Funding Guarantor in an amount equal to the amount of such payment, in each case multiplied by a fraction the numerator of which shall be the net worth of the Contributing Guarantor as of such date and the denominator of which shall be the aggregate net worth of all the Contributing Guarantors together with the net worth of the Funding Guarantor as of such date. Any Contributing Guarantor making any payment to a Funding Guarantor pursuant to this Section 2(b) shall be subrogated to the rights of such Funding Guarantor to the extent of such payment.

(c)     Reserved.

(d)     Anything contained in this Guaranty to the contrary notwithstanding, the obligations of each Guarantor under this Guaranty on any date shall be limited to a maximum aggregate amount equal to the largest amount that would not, on such date, render its obligations hereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of the United States Bankruptcy Code (11 U.S.C. §§ 101 et seq) or any applicable provisions of comparable laws relating to bankruptcy, insolvency, or reorganization, or relief of debtors (collectively, the "Fraudulent Transfer Laws"), but only to the extent that any Fraudulent Transfer Law has been found in a final non-appealable judgment of a court of competent jurisdiction to be applicable to such obligations as of such date, in each case:

(i)     after giving effect to all liabilities of such Guarantor, contingent or otherwise, that are relevant under the Fraudulent Transfer Laws, but specifically excluding:

(A)     any liabilities of such Guarantor in respect of intercompany indebtedness to the Borrower or other affiliates of the Borrower to the extent that such indebtedness would be discharged in an amount equal to the amount paid by such Guarantor hereunder;

(B)     any liabilities of such Guarantor under this Guaranty; and

(C)     any liabilities of such Guarantor under each of its other guarantees of and joint and several co-borrowings of Debt, in each case entered into on the date this Guaranty becomes effective, which contain a limitation as to maximum amount substantially similar to that set forth in this Section 2(d) (each such other guarantee and joint and several co-borrowing entered into on the date this Guaranty becomes effective, a "Competing Guaranty") to the extent such

Guarantor's liabilities under such Competing Guaranty exceed an amount equal to (1) the aggregate principal amount of such Guarantor's obligations under such Competing Guaranty (notwithstanding the operation of that limitation contained in such Competing Guaranty that is substantially similar to this Section 2(d)), multiplied by (2) a fraction (i) the numerator of which is the aggregate principal amount of such Guarantor's obligations under such Competing Guaranty (notwithstanding the operation of that limitation contained in such Competing Guaranty that is substantially similar to this Section 2(d)), and (ii) the denominator of which is the sum of (x) the aggregate principal amount of the obligations of such Guarantor under all other Competing Guaranties (notwithstanding the operation of those limitations contained in such other Competing Guaranties that are substantially similar to this Section 2(d)), (y) the aggregate principal amount of the obligations of such Guarantor under this Guaranty (notwithstanding the operation of this Section 2(d)), and (z) the aggregate principal amount of the obligations of such Guarantor under such Competing Guaranty (notwithstanding the operation of that limitation contained in such Competing Guaranty that is substantially similar to this Section 2(d)); and

(ii)    after giving effect as assets to the value (as determined under the applicable provisions of the Fraudulent Transfer Laws) of any rights to subrogation, reimbursement, indemnification or contribution of such Guarantor pursuant to applicable law or pursuant to the terms of any agreement (including any such right of contribution under Section 2(b)).

Section 3.    Guaranty Absolute.   Each Guarantor guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Credit Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Secured Parties and any Lender with respect thereto but subject to Section 2(d) above.   The obligations of each Guarantor under this Guaranty are independent of the Guaranteed Obligations, and a separate action or actions may be brought and prosecuted against a Guarantor to enforce this Guaranty, irrespective of whether any action is brought against the Borrower, any other Guarantor or any other Person or whether the Borrower, any other Guarantor or any other Person is joined in any such action or actions.   The liability of each Guarantor under this Guaranty shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defenses it may now or hereafter have in any way relating to, any or all of the following:

(a)    any lack of validity or enforceability of any Credit Document or any agreement or instrument relating thereto or any part of the Guaranteed Obligations being irrecoverable;

(b)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations or any other obligations of any Person under the Credit Documents, or any other amendment or waiver of or any consent to departure from any Credit Document, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to the Borrower or otherwise;

(c)     any taking, exchange, release or non-perfection of any Collateral, or any taking, release or amendment or waiver of or consent to departure from any other guaranty, for all or any of the Guaranteed Obligations;

(d)     any manner of application of Collateral, or proceeds thereof, to all or any of the Guaranteed Obligations, or any manner of sale or other disposition of any collateral for all or any of the Guaranteed Obligations or any other obligations of any other Person under the Credit Documents or any other assets of the Borrower or any Guarantor;

(e)     any change, restructuring or termination of the corporate structure or existence of the Borrower or any Guarantor;

(f)     any failure of any Lender or any other Secured Party to disclose to the Borrower or any Guarantor any information relating to the business, condition (financial or otherwise), operations, properties or prospects of any Person now or in the future known to any Lender or any other Secured Party (and each Guarantor hereby irrevocably waives any duty on the part of any Secured Party to disclose such information);

(g)     any signature of any officer of the Borrower or any Guarantor being mechanically reproduced in facsimile or otherwise; or

(h)     any other circumstance or any existence of or reliance on any representation by any Secured Party that might otherwise constitute a defense available to, or a discharge of, the Borrower, any Guarantor or any other guarantor, surety or other Person.

Section 4.     <u>Continuation and Reinstatement, Etc.</u>  Each Guarantor agrees that, to the extent that payments of any of the Guaranteed Obligations are made, or any Secured Party receives any proceeds of Collateral, and such payments or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside, or otherwise required to be repaid, then to the extent of such repayment the Guaranteed Obligations shall be reinstated and continued in full force and effect as of the date such initial payment or collection of proceeds occurred.  **EACH GUARANTOR SHALL DEFEND AND INDEMNIFY EACH SECURED PARTY FROM AND AGAINST ANY CLAIM, DAMAGE, LOSS, LIABILITY, COST, OR EXPENSE UNDER THIS <u>SECTION 4</u> (INCLUDING REASONABLE ATTORNEYS' FEES AND EXPENSES) IN THE DEFENSE OF ANY SUCH ACTION OR SUIT, INCLUDING SUCH CLAIM, DAMAGE, LOSS, LIABILITY, COST, OR EXPENSE ARISING AS A RESULT OF THE INDEMNIFIED SECURED PARTY'S OWN NEGLIGENCE BUT EXCLUDING SUCH CLAIM, DAMAGE, LOSS, LIABILITY, COST, OR EXPENSE THAT IS FOUND IN A FINAL, NON-APPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED FROM SUCH INDEMNIFIED SECURED PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; PROVIDED, HOWEVER, THAT IT IS THE INTENTION OF THE PARTIES HERETO THAT EACH INDEMNIFIED SECURED PARTY BE INDEMNIFIED IN THE CASE OF ITS OWN NEGLIGENCE (OTHER THAN GROSS NEGLIGENCE), REGARDLESS OF WHETHER SUCH NEGLIGENCE IS SOLE OR CONTRIBUTORY, ACTIVE OR PASSIVE, IMPUTED, JOINT OR TECHNICAL**.

Section 5.    <u>Waivers and Acknowledgments</u>.

(a)    Each Guarantor hereby waives promptness, diligence, presentment, notice of acceptance and any other notice with respect to any of the Guaranteed Obligations and this Guaranty and any requirement that any Secured Party protect, secure, perfect or insure any Lien or any property or exhaust any right or take any action against the Borrower or any other Person or any Collateral.

(b)    Each Guarantor hereby irrevocably waives any right to revoke this Guaranty, and acknowledges that this Guaranty is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

(c)    Each Guarantor acknowledges that it will receive substantial direct and indirect benefits from the financing arrangements involving the Borrower or any Guarantor contemplated by the Credit Documents.

(d)    Each Guarantor acknowledges that the Secured Parties may, to the extent permitted by applicable law and after the occurrence and during the continuance of an Event of Default, without notice to or demand upon such Guarantor and without affecting the liability of such Guarantor under this Guaranty, foreclose under any Credit Document by non-judicial sale, and each Guarantor hereby waives (to the extent permitted by applicable law) any defense to the recovery by the Secured Parties against such Guarantor of any deficiency after such non-judicial sale and any defense or benefits that may be afforded by applicable law.

(e)    Each Guarantor hereby unconditionally and irrevocably waives (to the extent permitted by applicable law) (i) any defense arising by reason of any claim or defense based upon an election of remedies by any Secured Party that in any manner impairs, reduces, releases or otherwise adversely affects the subrogation, reimbursement, exoneration, contribution or indemnification rights of such Guarantor or other rights of such Guarantor to proceed against any of the other Credit Parties, any other guarantor or any other Person or any Collateral and (ii) any defense based on any right of set-off or counterclaim against or in respect of the Guaranteed Obligations of such Guarantor hereunder.

(f)    Each Guarantor hereby unconditionally and irrevocably waives any duty on the part of any Secured Party to disclose to such Guarantor any matter, fact or thing relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Credit Party or any of its Subsidiaries now or hereafter known by such Secured Party, as the case may be.

Section 6.    <u>Subrogation and Subordination</u>.

(a)    No Guarantor will exercise any rights that it may now have or hereafter acquire against the Borrower or any other Person to the extent that such rights arise from the existence, payment, performance or enforcement of such Guarantor's obligations under this Guaranty or any other Credit Document, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of any Secured Party against the Borrower or any other Person, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including,

without limitation, the right to take or receive from the Borrower or any other Person, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim, remedy or right, unless and until the Termination Date (as defined in the Security Agreement).  If any amount shall be paid to a Guarantor in violation of the preceding sentence at any time prior to or on the Termination Date, such amount shall be held in trust for the benefit of the Secured Parties and shall forthwith be paid to the Secured Parties to be credited and applied to the Guaranteed Obligations and any and all other amounts payable by the Guarantors under this Guaranty, whether matured or unmatured, in accordance with the terms of the Credit Documents.

(b)     Each Guarantor agrees that, until after the Termination Date, all Subordinated Guarantor Obligations (as hereinafter defined) are and shall be subordinate and inferior in rank, preference and priority to all obligations of such Guarantor in respect of the Guaranteed Obligations hereunder, and such Guarantor shall, if requested by the Secured Parties, execute a subordination agreement reasonably satisfactory to the Secured Parties to more fully set out the terms of such subordination.  Each Guarantor agrees that none of the Subordinated Guarantor Obligations shall be secured by a lien or security interest on any assets of such Guarantor or any ownership interests in any Subsidiary of such Guarantor.  "<u>Subordinated Guarantor Obligations</u>" means any and all obligations and liabilities of a Guarantor owing to the Borrower or any other Guarantor, direct or contingent, due or to become due, now existing or hereafter arising, including, without limitation, all future advances, with interest, attorneys' fees, expenses of collection and costs.

Section 7.     <u>Representations and Warranties.</u>  Each Guarantor hereby represents and warrants as follows:

(a)     There are no conditions precedent to the effectiveness of this Guaranty. Such Guarantor benefits from executing this Guaranty.

(b)     Such Guarantor has, independently and without reliance upon the Secured Parties or any Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Guaranty, and such Guarantor has established adequate means of obtaining from the Borrower and each other relevant Person on a continuing basis information pertaining to, and is now and on a continuing basis will be completely familiar with, the business, financial condition, operations and properties of the Borrower and each other relevant Person.

(c)     The obligations of such Guarantor under this Guaranty are the valid, binding and legally enforceable obligations of such Guarantor (except as limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws at the time in effect affecting the rights of creditors generally and (ii) general principles of equity whether applied by a court of law or equity) and the execution and delivery of this Guaranty by such Guarantor has been duly and validly authorized in all respects by all requisite corporate, limited liability company or partnership actions on the part of such Guarantor, and the Person who is executing and delivering this Guaranty on behalf of such Guarantor has full power, authority and legal right to so do, and to observe and perform all of the terms and conditions of this Guaranty on such Guarantor's part to be observed or performed.

Section 8.    <u>Right of Set-Off</u>.  Upon the occurrence and during the continuance of any Event of Default, any Lender or any other Secured Party is hereby authorized at any time, to the fullest extent permitted by law, to set-off and apply any deposits (general or special, time or demand, provisional or final) and other indebtedness owing by such Secured Party to the account of each Guarantor against any and all of the obligations of the Guarantors under this Guaranty, irrespective of whether or not such Secured Party shall have made any demand under this Guaranty and although such obligations may be contingent and unmatured.  Such Secured Party shall promptly notify the affected Guarantor after any such set-off and application is made, provided that the failure to give such notice shall not affect the validity of such set-off and application.  The rights of the Secured Parties under this <u>Section 8</u> are in addition to other rights and remedies (including, without limitation, other rights of set-off) which any Secured Party may have.

Section 9.    <u>Amendments, Etc.</u>  No amendment or waiver of any provision of this Guaranty and no consent to any departure by any Guarantor therefrom shall in any event be effective unless the same shall be in writing and signed by the affected Guarantor and the Secured Parties, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 10.    <u>Notices, Etc.</u>    All notices and other communications provided for hereunder shall be sent in the manner provided for in <u>Section 9.9</u> of the Credit Agreement, in writing and hand delivered with written receipt, telecopied, sent by facsimile, sent by a nationally recognized overnight courier, or sent by certified mail, return receipt requested, if to a Guarantor, at its address for notices specified in <u>Schedule II</u> to the Security Agreement, and if to the Secured Parties or any Lender, at its address specified in or pursuant to the Credit Agreement.  All such notices and communications shall be effective when delivered.

Section 11.    <u>No Waiver: Remedies</u>.  No failure on the part of any Secured Party to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

Section 12.    <u>Continuing Guaranty: Assignments under the Credit Agreement.</u>  This Guaranty is a continuing guaranty and shall (a) remain in full force and effect until the Termination Date, (b) be binding upon each Guarantor and its successors and assigns, and (c) inure to the benefit of and be enforceable by each Secured Party, each other Lender and their respective successors, and, in the case of transfers and assignments made in accordance with the Credit Agreement, transferees and assigns.  Without limiting the generality of the foregoing clause (c), subject to <u>Section 9.7</u> of the Credit Agreement, any Lender may assign or otherwise transfer all or any portion of its rights and obligations under the Credit Agreement to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to such Lender herein or otherwise, subject, however, in all respects to the provisions of the Credit Agreement.  Each Guarantor acknowledges that upon any Person becoming a Lender or a Secured Party in accordance with the Credit Agreement, such Person shall be entitled to the benefits hereof.

Section 13.   <u>Governing Law; Venue; Waiver of Jury Trial</u>.  This Guaranty shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas.  The other provisions of <u>Section 9.13</u> of the Credit Agreement are incorporated herein, *mutatis mutandis*, as if a part hereof.

Section 14.   **INDEMNIFICATION.   EACH   GUARANTOR   HEREBY INDEMNIFIES AND HOLDS HARMLESS EACH SECURED PARTY AND EACH OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES AND AGENTS (THE "INDEMNITEES") FROM AND AGAINST ANY AND ALL CLAIMS, DAMAGES, LOSSES, LIABILITIES, COSTS, AND EXPENSES OF ANY KIND OR NATURE WHATSOEVER TO WHICH ANY OF THEM MAY BECOME SUBJECT RELATING TO OR ARISING OUT OF THIS GUARANTY, INCLUDING SUCH INDEMNITEE'S OWN NEGLIGENCE, EXCEPT TO THE EXTENT SUCH CLAIMS, LOSSES OR LIABILITIES ARE FOUND IN A FINAL, NON-APPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED FROM SUCH INDEMNITEE'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.**

Section 15.   <u>Reserved</u>.

Section 16.   <u>Additional Guarantors</u>.  Pursuant to <u>Section 5.6</u> of the Credit Agreement, certain Material Domestic Subsidiaries that were not in existence on the Effective Date may be required to enter into this Guaranty as a Guarantor upon becoming a Material Domestic Subsidiary.  Upon execution and delivery after the date hereof by such Material Domestic Subsidiary of an instrument in the form of Annex 1, such Material Domestic Subsidiary shall become a Guarantor hereunder with the same force and effect as if originally named as a Guarantor herein.  The execution and delivery of any instrument adding an additional Guarantor as a party to this Guaranty shall not require the consent of any other Guarantor hereunder.  The rights and obligations of each Guarantor hereunder shall remain in full force and effect notwithstanding the addition of any new Guarantor as a party to this Guaranty.

Section 17.   <u>USA Patriot Act</u>.  Each Secured Party that is subject to the Act (as hereinafter defined) and each Secured Party hereby notifies each Guarantor that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "<u>Act</u>"), it is required to obtain, verify and record information that identifies such Guarantor, which information includes the name and address of such Guarantor and other information that will allow such Secured Party to identify such Guarantor in accordance with the Act.  Following a request by any Secured Party, each Guarantor shall promptly furnish all documentation and other information that such Secured Party reasonably requests in order to comply with its ongoing obligations under the applicable "know your customer" and anti-money laundering rules and regulations, including the Act.

Section 18.   **ORAL AGREEMENTS.  PURSUANT TO SECTION 26.02 OF THE TEXAS BUSINESS AND COMMERCE CODE, AN AGREEMENT IN WHICH THE AMOUNT INVOLVED IN AGREEMENT EXCEEDS $50,000 IN VALUE IS NOT ENFORCEABLE UNLESS THE AGREEMENT IS IN WRITING AND SIGNED BY THE PARTY TO BE BOUND OR THAT PARTY'S AUTHORIZED REPRESENTATIVE.**

**THE RIGHTS AND OBLIGATIONS OF THE PARTIES TO AN AGREEMENT SUBJECT TO THE PRECEDING PARAGRAPH SHALL BE DETERMINED SOLELY FROM THE WRITTEN AGREEMENT, AND ANY PRIOR ORAL AGREEMENTS BETWEEN THE PARTIES ARE SUPERSEDED BY AND MERGED INTO THIS GUARANTY.  THIS GUARANTY AND THE CREDIT DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.**

Section 19.    <u>Amendment and Restatement</u>.  This Guaranty shall be deemed to amend, restate and replace the DIP Guaranty in its entirety as the date hereof.  It is expressly understood and agreed by each of the parties hereto that this Guaranty is in no way intended and shall not be deemed or construed to constitute a novation agreement.  Each Guarantor acknowledges and agrees that (a) each reference in the Credit Documents to the "Guaranty" or "Guaranty Agreement" (or words of similar import) made by any Guarantor shall be a reference to this Guaranty and (b) with respect to matters prior to the date hereof, all terms of the DIP Guaranty are ratified and confirmed.

[Remainder of this page intentionally left blank.]

Each Guarantor has caused this Guaranty to be duly executed as of the date first above written.

**GUARANTORS:**

**CARBO CERAMICS INC.**

By:_____
Name:_____
Title: _____

**ASSET GUARD PRODUCTS INC.**

By:_____
Name:_____
Title: _____

**STRATAGEN, INC.**

By:_____
Name:_____
Title: _____

Annex 1 to the Guaranty Agreement

SUPPLEMENT dated as of _____ (the "Supplement"), to the Amended and Restated Guaranty Agreement dated as of [__], 2020 (as amended, restated, amended and restated, supplemented and/or modified from time to time, the "Guaranty Agreement"), among CARBO Ceramics Inc. (the "Borrower"), each Material Domestic Subsidiary of Borrower party thereto from time to time (collectively with the Borrower, the "Guarantors" and individually, a "Guarantor"), in favor of WILKS BROTHERS, LLC, as Secured Party (as defined in the Credit Agreement), and the other Secured Parties from time to time.

A.      Reference is made to that certain Amended and Restated Credit Agreement, dated as of [__], 2020 (as amended, restated, amended and restated, supplemented and/or modified from time to time, the "Credit Agreement"), among the Borrower, the lenders from time to time party thereto (the "Lenders"), and Wilks Brothers, LLC, as Lender.

B.      Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Guaranty Agreement and the Credit Agreement.

C.      The Guarantors have entered into the Guaranty Agreement in order to induce the Lenders to make extensions of credit.  Section 16 of the Guaranty Agreement provides that additional Material Domestic Subsidiaries of the Borrower shall become Guarantors under the Guaranty Agreement by execution and delivery of an instrument in the form of this Supplement. The undersigned Material Domestic Subsidiary of the Borrower (the "New Guarantor") is executing this Supplement in accordance with the requirements of the Credit Agreement to become a Guarantor under the Guaranty Agreement as consideration for the extensions of credit previously made by the Lenders.

Accordingly, the New Guarantor agrees as follows:

SECTION 1.  In accordance with Section 16 of the Guaranty Agreement, the New Guarantor by its signature below becomes a Guarantor under the Guaranty Agreement with the same force and effect as if originally named therein as a Guarantor and the New Guarantor hereby (a) agrees to all the terms and provisions of the Guaranty Agreement applicable to it as a Guarantor thereunder and (b) represents and warrants that the representations and warranties made by it as a Guarantor thereunder are true and correct in all material respects on and as of the date hereof.  Each reference to a "Guarantor" in the Guaranty Agreement shall be deemed to include the New Guarantor.  The Guaranty Agreement is hereby incorporated herein by reference.

SECTION 2.  The New Guarantor represents and warrants to each Secured Party that this Supplement has been duly authorized, executed and delivered by it by all requisite corporate limited liability company or partnership action and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

99718855.10

Exhibit C – Form of Guaranty
-12-

SECTION 3.  This Supplement may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Supplement shall become effective when the Secured Parties shall have received counterparts of this Supplement that, when taken together, bear the signatures of the New Guarantor.  Delivery of an executed signature page to this Supplement by fax transmission or by e-mail "PDF" copy shall be as effective as delivery of a manually executed counterpart of this Supplement.

SECTION 4.  Except as expressly supplemented hereby, the Guaranty Agreement shall remain in full force and effect.

SECTION 5.  THIS SUPPLEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS.  The New Guarantor hereby irrevocably submits to the jurisdiction of any Texas state or federal court sitting in Houston, Texas in any action or proceeding arising out of or relating to this Supplement or the Guaranty Agreement and the other Credit Documents, and the New Guarantor hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such court.  The New Guarantor hereby irrevocably waives, to the fullest extent it may effectively do so, any right it may have to the defense of an inconvenient forum to the maintenance of such action or proceeding.  The New Guarantor hereby agrees that service of copies of the summons and complaint and any other process which may be served in any such action or proceeding may be made by mailing or delivering a copy of such process to such Guarantor at its address set forth on the signature page hereof.  The New Guarantor agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Section 5 shall affect the rights of any Secured Party to serve legal process in any other manner permitted by the law or affect the right of any Secured Party to bring any action or proceeding against the New Guarantor or its Property in the courts of any other jurisdiction.

SECTION 6.  **THE NEW GUARANTOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, EACH CREDIT DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF ANY SECURED PARTY OR ANY OBLIGOR IN CONNECTION THEREWITH.  THE NEW GUARANTOR ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION (AND EACH OTHER PROVISION OF EACH OTHER CREDIT DOCUMENT TO WHICH IT IS A PARTY) AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR EACH LENDER ENTERING INTO THE CREDIT DOCUMENTS.**

SECTION 7.  In case any one or more of the provisions contained in this Supplement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and in the Guaranty Agreement shall not in any way be affected or impaired thereby (it being understood that the invalidity of a

particular provision hereof in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction).  The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 8.   All communications and notices hereunder shall be in writing and given as provided in <u>Section 10</u> of the Guaranty Agreement.

THIS SUPPLEMENT, THE GUARANTY AGREEMENT AND THE OTHER CREDIT DOCUMENTS, AS DEFINED IN THE CREDIT AGREEMENT REFERRED TO IN THIS SUPPLEMENT, REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES HERETO.

IN WITNESS WHEREOF, the New Guarantor has duly executed this Supplement to the Guaranty Agreement as of the day and year first above written.

[Name of New Guarantor]

By:_____
Name:_____
Title:_____

**EXHIBIT D**

**FORM OF TERM NOTE**

**THE FOLLOWING INFORMATION IS SUPPLIED SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES. THIS NOTE WAS ISSUED WITH ORIGINAL ISSUE DISCOUNT ("OID") WITHIN THE MEANING OF SECTION 1273 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), AND THIS LEGEND IS REQUIRED BY SECTION 1275(c) OF THE CODE. HOLDERS MAY OBTAIN INFORMATION REGARDING THE AMOUNT OF OID, THE ISSUE PRICE, THE ISSUE DATE AND THE YIELD TO MATURITY RELATING TO THE NOTES BY CONTACTING THE BORROWER AT: CARBO CERAMICS INC., ATTN: [name], [title], [address].**

**CARBO CERAMICS INC.**

**TERM NOTE**

$_____                                                            _____, 20__

  For value received, the undersigned **CARBO CERAMICS INC.**, a Delaware corporation ("Borrower"), hereby promises to pay to the order of WILKS BROTHERS, LLC ("Payee") the principal amount of _____ No/100 DOLLARS ($_____) or, if less, the aggregate outstanding principal amount of the Payee's Loans (as defined in the Credit Agreement referred to below) made by the Payee (or predecessor in interest) to the Borrower, together with interest on the unpaid principal amount of the Loans until such principal amount is paid in full, at such interest rates, and at such times, as are specified in the Credit Agreement. The Borrower may make prepayments on this Term Note in accordance with the terms of the Credit Agreement.

  This Note is one of the Notes referred to in, and is entitled to the benefits of, and is subject to the terms of, that certain Amended and Restated Credit Agreement dated as of [__], 2020 (as the same may be amended, restated, amended and restated, supplement and/or modified from time to time, the "Credit Agreement"), among the Borrower, the lenders party thereto (the "Lenders"), the guarantors party thereto, and Wilks Brothers, LLC, as Lender. Capitalized terms used in this Note that are defined in the Credit Agreement and not otherwise defined in this Note have the meanings assigned to such terms in the Credit Agreement. The Credit Agreement contains, among other things, provisions for acceleration of the maturity of the unpaid principal amount of this Note upon the happening of certain events stated in the Credit Agreement and for prepayments of principal prior to the maturity of this Note upon the terms and conditions specified in the Credit Agreement.

  Both principal and interest are payable in lawful money of the United States of America to the Payee at the location or address specified by the Payee to the Borrower in same day funds. The Payee shall record payments of principal made under this Note, but no failure of the Payee to make such recordings shall affect the Borrower's repayment obligations under this Note.

This Note is guaranteed pursuant to the terms of the Guaranties.

This Note is made expressly subject to the terms of <u>Section 9.11</u> and <u>Section 9.12</u> of the Credit Agreement.

Except as specifically provided in the Credit Agreement, the Borrower hereby waives presentment, demand, protest, notice of intent to accelerate, notice of acceleration, and any other notice of any kind.  No failure to exercise, and no delay in exercising, any rights hereunder on the part of the holder of this Note shall operate as a waiver of such rights.

**THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS.  THE PROVISIONS OF <u>SECTION 9.13</u> OF THE CREDIT AGREEMENT ARE INCORPORATED HEREIN, *MUTATIS MUTANDIS*, AS IF A PART HEREOF.**

**THIS NOTE AND THE OTHER CREDIT DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.**

[REMAINDER OF THE PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Borrower has caused this Term Note to be executed as of the date first above written.

**CARBO CERAMICS INC.,** a Delaware corporation

By:                             
Name:
Title:

**EXHIBIT E**

**[RESERVED]**

# EXHIBIT F

# [RESERVED]

**EXHIBIT G**

**[RESERVED]**

### SCHEDULE 1.2
### Existing Letters of Credit

#### JPMorgan Chase Bank, N.A.

| Beneficiary Name | LC Commitment |
|---|---|
| CITY OF MILLEN | 1,300,000.00 |
| CITY OF MILLEN | 1,300,000.00 |
| CITY OF MILLEN | 250,000.00 |
| FIFTH THIRD EQUIPMENT FINANCE CO. | 1,000,000.00 |
| GREENBRIER LEASING COMPANY LLC | 450,000.00 |
| JPMorgan Chase Bank, N.A. | 18,300.00 |
| JPMorgan Chase Bank, N.A. | 2,500.00 |
| MUL RAILCARS, INC. | 500,000.00 |
| PLANTERS ELECTRIC MEMBERSHIP | 2,000,000.00 |
| RAIL PARTNERS SELECT LLC AND ITS | 675,000.00 |
| YAPI VE KREDI BANKASI A.S. | 146,827.50 |
| YAPI VE KREDI BANKASI A.S. | 37,064.62 |
| YAPI VE KREDI BANKASI A.S. | 109,565.20 |
| YAPI VE KREDI BANKASI A.S. | 99,369.90 |
| Total Letters of Credit ("LCs") [1] | $ 7,888,627.22 |

(1) LC's backed by approximately $8.2 million of restricted cash.

**SCHEDULE 4.1**

<u>Organizational Information</u>

# CARBO Ceramics Inc.

| | |
|---|---|
| **Principal Office:** | 575 N. Dairy Ashford, Ste. 300 Houston, TX 77079 |
| **Local Office:** | Same as Principal |
| **Date of Incorporation:** | **Delaware - June 23, 1987** |
| **Type of Organization:** | **Corporation** |

# Asset Guard Products Inc. (d/b/a Falcon Technologies and Services, Inc.)
f/k/a/ Falcon Technologies and Services, Inc.[2]
f/k/a Falcon Technology Services, Inc.[1]

| | |
|---|---|
| **Principal Office:** | 575 N. Dairy Ashford, Ste. 300, Houston, Texas 77079 |
| **Local Offices:** | 2242 East Hwy 380 Decatur, Texas 76234 |
| **Date of Incorporation** | **Delaware — September 15, 2009** |
| **and Name Change Dates:** | Name Change — September 29, 2009[1] |
| | Name Change — December 12, 2016[2] |
| **Type of Organization:** | **Corporation** |

# StrataGen, Inc.[15]

| | |
|---|---|
| Principal Office: | 575 N. Dairy Ashford Ste. 300 Houston, TX 77079 |
| Sales and Operations Local Office: | 575 N. Dairy Ashford Ste. 300 Houston, TX 77079 |
| Date of Incorporation and Name Change Dates: | Delaware — July 2, 2012 |
| Type of Organization: | Corporation |

---

[15] Previously incorporated in California — September 11, 1992. In California, name changed to: (i) StrataGen Engineering, Inc. on February 26, 2009, and (ii) StrataGen, Inc. on March 24, 2009.

99718855.10

## SCHEDULE 4.7

<u>Litigation</u>

Well Site Supply, Inc. vs. CARBO Ceramics Inc., Cause # 01-19-0004-6529, American Arbitration Association.  Breach of Contract claim.  Alleged damages $2.42M.

**SCHEDULE 4.8**

Defaults

1. Failure to meet railcar rent obligations due under the Lease Agreement (the "Master Lease") dated effective October 1, 2011 between MUL Railcars, Inc. (as successor-interest to MUL Railcars Leasing, LLC)(as assignee of Greenbrier Leasing company LLC) and CARBO Ceramics Inc., and that certain Schedule No. 8 to the Master Lease dated April 15, 2014 and effective as of February 1, 2014, as amended and modified from time to time.

2. Failure to meet railcar rent obligations due under the Lease Agreement (the "Master Lease") dated effective October 1, 2011 between Bridge Funding Group (as successor-interest to Bridge Capital Leasing, Inc.)(as assignee of Greenbrier Leasing company LLC) and CARBO Ceramics Inc., and those certain Schedule Nos. 9 and 10 to the Master Lease dated June 30, 2014 and September 15, 2014, respectively, as amended and modified from time to time.

3. Failure to meet railcar rent obligations due under the Lease Agreement (the "Master Railcar Lease") dated effective April 17, 2006 between The CIT Group/Equipment Financing, Inc. and CARBO Ceramics Inc., and those certain Schedule Nos. 1-7 and 9-14 to the Master Railcar Lease dated, April 17, 2006, March 9, 2007, March 13, 2008, March 14, 2008, April 7, 2008, April 7, 2008, February 18, 2010, April 6, 2011, May 10, 2011, May 10, 2011, February 28, 2017, February 28, 2017, and February 28, 2017, respectively, as amended and modified from time to time.

4. Failure to meet railcar rent obligations due under the Lease Agreement (the "Master Lease") dated effective October 1, 2011 between Greenbrier Leasing company LLC) and CARBO Ceramics Inc., and its Schedule Nos. 1-11, of which Schedule No. 1 is assigned to CFG Community Bank, Schedule No. 2 is assigned to Fifth Third Equipment Finance Company, Schedule Nos. 1B, 3, 5, and 6 are assigned to Capital One Equipment Finance Corp., Schedule Nos. 7 and 11 are assigned to Green Union IV Trust, Schedule No. 8 is assigned to MUL as described in item #1 above, and Schedule Nos. 9 and 10 are assigned to Bridge Funding Group as described in item #2 above.

5. Failure to meet railcar rent obligations due under the Lease Agreements dated August 21, 1984, November 2, 1993, October 25, 1999, and July 31, 2006, between Chicago Freight Car Leasing Co. ("Car Company") ("Lessor") and Carbo Ceramics Inc. ("Lessee") and that certain Third Supplement to lease effective August 1, 2014, and terminates July 31, 2021.

6. Failure to meet railcar rent obligations due under the JAIX/SMBC Master Railcar Lease Agreement ("Agreement") between Jaix Leasing Company ("Lessor") and Carbo Ceramics Inc. ("Lessee") executed and accepted on the 29th day of July 2014 and Equipment Riders, each constituting a lease, to be entered into from to time.

7. Failure to meet railcar rent obligations due under the Wells Fargo Railroad Corporation (as successor to General Electric Railcar Services Corporation) ("Lessor") Car Leasing Agreement No. 2183-97-00 with CARBO Ceramics Inc. ("Lessee") dated March 5, 2002, to lease railroad cars subject to this agreement and subsequent riders.

8. Failure to meet rent obligations due under the Lease Agreement dated December 31, 2014, as amended by First Amendment to Lease dated February 3, 2015 and by that Second Amendment

to Lease dated November 30, 2015 (collectively, the "Lease") by and between CARBO Ceramics Inc. and KTJ 251, LLC.

9.  Failure to meet payment obligations due under the Wildcat Minerals LLC ("Operator") Material Handling and Storage Agreement Dated October 11, 2013, with CARBO Ceramics Inc. Operator to perform the necessary transloading, handling and inventory storage services of proppant for CARBO. The term of the agreement began on the agreement date and ends on December 31, 2023.

10. Failure to meet rent obligations due under the Lease Agreement dated November 20, 2014, as amended by First Amendment dated January 21, 2015, by that Second Amendment dated February 3, 2015, and by that Third Amendment dated August 20, 2015 (collectively, the "Lease") by and between CARBO Ceramics Inc. and KTJ 250, LLC.

11. Failure to meet payment obligations due under the Wildcat Minerals LLC ("Wildcat") Storage Facility Agreement dated October 11, 2013, with Carbo Ceramics Inc. ("Company") for construction of a silo and storage in that silo aggregating 10,000 tons of storage space. The term of the agreement began on the agreement date and ends on December 31, 2023.

**SCHEDULE 4.10**

<u>Environmental Conditions</u>

1.   A claim from The Port of Shreveport-Bossier for $68,208.92*.


*CARBO has received an invoice from The Port of Shreveport-Bossier for environmental remediation work in an amount of $68,408.92.  We have sent a letter to the Port of Shreveport-Bossier disputing the necessity of such remediation and are seeking at least a mutually-agreeable reduction in the amount of this invoice.

**SCHEDULE 4.11**

<u>Subsidiaries</u>

| NAME OF ENTITY | JURISDICTION OF ORGANIZATION | OWNER | OWNERSHIP INTEREST |
|---|---|---|---|
| 1.  CARBO Ceramics (Mauritius) Inc. | Mauritius | CARBO Ceramics Inc. | 100% |
| 2.  CARBO Ceramics (China) Company Ltd. | China | CARBO Ceramics (Mauritius) Inc. | 100% |
| 3.  LLC CARBO International Eurasia | Russia | CARBO International, Inc. | 100% |
| 4.  CARBO International, Inc. | Delaware, USA | CARBO Ceramics Inc. | 100% |
| 5.  Asset Guard Products Inc. (formerly known as Falcon Technologies and Services, Inc.) | Delaware, USA | CARBO Ceramics Inc. | 100% |
| 6.  StrataGen, Inc. | Delaware, USA | CARBO Ceramics Inc. | 100% |
| 7.  CARBO Ceramics (Canada) Inc. | BC, Canada | CARBO International, Inc. | 100% |

**SCHEDULE 4.13**

Waivers of Tax Statute of Limitations

1. Asset Guard Products Inc. has entered into a waiver of the statute of limitations with respect to an audit relating to the payment of state sales tax in the State of Texas during the period from May 2016 through May 2019.

2. CARBO Ceramics Inc. has entered into a waiver of the statute of limitations with respect to an audit relating to the payment of federal income tax during the period from 2012 through 2015.

3. CARBO Ceramics Inc. has entered into a waiver of the statute of limitations with respect to an audit relating to the payment of state sales tax in the State of Texas during the period from January 2014 through June 2017.

4. CARBO Ceramics Inc. has entered into a waiver of the statute of limitations with respect to an audit relating to a refund of state sales tax paid in the State of Georgia during the period from December 2013 through December 2015.

## SCHEDULE 4.20

### Sanctions

The Borrower's indirect, wholly-owned subsidiary, LLC CARBO International Eurasia, is organized in the Russian Federation and conducts sales operations in that country.  From time to time, the Borrower or its other Subsidiaries may enter into business transactions with that entity or with customers located in the Russian Federation.

## SCHEDULE 4.21

Deposit Accounts

| | Name of Grantor | Name of Depository Institution | Account Number | Description of Account |
|---|---|---|---|---|
| 1. | Carbo Ceramics Inc. | JPMorgan Chase Bank, N.A. | 3705590132 | Premium Commercial Money Market |
| 2. | Carbo Ceramics Inc. | JPMorgan Chase Bank, N.A. | Lockbox | Lockbox |
| 3. | Carbo Ceramics Inc. | JPMorgan Chase Bank, N.A. | 298287613 | Accounts Payable |
| 4. | Carbo Ceramics Inc. | JPMorgan Chase Bank, N.A. | 298279693 | Payroll |
| 5. | Carbo Ceramics Inc. | JPMorgan Chase Bank, N.A. | 298278315 | Operating |
| 6. | Carbo Ceramics Inc. | JPMorgan Chase Bank, N.A. | 359236061 | Ecommerce |
| 7. | Asset Guard Products Inc. | JPMorgan Chase Bank, N.A. | Lockbox | Lockbox |
| 8. | Asset Guard Products Inc. | JPMorgan Chase Bank, N.A. | 298316651 | Accounts Payable - ZBA |
| 9. | Asset Guard Products Inc. | JPMorgan Chase Bank, N.A. | 298316537 | Operating |
| 10. | StrataGen Inc. | JPMorgan Chase Bank, N.A. | Lockbox | Lockbox |
| 11. | StrataGen Inc. | JPMorgan Chase Bank, N.A. | 298317121 | Operating |
| 12. | StrataGen Inc. | JPMorgan Chase Bank, N.A. | 298317071 | Accounts Payable - ZBA |
| 13. | Carbo Ceramics Inc. | Wells Fargo Bank, National Association | Lockbox | Legacy Lockbox |
| 14. | Carbo Ceramics Inc. | Wells Fargo Bank, National Association | 4950031153 | Legacy Receipts Account |
| 15. | Asset Guard Products Inc. f/k/a Falcon Technologies and Services Inc. | Wells Fargo Bank, National Association | Lockbox | Legacy Lockbox |
| 16. | Asset Guard Products Inc. f/k/a Falcon Technologies and Services Inc. | Wells Fargo Bank, National Association | 4122000599 | Operating |
| 17. | StrataGen Inc. | Wells Fargo Bank, National Association | 4121685424 | Operating |
| 18. | StrataGen Inc. | Wells Fargo Bank, National Association | Lockbox | Legacy Lockbox |
| 19. | Carbo Ceramics Inc. | Wells Fargo Bank, National Association | 9600031814 | Legacy Outstanding Chks AP |

| 20.. | Carbo Ceramics Inc. | Wells Fargo Bank, National Association | 4945077261 | Outstanding Chks PR – Proposed Utility Adequate Assurance Escrow Account |
| 21. | Asset Guard Products Inc, f/k/a Falcon Technologies and Services Inc. | Wells Fargo Bank, National Association | 9600134246 | Legacy Accounts Payable |
| 22. | Carbo Ceramics Inc. | Wells Fargo Bank, National Association | 4121233100 | Legacy FSA Disbursement |
| 23. | Carbo Ceramics Inc. | Wells Fargo Bank, National Association | 4067470724 | Amazon Disbursement – Proposed Professional Fee Escrow Account |
| 24. | Carbo Ceramics Inc., Mauritius, CIE, Dubai | Foreign bank accounts | | Various operating |
| 25. | Century Bank & Trust | Certificates of Deposit | Accounts ending 3253,3260,2429 | Collateral for reclamation bonds |
| 26. | Carbo Ceramics Inc. | Wells Fargo Bank, National Association | Accounts ending 3458,3466,3474 | Collateral for Credit Cards |

**SCHEDULE 5.9(d)[16]**

<u>Real Property</u>

| Type | Address | City | State | Zip | Credit Party | Title Held |
|---|---|---|---|---|---|---|
| Plant | 1800 Dent Rd | Toomsboro | GA | 31090 | | |
| Plant | 2301 East 4th Street | Marshfield | WI | 54449 | | |
| Plant | 2295 Wriley Road | McIntyre | GA | 31054 | | |
| Plant | 36 Arch Drive | Eufaula | AL | 36027 | | |
| Plant | 4801 Industrial Drive | New Iberia | LA | 70560 | | |
| Office/Manufacturing Facility | 2242 East Hwy 380 | Decatur | TX | 76234 | | |
| Minerals Sand – Helgerson | 9240 County Road V | Marshfield | WI | 54449 | | |
| Minerals Sand - Hansen | 11575 MacArthur Drive | Marshfield | WI | 54449 | | |
| Minerals Sublease - Kaolin Allen North | | Wilkinson County | GA | | | |
| Minerals owned Kaolin Brannan | | Wilkinson County | GA | | | |
| Minerals owned Kaolin Kellam | | Wilkinson County | GA | | | |
| Minerals owned Kaolin CE Dent | | Wilkinson County | GA | | | |
| Minerals owned Kaolin CBrick | | Wilkinson County | GA | | | |
| Minerals Sublease Kaolin F Wall | | Wilkinson County | GA | | | |
| Minerals Sublease Kaolin CM Shepherd 1 | | Wilkinson County | GA | | | |
| Minerals Sublease Kaolin CM Shepherd 2 | | Wilkinson County | GA | | | |
| Minerals Sublease CD Dent | | Wilkinson County | GA | | | |
| Minerals Sublease - Kaolin CM Shepherd 2N | | Wilkinson County | GA | | | |
| Minerals stockpile Kaolin Roland | | Henry County | AL | | | |
| Minerals stockpile kaolin Sellers | | Henry County | AL | | | |
| Minerals stockpile kaolin Bell | | Henry County | AL | | | |
| Minerals stockpile kaolin Espy 4 | | Barbour County | AL | | | |
| Distribution Center | 4810 Industrial Drive | New Iberia | LA | 70560 | | |
| Distribution Center | 1975 W Blairtown Rd. | Rock Springs | WY | 82901 | | |
| Distribution Center | 2600 10180 101 St | Edmonton, AB | CA | T5J 3Y2 | | |
| Distribution Center | 8715 Park Road | Grand Prairie, AB | CA | T6R 2W9 | | |
| Distribution Center | 2346 CR 115 | Alice | TX | 78332 | | |

---

[16] <u>NTD</u>:  Borrower/VE to confirm.

99718855.10

| | | | | | |
|---|---|---|---|---|---|
| Distribution Center | 51 Main Street | Douglas | ND | 58735 | |
| 195.33 Acres (Branan Tract) | | Wilkinson County | GA | | Fee Simple |
| Mineral Lease – Kaolin/Bauxite (Roland) | | Henry County | AL | | Lease |
| Tract of Land – 508 Acres | | Henry County | AL | | |
| 13.47 Acres | | Grande Prairie | Alberta | | Fee Simple |
| 13.99 Acres | 36 Arch Drive | Eufaula | AL | 36027 | Fee Simple |
| 7.78 Acres | 36 Arch Drive | Eufaula | AL | 36027 | Fee Simple |
| 3.21 Acres | | Leduc | Alberta | | Fee Simple |
| 5.68 Acres | | Leduc | Alberta | | Fee Simple |
| 1.003 Acres | | Jenkins County | GA | | Fee Simple |
| Lot (.5 Acres) | | Jenkins County | GA | | Fee Simple |
| 36.43 Acres | 2295 Wriley Road | McIntyre | GA | | Leasehold |
| 70.41 Acres | | Wilkinson County | GA | | Fee Simple |
| 349.07 Acres (multiple tracts) | | Wilkinson County | GA | | Fee Simple |
| 195.33 Acres | | Wilkinson County | GA | | Fee Simple |
| 1509.42 Acres (Dent Tract/Chattahoochee Brick Tract/Main Tract) | | Wilkinson County | GA | | Fee Simple |
| 78.93 Acres | | Wilkinson County | GA | | Fee Simple |
| 10.799 Acres | | Iberia Parish | LA | | Fee Simple |
| 13.284 Acres | | Iberia Parish | LA | | |
| Tract of Land | | Gladstone | ND | 58630 | Fee Simple |
| 83.96 Acres | | Stark County | ND | | Fee Simple |
| 4.23 Acres | | Ward County | ND | | Fee Simple |
| Tract of Land | | Ward County | ND | | Fee Simple |
| 43.668 Acres | | Jim Wells County | TX | | Fee Simple |
| Two land parcels | 2009 / 2301 East 4th St | Marshfield | WI | 54449 | Fee Simple |
| Easement to State Hwy 13 | | Marshfield | WI | 54449 | |
| 58.992 Acres | | Wood County | WI | | Fee Simple |
| Vacant Land (less a portion that was sold 1/7/2016 to Hughes) | | Town of Wood (HWY 13) | WI | | Fee Simple |
| Rock Springs Industrial Park (Lots 15-18) | | Rock Springs | WY | | Fee Simple |
| Tract of Land | | Sweetwater County | WY | | Fee Simple |

**SCHEDULE 6.2(f)**

<u>Purchase Money Debt and Capital Leases</u>

1.  Development Authority of Wilkinson County (as "Lessor") and CARBO Ceramics Inc. (as "Lessee") dated November 1, 2008, as amended, pertaining to each of the Toomsboro Facility and McIntyre Facility, respectfully.

## SCHEDULE 6.2(k)

<u>Outstanding Debt</u>

NONE

**SCHEDULE 6.2(m)**

<u>Existing Corporate Credit Card Services</u>

As part of the Cash Management System, and in the ordinary course of business, the Debtors maintain various Company-paid credit cards (collectively, the "***Credit Cards***") and various corporate purchasing cards and corporate fuel cards (collectively, the "***P-Cards,***" and together with the Credit Cards, the "***Corporate Cards***") that are utilized to pay for certain work related expenses, such as work-related travel, fuel charges, and other small, non-recurring purchases made on behalf of the Debtors (collectively, the "***Corporate Card Programs***").  The Corporate Cards are issued by four credit card providers, Wells Fargo, The Universal Air Travel Plan, Inc. ("***UATP***"), Universal Advantage Fleet Card ("***Universal***"), and Wright Express Fleet Card ("***WEX,***" and together with Wells Fargo, UATP, and Universal, the "***Credit Card Providers***").

**SCHEDULE 6.4(a)**

Investments

NONE

**SCHEDULE 6.9(a)(iii)**

<u>Specified Dispositions</u>

NONE

## Exhibit H

### Identity and Affiliations of the Members of the
### New Board of Reorganized CARBO as of the Effective Date

Philip Pecora, Matthew D. Wilks, and Justin Wilks will serve as the members of the New Board of Reorganized CARBO, from and after the Effective Date in accordance with the terms of the New Organizational Documents attached hereto as **Exhibit I** and applicable non-bankruptcy law.  None of the foregoing individuals will receive any compensation on account of their service as members of the New Board.

Mr. Pecora is currently a Portfolio Manager at Wilks Brothers, LLC, a multifaceted, family-based partnership headquartered in Cisco, Texas.  Mr. Pecora has extensive experience in financial and business management, and previous worked as an analyst at an investment firm focused on high-yield and convertible debt instruments, and a full service brokerage and investment banking firm.  Mr. Pecora has a bachelor's degree in Finance from Susquehanna University.

Matthew D. Wilks has developed a broad skill set in supply chain management, project management, and finance in the construction, manufacturing, and energy industries. From 1996, he held various roles at Wilks Masonry including Estimator, Project Manager, and Vice President. Notably in 2001, he worked with Cisco High Lift modeling estimated costs associated with the first frac pumps that would later become Frac Tech. In 2009, Mr Wilks left the construction industry to join Frac Tech as Vice President of Logistics. In preparation for an anticipated growth in pressure pumping and an even greater expansion to the associated supply chain, Mr. Wilks coordinated the planning and construction of sand mines, transloads, and the last mile logistics for Frac Tech until 2012. In 2012, he established a family office for the Wilks where he and the team executed M&A transactions, debt originations, and actively managed a portfolio of private and public equity and debt investments with assets exceeding $1 billion. Seeing an opportunity in 2016, he orchestrated the evaluation of 6 million horsepower before concluding that the condition of pumping equipment was in disrepair and that newbuild would need to be the path forward. Since 2017, Mr. Wilks has been with Profrac Services, LLC, serving as Chief Financial Officer and President. With 1 million HHP, Profrac has become one of the leading pressure pumping service providers in North America in under 3 years.

Justin Wilks currently serves as Chief Executive Officer at Equify, LLC, an industrial asset-based lending, risk, and auction company, and Chief Executive Officer of Alpine Silica, an in-basin natural sand provider to the oil & gas industry.  Since 2012, Mr. Wilks has also served as Senior Vice President of Wilks Brothers, LLC, a multi-billion dollar single family office located in Cisco, Texas.   Wilks has spent his entire professional career managing and building businesses in the construction, logistics, transportation, oil & gas, mining and finance industries.   Wilks previously served as President of Wilks Masonry Corporation from 2005 to 2010; Senior Vice President of Logistics at FTS International, Inc., from 2010 to 2012; and President of Vertex Solutions, a wholly-owned subsidiary of Frac Tech Services, LLC, from 2010 to 2012.

**Exhibit I**

**Forms of Material New Organizational Documents**

Exhibit I-1

US 7087371

**<u>Exhibit I-1</u>**

**Charter**

Exhibit I-2

US 7087371

**AMENDED AND RESTATED**
**CERTIFICATE OF INCORPORATION**
**OF**
**CARBO CERAMICS INC.**

## ARTICLE I

## NAME OF THE CORPORATION

The name of the corporation is CARBO Ceramics Inc. (the "**Corporation**").

## ARTICLE II

## REGISTERED AGENT

The address of the registered office of the Corporation in the State of Delaware is 1209 Orange Street, in the City of Wilmington, Delaware 19801, in the County of New Castle. The name of the registered agent of the Corporation at that address is The Corporation Trust Company.

## ARTICLE III

## CORPORATE PURPOSE

The nature of the business or purposes to be conducted or promoted by the Corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of the State of Delaware (the "**DGCL**").

## ARTICLE IV

## CAPITAL STOCK

4.1     Authorized Capital Stock.   The total number of shares of stock which the Corporation is authorized to issue is 1,000 shares.  All shares shall be Common Stock, par value $0.01 per share, and are to be of one class.

4.2     Common Stock.  Except as otherwise required by the DGCL or as provided by or pursuant to the provisions of this Amended and Restated Certificate of Incorporation of the Corporation (this "**Certificate of Incorporation**"), each holder of Common Stock shall be entitled to one vote for each share of Common Stock held of record by such holder.  The holders of shares of Common Stock shall not have cumulative voting rights.

4.3     Non-voting Equity Securities.   The Corporation shall not issue any non-voting equity securities (which shall not be deemed to include any warrants or options to purchase capital stock of the Corporation) to the extent prohibited by Section 1123(a)(6) of the Bankruptcy Code as in effect on the date of filing of this Amended and Restated Certificate of Incorporation with the Secretary of State of the State of Delaware; *provided, however*, that the foregoing restriction

(i) shall have such force and effect only for so long as Section 1123 of the Bankruptcy Code is in effect and applicable to the Corporation, (ii) shall not have any further force or effect beyond that required under Section 1123(a)(6), (iii) shall be deemed void or eliminated if required by applicable law, and (iv) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect.

## ARTICLE V

## STOCKHOLDER ACTION BY WRITTEN CONSENT

Any action required or permitted to be taken at any annual or special meeting of stockholders of the Corporation may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of shares having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the Corporation in accordance with Section 228 of the DGCL.

## ARTICLE VI

## BOARD OF DIRECTORS

6.1     <u>General Powers</u>.  The business and affairs of the Corporation shall be managed by or under the direction of the board of directors of the Corporation (the "**Board of Directors**").

6.2     <u>Number</u>.  The Board of Directors shall consist of one or more members, the number thereof to be determined from time to time by resolution of the Board of Directors.

6.3     <u>Written Ballot</u>. Unless and except to the extent that the Bylaws shall so require, the election of directors of the Corporation need not be by written ballot.

## ARTICLE VII

## BYLAW AMENDMENTS

In furtherance and not in limitation of the powers conferred by law, the Board of Directors is expressly authorized and empowered to adopt, amend, alter, or repeal the Bylaws without any action on the part of the stockholders.  The stockholders shall also have the power to adopt, amend, alter, or repeal the Bylaws.

## ARTICLE VIII

## LIMITATION ON DIRECTOR LIABILITY

A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for any act or omission not in good faith or which involves intentional misconduct or a knowing violation of law, (iii) under Section 174 of the DGCL, or (iv) for any transaction from which the director derived an improper personal benefit.  If the DGCL is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the DGCL, as so

amended. In the event that it is determined that Delaware law does not apply, the liability of a director of the Corporation to the company or its stockholders for monetary damages shall be eliminated to the fullest extent permissible under applicable law. Any repeal or modification of the foregoing paragraph shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

## ARTICLE IX

## INDEMNIFICATION OF DIRECTORS AND OFFICERS

9.1    <u>Generally</u>. Each person who was or is a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (a "**proceeding**"), by reason of the fact that he or she, or a person of whom he or she is the legal representative, is or was a director or officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, manager, employee or agent of another corporation or of a limited liability company, partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans (hereinafter, a "**Covered Person**"), whether the basis of such proceeding is alleged action or inaction in an official capacity or in any other capacity while serving as director, officer, manager, employee or agent, shall be indemnified and held harmless by the Corporation to the fullest extent permitted by the DGCL, as amended from time to time (but in the case of any such amendment, to the fullest extent permitted by law, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such amendment), against all costs, charges, expenses, liabilities and losses (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such Covered Person in connection therewith, and that indemnification shall continue as to a Covered Person who has ceased to be a director, officer, manager, employee or agent and shall inure to the benefit of his or her heirs, executors, administrators and personal and legal representatives; *provided, however*, that, except as provided in Section 9.3 below, the Corporation shall indemnify any such Covered Person seeking indemnification in connection with a proceeding (or part thereof) initiated by that Covered Person, only if that proceeding (or part thereof) was authorized by the Board of Directors. The right to indemnification conferred in this Article shall be a contract right and shall include the right to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of its final disposition; *provided, however*, that, if the DGCL, as amended from time to time, requires, the payment of such expenses incurred by a director or officer in his capacity as a director or officer in advance of the final disposition of a proceeding shall be made only upon delivery to the Corporation of an undertaking, by or on behalf of such director or officer, to repay all amounts so advanced, if it shall ultimately be determined that such director or officer is not entitled to be indemnified under this Article or otherwise. No director or officer will be required to post any bond or provide any other security with respect to any such undertaking.

9.2    <u>Primary Indemnitor</u>. The Corporation hereby acknowledges that certain Covered Persons may have rights to indemnification and advancement of expenses (directly or through insurance obtained by any such entity) provided by one or more third parties (collectively, the "**Other Indemnitors**"), and which may include third parties for whom such Covered Person serves as a manager, member, officer, employee or agent. The Corporation hereby agrees and acknowledges that notwithstanding any such rights that a Covered Person may have with respect to any Other Indemnitor(s), (i) the Corporation is the indemnitor of first resort with respect to all Covered Persons and all obligations to indemnify and provide advancement of expenses to Covered Persons, (ii) the Corporation shall be required to indemnify and advance the full amount

of expenses incurred by the Covered Persons, to the fullest extent required by law, the terms of this Amended and Restated Certificate of Incorporation, the Bylaws, any agreement to which the Corporation is a party, any vote of the stockholders or the Board of Directors, or otherwise, without regard to any rights the Covered Persons may have against the Other Indemnitors and (iii) to the fullest extent permitted by law, the Corporation irrevocably waives, relinquishes and releases the Other Indemnitors from any and all claims for contribution, subrogation or any other recovery of any kind in respect thereof. The Corporation further agrees that no advancement or payment by the Other Indemnitors with respect to any claim for which the Covered Persons have sought indemnification from the Corporation shall affect the foregoing and the Other Indemnitors shall have a right of contribution and/or be subrogated to the extent of any such advancement or payment to all of the rights of recovery of the Covered Persons against the Corporation. These rights shall be a contract right, and the Other Indemnitors are express third party beneficiaries of the terms of this paragraph.

9.3    Right of Claimant to Bring Suit.  If a claim under this Article is not paid in full by the Corporation within 30 days after a written claim has been received by the Corporation, the claimant may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim and, if successful in whole or in part, the claimant also shall be entitled to be paid the expense of prosecuting that claim.  It shall be a defense to any such action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition, where the required undertaking, if any, is required and has been tendered to the Corporation) that the claimant has failed to meet a standard of conduct that makes it permissible under Delaware law for the Corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Corporation.  Neither the failure of the Corporation (including its Board of Directors, its independent legal counsel or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the claimant is permissible in the circumstances because he or she has met the applicable standard of conduct set forth in the DGCL, nor an actual determination by the Corporation (including its Board of Directors, its independent legal counsel or its stockholders) that the claimant has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that the claimant has not met the applicable standard of conduct.

9.4    Non-Exclusivity of Rights.   The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Article shall not be exclusive of any other right that any person may have or hereafter acquire under any statute, provision of this Amended and Restated Certificate of Incorporation, the bylaws of the Corporation, any agreement to which the Corporation is a party, any vote of the stockholders or the Board of Directors or otherwise.

9.5    Insurance.  The Corporation may maintain insurance, at its expense, to protect itself and any director, officer, manager, employee or agent of the Corporation or another corporation, limited liability company, partnership, joint venture, trust or other enterprise against any such expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against that expense, liability or loss under Delaware law.

9.6    Expenses as a Witness.  To the extent any director, officer, manager, employee or agent of the Corporation is by reason of such position, or a position with another entity at the request of the Corporation, a witness in any action, suit or proceeding, he or she shall be indemnified against all costs and expenses actually and reasonably incurred by him or her or on his or her behalf in connection therewith.

9.7     <u>Indemnification of Employees and Agents</u>.  The Corporation may, to the extent authorized from time to time by the Board of Directors, grant rights to indemnification, and rights to be paid by the Corporation the expenses incurred in defending any proceeding in advance of its final disposition, to any employee or agent of the Corporation to the fullest extent of the provisions of this Article with respect to the indemnification and advancement of expenses of directors and officers of the Corporation.

9.8     <u>Severability</u>.  If any provision or provisions of this Article shall be held to be invalid, illegal or unenforceable for any reason whatsoever: (i) the validity, legality and enforceability of the remaining provisions of this Article (including, without limitation, each portion of any paragraph of this Article containing any such provision held to be invalid, illegal or unenforceable, that is not itself held to be invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby; and (ii) to the fullest extent possible, the provisions of this Article (including, without limitation, each such portion of any paragraph of this Article containing any such provision held to be invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested by the provision held invalid, illegal or unenforceable.

9.9     <u>Nature of Rights; Amendments to this Article</u>.   The rights conferred upon indemnitees in this Article shall be contract rights and such rights shall continue as to an indemnitee who has ceased to be a director, officer or trustee and shall inure to the benefit of the indemnitee's heirs, executors and administrators.  Any repeal, amendment or modification of this Article or any of the provisions hereof shall not adversely affect any rights to indemnification and to the advancement of expenses of a director or officer of the Corporation existing at the time of such repeal or modification with respect to any acts or omissions occurring prior to such repeal or modification.

## ARTICLE X

## BUSINESS OPPORTUNITIES

To the fullest extent permitted by Section 122(17) of the DGCL (or any successor provision) and except as may be otherwise expressly agreed in writing by the Corporation and any Dual Role Person (as defined below), the Corporation, on behalf of itself and its subsidiaries, renounces and waives any interest or expectancy of the Corporation and its subsidiaries in, or in being offered an opportunity to participate in, directly or indirectly, any potential transactions, matters or business opportunities (including, without limitation, any business activities or lines of business that are the same as or similar to those pursued by, or competitive with, the Corporation or any of its subsidiaries or any dealings with customers or clients of the Corporation or any of its subsidiaries) that are from time to time presented to any Dual Role Person, even if the transaction, matter or opportunity is one that the Corporation or its subsidiaries might reasonably be deemed to have pursued or had the ability or desire to pursue if granted the opportunity to do so and no such person shall be liable to the Corporation or any of its subsidiaries or affiliates for breach of any fiduciary or other duty, as a director or officer or otherwise, by reason of the fact that such person pursues, acquires or participates in such business opportunity, directs such business opportunity to another person or fails to present such business opportunity, or information regarding such business opportunity, to the Corporation or its subsidiaries.  Without limiting the foregoing renunciation, the Corporation acknowledges that certain of the stockholders are in the business of making investments in, and have investments in, other businesses similar to that and that may compete with the Corporation's businesses ("**Competing Businesses**"), and agrees that each such stockholder shall have the right to make additional investments in or have relationships with other Competing Businesses independent of its investment in the Corporation. Any person

purchasing or otherwise acquiring any interest in any shares of stock of the Corporation shall be deemed to have notice of and consented to the provisions of this paragraph.  Neither the alteration, amendment or repeal of this paragraph, nor the adoption of any provision of this Amended and Restated Certificate of Incorporation inconsistent with this paragraph, nor, to the fullest extent permitted by Delaware law, any modification of law, shall eliminate or reduce the effect of this paragraph in respect of any business opportunity first identified or any other matter occurring, or any cause of action, suit or claim that, but for this paragraph, would accrue or arise, prior to such alteration, amendment, repeal, adoption or modification.  If any provision or provisions of this paragraph shall be held to be invalid, illegal or unenforceable as applied to any circumstance for any reason whatsoever: (i) the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this paragraph (including, without limitation, each portion of any paragraph of this paragraph containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby and (ii) to the fullest extent possible, the provisions of this paragraph (including, without limitation, each such portion of any paragraph of this paragraph containing any such provision held to be invalid, illegal or unenforceable) shall be construed so as to permit the Corporation to protect its directors, officers, employees and agents from personal liability in respect of their good faith service to or for the benefit of the Corporation to the fullest extent permitted by law.  This paragraph shall not limit any protections or defenses available to, or indemnification or advancement rights of, any director or officer of the Corporation under this Amended and Restated Certificate of Incorporation, the bylaws of the Corporation, or applicable law.  As used herein, "**Dual Role Person**" shall mean any individual who is a director of the Corporation and is otherwise an employee, officer, partner, member, manager, owner (direct or indirect) or a director of a stockholder.

## ARTICLE XI

## AMENDMENTS

Except as expressly provided in this Amended and Restated Certificate of Incorporation, the Corporation reserves the right to amend or repeal any provision contained in this Amended and Restated Certificate of Incorporation in the manner prescribed by the laws of the State of Delaware and all rights conferred upon stockholders are granted subject to this reservation.

## **Exhibit I-2**

### **Bylaws**

Exhibit I-3

US 7087371

**AMENDED AND RESTATED
BYLAWS
OF
CARBO CERAMICS INC.**

**Effective [●], 2020**

# ARTICLE 1

## OFFICES

**Section 1.1    Offices**.  The address of the registered office of CARBO Ceramics Inc. (the "**Corporation**") in the State of Delaware shall be at The Corporation Trust Company, 1209 Orange Street, in the City of Wilmington, County of New Castle, Delaware 19808.  The Corporation may have other offices, both within and without the State of Delaware, as the board of directors of the Corporation (the "**Board of Directors**") from time to time shall determine or the business of the Corporation may require.

**Section 1.2    Books and Records**.  Any records administered by or on behalf of the Corporation in the regular course of its business, including its stock ledger, books of account, and minute books, may be maintained on any information storage device, method, or one or more electronic networks or databases (including one or more distributed electronic networks or databases); *provided that* the records so kept can be converted into clearly legible paper form within a reasonable time, and, with respect to the stock ledger, the records so kept comply with Section 224 of the Delaware General Corporation Law.  The Corporation shall so convert any records so kept upon the request of any person entitled to inspect such records pursuant to applicable law.

# ARTICLE 2

## MEETINGS OF THE STOCKHOLDERS

**Section 2.1    Place of Meetings**.  All meetings of the stockholders shall be held at such place, if any, either within or without the State of Delaware, or by means of remote communication, as shall be designated from time to time by resolution of the Board of Directors and stated in the notice of meeting.

**Section 2.2    Annual Meeting**.  The annual meeting of the stockholders for the election of directors and for the transaction of such other business as may properly come before the meeting shall be held at such date, time and place, if any, as shall be determined by the Board of Directors and stated in the notice of the meeting.

**Section 2.3    Special Meetings**.  Special meetings of stockholders for any purpose or purposes shall be called pursuant to a resolution approved by the Board of Directors and may not be called by any other person or persons.  The only business which may be conducted at a special meeting shall be the matter or matters set forth in the notice of such meeting.

**Section 2.4    Adjournments**.  Any meeting of the stockholders, annual or special, may be adjourned from time to time to reconvene at the same or some other place, if any, and notice need not be given of any such adjourned meeting if the time, place, if any, thereof and the means

of remote communication, if any, are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the Corporation may transact any business which might have been transacted at the original meeting.  If the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.  If after the adjournment a new record date is fixed for stockholders entitled to vote at the adjourned meeting, the Board of Directors shall fix a new record date for notice of the adjourned meeting and shall give notice of the adjourned meeting to each stockholder of record entitled to vote at the adjourned meeting as of the record date fixed for notice of the adjourned meeting.

Section 2.5    **Notice of Meetings**.  Notice of the place, if any, date, hour, the record date for determining the stockholders entitled to vote at the meeting (if such date is different from the record date for stockholders entitled to notice of the meeting) and means of remote communication, if any, of every meeting of stockholders shall be given by the Corporation not less than ten days nor more than 60 days before the meeting (unless a different time is specified by law) to every stockholder entitled to vote at the meeting as of the record date for determining the stockholders entitled to notice of the meeting.  Notices of special meetings shall also specify the purpose or purposes for which the meeting has been called.  Notices of meetings to stockholders may be given by mailing the same, addressed to the stockholder entitled thereto, at such stockholder's mailing address as it appears on the records of the corporation and such notice shall be deemed to be given when deposited in the U.S. mail, postage prepaid.  Without limiting the manner by which notices of meetings otherwise may be given effectively to stockholders, any such notice may be given by electronic transmission in accordance with applicable law.  Notice of any meeting need not be given to any stockholder who shall, either before or after the meeting, submit a waiver of notice or who shall attend such meeting, except when the stockholder attends for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.  Any stockholder so waiving notice of the meeting shall be bound by the proceedings of the meeting in all respects as if due notice thereof had been given.

Section 2.6    **List of Stockholders**.  The Corporation shall prepare a complete list of the stockholders entitled to vote at any meeting of stockholders (*provided, however*, if the record date for determining the stockholders entitled to vote is less than ten days before the date of the meeting, the list shall reflect the stockholders entitled to vote as of the tenth day before the meeting date), arranged in alphabetical order, and showing the address of each stockholder and the number of shares of each class of capital stock of the Corporation registered in the name of each stockholder at least ten days before any meeting of the stockholders.  Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, on a reasonably accessible electronic network if the information required to gain access to such list was provided with the notice of the meeting or during ordinary business hours, at the principal place of business of the Corporation for a period of at least ten days before the meeting.  If the meeting is to be held at a place, the list shall also be produced and kept at the time and place of the meeting the whole time thereof and may be inspected by any stockholder who is present.  If the meeting is held solely by means of remote communication, the list shall also be open for inspection by any stockholder during the whole time of the meeting as provided by applicable law.  Except as provided by applicable law, the stock ledger of the Corporation shall be the only evidence as to who are the stockholders entitled to examine the stock ledger and the list of stockholders or to vote in person or by proxy at any meeting of stockholders.

Section 2.7    **Quorum**.  Unless otherwise required by law, the Corporation's Certificate of Incorporation (the "**Certificate of Incorporation**") or these bylaws, at each meeting of the stockholders, a majority in voting power of the shares of the Corporation entitled to vote at the

meeting, present in person or represented by proxy, shall constitute a quorum. If, however, such quorum shall not be present or represented at any meeting of the stockholders, the stockholders entitled to vote thereat, present in person or represented by proxy, shall have power, by the affirmative vote of a majority in voting power thereof, to adjourn the meeting from time to time, in the manner provided in **Section 2.4**, until a quorum shall be present or represented. A quorum, once established, shall not be broken by the subsequent withdrawal of enough votes to leave less than a quorum. At any such adjourned meeting at which there is a quorum, any business may be transacted that might have been transacted at the meeting originally called.

Section 2.8    **Conduct of Meetings**. The Board of Directors may adopt by resolution such rules and regulations for the conduct of the meeting of the stockholders as it shall deem appropriate. At every meeting of the stockholders, the President, or in his or her absence or inability to act, the person whom the President shall appoint, shall act as chairman of, and preside at, the meeting. The secretary or, in his or her absence or inability to act, the person whom the chairman of the meeting shall appoint secretary of the meeting, shall act as secretary of the meeting and keep the minutes thereof. Except to the extent inconsistent with such rules and regulations as adopted by the Board of Directors, the chairman of any meeting of the stockholders shall have the right and authority to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such chairman, are appropriate for the proper conduct of the meeting. Such rules, regulations or procedures, whether adopted by the Board of Directors or prescribed by the chairman of the meeting, may include, without limitation, the following: (a) the establishment of an agenda or order of business for the meeting; (b) the determination of when the polls shall open and close for any given matter to be voted on at the meeting; (c) rules and procedures for maintaining order at the meeting and the safety of those present; (d) limitations on attendance at or participation in the meeting to stockholders of record of the corporation, their duly authorized and constituted proxies or such other persons as the chairman of the meeting shall determine; (e) restrictions on entry to the meeting after the time fixed for the commencement thereof; and (f) limitations on the time allotted to questions or comments by participants.

Section 2.9    **Voting; Proxies**. Unless otherwise required by law or the Certificate of Incorporation the election of directors shall be decided by a plurality of the votes cast at a meeting of the stockholders by the holders of stock entitled to vote in the election. Unless otherwise required by law, the Certificate of Incorporation or these bylaws, any matter, other than the election of directors, brought before any meeting of stockholders shall be decided by the affirmative vote of the majority of shares present in person or represented by proxy at the meeting and entitled to vote on the matter. Each stockholder entitled to vote at a meeting of stockholders or to express consent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period. A proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A stockholder may revoke any proxy which is not irrevocable by attending the meeting and voting in person or by delivering to the secretary of the Corporation a revocation of the proxy or a new proxy bearing a later date. Voting at meetings of stockholders need not be by written ballot.

Section 2.10   **Inspectors at Meetings of Stockholders**. The Board of Directors, in advance of any meeting of stockholders, may, and shall if required by law, appoint one or more inspectors, who may be employees of the Corporation, to act at the meeting or any adjournment thereof and make a written report thereof. The Board of Directors may designate one or more persons as alternate inspectors to replace any inspector who fails to act. If no inspector or alternate is able to act at a meeting, the person presiding at the meeting shall appoint one or more

inspectors to act at the meeting.  Each inspector, before entering upon the discharge of his or her duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability.  The inspectors shall (a) ascertain the number of shares outstanding and the voting power of each, (b) determine the shares represented at the meeting, the existence of a quorum and the validity of proxies and ballots, (c) count all votes and ballots, (d) determine and retain for a reasonable period a record of the disposition of any challenges made to any determination by the inspectors, and (e) certify their determination of the number of shares represented at the meeting and their count of all votes and ballots.  The inspectors may appoint or retain other persons or entities to assist the inspectors in the performance of their duties.  Unless otherwise provided by the Board of Directors, the date and time of the opening and the closing of the polls for each matter upon which the stockholders will vote at a meeting shall be announced at the meeting.  No ballot, proxies, votes or any revocation thereof or change thereto, shall be accepted by the inspectors after the closing of the polls unless the Court of Chancery of the State of Delaware upon application by a stockholder shall determine otherwise.  In determining the validity and counting of proxies and ballots cast at any meeting of stockholders, the inspectors may consider such information as is permitted by applicable law.  No person who is a candidate for office at an election may serve as an inspector at such election.

**Section 2.11  Written Consent of Stockholders Without a Meeting**.  Any action to be taken at any annual or special meeting of stockholders may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action to be so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered (by hand or by certified or registered mail, return receipt requested) to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Every written consent shall bear the date of signature of each stockholder who signs the consent, and no written consent shall be effective to take the corporate action referred to therein unless, within 60 days of the earliest dated consent delivered in the manner required by this **Section 2.11**, written consents signed by a sufficient number of holders to take action are delivered to the Corporation as aforesaid.  Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall, to the extent required by applicable law, be given to those stockholders who have not consented in writing, and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for notice of such meeting had been the date that written consents signed by a sufficient number of holders to take the action were delivered to the Corporation.

**Section 2.12  Fixing the Record Date**.

(a)      In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than 60 nor less than ten days before the date of such meeting.  If the Board of Directors so fixes a date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board of Directors determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination.  If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is

waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; *provided, however*, that the Board of Directors may fix a new record date for the determination of stockholders entitled to vote at the adjourned meeting and in such case shall also fix as the record date for stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for the determination of stockholders entitled to vote therewith at the adjourned meeting.

(b)     In order that the Corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than ten days after the date upon which the resolution fixing the record date is adopted by the Board of Directors.  If no record date has been fixed by the Board of Directors, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting: (i) when no prior action by the Board of Directors is required by law, the record date for such purpose shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery (by hand, or by certified or registered mail, return receipt requested) to its registered office in the State of Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded and (ii) if prior action by the Board of Directors is required by law, the record date for such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.

(c)     In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 days prior to such action.  If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

## ARTICLE 3

## BOARD OF DIRECTORS

**Section 3.1     General Powers**.  The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors.  The Board of Directors may adopt such rules and procedures, not inconsistent with the Certificate of Incorporation, these bylaws or applicable law, as it may deem proper for the conduct of its meetings and the management of the Corporation.

**Section 3.2     Number; Term of Office**.  The Board of Directors shall consist of one or more members, the number thereof to be determined from time to time by resolution of the Board of Directors.  Each director shall hold office until a successor is duly elected and qualified or until the director's earlier death, resignation, disqualification or removal.

**Section 3.3     Newly Created Directorships and Vacancies**.  Any newly created directorships resulting from an increase in the authorized number of directors and any vacancies occurring in the Board of Directors, may be filled by the affirmative votes of a majority of the

remaining members of the Board of Directors, although less than a quorum, or by a sole remaining director.  A director so elected shall be elected to hold office until the earlier of the expiration of the term of office of the director whom he or she has replaced, a successor is duly elected and qualified or the earlier of such director's death, resignation or removal.

**Section 3.4    Resignation**.  Any director may resign at any time by notice given in writing or by electronic transmission to the Corporation.  Such resignation shall take effect at the date of receipt of such notice by the Corporation or at such later time as is therein specified.

**Section 3.5    Removal**.  Except as prohibited by applicable law or the Certificate of Incorporation, the stockholders entitled to vote in an election of directors may remove any director from office at any time, with or without cause, by the affirmative vote of a majority in voting power thereof.

**Section 3.6    Fees and Expenses**.  Directors shall receive such fees and expenses as the Board of Directors shall from time to time prescribe.

**Section 3.7    Regular Meetings**.  Regular meetings of the Board of Directors may be held without notice at such times and at such places as may be determined from time to time by the Board of Directors or its chairman.

**Section 3.8    Special Meetings**.  Special meetings of the Board of Directors may be held at such times and at such places as may be determined by the chairman or the President on at least 24 hours' notice to each director given by one of the means specified in **Section 3.11** hereof other than by mail or on at least three days' notice if given by mail.  Special meetings shall be called by the chairman or the President in like manner and on like notice on the written request of any two or more directors.

**Section 3.9    Telephone Meetings**.  Board of Directors or Board of Directors committee meetings may be held by means of telephone conference or other communications equipment by means of which all persons participating in the meeting can hear each other and be heard. Participation by a director in a meeting pursuant to this **Section 3.9** shall constitute presence in person at such meeting.

**Section 3.10    Adjourned Meetings**.  A majority of the directors present at any meeting of the Board of Directors, including an adjourned meeting, whether or not a quorum is present, may adjourn and reconvene such meeting to another time and place.  At least 24 hours' notice of any adjourned meeting of the Board of Directors shall be given to each director whether or not present at the time of the adjournment, if such notice shall be given by one of the means specified in **Section 3.11** hereof other than by mail, or at least three days' notice if by mail.  Any business may be transacted at an adjourned meeting that might have been transacted at the meeting as originally called.

**Section 3.11    Notices**.  Subject to **Section 3.8**, **Section 3.10** and **Section 3.12** hereof, whenever notice is required to be given to any director by applicable law, the Certificate of Incorporation or these bylaws, such notice shall be deemed given effectively if given in person or by telephone, mail addressed to such director at such director's address as it appears on the records of the Corporation, facsimile, email or by other means of electronic transmission.

**Section 3.12    Waiver of Notice**.  Whenever notice to directors is required by applicable law, the Certificate of Incorporation or these bylaws, a waiver thereof, in writing signed by, or by

electronic transmission by, the director entitled to the notice, whether before or after such notice is required, shall be deemed equivalent to notice.  Attendance by a director at a meeting shall constitute a waiver of notice of such meeting except when the director attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any regular or special Board of Directors or committee meeting need be specified in any waiver of notice.

**Section 3.13  Organization**.  At each meeting of the Board of Directors, the chairman or, in his or her absence, another director selected by the Board of Directors shall preside.  The secretary shall act as secretary at each meeting of the Board of Directors.  If the secretary is absent from any meeting of the Board of Directors, an assistant secretary shall perform the duties of secretary at such meeting; and in the absence from any such meeting of the secretary and all assistant secretaries, the person presiding at the meeting may appoint any person to act as secretary of the meeting.

**Section 3.14  Quorum of Directors**.  Except as otherwise permitted by the Certificate of Incorporation, these bylaws, or applicable law, the presence of a majority of the Board of Directors shall be necessary and sufficient to constitute a quorum for the transaction of business at any meeting of the Board of Directors.

**Section 3.15  Action by Majority Vote**.  Except as otherwise expressly required by these bylaws, the Certificate of Incorporation or by applicable law, the vote of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors.

**Section 3.16  Action Without Meeting**.  Unless otherwise restricted by the Certificate of Incorporation or these bylaws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting if all directors or members of such committee, as the case may be, consent thereto in writing or by electronic transmission, and the writings or electronic transmissions are filed with the minutes of proceedings of the Board of Directors or committee in accordance with applicable law.

**Section 3.17  Committees of the Board of Directors**.  The Board of Directors may designate one or more committees, each committee to consist of one or more of the directors of the Corporation.  The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.  If a member of a committee shall be absent from any meeting, or disqualified from voting thereat, the remaining member or members present at the meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member.  Any such committee, to the extent permitted by applicable law, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation and may authorize the seal of the Corporation to be affixed to all papers that may require it to the extent so authorized by the Board of Directors.  Unless the Board of Directors provides otherwise, at all meetings of such committee, a majority of the then authorized members of the committee shall constitute a quorum for the transaction of business, and the vote of a majority of the members of the committee present at any meeting at which there is a quorum shall be the act of the committee.  Each committee shall keep regular minutes of its meetings.  Unless the Board of Directors provides otherwise, each committee designated by the Board of Directors may make, alter and repeal rules and procedures for the conduct of its business.  In the absence of such rules and procedures each

committee shall conduct its business in the same manner as the Board of Directors conducts its business pursuant to this **ARTICLE 3**.

## ARTICLE 4

## OFFICERS

**Section 4.1    Positions and Election**.  The officers of the Corporation shall be elected by the Board of Directors and shall include a president, a treasurer and a secretary.  The Board of Directors, in its discretion, may also elect a chairman (who must be a director), one or more vice chairmen (who must be directors) and one or more vice presidents, assistant treasurers, assistant secretaries and other officers.  Any two or more offices may be held by the same person.

**Section 4.2    Term**.  Each officer of the Corporation shall hold office until such officer's successor is elected and qualified or until such officer's earlier death, resignation or removal.  Any officer elected or appointed by the Board of Directors may be removed by the Board of Directors at any time, with or without cause, by the majority vote of the members of the Board of Directors then in office.  The removal of an officer shall be without prejudice to his or her contract rights, if any.  The election or appointment of an officer shall not of itself create contract rights.  Any officer of the Corporation may resign at any time by giving written notice of his or her resignation to the president or the secretary.  Any such resignation shall take effect at the time specified therein or, if the time when it shall become effective shall not be specified therein, immediately upon its receipt.  Unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.  Should any vacancy occur among the officers, the position shall be filled for the unexpired portion of the term by appointment made by the Board of Directors.

**Section 4.3    The President**.  The president shall have general supervision over the business of the Corporation and other duties incident to the office of president, and any other duties as may be from time to time assigned to the president by the Board of Directors and subject to the control of the Board of Directors in each case.

**Section 4.4    Vice Presidents**.  Each vice president shall have such powers and perform such duties as may be assigned to him or her from time to time by the chairman of the Board of Directors or the president.

**Section 4.5    The Secretary**.  The secretary shall attend all sessions of the Board of Directors and all meetings of the stockholders and record all votes and the minutes of all proceedings in a book to be kept for that purpose, and shall perform like duties for committees when required.  He or she shall give, or cause to be given, notice of all meetings of the stockholders and meetings of the Board of Directors, and shall perform such other duties as may be prescribed by the Board of Directors or the president.  The secretary shall keep in safe custody the seal of the Corporation and have authority to affix the seal to all documents requiring it and attest to the same.

**Section 4.6    The Treasurer**.  The treasurer shall have the custody of the corporate funds and securities, except as otherwise provided by the Board of Directors, and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation and shall deposit all moneys and other valuable effects in the name and to the credit of the Corporation in such depositories as may be designated by the Board of Directors.  The treasurer shall disburse the funds of the Corporation as may be ordered by the Board of Directors, taking proper vouchers for such disbursements, and shall render to the president and the directors, at the regular

meetings of the Board of Directors, or whenever they may require it, an account of all his or her transactions as treasurer and of the financial condition of the Corporation.

**Section 4.7    Duties of Officers May Be Delegated**.  In case any officer is absent, or for any other reason that the Board of Directors may deem sufficient, the president or the Board of Directors may delegate for the time being the powers or duties of such officer to any other officer or to any director.

## ARTICLE 5

### STOCK CERTIFICATES AND THEIR TRANSFER

**Section 5.1    Certificates Representing Shares**.    The shares of stock of the Corporation shall be represented by certificates; *provided that* the Board of Directors may provide by resolution or resolutions that some or all of any class or series shall be uncertificated shares that may be evidenced by a book-entry system maintained by the registrar of such stock.  If shares are represented by certificates, such certificates shall be in the form, other than bearer form, approved by the Board of Directors.  The certificates representing shares of stock of each class shall be signed by, or in the name of, the Corporation by any two authorized officers of the Corporation.  Any or all such signatures may be facsimiles.  Although any officer, transfer agent or registrar whose manual or facsimile signature is affixed to such a certificate ceases to be such officer, transfer agent or registrar before such certificate has been issued, it may nevertheless be issued by the Corporation with the same effect as if such officer, transfer agent or registrar were still such at the date of its issue.

**Section 5.2    Transfers of Stock**.  Stock of the Corporation shall be transferable in the manner prescribed by law and in these bylaws.  Transfers of stock shall be made on the books of the Corporation only by the holder of record thereof, by such person's attorney lawfully constituted in writing and, in the case of certificated shares, upon the surrender of the certificate thereof, which shall be cancelled before a new certificate or uncertificated shares shall be issued.  No transfer of stock shall be valid as against the Corporation for any purpose until it shall have been entered in the stock records of the Corporation by an entry showing from and to whom transferred. To the extent designated by the president or any vice president or the treasurer of the Corporation, the Corporation may recognize the transfer of fractional uncertificated shares, but shall not otherwise be required to recognize the transfer of fractional shares.

**Section 5.3    Transfer Agents and Registrars**.  The Board of Directors may appoint, or authorize any officer or officers to appoint, one or more transfer agents and one or more registrars.

**Section 5.4    Lost, Stolen or Destroyed Certificates**.  The Board of Directors may direct a new certificate or uncertificated shares to be issued in place of any certificate theretofore issued by the Corporation alleged to have been lost, stolen or destroyed upon the making of an affidavit of that fact by the owner of the allegedly lost, stolen or destroyed certificate.  When authorizing such issue of a new certificate or uncertificated shares, the Board of Directors may, in its discretion and as a condition precedent to the issuance thereof, require the owner of the lost, stolen or destroyed certificate, or the owner's legal representative to give the Corporation a bond sufficient to indemnify it against any claim that may be made against the Corporation with respect to the certificate alleged to have been lost, stolen or destroyed or the issuance of such new certificate or uncertificated shares.

## ARTICLE 6

## GENERAL PROVISIONS

**Section 6.1     Seal**.  The seal of the Corporation shall be in such form as shall be approved by the Board of Directors.  The seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise, as may be prescribed by law or custom or by the Board of Directors.

**Section 6.2     Fiscal Year**.  The fiscal year of the Corporation shall begin on January 1 and end on December 31 of each year.

**Section 6.3     Checks, Notes, Drafts, Etc**.  All checks, notes, drafts or other orders for the payment of money of the Corporation shall be signed, endorsed or accepted in the name of the Corporation by such officer, officers, person or persons as from time to time may be designated by the Board of Directors or by an officer or officers authorized by the Board of Directors to make such designation.

**Section 6.4     Dividends**.  Subject to applicable law and the Certificate of Incorporation, dividends upon the shares of capital stock of the Corporation may be declared by the Board of Directors at any regular or special meeting of the Board of Directors.  Dividends may be paid in cash, in property or in shares of the Corporation's capital stock, unless otherwise provided by applicable law or the Certificate of Incorporation.

**Section 6.5     Conflict with Applicable Law or Certificate of Incorporation**.  These bylaws are adopted subject to any applicable law and the Certificate of Incorporation.  Whenever these bylaws may conflict with any applicable law or the Certificate of Incorporation, such conflict shall be resolved in favor of such law or the Certificate of Incorporation.

## ARTICLE 7

## AMENDMENTS

These bylaws may be adopted, amended, or repealed or new bylaws adopted by the Board of Directors.  The stockholders may make additional bylaws and may adopt, amend, or repeal any bylaws whether such bylaws were originally adopted by them or otherwise.